# IN THE COURT OF COMMON PLEAS OF LUCAS COUNTY, OHIO

STATE OF OHIO,          )

       Plaintiff,     )

      vs.          ) Case No. CR0201703023

LAMONTE HOBBS,      ) Hon. Stacy L. Cook

       Defendant.    )

- - -

## TRANSCRIPT OF PROCEEDINGS

BE IT REMEMBERED, that the above-entitled cause came on for bench trial before The Honorable Stacy L. Cook, in Courtroom Number 6, in the Lucas County Court of Common Pleas, commencing on the 25th day of June, 2018. The following proceedings were had, to wit:

**VOLUME I OF IV**

APPEARANCES:

On behalf of the State of Ohio:

JULIA R. BATES, Prosecuting Attorney
By: Brian O. Boos, Assistant Prosecuting Attorney

On behalf of the Defendant:

Ronnie L. Wingate, Esquire

1                    I N D E X

2

3

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|

4 State's case in chief:

| | DX | CX | RDX | RCX |
|---|---|---|---|---|
| TODD REED | 7/3 | 21/14 | 32/20 35/24 | 33/21 -- |
| TIMOTHY MCGOVERN | 39/17 | 48/24 | 72/13 | 74/6 |
| DAVE CARTER | 76/12 | 80/19 | 97/21 -- 105/11 | 99/12 101/24 107/19 |

8 Rebuttal witness:

| | DX | CX | RDX | RCX |
|---|---|---|---|---|
| DAMON SMITH | 206/22 | 212/7 | 220/13 223/5 226/8 | 222/1 223/14 -- |

11 Defendant's case in chief:

| | DX | CX | RDX | RCX |
|---|---|---|---|---|
| MARK GUMPF | 118/24 | 131/6 | 139/19 147/19 149/10 | 145/22 148/20 -- |
| LAMONTE HOBBS | 156/14 | 170/13 | 187/16 198/6 203/25 | 194/14 201/23 -- |

15

16             - - -

17           E X H I B I T S

18

| State's Exhibits | ID | OFF | OBJ | ADM |
|---|---|---|---|---|
| 1 (photograph) | 30/13 | 44/25 | -- | 45/6 |
| 2 (photograph) | 30/14 | 44/25 | -- | 45/6 |
| 3 (photograph) | 30/14 | 44/25 | -- | 45/6 |
| 4 (photograph) | 44/20 | 44/25 | -- | 45/6 |
| 5 (photograph) | 44/20 | 44/25 | -- | 45/6 |
| 6 (report) | 8/18 | 9/6 | -- | 9/11 |
| 7 (DVD) | 12/12 | 13/4 | -- | 13/7 |

23 Defendant's Exhibits

24     (No defense exhibits)

25             - - -

1          (Case commenced at 10:16 a.m.:)

2          THE COURT:  Matter is before -- thanks, you may

3    be seated.  Matter is before the Court, State of Ohio versus

4    Lamonte Hobbs, case number 173023.  Matter is scheduled for

5    trial today.

6          Mr. Wingate, you are here on behalf of Mr. Hobbs.

7    Mr. Hobbs, you have a right to a jury trial.  Today, this has

8    been scheduled still leaving the jury demand available to you,

9    but the Court was notified that this would be a bench trial.

10         Mr. Wingate, is your client prepared to waive his right to

11   a jury trial this morning?

12         MR. WINGATE:  He is, Your Honor.

13         THE COURT:  All right.  Let me go ahead and give

14   this document to you to review with him.

15         MR. WINGATE:  May I approach?

16         THE COURT:  Sure.

17         MR. WINGATE:  And, Your Honor, I'll indicate for

18   the record that I had an opportunity to review the waiver of

19   jury, waiver of jury trial with the -- any questions he had were

20   answered, and he knowingly, intelligently, and voluntarily

21   placed his signature on the document.

22         THE COURT:  Thank you.  I'm going to hand this to

23   my bailiff, Ms. Blossom.  She'll take it downstairs to be

24   file-stamped.

25         Are you comfortable, Mr. Boos, beginning your trial as

1  she's getting it file-stamped at this time or --

2             MR. BOOS:  I am, Your Honor.

3             THE COURT:  -- do you want to wait until you

4  actually see the file-stamped copy?

5             MR. BOOS:  No, we are comfortable beginning at

6  this time.

7             THE COURT:  Mr. Wingate, are you comfortable

8  before you see the file-stamped copy?

9             MR. WINGATE:  I am, Your Honor.

10            THE COURT:  All right.  And since it's a bench

11  trial, do you wish to do opening statements or any preliminary

12  information that you would like?

13            MR. BOOS:  Your Honor, we would do a brief

14  opening statement as it is a bench trial.

15            THE COURT:  All right.  Thank you.

16            MR. BOOS:  Your Honor, the defendant is charged

17  with one count of assault alleging that the defendant did cause

18  or attempted to cause physical harm to Tim McGovern.

19      The evidence will show that Tim McGovern was arrested on

20  November 10th, 2017, for charges related to O.V.I. and menacing.

21  The State intended to play video footage from the timeframe of

22  5:25 a.m. to 5:40 a.m.  This incident and offense just occurred

23  just before 5:33 a.m.

24      What the video footage will depict, Your Honor, is Tim

25  McGovern in a pod.  He will get up from the back of the pod and

1  walk towards the doorway entry of the pod, have a discussion

2  with the defendant, Corrections Officer Hobbs, about use of the

3  phone.  It is clear that McGovern is frustrated by not being

4  able to use the phone.  As he's informed that he will not be

5  allowed to use the phone, he does display his middle finger at

6  CO Hobbs and walks away.

7      There is a dispute, Your Honor, over what words were

8  exchanged between the two before the incident; however, it will

9  be the State's position that that word exchange is not relevant

10  in this case when the victim of the offense turns his back and

11  is actually walking away back into the pod away from the

12  corrections officer.  What happens next is, as the victim is

13  walking away, the video will show the defendant grab by the neck

14  McGovern, slam him to the ground, causing injuries.  There will

15  be an audible thud when the victim's head hits the doorframe.

16      Then, later, the State will report or show a report by

17  Hobbs that asserts the report written by Hobbs that will show a

18  report of conduct that did not occur.  Hobbs authored a report

19  indicating he was trying to escort McGovern into another cell

20  and, during that escort, McGovern resisted.  The video will show

21  there was not even an opportunity to resist, because he actually

22  had his back turned, walking away from Hobbs, and was simply

23  grabbed by the neck and slammed to the ground.  So, again, no

24  opportunity to even resist and certainly no resisting.

25      That evidence, Your Honor, the State is confident will

1  convince the Court beyond a reasonable doubt that the defendant

2  is guilty of the offense of assault.

3        THE COURT:  Thank you.

4  Mr. Wingate.

5        MR. WINGATE:  Yes, Your Honor.  We would waive

6  any opening statement and move for a separation of witnesses.

7        THE COURT:  Thank you.

8  Do we have any witnesses here in the courtroom at this

9  point?

10       MR. BOOS:  Your Honor, the investigating

11  detective will be seated with the State throughout the trial.

12  The other witnesses are outside of the courtroom at this time.

13       THE COURT:  Thank you.  We will maintain a

14  separation of witnesses and leaving the investigating detective

15  in place.

16       MR. BOOS:  Thank you.

17       THE COURT:  Thank you.

18       MR. BOOS:  And State is prepared to proceed.

19       THE COURT:  Thank you.

20       MR. BOOS:  State would call Lieutenant Todd Reed.

21              - - -

22      Thereupon, the State, in order to maintain the issues

23  on their part to be maintained, called as a witness,

24          TODD REED,

25  who, having been duly sworn as provided by law, testified and

 1  said as follows:

 2                              - - -

 3                      DIRECT EXAMINATION

 4                  THE COURT:  Thank you.

 5  BY MR. BOOS:

 6  Q    Lieutenant, can you please state your name for the record.

 7  A    Todd Reed.

 8  Q    And where are you employed?

 9  A    Lucas County Sheriff's Office.

10  Q    How long have you been with the Lucas County Sheriff's

11  Office?

12  A    A little over 24 years.

13  Q    And you are actually in an acting capacity right now?

14  What's your position at this time?

15  A    Acting, I currently hold the rank of Acting Captain, and

16  I'm the Acting Director of Jail Security.

17  Q    Describe the responsibilities that that involves as well as

18  your responsibilities on November -- in November of 2017.

19  A    Currently, I'm the supervisor of 4 lieutenants, 14, 14 or

20  15 sergeants that report to me.  I'm in charge of jail

21  operations, and I report directly to the Corrections

22  Administrator and to the Sheriff.

23  Q    Describe jail operations.  What type of things are you

24  required to review and look at.

25  A    Every morning, I review all incident reports that are

1    generated out of the Corrections Center, any report that an

2    officer, a corrections officer or deputy sheriff, a sergeant, a

3    lieutenant writes from the previous day up until the time I get

4    into work that day.  I review all of those reports.

5    Q    Okay.  And, at some point, did you review a report as well

6    as a video involving Lamonte Hobbs?

7    A    Yes, I did.

8    Q    And that was pursuant to the regular scope of your

9    performance and your job responsibilities?

10   A    Yes, it was.

11   Q    Why did you review -- what did you review first, either the

12   report or the video?

13   A    It's always the report first.

14   Q    Okay.

15              MR. BOOS:  Your Honor, may I approach?

16              THE COURT:  Sure.

17   Q    (By Mr. Boos) Captain, I'm handing you now what has been

18   marked as State's Exhibit 6 for purposes of identification.  Can

19   you take a look at that item and tell us what it is?

20   A    It is a corrections officer report written within our jail

21   report writing system.

22   Q    Okay.  And who was the report written by?

23   A    Lamonte Hobbs.

24   Q    Okay.  And is the report dated?

25   A    Yes, the report is dated November 10th, 2017.  And it was

1  written at 11:45 in the evening, 2345 hours.

2  Q    Is that a fair and accurate copy of the report drafted by

3  Officer Hobbs?

4  A    Yes.

5              MR. BOOS:  Your Honor, at this time, we would

6  move to submit what's been marked as State's Exhibit 6 into

7  evidence.

8              THE COURT:  Any objection, Mr. Wingate?

9              MR. WINGATE:  No.

10              THE COURT:  Thank you.  State's Exhibit 6 will be

11  moved into evidence without objection.

12              MR. BOOS:  And, Your Honor, we will be publishing

13  admitted exhibits throughout the trial since it's a Court trial.

14              THE COURT:  Thank you.

15              MR. BOOS:  We will be asking permission to

16  publish, if it's okay.

17              THE COURT:  Thank you.  Sure, no problem.  Unless

18  objected to, Mr. Wingate, I'm just going to leave it open --

19              MR. WINGATE:  Sure.

20              THE COURT:  -- to be able to be published.

21  Q    (By Mr. Boos) At this time, we would ask, Captain, if you

22  could read the report provided drafted by Lamonte Hobbs that you

23  reviewed in this case.

24              MR. WINGATE:  I would object to it being read.

25              THE COURT:  I'm sorry.  You want to ask questions

1  off the report?

2          MR. BOOS:  We are asking him to read the report

3  into the record.  It's now an admitted exhibit.

4          THE COURT:  Thanks.  What would be the basis for

5  the objection?

6          MR. WINGATE:  Your Honor, the affidavit -- the

7  exhibit speaks for itself.

8          THE COURT:  All right.

9          MR. WINGATE:  And it's already been admitted.

10          THE COURT:  Since the Court is going to be also

11  reviewing it and it's to the Court, I don't believe that it will

12  have any additional influence other than I'll be reading the

13  report and hearing the report.

14          MR. BOOS:  Your Honor, I do intend to ask

15  questions then about specific portions that the lieutenant

16  reviewed prior to viewing the disk, so that would involve him --

17  which is fine.  He doesn't have to read the entire thing, but we

18  would ask him to.

19          MR. WINGATE:  Read it to himself?

20          MR. BOOS:  Read what he --

21          THE COURT:  Do you want him to review the report?

22          MR. BOOS:  What is significant compared to --

23  prior to reviewing the disk -- what certain portions were

24  consistent or not consistent with the disk.

25          THE COURT:  Lieutenant, have you reviewed the

1  report before?

2  THE WITNESS:  I have.

3  THE COURT:  Okay.  And do you want him to refresh

4  before you ask any questions at this time?

5  MR. BOOS:  No, Your Honor.  We will admit the

6  disk, but I'm just letting the Court know I do intend to ask

7  questions about certain portions of that report based on his

8  review and whether it's consistent with what's depicted in the

9  disk.

10  THE COURT:  I don't have any problem with that

11  line of questioning.

12  MR. WINGATE:  And I don't have any problem with

13  that.  The problem I think, as the State is indicating, is it

14  wishes for him to read out loud those specific portions, and

15  I'm saying that the State can ask about any portions that

16  cause --

17  THE COURT:  I'll allow you to ask questions off

18  the report then, Mr. Boos.

19  MR. BOOS:  Yes.  Thank you, Your Honor.

20  Q    (By Mr. Boos) After reviewing the report, did you obtain or

21  review surveillance video footage of the incident at the jail

22  that is referenced by CO Hobbs?

23  A    I did.

24  Q    Okay.  And how do you go about doing that?

25  A    I review the report, and any time there's a report

1   generated that involves some type or form of use of force,

2   anything that's out of the normal, I then take and print a copy

3   of the report and I pull the video and watch the video and make

4   sure everything coincides.  And if it doesn't, then I start

5   looking into it a little bit more.

6   Q   After reviewing the footage in this case, did you place it

7   onto a CD capable of being played in court today?

8   A   I did.

9               MR. BOOS:  Your Honor, may I approach?

10              THE COURT:  Yes.

11  Q   (By Mr. Boos) Handing the witness now what's been marked as

12  State's Exhibit 7, for purposes of identification, can you take

13  a look at that exhibit and tell us what it is.

14  A   It is a DVD with RB number 00589817 on it, 11/10 of '17,

15  Lamonte Hobbs.

16  Q   And is that a fair and accurate depiction of the video

17  footage you reviewed involving this incident with CO Hobbs?

18  A   Without seeing what's on this disk, I can't tell you that

19  until it's played.

20  Q   Did you have an opportunity to review the disk with me?

21  A   I have.

22  Q   In my office?

23  A   I have.

24  Q   Okay.  So are you able to say that the disk you reviewed is

25  fair and accurate?

1   A    Yes.

2   Q    Okay.

3        MR. BOOS:  At this time, we would move to admit

4   what's been marked as State's Exhibit 7 into evidence.

5        THE COURT:  Any objection, Mr. Wingate?

6        MR. WINGATE:  No.

7        THE COURT:  Thank you.  Moved and admitted.

8   Q    (By Mr. Boos) And what is the range date and time of the

9   reporting in this case that you put onto the CD?  Would seeing

10  the CD refresh --

11  A    Yes.

12  Q    -- your recollection regarding --

13  A    Without seeing the exact footage, I don't recall,

14  specifically, what timeframe I recorded onto the disk.

15  Q    And where did this incident occur?

16  A    In booking, first floor of the Lucas County Corrections

17  Center.

18  Q    And while we are waiting for this to load, is the Lucas

19  County Corrections Center in Lucas County, Ohio?

20  A    It is.

21       THE COURT:  Is there a possibility that I can

22  review the written report before I'm watching, also?

23       MR. BOOS:  Absolutely, Your Honor.

24       THE COURT:  Thank you.

25       Any objection, Mr. Wingate?

1          MR. WINGATE:  No.

2          THE COURT:  If you just give me a moment before

3  you hit play.  Thank you.

4          MR. BOOS:  And if we could dim the lights for

5  this portion of the examination.

6          (DVD exhibit played in open court.)

7  Q    (By Mr. Boos) Okay.  Lieutenant, can you describe the date

8  and time of the video recording you see at the bottom of the

9  screen.  If you can see the screen okay?

10  A    Yes, it's November 10th, 2017, 5:24 and 59 seconds, and I

11  believe I recorded up until 5:40.  It's approximately a 15

12  minute recording.

13  Q    Okay.  And we see four boxes.  Can you describe for the

14  Court the portion -- describe how we would hear audio and what

15  portions we can actually hear audio from in relation to where

16  any speakers would be?

17  A    The blue square that is in the top left quadrant of the

18  screen right now is showing you the west hallway of booking.

19  The audio mic is not associated with that box.  The audio mic is

20  associated with that, the lower left-hand quadrant right there.

21  If you just have the 1-50 camera, which is the west hall in the

22  top left corner of the screen there, you cannot hear the audio.

23  In order to pick up the audio, you have to place the blue ring

24  around the 1-44 camera.  That camera and that microphone are

25  approximately 40 feet from the cameras that pick up the

1  incident.

2  Q    Okay.  And which box will depict the incident most clearly

3  on the screen?

4  A    The bottom right quadrant that's a little fuzzy to me.  I

5  believe it's 1-48 camera.

6  Q    Okay.  At this time, I'm hitting play in the other box.  It

7  should come into view.

8              THE COURT:  So if I'm to understand it correctly,

9  while we may see visual, we won't hear audio on the other three

10 boxes?

11             MR. BOOS:  If -- yes.  And I'm going to ask the

12 witness that question, Your Honor.

13 Q    (By Mr. Boos) If we view -- if we blow up the box in the

14 bottom right that the offense occurs and it's just the blown up

15 version, can you hear audio?

16 A    No, you cannot.  You need to have it on the four-way with

17 the booking counter, the bottom left-hand screen, highlighted in

18 order to capture the audio --

19             THE COURT:  Got it.

20 A    -- in the bottom right.

21             THE COURT:  Let me just make sure that the Court

22 of Appeals record will properly reflect that the Court right now

23 is viewing a screen.  I have four individual camera angles

24 going.  The highlighted box with a blue square around it would

25 be in the lower left-hand corner.  In order to be able to watch

1  all four screens active and pick up an audio, for Court of

2  Appeals purposes, they will need to be able to view all four

3  screens at the same time.  If you blow-up any one of the

4  screens, you -- of the three unlit screens -- you will not have

5  audio at the same time, correct?

6                THE WITNESS:  Correct.

7                THE COURT:  All right.  Comfortable with Court of

8  Appeals record at this point?

9                MR. BOOS:  Yes, Your Honor.  Thank you.

10              THE COURT:  All right.

11  Q   (By Mr. Boos) And, at this time, I will advance the video

12  to the 5:32 mark and actually move it back 5:31.7.

13     And, Lieutenant, if you could identify when we see

14  Mr. McGovern approach the doorway in the bottom right quadrant.

15  And I would also ask you to identify the person we see in the

16  top right as well as standing in the bottom right, left corner,

17  partially off the screen.  Not the gentleman there.

18  A   There's inmate McGovern approaching the doorway right

19  there.

20  Q   And, at this point, who is inmate McGovern speaking to in

21  the doorway?

22  A   Corrections Officer Hobbs.

23  Q   And Corrections Officers Hobbs you are referring to, do you

24  see in the courtroom today?

25  A   I do.

1 Q    And can you please point him out and identify what he's

2 wearing.

3 A    He's wearing a gray suit with a bluish tie sitting next to

4 counsel, Wingate.

5 Q    Okay.

6            MR. BOOS:  Your Honor, at this time, we would ask

7 the record to reflect that the witness has identified the

8 defendant.

9            THE COURT:  Thank you.  The record will so

10 reflect.

11 Q    (By Mr. Boos) And, again, picking up after the conversation

12 has started at the 5:32:29 seconds, resuming the video.  Are we

13 able to hear the conversation at this point between Hobbs and

14 McGovern?

15            (DVD exhibit played in open court.)

16 A    Portions of it, yes.

17            THE COURT:  And I apologize.  I'm not able to

18 hear any of it.

19            MR. BOOS:  I'm sorry, Your Honor.  You had --

20            THE COURT:  I'm just not able to hear any of the

21 verbal, so.

22            MR. BOOS:  Right.  And this -- there are -- there

23 is some audio being picked up, but the -- I can ask the witness

24 again.

25 Q    (By Mr. Boos) The dialogue that occurs before the physical

1  contact between Hobbs and McGovern, are you able to hear any of

2  that dialogue?

3  A    Portions of it.

4  Q    Okay.  What portions did you hear dialogue or are able to

5  identify?

6  A    I hear --

7  Q    From --

8  A    -- I hear inmate McGovern speaking with Corrections Officer

9  Hobbs.  At one point, he apologizes for his behavior earlier in

10  the evening, then he goes on to try and ask Officer Hobbs if he

11  can use the telephone.  Officer Hobbs, it's inaudible at one

12  point, but at one point, Officer Hobbs does say then the phone

13  is right there on the wall, and he gestures towards the phone on

14  the wall in the module, in the housing module there.  And at

15  that point is when inmate McGovern turns away from him.

16  Q    Okay.  And are you -- you are saying you are able to hear

17  that audio?  I know we can see gestures, but you are able to

18  clearly hear?

19  A    If you turn that up loud enough, yes, I can hear portions

20  of that audio.

21  Q    We would note that the volume is at the highest level at

22  this point, and I'll rewind back at this point to the beginning

23  of the dialogue.  And if you want to step down and closer to the

24  speaker if it --

25             (DVD exhibit played in open court.)

1  A    You've only got audio coming through your computer.  You

2  don't have it coming through the speaker.  That's part of the

3  problem.

4            (DVD exhibit played in open court.)

5  A    Right there, he stated he apologized.  He asked for a

6  phone.  He said the phone is right there.

7            (DVD continuously playing.)

8            THE COURT:  Is that an alarm that goes off?

9            THE WITNESS:  No, ma'am.  That's something I've

10  never heard before.

11           THE COURT:  Do you get more than one incident

12  report when this happens?

13           THE WITNESS:  Yes, ma'am.

14           THE COURT:  Okay.

15  Q    (By Mr. Boos) And there's a statement made after the

16  physical contact, officer, that I do want to ask you about.

17  Hopefully the microphone will not -- all right.  The voice that

18  repeatedly states don't grab at me, don't grab at me, are you

19  able to identify the person making that statement?

20  A    Yes.

21  Q    And who was that?

22  A    Officer Hobbs.

23  Q    The voice we hear saying I'm not resisting, I'm not

24  resisting, are you able to identify that person?

25  A    Yes.

1  Q    And who was that?

2  A    Inmate McGovern.

3  Q    How does the video differ, the video that you've had an

4  opportunity to review prior to court and you've reviewed again

5  today differ from the report drafted and prepared by CO Hobbs in

6  this case?

7  A    What specifically made me look at this incident even closer

8  is the statement in Officer Hobbs' report that says I then

9  grabbed inmate by his left arm and shoulder to escort him to

10 single number seven for being disruptive and disrespectful

11 towards staff.  When I watched the video, I never saw him grab

12 him by his left arm or his shoulder.  All I saw was the jerk by

13 the back of his jumpsuit.

14 Q    At any point in the video was -- we hear the don't grab at

15 me.  At any point in the video does it appear to you that

16 McGovern grabs CO Hobbs?

17 A    Not that I saw, no.

18 Q    At any point in the video does it appear that McGovern

19 resists CO Hobbs?

20 A    Not that I can tell.

21 Q    At any point in the video does it appear that McGovern even

22 has an opportunity to resist CO Hobbs?

23 A    No, it does not.

24 Q    And after seeing and identifying this discrepancy, what is

25 your role as lieutenant, now acting captain?

1  A    I draft a report to the Corrections Administrator asking

2  him to forward it to Internal Affairs for further investigation.

3  And, also, and I believe in this case there was also a general

4  offense report written for an injured inmate.  That portion of

5  the packet of reports would go to Lieutenant Carter, and then I

6  send my report to the Corrections Administrator and he basically

7  sends it in two different directions.

8  Q    Okay.  And, at this point, I think we can turn the lights

9  back on.  I don't have any other questions for you, lieutenant.

10              THE COURT:  Thank you.

11      Mr. Wingate.

12              MR. WINGATE:  Yes.

13                   - - -

14              CROSS EXAMINATION

15  BY MR. WINGATE:

16  Q    Lieutenant Reed, as it relates to your involvement in this

17  matter, you had an opportunity to speak with other officers that

18  were involved in this incident?

19  A    I did not.

20  Q    Did you -- did you receive any reports or review any

21  reports from other officers?

22  A    There were other reports written, yes, sir.

23  Q    All right.  And did you become aware, in those other

24  reports, of officers indicating that they, too, were telling

25  McGovern stop resisting, don't resist?

1  A    I would have to review those reports, but I believe -- I

2  believe those statements are in their reports.

3  Q    How about officer is it Gumpf?

4  A    Sergeant Gumpf, yes, sir.

5  Q    Sergeant Gumpf.  Did you read his report?

6  A    I did, sir.

7  Q    And, in that report, does he clearly indicate that the

8  inmate was resisting the officers' efforts to handcuff?

9  A    I would have to review his report.

10 Q    Do you have that with you?  Do you have a file or anything

11 with you?

12 A    I do not have a copy with me.

13          MR. BOOS:  Your Honor, at this time, I'm going to

14 object to this line of questioning as well on the basis of

15 relevance.  The referenced portion, it occurs after he is

16 already on the ground.  The assault, the offense, occurs prior

17 to the -- when the officer tackles him to the ground and several

18 other deputies show up.  There are no other deputies present

19 when the grab and the slam to the ground occurs.  So we would

20 say that this is not relevant what happens after he is assaulted

21 by the officer.

22          MR. WINGATE:  Your Honor, if I am not --

23          THE COURT:  Mr. Wingate, in terms of the line of

24 questioning, the Court does see that there is the initial

25 contact.  The other officers are not in view of the victim and

1  Mr. Hobbs at that time, so I'll allow a line of questionings

2  with distinction.

3             MR. WINGATE:  All right.  That's fine.

4  Q    (By Mr. Wingate) The time that you hear Detective Hobbs

5  talking about resisting is when the other officers are there and

6  they are all struggling with Mr. McGovern; isn't that correct?

7  A    At the same time they are arriving, yes.

8  Q    And, at that time, the other officers joined in trying to

9  cuff him; is that correct?

10 A    Yes.

11 Q    Now as it relates to Mr. Hobbs, you talk about him or you

12 listened to the video and there is an apology for the way he

13 acted?

14 A    Yes.

15 Q    Do you recall?

16 A    Yes.

17 Q    All right.  And you heard that on the video?

18 A    I hear inmate McGovern say I apologize.

19 Q    All right.  And my question for you is this.  Did you talk

20 to Mr. McGovern individually?

21 A    I did not.

22 Q    All right.  Did you see any reports relative to his

23 statements that he made?

24 A    The reports that I saw are reports that were generated in

25 relationship to this incident.

GB000294

1   Q    Right, and it included an interview or interviews of

2   Mr. McGovern?

3   A    I have not seen any report generated about the interview of

4   inmate McGovern.

5   Q    Did not?

6   A    I have not.

7   Q    Did you see the report of Detective -- Lieutenant Dave

8   Carter?

9   A    I have not.

10  Q    So then you are unaware if any statement by Mr. McGovern

11  contains a statement indicating he apologized?

12  A    I have not seen any report written about an interview with

13  inmate McGovern.

14  Q    And were you aware of how the demeanor of Mr. McGovern was

15  when he arrived at the county jail?

16  A    I was not.

17  Q    Did you read any reports relative to that?

18  A    There were no reports written regarding his initial booking

19  prior to this incident that I'm aware of.

20  Q    Did you have an opportunity to review the booking paperwork

21  for Mr. -- Mr. McGovern?

22  A    (Nonverbal answer.)

23  Q    All right.  Did you -- all right, and I'm sorry.  You said

24  you did not or did?

25  A    If you can ask me the question again, sir.

1  Q    Just one second.  What was my question?

2          (Court Reporter read back last question:  Q:  Did you

3          have an opportunity to review the booking paperwork

4          for Mr. McGovern?)

5  Q    Yes, the booking paperwork generated as he is taken through

6  the process, did you have an opportunity to review any of that?

7  A    I would have had the opportunity, but I did not take that

8  opportunity.

9  Q    You did not.  So you do not know whether he was intoxicated

10 and uncooperative when he was brought into the booking area?

11 A    I do not.

12 Q    Do you not know that he was brought in by four officers?

13 A    I do not.

14 Q    You do not know that he was threatening those officers?

15 A    I do not.

16 Q    Did not know that he was yelling, screaming, trying to

17 headbutt officers?

18 A    I do not.

19 Q    And that is because you did not see the booking paperwork

20 for Timothy McGovern as he was booked on that night?

21 A    I did not see his booking paperwork, and none of the

22 officers that were working that night submitted any reports

23 about his initial booking that I'm aware of.

24 Q    That you are aware of?

25 A    Correct.

1  Q    You are not saying they don't exist, you are just saying

2  you are not aware of it?

3  A    I never saw them if they do exist.

4  Q    Did you take time to look for them?

5  A    I don't recall if I -- if I did or not.

6  Q    Okay.  Now let me ask this.  Did you have an opportunity to

7  talk to Mr. Hobbs, himself?

8  A    I don't believe so pertaining to this incident.  I don't

9  believe --

10 Q    All right.

11 A    -- Officer Hobbs and I had a conversation about this.

12 Q    All right.  And you are aware that this incident took

13 place, according to Mr. Hobbs' report, at approximately 4:00; is

14 that correct?

15 A    On the morning of November 11th, correct.

16 Q    On the morning of November the 10th?

17 A    November the 10th.  I'm sorry.

18 Q    All right.  And the report was at November the 10th at

19 approximately 4 a.m.; is that correct?  Incident date and time?

20 A    Correct.  That -- that date and time is added to our report

21 system by Officer Hobbs.

22 Q    I understand that.

23 A    Okay.

24 Q    I just asked that's what it says?

25 A    Yeah, that's what it says, yes.

1  Q   All right. And as far as the report date and time, it's

2  November the 10th at 2345, which would be 11:45 at night; is

3  that correct?

4  A   Correct.

5  Q   And that would have indicated -- would that be indicative

6  to you that Mr. Hobbs had completed his shift, left and returned

7  before this report was generated?

8  A   Yes.

9  Q   Now did you ever work in the booking area?

10  A   I did for approximately six months as a sergeant.

11  Q   All right. Is there any significance attached to an

12  individual that's being processed in the booking area that does

13  not have a photograph on their paperwork? I'll ask --

14  A   I don't understand your question.

15  Q   Well let me ask a different way.

16  A   Sure.

17  Q   Would you agree that an individual who does not have his

18  photograph on the booking paperwork is usually someone that's

19  uncooperative or someone that is misbehaving; would you agree

20  with that?

21  A   Yes.

22  Q   And would it be fair to say -- if I show you, may I

23  approach and show you that document? Do you recognize that?

24  A   It's page one of a booking sheet.

25  Q   All right. Is there -- and whose name is at the top of

GB000298

1    that booking sheet?

2    A    Timothy McGovern.

3    Q    All right.  Is there a photograph of Mr. McGovern?

4    A    There is not.

5    Q    Okay.  And that is page one?

6    A    Yes, it is.

7    Q    Okay.  And they generally consistent of about three or four

8    pages?

9    A    Generally, yes.

10   Q    All right.  And I'll ask you to look at page two and where

11   it says remarks.  Is that also the booking photo for Timothy

12   McGovern?

13   A    There is no photo attached to page two.

14   Q    Okay.  I understand that, but is there a name attached to

15   it?

16   A    Yes.

17   Q    Okay.  Timothy McGovern?

18   A    Yes.

19   Q    All right.  And as it relates to the remarks, does it

20   indicate that he was uncooperative?  Cooperative or

21   uncooperative?

22   A    It states on page two uncooperative.

23   Q    All right.  And the fact that there is no photo on page two

24   would also be indicative that he was, in fact, uncooperative or

25   his behavior --

1  A    I don't believe there is normally a photo on page two.

2  Q    Okay.  But you mentioned it.  You are the one that

3  mentioned it.

4  A    You asked me the question --

5  Q    No.

6  A    -- if there was a photo on page two and I said no.

7  Q    After you said there was no photo, I said, I asked you

8  about the remarks?

9  A    That's page one.

10  Q    All right.  And that's page two.

11  A    Page two does not have a photo.

12  Q    And I never asked about a photo.  That was something that

13  you gratuitously gave me.  I asked about the remarks.

14  A    Okay.

15  Q    Okay.  And when you said there wasn't one, I just simply

16  asked was there one of him, and you said no.

17  A    No, there isn't one of him.

18  Q    Okay.

19  A    On page two.

20  Q    All right.  Now as it relates to, and I think the

21  prosecutor indicated, did you see any injuries to Mr. McGovern?

22  A    I saw some photos.

23  Q    Okay.  You saw photos of the injuries?

24  A    Yes.

25  Q    And as it relates to the injuries, abrasions on the elbow,

1   the right elbow?

2   A    Yes.

3   Q    Right?

4   A    I believe so.  I would have to review the pictures.

5   Q    All right.

6             THE COURT:  Are any of these marked I'm looking

7   at?

8             MR. BOOS:  State has marked them, Your Honor, and

9   would be intending to question Mr. McGovern about the photos,

10  who will testify.

11            MR. WINGATE:  All right.  That's fine.

12  Q    (By Mr. Wingate) I'm going to hand you what's been marked

13  for identification purposes State's Exhibit 1, State's

14  Exhibit 2, State's Exhibit 3.  Are those the photographs that

15  you looked at?

16  A    Yes, sir.

17  Q    All right.  And as it relates to photograph 1, an abrasion

18  on the right elbow?

19  A    Yes, sir.

20  Q    As it relates to photo marked for identification purposes

21  number 2, photo of his right side of his face?

22  A    Yes.

23  Q    Abrasion on the head?

24  A    Yes.

25  Q    All right.  Forehead.  And as it relates to what's been

1  marked for identification purposes as State's Exhibit 3 is

2  abrasion on the right forehead?

3  A     Two and 3 appear, to me, to be the same, just number 3 is a

4  closeup, closer view of number 2's injury to the head.

5  Q     Okay.  I agree with that, but, as I said, the abrasion on

6  the forehead, number 3 is a closeup of the abrasion on the

7  forehead?

8  A     Yes.

9  Q     Okay.  Now as it relates to these injuries that you see,

10  you can't tell these jurors, this Court, if those abrasions were

11  the result of this altercation that you see with all the

12  officers on him or not, can you?

13  A     I do not know, no.

14  Q     Right.  As a matter of fact, you cannot say if Mr. Hobbs

15  caused these abrasions on the elbow and the head; is that

16  correct?

17          MR. BOOS:  Objection, Your Honor.  He's never

18  purported to be able to say that or made that assertion.

19          THE COURT:  I'll overrule.

20  A     I believe I know when the injuries to the head occurred.

21  Q     I understand, but did you understand my question?

22  A     Repeat it, please.

23  Q     I said that you can't say that Mr. Hobbs caused those

24  injuries, the abrasion to the elbow on the right arm, the

25  abrasion to the right side of the head, since you don't know if

1 the abrasions were caused during this incident or not; isn't

2 that correct?

3 A   I was not there, so no, I do not know if he caused them or

4 not.

5 Q   As it relates to Mr. Hobbs, do you know how long he has

6 been employed with the Lucas County Sheriff's Department?

7 A   Specifically, no.  I would guess that Officer Hobbs had

8 been there ten plus years.

9 Q   Okay.  And as a result of your knowledge of him being

10 there, are you aware of any incident that led to disciplinary

11 actions again Mr. Hobbs?

12                MR. BOOS:  Objection, relevance.

13                THE COURT:  I'll allow.

14 A   I do not.

15                MR. WINGATE:  No further questions.

16                THE COURT:  Thank you.

17    Mr. Boos.

18                    - - -

19              REDIRECT EXAMINATION

20 BY MR. BOOS:

21 Q   Was, in the video you viewed, do you see Timothy McGovern

22 ever try to headbutt Officer Hobbs?

23 A   I do not.

24 Q   Do you see Timothy McGovern walking toward or away from

25 Mr. Hobbs when the physical contact occurs?

1   A     He's walking away from Officer Hobbs.

2   Q     So would he be facing Officer Hobbs or have his back to

3   him?

4   A     He was quartered and turning and walking away at the time

5   Officer Hobbs grabs him.

6   Q     Does this video, which, and we are talking about the

7   portion at 5, between 5:32 and 5:34, show Mr. McGovern initiate

8   any physical contact with Officer Hobbs?

9   A     No, it doesn't.

10   Q     Who initiates the first physical contact?

11   A     Officer Hobbs does.

12   Q     Who approaches the other person to initiate the physical

13   contact?

14   A    Officer Hobbs does.

15            MR. BOOS:  No further questions, Your Honor.

16            THE COURT:  Thank you.

17   Mr. Wingate.

18            MR. WINGATE:  Yes, just a couple of questions.

19                   - - -

20            RECROSS EXAMINATION

21   BY MR. WINGATE:

22   Q     As it relates to you telling the prosecutor that Mr. Hobbs

23   was the first to approach Mr. McGovern, do you recall telling

24   the prosecutor that?

25   A     In this video, yes.

1  Q    Yes.  And you recall telling that Mr. Hobbs was the first

2  individual or was the first to cause physical contact that being

3  with Mr. McGovern?

4  A    Yes.

5  Q    Do you recall telling that?

6  A    Yes.

7  Q    Based upon what you saw, okay, that physical contact did

8  not cause any injury to Mr. McGovern?

9  A    I cannot say that.

10  Q    I understand that.  That's all I asked, okay.  And since

11  you say that I can't or cannot say that, all you saw was him

12  grab him, right?

13  A    Yes.

14  Q    And they went down?

15  A    Yes.

16  Q    And would it be fair to say, since you can't say it caused

17  any injuries, you cannot tell this Court that any physical

18  contact, the initial contact by Mr. Hobbs caused any injuries?

19  A    I cannot say that.  I do believe that when -- I know when

20  the injuries to his head occurred.

21  Q    I know what you want to say is that you heard a thud and

22  his head hit this bar here; is that correct?

23  A    That's exactly right, sir.

24  Q    All right.  But since you can't see his head, his right arm

25  could have also hit that bar?

1  A    It could have.

2  Q    And it made that sound?

3  A    Could have.

4  Q    Right.  So you don't know, right?

5  A    I know his head hit that doorframe.

6  Q    No, you don't know.  Did he ever tell you that his head hit

7  that door?

8  A    Inmate McGovern did not tell me, no.

9  Q    Did he ever tell anyone that his head hit that door?

10  A    I do not know that.

11  Q    So your theory, what you are assuming is that the sound

12  that you heard, which could have been created by his arm hitting

13  that door railing or wall, whatever you call it -- I call it

14  jamb -- his arm hitting the doorjamb or his head hitting the

15  doorjamb, you can't tell this Court whether either one of those

16  was the one that caused that sound; is that correct?

17  A    I cannot, no.

18  Q    Thank you.

19            THE COURT:  Thank you.

20      Mr. Boos.

21            MR. BOOS:  Brief limited redirect, Your Honor.

22                  - - -

23            FURTHER REDIRECT EXAMINATION

24  BY MR. BOOS:

25  Q    Lieutenant Captain, handing you what's been marked as

1    State's Exhibit 1, do you see an injury on State's Exhibit 1?

2    A    I do.

3    Q    Where is the injury?

4    A    To his right forearm.

5                MR. BOOS:  No further questions.

6                THE COURT:  The question -- my question is you

7    are saying contact was made with the door, the doorjamb.  We see

8    like a small gray object on the doorjamb.  Is that the doorjamb

9    that you are talking about?

10                THE WITNESS:  Yes, ma'am.

11                THE COURT:  Okay.  Body side that's coming out of

12   the door, at that point, would be what side of Mr. McGovern's

13   body?

14                THE WITNESS:  His right side.

15                THE COURT:  Coming out of the door, what side

16   would it be?

17                THE WITNESS:  As Officer Hobbs grabs the -- his

18   back collar of his jumpsuit and he pulls him back, McGovern

19   starts to fall, and his right side would be hitting that

20   doorjamb.

21                THE COURT:  Okay.  So as he is making his way

22   through that doorjamb, he's not forward-facing?

23                THE WITNESS:  Correct.

24                THE COURT:  He's moving backwards?

25                THE WITNESS:  Correct.

1           THE COURT:  And that's the contact, okay.

2       Could I see that part of the video again, please?

3           MR. BOOS:  Oh, the video.  Yes, Your Honor.

4           THE COURT:  Yes.  And I would like to look at the

5       pictures, too, Mr. Boos.

6           MR. BOOS:  Yes, and I intended to question

7       Mr. McGovern, but I can approach with the photographs.

8           THE COURT:  I just want to make sure that with

9       thinking of him coming through forward facing, it would be on

10      his left side, but if he's coming through backwards, it would be

11      his right side.

12          MR. WINGATE:  And, Your Honor, if I may, not only

13      is he coming through backwards, he's coming through turning to

14      his right.

15          THE COURT:  I just want to be able to visualize

16      it.

17          MR. WINGATE:  Sure.

18          THE COURT:  Thank you.  Thank you.

19      And just for the purposes of the days the pictures are

20      taken, two and three look like they are taken fresh in time, and

21      probably an internal facility.  I'm sorry, one, two and three.

22      And four and five are scabbed over and dried.  Is that a

23      different timeframe?

24          MR. BOOS:  That is, Your Honor.  And I had

25      intended to discuss that with both Mr. McGovern and Detective

1 Carter.

2         THE COURT: That's fine. I'll give these back to

3 you. I just wanted to clarify. I apologize, Mr. Boos. And

4 then if I could see the video, again.

5         MR. BOOS: Your Honor, if the State can play the

6 audio version or it can play the enlarged version, which would

7 not have the audio.

8         THE COURT: Could I see the enlarged version

9 first, please?

10         MR. BOOS: Yes. Yes, Your Honor.

11         THE WITNESS: Put your -- put your cursor over

12 that, double left tap.

13         MR. BOOS: Go ahead.

14         THE COURT: Thank you.

15         (DVD exhibit played in open court.)

16         THE COURT: Thank you. Could I have the lights,

17 please? Thank you.

18     Mr. Boos.

19         MR. BOOS: State does not have any other

20 questions for this witness, Your Honor.

21         THE COURT: Any additional questions off of the

22 video, Mr. Wingate?

23         MR. WINGATE: Nothing further. Thank you.

24         THE COURT: Thank you.

25         THE WITNESS: Thank you, Your Honor.

1                    THE COURT:  Thanks.

2                    MR. BOOS:  And, at this time, the State would

3    intend to call Mr. McGovern.  He is downstairs.  I will bring

4    him up if the Court is ready to proceed.  May counsel approach

5    briefly, Your Honor?

6                    THE COURT:  Sure.

7                    (Discussion held off record.)

8                         - - -

9         Thereupon, the State, in order to maintain the issues

10   on their part to be maintained, called as a witness,

11                    TIMOTHY MCGOVERN,

12   who, having been duly sworn as provided by law, testified and

13   said as follows:

14                         - - -

15                    DIRECT EXAMINATION

16                    THE COURT:  Thank you.

17      Mr. Boos.

18   BY MR. BOOS:

19   Q    Mr. McGovern, can you please state your full name for the

20   record.

21   A    Timothy Craig McGovern.

22   Q    And are you employed?

23   A    Not at this moment.

24   Q    Were you employed on November 10th, 2017?

25   A    I was.

1    Q    Where were you employed?

2    A    Service Master Disaster Restoration Cleaning.

3    Q    Where do you reside?

4    A    Right now, at 605 Cincinnati, Toledo, Ohio.

5    Q    Are you from Toledo originally?

6    A    I'm not.

7    Q    Where are you originally from?

8    A    St. Louis, Missouri.

9    Q    Did you get arrested in Toledo, Ohio, on November 10th,

10   2017?

11   A    I did.

12   Q    What were you charged with?

13   A    O.V.I., I believe, and menacing.

14   Q    What's the status of those cases?

15   A    Right now, they are being processed.  They are not --

16   nothing's been -- I haven't been charged with anything right

17   now.  It's in court.

18   Q    After being arrested, where were you taken?  What facility

19   were you taken to?

20   A    I was actually taken to the police station, and then from

21   the police station, with the menacing charge, they had decided

22   to book me on it and they took me to the county jail.

23   Q    Okay.  Again, is it Lucas County Jail in Lucas County,

24   Ohio?

25   A    Yes, it is.

1 Q    Describe what occurred when you were first booked into the

2 jail.

3 A    When we come in, I believe, it's been a while, going to the

4 desk, they take your information, they take the property from

5 you.  Eventually, they are supposed to fingerprint you, run you

6 through the process and then take you in and switch you out with

7 some clothes, which, you know that that didn't happen.

8 Q    Okay.  Eventually what location were you placed into?

9 A    Oh, I went from putting the jumpsuit on into the cell.

10 Q    Okay.

11 A    Or into whatever, the pod.

12 Q    And directing your attention to the screen, can you see the

13 screen okay?

14 A    I can.

15 Q    And directing your attention to the bottom right corner.

16 A    Okay.

17 Q    Do you see the pod that you were placed into?

18 A    I do.

19 Q    At some point, in looking at State's Exhibit 7, you come

20 from the back of the pod to speak to an officer.  Why did you

21 walk from the back of the pod to speak to the officer?

22 A    Because I wanted to make a phone call.

23           MR. BOOS:  I apologize.  Could we do the lights

24 again?

25           (DVD played in open court).

```
 1    Q    (By Mr. Boos) Okay.  Directing your attention now to the

 2    screen, do you see the person in the doorway in orange?

 3    A    I do.

 4    Q    And who is that person?

 5    A    That's myself.

 6    Q    And the person you are speaking with, do you remember that

 7    person?

 8    A    I do.

 9    Q    And do you see that person in the courtroom today?

10    A    I do.

11    Q    Can you please point him out and identify what he's

12    wearing.

13    A    He's wearing a suit, white shirt, glasses, right there.

14    Q    Okay.

15              MR. BOOS:  Your Honor, we would ask that the

16    record reflect the witness has identified the defendant.

17              THE COURT:  Yes, I'll show, note that the record

18    will reflect that the witness has identified the defendant.

19    Q    (By Mr. Boos) Describe your conversation with Officer Hobbs

20    about whether or not you were going to be allowed to use the

21    phone.

22    A    Well I asked him if I could use the phone.  He pointed over

23    to the phone that was sitting on the wall.  He told me to use

24    that phone right there.  I explained to him that because, when

25    they booked me, they didn't fingerprint me, didn't mugshot me.
```

1   Usually they give you a printout on a piece of paper that they

2   gave you a number to be able to dial out on that phone, and that

3   they didn't do.  And I explained to him that they didn't give me

4   that, and when I -- well, I first -- I was waiting patiently

5   because he was bringing a guy into the cell.  So after -- after

6   he had put the guy in the cell, that's when I, you know, with

7   the phone, and then when I walked away, I kind of -- I flipped

8   him off and said F you.

9   Q    Okay.  So what was the final thing Officer Hobbs told you

10  as far as whether you were going to be able to use the phone or

11  not?

12  A    He just told me to use that phone right there, and I just

13  explained that I couldn't use that phone.

14  Q    After you flipped him off and said F you, what did you do?

15  A    I turned around and started walking toward my -- my bunk.

16  Q    And when you turned around and started walking back, what

17  happened?

18  A    I got snagged up.

19  Q    Okay.  Describe being snagged up.

20  A    I was put in a chokehold and as far as, like, I was slammed

21  on my head and then a bunch of them come in and jumped on me

22  and --

23  Q    And as that was happening, do you remember what you were

24  saying?

25  A    I was saying, well, he, at first, he was telling me like

1   quit resisting.  I was putting my arms out and said I was not

2   resisting.  I'm not resisting.  I'm not resisting.

3   Q    Did Officer Hobbs ever tell you that he was going to escort

4   you into single cell seven?

5   A    Nope, they just put me in there.

6   Q    Did he ever attempt to guide you into a different cell?

7   A    No.

8   Q    Did you ever physically resist Officer Hobbs?

9   A    No.

10  Q    What injuries did you sustain as a result of this?

11  A    Well, the side of my head was -- it was split open, and

12  then I had big gashes on my -- on the forearm.

13              MR. BOOS:  If I may approach the witness, Your

14  Honor?

15              THE COURT:  Sure.

16  Q    (By Mr. Boos) Mr. McGovern, if you could look at each

17  exhibit that I'm directing your attention to, that's Exhibit 1

18  through 5, and when you are done looking at each of them, I have

19  a question for you.

20  A    Okay.

21  Q    Do those photographs fairly and -- depict injuries you

22  sustained as a result of the encounter with Officer Hobbs?

23  A    It is.

24              MR. BOOS:  At this time, we would move that

25  State's 1 through 5 be admitted into evidence, and we would ask

1  permission to publish so we can question the witness about the

2  injuries.

3               THE COURT:  Any objection, Mr. Wingate?

4               MR. WINGATE:  No.

5               THE COURT:  Thank you.  I'll take the -- we'll

6  move those exhibits into evidence.

7        Could I have the lights on, please.

8  Q    (By Mr. Boos) Okay.  And, first, Mr. McGovern, looking at

9  State's Exhibit 1, is that your right or your left arm?

10 A    That is my right.

11 Q    Okay.  And can you describe the injury on that arm?

12 A    It was to the forearm, the elbow where it was split open.

13 Q    Okay.  And how did you sustain that injury?

14 A    I believe from being slammed on the ground.

15 Q    State's Exhibit 2, is that the right or left side of your

16 head?

17 A    That is the right side of my head.

18 Q    Okay.  And describe the injury we see on your head.

19 A    That was from being slammed on my head.

20 Q    And where are you when these photographs are taken,

21 State's 1 and 2?

22 A    I am in the holding tank, the holding cell on seven,

23 whatever the other one that they put me in.

24 Q    State's Exhibit 3, again, what do we see in State's

25 Exhibit 3?

1   A       Injury to my head.

2   Q       With respect to State's Exhibit 4, where was this

3   photograph taken?

4   A       That was taken where I -- where I live.

5   Q       Who took that photograph?

6   A       Detective Carter.

7   Q       Okay.  And describe the injury status at that point.

8   A       It was healing.  It was healing.  It's been -- it's been a

9   while since it happened.

10  Q       Okay.  Approximately how long after the offense?

11  A       Oh, I would say maybe almost a week.

12  Q       Okay.  State's Exhibit 5, again, what do we see in State's

13  Exhibit 5?

14  A       That was the injury to my elbow, forearm.

15  Q       What other ailments or medical issues have you had as a

16  result of your encounter with Officer Hobbs?

17  A       I had went to the emergency room after this all come about

18  because I, as far as I knew, I didn't even have a right.  And so

19  I made it.  They did a CT scan and they said I had a slight

20  concussion.  I've been getting headaches and so they -- they did

21  a CAT scan.

22              MR. WINGATE:  Your Honor, I'm going to object.

23              THE COURT:  Basis?

24              MR. WINGATE:  Your Honor, it's hearsay, what he

25  was told by the medical personnel.

```
1              THE COURT:  Thank you.

2      Were you taken directly from the jail to the ER?

3              THE WITNESS:  No, I wasn't.

4              THE COURT:  You went on your own?

5              THE WITNESS:  I went on my own.

6              THE COURT:  Have any of those documents been

7  turned over to the State?

8              THE WITNESS:  No.

9              MR. BOOS:  We didn't solicit any.  This is -- we

10 did not procure any medical record.  We were not aware he was

11 hospitalized.

12             THE COURT:  All right.  Without there being

13 diagnoses, he can testify that he went to the doctors and what

14 his follow-up next was, and he can testify to what's physically

15 going on with him.

16     You just can't testify to what they told you, all right?

17             THE WITNESS:  Okay.

18             THE COURT:  While you are cueing that up,

19 Mr. Boos, I need to go look for a textbook very quickly, okay.

20             MR. BOOS:  Okay.

21             THE COURT:  So please stay seated.

22 Q   (By Mr. Boos) And, Mr. McGovern, I want to direct your

23 attention to the top right box on the screen.

24             (DVD exhibit played in open court.)

25             THE COURT:  Thank you.
```

1  Q    (By Mr. Boos) Can you identify the person being placed into

2  that holding cell?

3  A    I can't.  I couldn't really see that.

4  Q    Do you need to view that again?

5  A    Yes, please.

6  Q    Down here, Mr. McGovern.  The person in orange on the

7  ground, do you know who that person is?

8  A    That's myself.

9  Q    Okay.  I'll ask you the question again.  Do you know who

10  the person that was placed into the holding cell on the top

11  right corner of the screen is?

12  A    That's me.

13  Q    Okay.  Thank you.  At approximately how long were you in

14  that cell until the, if you remember, until the photographs were

15  taken of your injuries?

16  A    I was probably maybe a half hour, if that.

17             MR. BOOS:  No further questions.

18             THE COURT:  Thank you.

19       Mr. Wingate.

20             MR. WINGATE:  Yes.

21                    - - -

22             CROSS EXAMINATION

23  BY MR. WINGATE:

24  Q    Now, Mr. McGovern, would you agree with me that when you

25  were brought to the jail, you were brought on several charges,

1  right?

2  A    I believe three other.

3  Q    Menacing, D.U.I., under the influence of alcohol or drugs,

4  operating without reckless -- reckless operation, seatbelt,

5  right?

6  A    Yes.

7  Q    Okay.  And would it be fair to say that at that time that

8  you arrived at the jail, you had been arguing with the police

9  all along?

10         MR. BOOS:  Objection, Your Honor, relevancy.  The

11  relevant portion is his conduct at the time the incident

12  occurred, not prior contacts with other officers.

13         MR. WINGATE:  And, Your Honor, it goes towards

14  his demeanor while he was there.  It was his encounter with

15  Mr. --

16         THE COURT:  Was there physical contact that we

17  are missing?

18         MR. WINGATE:  With the police officer?

19         THE COURT:  Right.

20         MR. WINGATE:  There were threats.  There were

21  name calling.  He had to be restrained.

22         MR. BOOS:  And statements of counsel, Your Honor,

23  are not evidence.  The State's not disputing that, but, again.

24         THE COURT:  Will the Court be seeing anything

25  additional on film?  Is there any component or anything that

1   picks up additional time or contacts?

2            MR. BOOS:  The portion that the State has is 5:25

3   to 5:40, Your Honor, and that's not depicting other contacts, as

4   far as the State is aware, with law enforcement physical

5   contact.

6            MR. WINGATE:  Well, Your Honor, if that is the

7   case, then if the State has edited this tape, I will just

8   indicate to the Court that I believe that that constitutes a

9   Brady violation inasmuch as the request for discovery

10  encompasses exculpatory and inculpatory evidence, and if this

11  evidence is, in fact, depicted on the tape, then I think we

12  should have been provided that.

13           MR. BOOS:  And, Your Honor, it's not --

14           MR. WINGATE:  May I finish?

15           MR. BOOS:  Yes, you may finish, but this is

16  not -- the tape was not edited, Your Honor.

17           THE COURT:  Well, certainly, certainly the Court

18  can take in, for the purposes of meeting the elements for

19  assault, I would be looking at the elements with regard to the

20  contact with Mr. McGovern.  Is there more to the tape with

21  regard to anything that he's trying to give the Court -- not

22  that it necessarily is a defense, not a defense, one way or the

23  other -- was there a timeframe?  Is the booking available from

24  beginning to end?

25           MR. BOOS:  That, I -- we would -- maybe I need to

1   ask Lieutenant Reed again.  But, Your Honor, the State's

2   position is, even if he assaulted or shot at police officers

3   hours earlier, what's going on and what's relevant is when he's

4   in custody at this exact moment, so abusive behavior,

5   threatening behavior, again, is not what we are here, that's at

6   issue at this time, Your Honor.

7           THE COURT:  Thank you.  And the Court does agree

8   with Mr. Boos with regard to the timeframe I have for these

9   elements.  You may have a mitigation argument with regard to

10  heightened information --

11          MR. WINGATE:  Well I --

12          THE COURT:  -- but.

13          MR. WINGATE:  Oh, I understand that, but I think

14  both the Court and the State is missing the objection.  If, in

15  fact, that these officers were there and it's depicted on the

16  tape, and we are not talking conduct that occurred an hour or

17  two prior.  We are talking about conduct that was occurring when

18  he was brought into the prison, into the jail, within minutes of

19  him being taken to the holding area, where he was.  And this is

20  a continuous course of conduct that we are talking about.

21          MR. BOOS:  And the Court has the footage from

22  seven minutes before and seven minutes after the exact moment

23  this occurred.

24          MR. WINGATE:  I understand that, Your Honor, but

25  all I'm saying is that that would be exculpatory evidence.  That

1   would be evidence that is beneficial to the Defense that the

2   State provided the tape of the sections that it considered

3   relevant. But there are, based upon what the State is, and what

4   I know from the police report, based upon what the State is

5   saying, objecting to my request about his conduct prior, that

6   that evidence is, in fact, on the video, and I would like to

7   have it and I don't have it. And it was a request made pursuant

8   to the Rules of Discovery.

9           MR. BOOS: And we would disagree with that, Your

10  Honor, as the State noted. This is -- the reports have been

11  provided to Mr. Wingate. The disk has been in Mr. Wingate's

12  possession from the time discovery was provided, and the State

13  is not -- does not see how the relevance of conduct, whether

14  it's 8 minutes prior, 20 minutes prior, that does not justify or

15  negate an assault of an inmate, so.

16          MR. WINGATE: Well --

17          MR. BOOS: We provided the relevant footage seven

18  minutes leading up to that and --

19          THE COURT: And, Mr. Wingate, we've had multiple

20  court dates on this case. We've had no additional requests for

21  discovery or request that discovery wasn't broad enough with

22  regard to tapes. I don't recall any additional discovery being

23  requested or asked for more than what the tapes showed.

24          MR. WINGATE: Well, Your Honor, let me just say

25  this. That is partially correct only because I had to bring it

1  to the State's attention that I was aware of exculpatory letters

2  that had been written by other officers that the State did not

3  have in its possession, and the State did go out and get those

4  letters, at least one, and provided that to me.

5  But as far as the disk, I had no -- I guess my problem is

6  this, is that if this is allowed to occur, then, primarily, the

7  State is making a determination as to what is or is not

8  exculpatory, and based upon the scope of its allegations against

9  the defendant, then the State will determine what will or will

10  not be released.

11  The State is well-aware of how he was brought to the jail,

12  his demeanor at the time, his conduct with the officers, how he

13  was treated when he was brought to the jail.  The Court is also,

14  if it just follows what the State has said, then I would not

15  have been able to get into the fact that his photograph was not

16  taken because he was acting uncooperative.  That conduct would

17  buttress my claim as to how his conduct was there.  And I don't

18  have that information.  That is the -- that is the buttress.

19  THE COURT:  Well, answer for the Court,

20  Mr. Wingate, if, even if, in all minutes prior, the victim is

21  out of control and that specific moment where the contact occurs

22  with the correction officer where I actually get to visualize

23  what the victim is doing, how does the prior become the --

24  MR. WINGATE:  Relevant?

25  THE COURT:  Yes.

1      MR. WINGATE:  Simply because there are certain
2  statements that are made, a derogatory term used that he has
3  denied making, and that conduct would be consistent with what
4  his conduct was with the officers.  And I think it becomes
5  relevant conduct because he at this time and he at the time that
6  he gave the interview to the officers indicated that he did not
7  say or do certain things.
8      THE COURT:  All right.
9      MR. WINGATE:  That's how.
10      THE COURT:  Can I have counsel approach?  Off
11  record, please.
12      (Discussion held off record.)
13      THE COURT:  At this point, with regard to the
14  elements and the charge, while there may be a point of reference
15  to the behavior of Mr. McGovern that the Court will be listening
16  to with other testimony, other exhibits, other witnesses and
17  whether or not there is a different video that the Court would
18  see that would go to potentially more of the state-of-mind of
19  the defendant, but with regard to the elements and what I have
20  on this video, I do feel like this video is relevant to the
21  elements timeframe-wise just in terms of a break in time
22  potentially from being put in the pod from however his behavior
23  was at the initial booking station or prior to arrest.  But the
24  Court will certainly listen to that information, if provided,
25  but, at this point, not asking for additional video unless

1  presented with a request from Defense.

2                MR. WINGATE: All right.

3  Q   (By Mr. Wingate) Mr. McGovern, as it relates to your

4  conduct, prior to you being put into that holding tank, you were

5  very uncooperative; is that correct?

6  A   In a way, yes.

7  Q   Angry?

8  A   Yes.

9  Q   As a matter of fact, threatened to headbutt officers?

10  A   I don't remember, recall saying that, probably.

11  Q   Probably. All right. And let me just ask this. You said

12  that you had gone to the emergency room or gone to the doctor

13  afterwards, after you had been released? You have to answer for

14  the record.

15  A   Yes.

16  Q   All right. And you said that you didn't think you had a

17  right?

18  A   I did.

19  Q   A right to do what?

20  A   I -- I, as far as I was concerned, that I was -- I took the

21  butt whooping as a butt whooping, and I didn't think I had a

22  right to what happened. I knew in myself something wasn't right

23  about that.

24  Q   Okay. But now, so when you said you took a butt whooping,

25  nobody punched you, right?

GB000326

```
 1   A    Well, I was pretty -- I was slammed on my head.

 2   Q    All right.  You were pulled down.  You said you were

 3   slammed on your head, but when you saw that video, both you and

 4   Mr. Hobbs fell, correct?

 5   A    He slammed me down and he landed on top of me.

 6   Q    Okay.  He slammed you down and landed on top of you?

 7   A    Yeah.

 8   Q    And he was saying to you don't resist, right?

 9   A    He did.

10   Q    All right.  And the other officers that came up to you were

11   saying don't resist?

12   A    I wasn't resisting.

13   Q    I understand that, but I didn't ask you that.

14   A    Okay.

15   Q    I said --

16   A    They said, yes.

17   Q    Right, so the other officers there were trying to get some

18   type of control over the situation were saying to you don't

19   resist, right?

20   A    Right.

21   Q    And that would have included Mr. Hobbs, right?

22   A    Right.

23   Q    And you saw at least three other officers, two on you, one

24   standing around, that also were telling you don't resist?

25   A    Right.
```

1  Q    Now would it be fair to say that, and you call it your head

2  was split open, right?

3  A    Right.

4  Q    But it was really just an abrasion, right?

5  A    Oh, it was bleeding.

6  Q    I understand.  But there's a difference between split open

7  and an abrasion, right?

8  A    Right, you are right.

9  Q    Right.  And yours, as you saw Exhibits 1, 2, 3, State's

10 Exhibits that's in front of you right now, those are abrasions,

11 correct?  Like scrapes?

12 A    Yeah.

13 Q    Right?

14 A    Yeah.

15 Q    From contact with the floor?

16 A    Yes.

17 Q    And would it be fair to say that at that time that you get

18 these scrapes and things on you, that you have at least three

19 officers on you; is that right?

20 A    Right.

21 Q    And all three are saying don't resist?

22 A    Yes.

23 Q    Now when you told -- now when you gave a statement and you

24 did give a statement to Detective Lieutenant Carter, did you

25 not?

1  A    I did.

2  Q    All right.  And you told him that you were very

3  cooperative?

4  A    I was, right.

5  Q    You just told the Court that you weren't cooperative.

6  A    Up to the point when I -- up to that point, I was.  I mean,

7  up to when he come in and I asked to use the phone, I went --

8  when I come in the door, I was very cooperative.  I was very

9  patient and waiting.

10  Q    All right.  You are talking about when he came to the door?

11  A    When he came in and let the other inmate inside the pod.

12  Q    Okay.

13  A    I was actually laying down and chilling out.

14  Q    All right.  And you asked to use the phone and he was --

15  politely told you to use the phone over there, right?

16  A    Kind of.  No, I don't know about, yeah, he said use that

17  one.

18  Q    Right.  He was cooperative with you.  Cooperating with you,

19  right?

20  A    Yep.  Yep, everything was fine.

21  Q    Okay.  And you told him that you can't use that?

22  A    I did.

23  Q    Right?

24  A    I did.

25  Q    Said that in a cooperative manner?

1  A    I did.

2  Q    And according to the detective, you told him that Mr. Hobbs

3  said, well, you know, I don't know what to tell you, right?

4  A    Pretty much.

5  Q    Very cooperative?

6  A    Pretty much.

7  Q    All right. And that's when you gave him the middle finger.

8  As he was closing the door, did you say anything to him?

9  A    I just gave him the middle finger and turned around and

10  said F you and then went back to my -- was heading back towards

11  my bunk to go sit back down.

12  Q    And you said F you. Did you ever use the N word?

13  A    No, sir.

14  Q    All right. And after you had said F you to him, Mr. Hobbs,

15  you turned to walk away from him, correct?

16  A    I did.

17  Q    Now do you -- are you familiar with that cell number seven?

18  Do you know what that is for?

19  A    No, I have never had, no, I've never -- I've never had to

20  experience it. I've never.

21  Q    All right. Were you ever told that it was for an

22  uncooperative or disruptive inmate?

23  A    No, I was pretty much just thrown in there.

24  Q    All right. Did you find out that it's for a disruptive and

25  or uncooperative?

1  A    No, I didn't.  No, I didn't.

2  Q    Now when you talked to Detective Carter, Detective

3  Lieutenant Carter, you told him that he grabbed you in a

4  headlock, right?

5  A    Yes.

6  Q    Now you didn't tell him that you were being choked, did

7  you?

8  A    I did.

9  Q    You did?

10  A    I did.  I believe I did.  I --

11  Q    You told him that you were in a headlock?

12  A    I said I was in a headlock.

13  Q    All right.  And that's with your head, right?

14  A    Being choked out.  I mean, yeah, headlock.  Headlock is his

15  arms are wrapped around my head.

16  Q    Your head, right?

17  A    Head, neck.  I mean, he had me in a headlock.  What's a

18  headlock?

19  Q    That's on your head?

20  A    It was around my neck.

21  Q    Okay.  And it was the detective that said to you well was

22  he choking you?  Do you recall him asking you that, right?

23  A    I believe I had said he was choking me, choking me.

24  Q    Do you recall the detective --

25  A    No, yeah.

1  Q    -- saying to you first?

2  A    Yes.

3  Q    Before you said anything about choking, do you recall the

4  detective saying to you first, were you being choked?  Do you

5  recall him asking you that?

6  A    Yes.

7  Q    And that's the first time you mentioned anything about

8  being choked; isn't that correct?

9  A    Well then likely some misunderstanding of a headlock and a

10  chokehold, I mean.  It was definitely not a headlock.

11  Q    And would it be fair to say that even if he had you in the

12  headlock slash chokehold, he's telling you, like the others,

13  stop resisting, right?

14  A    Right.

15  Q    He was trying to get some kind of control of you?

16  A    There was no -- no control to be taken over me.  I was --

17  Q    I understand that.

18  A    Okay.  Okay.

19  Q    But if there is no control over you, you have three

20  officers telling you stop resisting, right?

21  A    Yeah.

22  Q    So although it may not be a question to you about control,

23  at least these officers felt that you needed to do -- to follow

24  their commands?

25            MR. BOOS:  Objection as to his ability to testify

1  as to how other officers felt.

2              THE COURT:  I'll allow him to testify as to what

3  was happening at the time, but not their feelings.

4  A    They were all saying that it was -- like it was -- I feel

5  they -- they are or I believe they are just acting on his --

6  his -- what the way he was -- he was taking things in his hands

7  is the way they -- so that's their job.  They are just going to

8  react on another officers, so.

9  Q    Okay.  That's one interpretation, right?

10 A    Uh-huh, yes.

11 Q    And another one could be that, as they are looking at you,

12 they are telling you to stop resisting based upon your conduct,

13 right?  That's another?

14 A    They were all.  They were all saying that.

15 Q    Yeah.  And as far as the scrape on your arm and the scrape

16 on your head, you have three officers on you at one time; is

17 that correct?

18 A    I -- yes.

19 Q    And you were moving around on that concrete floor; is

20 correct?

21 A    I don't believe I was moving.  I believe I was being

22 manhandled.

23 Q    Okay.  All right.  Well manhandled with movement?

24 A    Yes.

25 Q    Right.  You were moving, they were moving?

| | | |
|---|---|---|
| 1 | A | They were moving me. |
| 2 | Q | Okay.  And they are moving you? |
| 3 | A | Yes. |
| 4 | Q | Right? |
| 5 | A | Yes. |
| 6 | Q | And as far as the scrape on your head, scrape on the elbow, |
| 7 | | could have occurred during that period of time, correct? |
| 8 | A | No. |
| 9 | Q | No? |
| 10 | A | No. |
| 11 | Q | When did it occur? |
| 12 | A | It occurred when I was slammed on my head. |
| 13 | Q | And you are sure of that? |
| 14 | A | Yes, I am sure of that. |
| 15 | Q | So -- |
| 16 | A | Yes. |
| 17 | Q | -- you were slammed on your head and all you got was a |
| 18 | | scrape on the elbow and the -- |
| 19 | A | I was slammed down.  When I was slammed down, I come down |
| 20 | | on my elbow and I come down on my head.  I -- I -- I remember |
| 21 | | being slammed down on my head.  I -- |
| 22 | Q | Did you lose consciousness? |
| 23 | A | I was dizzy.  I was picked up, put into the other room just |
| 24 | | like it was just like that.  Like a ragdoll. |
| 25 | Q | But that was after the other officers -- |

1  A    It happened so quick.

2  Q    It was after the other officers had got control of you and

3  cuffed you that you were taken into the other room, right?

4  A    There was nothing for them to control of me.

5  Q    You were taken into the other room --

6  A    Yes.

7  Q    -- after the officers telling you to quit resisting, put

8  your hands behind your back, right?

9  A    Yes.

10 Q    Cuffed you, right?

11 A    Yes.

12 Q    Picked you up, right?

13           MR. BOOS:  Your Honor, objection, at this point,

14 to this question.  We would stipulate that the other officers

15 came in and said quit resisting.  So we are --

16           MR. WINGATE:  We are past that, Your Honor.  We

17 are to the point that when you made it to the other room is

18 after --

19           THE COURT:  I'll overrule the objection.  Let me

20 just --

21           MR. WINGATE:  I'm sorry?

22           THE COURT:  Let's make the record clear.  Thanks.

23 Go ahead.

24           MR. WINGATE:  Oh, I'm sorry.

25 Q    (By Mr. Wingate) As it relates to you being placed in that

1  other room, it was after they had gotten your arms behind your

2  back and cuffed you, right?

3  A    Yes, yes.

4  Q    Picked you up?

5  A    And put me --

6  Q    And then walked you over to the other room?

7  A    Yes.

8  Q    Right?

9  A    Yes.

10  Q    All right.  And do you recall having a conversation with

11  Mr. Hobbs after you had been put in this room?

12  A    No.

13  Q    Did you ever ask for blankets?

14  A    They had pretty much gave me a blanket, threw one blanket

15  in there or something or gave me a blanket.

16  Q    Mr. Hobbs gave you a blanket?

17  A    Yeah, I believe so.

18  Q    And this was after you asked for one, right?

19  A    Yes.  I don't know.  I can't remember how long it took for

20  me to get one.

21  Q    But you eventually got it, right?

22  A    Yeah.

23  Q    And Mr. Hobbs was the one that gave it to you?

24  A    I don't remember.

25  Q    Well, you just said yes.

1  A    I'm -- somebody gave me.  I don't know if it was him.  I

2  don't remember who.  Somebody did.  So if it was him, it was

3  him.

4  Q    Now Detective Lieutenant Carter talked to you one week

5  after this; is that correct?

6  A    Yes.

7  Q    All right.  Like November the 17th?

8  A    I believe somewhere around there.

9  Q    And, at that time, you had gone to the hospital, to the ER

10  room?

11  A    I did.

12  Q    All right.  Did you tell the detective that you did not

13  seek outside treatment on November the 17th of 2017?

14  A    What do you mean outside treatment?

15  Q    He stated a nurse at the jail treated him.  That's you?

16  A    Yes.

17  Q    All right.  He did not seek outside treatment.  Do you

18  recall --

19  A    Yeah.

20  Q    -- telling him that?

21  A    At that time, I didn't, though.

22          THE COURT:  Mr. Wingate, I'm going to have to

23  break you shortly.

24          MR. WINGATE:  I know.

25          THE COURT:  Just because of the noon meeting that

1  I have to go to, so I'll leave it to you as to when you want to

2  pick a point to stop.

3             MR. WINGATE:  We can stop right now.

4             THE COURT:  All right.

5    Mr. McGovern, the Court is going to pick back up at 1:00,

6  so you are still under oath.  You are not to talk to anybody

7  about the case or have any additional conversation -- State, you

8  can obviously speak with your witness -- but nobody in the

9  hallway, don't speak to the paper, don't speak to anyone while

10 you are still under oath; do you understand that?

11            THE WITNESS:  I do.

12            THE COURT:  Mr. Wingate, are you comfortable

13 breaking at this time then?

14            MR. WINGATE:  I am.

15            THE COURT:  Court will be in short recess until

16 1:00.

17            (Recess taken at 11:57 a.m.)

18                      - - -

19            (Case resumed at 3:05 p.m.)

20            THE COURT:  We are back on the record.

21            MR. BOOS:  And I will go get Mr. McGovern, Your

22 Honor.

23            THE COURT:  All right.  Thank you.  And I believe

24 that we were in the middle of testimony.

25   Mr. Boos, do you need to, or Mr. Wingate, do you need to

1   have anything read back to review where you were?

2               MR. WINGATE: Yes, Your Honor. May I just ask

3   the last question and I can go from there?

4           (Last question read back by court reporter:

5           Q: He did not seek outside treatment. Do you recall

6           telling him that?)

7   Q   (By Mr. Wingate) I want to say, Mr. McGovern, I believe the

8   last question that I asked you had to do with whether or not you

9   had told the detective or Lieutenant Carter that you did not

10   seek outside treatment for your injuries. Do you recall me

11   asking you that question?

12   A   I do.

13   Q   And your answer was? Did you tell him that?

14   A   That I did?

15   Q   That you did not seek?

16   A   That I did not, yeah, I did not tell him that.

17   Q   You did not?

18   A   No, I told -- I didn't receive no treatment until after.

19   So, no, I didn't tell him I didn't receive no treatment if

20   that's what you are asking.

21   Q   Okay. So you told him -- you did not tell him that you did

22   not receive any treatment?

23   A   I told him I did not receive no -- from where? From the

24   emergency room?

25   Q   No, when you had the conversation with the detective on

1   November the 17th of 2017.

2   A   I did not.  I did not.

3   Q   Okay.  You did not tell him that?  This is what I'm asking,

4   okay.  So we are not getting confused.

5   A   Yeah.

6   Q   I'm asking you did you, when you talked to the detective on

7   November the 17th, did you tell that detective, Detective

8   Carter --

9   A   Yes.

10  Q   -- that I did not seek any outside treatment?  I'm sorry?

11  A   I did.

12  Q   All right.  Now when you were put in this unit by the other

13  deputy sheriffs, were you in -- you were in there for

14  approximately three days; is that correct?  Two or three days?

15  A   It was Thursday, Friday, I was released that Saturday.

16  Q   So but at no time were you taken out of that isolation unit

17  and put back in the other cell?

18  A   The next day.  Well, it would have been hours.  The

19  following shift come in and they -- they asked me why I was in

20  there.  They didn't even know why I was in there, so they --

21  they put -- turned around and put me in another cell back over

22  in population or whatever you want to call it.

23  Q   All right.  So you just told them why you were over there?

24  A   Well, they usually said -- well, he didn't know.  The

25  deputy, the sheriff that come to take me out of there, they

 1  didn't -- I don't know if they realized I was there, but he
 2  asked me what I was there for, and then he asked me if I would
 3  be okay and I said yes, so then they put me in the other cell or
 4  whatever you want to call it.
 5  Q    Back in the holding area?
 6  A    Pod, pod.
 7  Q    Back in the holding pod?
 8  A    Yeah, next to it.
 9  Q    Okay.  And, all right.  All right.  Give me just a couple
10  of more questions and I'll be done.
11       Now do you recall -- do you recall, when this altercation
12  was taking place, who had placed you in the cuffs, if you know?
13  A    And at what -- what do you mean cuffs?
14  Q    When you were taken and put into that small room that you
15  said that the other officers let you out of?
16  A    There seemed like there was so many people, I mean, the
17  cuffs just went on.  Just, I mean, everything just happened so
18  fast.
19  Q    Okay.  And you were highly intoxicated at this point?
20  A    No.
21  Q    You weren't intoxicated at all?
22  A    No.  I wasn't intoxicated throughout the whole, the whole
23  thing.  I was not even intoxicated.
24  Q    All right.  You weren't intoxicated when you were talking
25  to the officers?

1   A      No, I was -- I was -- I was just -- no, I wasn't.

2   Q      All right.  Let me ask this then.  You didn't take the

3   breathalyzer?

4                  MR. BOOS:  Objection as to relevance --

5                  MR. WINGATE:  Well --

6                  MR. BOOS:  -- of the breathalyzer, Your Honor.

7   That's ancillary.

8                  THE COURT:  I understand.  It's just a leading up

9   to the questions on the arrest.

10                 MR. WINGATE:  Yes.

11  Q      (By Mr. Wingate) Now although you are saying that you were

12  not intoxicated, you didn't take the breathalyzer, right?

13  A      Right.

14  Q      Didn't take the field sobriety test?

15  A      They didn't offer one.

16  Q      You are sure of that?

17  A      Yes, I'm positive.

18  Q      Okay.

19  A      And it was an hour and-a-half after that, they arrested me

20  and took me down.  It was an hour, almost hour and-a-half, then

21  they asked me if I wanted a breathalyzer.

22  Q      Okay.  So they arrested you for a D.U.I., an hour

23  and-a-half later, they asked you about a breathalyzer?

24  A      Yes.

25  Q      And you didn't take it?

1  A    I didn't.  I didn't take it.

2  Q    Refused it?

3  A    Yes.  Just yes.

4  Q    Okay.  And that's all that you remember from that evening?

5  A    That was pretty much all what really happened as far as the

6  arrest goes.

7  Q    Okay.  All right.

8          MR. WINGATE:  No further questions.

9                - - -

10              REDIRECT EXAMINATION

11  BY MR. BOOS:

12  Q    Did you threaten to headbutt Officer Hobbs in the moments

13  prior to being grabbed by him?

14  A    No.

15  Q    And there was questions about other officers telling you to

16  stop resisting.  How many officers grabbed you and slammed you

17  to the ground?

18  A    Well it was only one.

19  Q    Okay.  How many other officers were present, if you know,

20  when you were --

21  A    To me, it seemed like five, but.

22  Q    But at the time you were initially slammed to the ground,

23  how many officers were present?

24  A    It seemed like there was three, like four, five like.

25  Q    With respect to the injuries we saw, who caused those

1   injuries?

2   A    Hobbs.

3   Q    And what were you doing right before those injuries were

4   inflicted?

5   A    I was talking to him wanting to use the phone, make a phone

6   call.

7   Q    And after that conversation ended, what did you do?

8   A    I turned around to go back to my bunk and I turned around,

9   flipped him off, said F you and went to my bunk.

10  Q    So, to clarify, you said -- there were a number of

11  questions about your discussion with Lieutenant Carter.  So you

12  told -- it's your testimony that you told Lieutenant Carter you

13  did not seek medical treatment?

14  A    I didn't seek medical treatment until after, after the fact

15  that because, as far as I was concerned, there was -- I had no

16  rights.  I didn't know until up to my -- Carter had got a hold

17  of me.  My intentions, because I was -- I was getting headaches,

18  you know, so I figured I would do something about it.

19  Q    So at the time you talked to Lieutenant Carter, had you

20  sought any medical treatment?

21  A    No.

22  Q    Okay.

23            MR. BOOS:  No further questions, Your Honor.

24            THE COURT:  Thank you.  Anything additional off

25  that line of questioning?

1           MR. WINGATE:  Yes.

2                      - - -

3                RECROSS EXAMINATION

4    BY MR. WINGATE:

5    Q    And did you tell the prosecutor about you seeking medical

6    treatment after --

7    A    Yes.

8    Q    -- talking to -- did you tell him which hospital?

9    A    I believe I did.  I told Toledo.  I believe I did say

10   Toledo.

11   Q    All right.  Did he ask about medical records?

12   A    No, not that I know of.

13   Q    And when did you go to the hospital?

14   A    I believe I, after it was I came down here to the victims

15   and see what kind of help I could get as far as because I didn't

16   have medical insurance, and then --

17   Q    You are talking about the Victim's Assistance Program?

18   A    Yes.

19   Q    All right.  So let me just back up now.  I'm trying to get

20   a date in relationship to November the 17th, that's when you

21   talked to Detective Lieutenant Carter.  When did you go to see

22   the victims?

23   A    I believe it was like 18th or 19th.

24   Q    The next day?

25   A    Yes.

1    Q    And then when did you go to the Toledo Hospital?

2    A    That day after I talked to.

3    Q    The 18th or the 19th?

4    A    Yes, after I talked to the victim witness.

5    Q    Did you talk to the victim's advocate about being

6 compensated?

7    A    They -- they just gave me a bunch of paperwork to fill out.

8    Q    In order to get paid?

9    A    In order to, because I lost my job and -- and but I didn't

10 succeed. I didn't continue with it. I had never followed

11 through with it.

12    Q    You never followed through with it?

13    A    No.

14    Q    You were never told that you had to follow through on it?

15    A    Oh, I was told. I was told.

16    Q    And you just didn't do it?

17    A    I was just -- I kind of just waited it out. Tried to --

18 hopefully, tried to get another job.

19              MR. WINGATE: Okay. No further questions.

20              THE COURT: Thank you.

21    Mr. Boos.

22              MR. BOOS: No redirect, Your Honor.

23              THE COURT: You are all set. Thank you.

24    Mr. Boos, your next witness?

25              MR. BOOS: Yes, at this time, the State would

1  call Detective Carter.

2                              - - -

3            Thereupon, the State, in order to maintain the issues

4  on their part to be maintained, called as a witness,

5                          DAVE CARTER,

6  who, having been duly sworn as provided by law, testified and

7  said as follows:

8                              - - -

9                      DIRECT EXAMINATION

10  BY MR. BOOS:

11  Q    Detective, can you please state your name for the record.

12  A    Yes, it's Dave Carter.

13  Q    Where are you employed?

14  A    With the Lucas County Sheriff's Office.

15  Q    How long have you been employed at the Sheriff's Office?

16  A    Twenty-three years.

17  Q    What's your current position with the SO?

18  A    I'm the Detective Lieutenant in the Detective Bureau.  I

19  supervise the Bureau.

20  Q    Describe your responsibilities.

21  A    I manpower the Bureau and then I also get -- I'm

22  responsible for any officer involved investigations.

23  Q    And just describe some of the training, education and

24  experience you've had in order to become a detective with the

25  Sheriff's Office.

1  A   I've got numerous training courses.  I've had use of force.

2  I've had a few of those now.  Got --

3  Q   At some point, was a referral made regarding an

4  investigation regarding a corrections officer named Lamonte

5  Hobbs?

6  A   That's correct.

7  Q   And who made that referral?

8  A   It came from Captain Grove in Internal Affairs.

9  Q   The Lamonte Hobbs that you are referring to, do you see him

10  in the courtroom today?

11  A   I do.

12  Q   Can you please point him out and identify what he's

13  wearing.

14  A   He's got a gray shirt or a gray suit with paisley tie,

15  glasses.

16          MR. BOOS:  And, Your Honor, at this time, we

17  would ask the record reflect the witness has identified the

18  defendant.

19          THE COURT:  Thank you.  The witness has been

20  identified by or has identified the defendant at this time.

21  Q   (By Mr. Boos) What date was a referral made to you,

22  detective?

23  A   It was November 16th.

24  Q   Okay.  And what was the date the incident occurred?

25  A   November 10th.

1    Q    Of 2017?

2    A    Yes.

3    Q    All right.  Describe the information you were provided at

4    the time of the referral.

5    A    I was given the officer reports and also the video.

6    Q    So in terms of the items you obtained as part of your

7    investigation, what were they?  You said officer reports, video,

8    what other items did you collect as part of your investigation?

9    A    I interviewed Timothy McGovern the next day on the 17th.

10   Q    And what else did you do when you were there at that

11   interview?  What --

12   A    Oh, I took pictures of his injuries.

13   Q    As part of your investigation, did you read the defendant's

14   report?

15   A    I did.

16   Q    Okay.

17               MR. BOOS:  May I approach, Your Honor?

18               THE COURT:  Sure.

19   Q    (By Mr. Boos) I'd ask the witness to direct your attention

20   to what's been marked as State's Exhibit 6.  And prior to

21   viewing the video footage, did you read the report?

22   A    That's correct.

23   Q    Okay.  And you've had an opportunity to view State's

24   Exhibit 7?

25   A    I believe so.  It was -- which one was 7?

1  Q   That would be the surveillance footage.

2  A   Oh, yes, absolutely.

3  Q   Okay.  Is Mr. Hobbs' statement in the report consistent

4  with what you see on the video?

5  A   It is not.

6  Q   And in the moments leading up to the assault, are you able

7  to identify any point where it appears Officer Hobbs is trying

8  to guide Timothy McGovern into his cell?

9  A   I do not see that.

10  Q   Are you able to identify any part where McGovern is

11  resisting being escorted into a cell?

12  A   I do not.

13  Q   And the person we see slam Mr. McGovern to the ground, is

14  that the person you've identified as the defendant?

15  A   Yes, it is.

16  Q   How long have you been a detective?

17  A   Since 2007.

18  Q   Prior to being a detective, what experience have you had?

19  A   I worked on the road patrol.  I got promoted in 2012, so I

20  was briefly out of the Bureau, but went back to the road as a

21  sergeant.

22  Q   Were you trained in when it's appropriate for law

23  enforcement officers to use physical force?

24  A   I have been.

25  Q   And can you think of any scenario where a person walking

1  away from an officer where it would be appropriate to then grab

2  them from the collar and slam them on their head?

3  A    I do not.

4  Q    After reviewing the report, the photographs, the CD, what

5  sort of referral did you make in this case?

6  A    I referred it to the prosecutor's office.

7  Q    And why was it referred to the county prosecutor's office

8  in this case?

9  A    Because we've made it a directive that any county employee

10  now will be going through Common Pleas for any possible charges.

11            MR. BOOS:  I have no further questions, Your

12  Honor.

13            THE COURT:  Thank you.

14       Mr. Wingate.

15                     - - -

16                 CROSS EXAMINATION

17  BY MR. WINGATE:

18  Q    All right.  When you said we made a directive as far as

19  county charges, who is we?

20  A    Well, it originated with Chief Talbott.

21  Q    Chief who?

22  A    Chief Talbott.

23  Q    Anyone else?

24  A    Well with the county prosecutors.

25  Q    Okay.  Now let me just ask this.  The prosecutor asked you

1   more specifically about grabbing an individual from behind, use

2   of force as he's walking away.  He was grabbed by the collar and

3   slammed to the ground; is that correct?

4   A    I believe that's what he said.

5   Q    All right.  Now when you saw this video, you saw Mr. Hobbs

6   grab the individual, Mr. McGovern, pull him back; is that

7   correct?

8   A    Uh-huh.

9   Q    And they both fell, right?

10  A    That could be your interpretation.  I mean, he took him to

11  the ground, so.

12  Q    I understand, but now if I'm -- if you were to slam me to

13  the ground, you don't go down with me.  You throw me to the

14  ground, right?

15  A    Generally, if you are going to secure a person, you go with

16  it.

17  Q    Well that's generally --

18  A    But it's just an improper way to take a person to the

19  ground.

20  Q    I understand that.  You mean, going down with him?

21  A    Yeah, you go down with him to secure him.

22  Q    Okay.  And is that what Mr. Hobbs did?

23  A    Improperly, yes.

24  Q    Grabbed him, slammed him to the ground, fell with him just

25  to secure it?

1   A      That, generally, when you are going to take a person to the

2   ground, you are supposed to do how Officer Hobbs described it by

3   taking the arms like that.   You do not grab from the back of the

4   collar and yank backwards.

5   Q      Well, and by the same token, he also, if you grab someone

6   by the arms to escort them to another cell, you also grab them

7   by the arms, correct?

8   A      If you were going to escort.

9   Q      Okay.

10  A      Which does not happen in that video.

11  Q      I'm sorry, what?

12  A      That does not happen in that video.

13  Q      I understand.   But your perspective is he is slammed,

14  right?

15  A      Correct.

16  Q      Okay.  Could have fallen, right?

17  A      Possibly.

18  Q      Well let me just ask this.   Him grabbing, when you looked

19  at this video, and I just want you to take slam aside for a

20  second, okay?

21  A      Okay.

22  Q      All right.   When you look at this video, he grabs, he pulls

23  back, they both go down, right?

24  A      Right.

25  Q      That would be consistent with a slip and fall, correct?

1   Take slam out of your mind, just looking at that?

2   A    It's possible.

3   Q    Okay.  I understand that, and I'm not trying to get you to

4   say anything.  I'm just asking you, under the circumstances,

5   he's pulling back trying to pull him out, and if he slipped and

6   fell, they both would go down.  That's consistent with what we

7   are seeing on the video, right?

8   A    It's possible he could have slipped.

9   Q    Okay.  And the video was consistent with that?

10   A    What I saw on that video is an individual grabbing a guy by

11   the back of the collar and yanking him down.  So whether he

12   slipped during that process.

13   Q    But I understand, and I'm not trying to put words in your

14   mouth, but I'm saying to you, you would see the same thing if he

15   grabbed and pulled to slam him down or grabbed, pulled and fell

16   down with him?  You would see the same, same action that you saw

17   there?

18   A    Yeah, I saw a guy retreating in a cell, him yanking him and

19   grabbing him and him coming down.  Whether he slipped in the

20   process, the yank is not something that's taught, so.

21   Q    I understand that, but the yank is not an assault?

22   A    Yanking someone from the back of the collar, yeah, it

23   certainly would be assault, sir.

24   Q    Okay.  So then by yanking at the back of the collar, that

25   he's knowingly caused or attempted to cause physical harm,

1  right?

2  A    I would believe that that would be considered knowingly

3  cause physical harm if you are grabbing someone by the back of

4  the collar.

5  Q    Okay.  And you heard the testimony that he was -- from

6  Mr. McGovern -- that he was slammed on his head, correct?

7  A    I heard him say that.

8  Q    Right.  And the only indication of any type of injury was

9  an abrasion, correct?

10 A    Correct.

11 Q    And an abrasion is consistent with skin rubbing across the

12 floor?

13 A    Correct.

14 Q    Right.  That is what is consistent with what was seen on

15 his face and on his elbow; is that correct?

16 A    Correct.

17 Q    And if that is consistent with that type of injury, that

18 could have occurred while all three men were on him; is that

19 correct?

20 A    It's possible it -- I don't -- I can't pinpoint exactly

21 when the injury occurred, but that doesn't lessen the fact that

22 he was yanked, which is improper.

23 Q    I understand.  I understand that.

24 A    Right.

25 Q    But had he not slipped and fell, the yank would not have

1   injured him?  It would have removed him from the cell?

2   A    Which is still been -- it's still an assault, so.

3   Q    But that's in your mind, right?

4   A    Well, I can't see any time in my career when it's been

5   appropriate just to grab someone by the back of their collar and

6   yank them back when you have the other tools that are your

7   options.

8   Q    Have you ever --

9   A    He could have just shut the door and called another person

10  to come over.

11  Q    In the course of your career, have you ever worked in

12  booking?

13  A    I have not.

14  Q    Okay.  And would it be fair to say that although that may

15  be the textbook way that it should be done, in reality, things

16  can happen differently in the booking process; is that correct?

17  A    Things can happen, but, you know, if you improperly --

18  Q    I understand.

19  A    I mean, it's -- it's --

20  Q    I'm not fighting you on that.  I'm just saying I'm not

21  fighting with you saying that he didn't do something properly,

22  but not doing some properly doesn't equate to an assault, right?

23  You are talking about two different things.  You are talking

24  about administratively, right, with whether or not it's done

25  properly?  That's administrative, right?

1  A    Policies and procedures, correct.

2  Q    All right.  That's all that that is.  I am talking about an

3  allegation of a criminal offense of assault, okay.  And that's

4  what we are here for.

5  A    Correct.

6  Q    All right.  Now had Mr. McGovern been slammed on his head

7  as he testified to, would you have expected to see greater

8  degree of injuries?

9  A    It's possible there would have been more injuries.

10 Q    And when you talk about slam, you are talking about using a

11 certain degree of force; is that correct?

12 A    Sure.

13 Q    All right.  And force, which would be applied to the skull

14 and the face if you are slamming somebody down on their head,

15 correct?  As he testified?

16 A    Yeah, I mean, I can't deem on which force it takes for it

17 to be considered slammed.  I didn't live it, so.

18 Q    I understand that, but you saw it --

19 A    Oh, I did see it.

20 Q    -- on the video?

21 A    Yes.

22 Q    Okay.  And he specifically said slammed on his head?

23 A    That's what --

24 Q    Now let me ask you this.  When you talked to Mr. McGovern,

25 you talked to him about how he had been grabbed; is that

1    correct?  He said that he was grabbed, he grabbed him in a

2    headlock --

3    A    Correct.

4    Q    -- right?  Is that correct?  That's what he told you?

5    A    After being yanked, yes.

6    Q    Okay.  And you asked him, up until that point, he had never

7    mentioned anything about being choked; is that correct?

8    A    That's correct.

9    Q    All right.  It was then when you said I asked him if he was

10   being choked at the time and he stated he was?

11   A    Uh-huh.

12   Q    All right.  So he didn't mention choke until you brought --

13   A    Until I brought it up.

14   Q    Right, okay.

15   A    I brought it up because, in the video, you see briefly

16   where it goes around there, so I was going to see what he said

17   in my investigation, so.

18   Q    Okay.  And when you said that it went around his neck

19   briefly, you are not here to say he was being choked at that

20   point?

21   A    I am not.

22   Q    Okay.  And as the detective in this case, you received

23   reports indicating that whatever was going on with Mr. McGovern

24   in that incident, that several officers were yelling at him to

25   stop resisting?

1   A    Correct.

2   Q    Right.  You had a report from a Mr. Meyers; is that

3   correct?

4   A    Uh-huh.

5   Q    I'll give you his name, Nathan Meyers.  You had a report

6   from him?

7   A    Should be in there.

8   Q    Okay.  And he was one of the officers that actually helped

9   put the cuffs and everything on him?  He was one of the

10  individuals saying stop resisting?

11  A    Uh-huh, yes.

12              MR. BOOS:  Your Honor, I would again renew my

13  objection as to the relevance to the stop resisting that occurs

14  after the offense occurred in this case.

15              THE COURT:  Court is certainly able to delineate

16  the language after the takedown.

17              MR. WINGATE:  Okay.

18  Q    (By Mr. Wingate) And you also had further statement from

19  Mark Gumpf?

20  A    Correct.

21  Q    And what is -- who is Mark Gumpf?

22  A    He's a sergeant in booking.

23  Q    And he was the sergeant in booking at the time of this

24  incident; is that correct?

25  A    That's correct.

1    Q    All right.  And if I'm not mistaken, in Gumpf's, the

2    sergeant's report, he stated that he saw Meyers and Hobbs

3    fighting with the inmate, is that correct, on the floor?

4    A    I would have to read the full report, but I believe you if

5    that's what's in there, but I don't recall exactly what it says,

6    but I believe you.

7    Q    Up here, goes all the way down to there.  That second full

8    line.

9    A    Yeah, it says that, states that he was fighting with --

10   Q    I don't need you to read it out loud.

11   A    Okay.

12   Q    But that's what he has in his report?

13   A    Yep, correct.

14   Q    Okay.  Now as it relates to Mr. McGovern, you heard him

15   testify that he was not intoxicated; is that correct?

16   A    That's correct.

17   Q    All right.  And being the lead detective, did you receive

18   information -- is that consistent with the information that you

19   received from officers in this event?

20   A    That is not consistent.

21   Q    Inconsistent, right?

22   A    Right.  Now whether he was sober at the time of the

23   incident, I do not know this.

24   Q    Well, I want to say he came in about --

25   A    4:00.

1  Q    Yes.

2  A    The incident was at 5:30, so an hour and-a-half later.

3  Q    And that hour and-a-half later, he was --

4  A    I don't know.

5  Q    All right.  And do you know anything about his conduct?

6  A    I heard what you stated when he first got booked in.

7  Watching the video, I don't see that conduct.

8  Q    I'm sorry.  You heard what?

9  A    I had heard that you said that he was out of line when he

10  first got booked in, but watching the video, I don't see that

11  conduct.

12  Q    No.  No, you misunderstand me.  I'm asking about the

13  information that you received as lead detective about his

14  conduct prior to this incident?

15  A    Yeah, that he was intoxicated when he got booked, correct?

16  Maybe I'm confused.

17  Q    Intoxicated when he got booked, uncooperative when he got

18  booked, also?

19  A    Right.  Right, that's what you were saying, yeah.

20  Q    Right.  Also, and you heard the testimony of Lieutenant

21  Reed, who said that when the booking photo isn't on the booking

22  sheets, that's generally indicative that the individual may be

23  uncooperative or --

24  A    Correct.

25  Q    -- something else, right?

1  A    Correct.

2  Q    And, as a matter of fact, specifically, states on his

3  report that he was uncooperative at that time, correct?

4  A    Correct.  There was a spot in there that says that, yes.

5  Q    All right.  Do you know who booked him in?  Who actually

6  did the physical work?

7  A    I would have to look at the booking sheet again.  I would

8  assume it was Mr. Hobbs.

9  Q    All right.  As it relates to the incident after he's yanked

10  out, okay?

11  A    Okay.

12  Q    He's yanked out.  No blows are thrown, correct?

13  A    Correct.

14  Q    By -- by anyone?

15  A    Nope, you can see McGovern's arms are out to the side and

16  he's saying I'm not resisting, I'm not resisting.

17  Q    Now although you keep saying that, what were the other

18  officers saying to him?

19  A    Stop resisting.

20  Q    And would it be fair to say that if his arms are out to the

21  side and he's refusing to put them behind his back that he is

22  resisting?

23  A    It does not appear to me that way when I watch the video.

24  Q    I understand that, but my question is --

25  A    But I've wrestled with a lot of people when they've tried

1   to do that resistance, and that did not look like anybody that

2   was actually resisting.

3   Q   Well I understand, but that's your perspective.

4   A   That's my perspective.

5   Q   Right, after looking at this, right.  But everyone there in

6   that photo was screaming quit resisting?

7   A   Correct.

8   Q   Stop resisting.  And my question to you is if I'm under

9   arrest or if you are trying to control me and even though my

10   hands may be out like that and you are trying to put them behind

11   me and I won't put them behind me, that is resisting, isn't it?

12   A   That would be.

13   Q   And that is what the officers and you said that his arms

14   are out like that, right?

15   A   Well, his arms are out there when he's stating I'm not

16   resisting, and he lets him put it behind him after that.  So, I

17   mean, it just did not look like a guy that was resisting.

18   Q   All right.  And the other officers that were in booking

19   that were making that assessment that he was resisting would

20   have a better view of what was going on and a better

21   understanding of the circumstances; is that correct?

22   A   Oh, they were.

23   Q   And they were clearly saying quit resisting, right?

24   A   Uh-huh.

25   Q   Right?

1  A    Correct, they were saying quit, no resisting.

2            MR. WINGATE:  Just one second, Your Honor.

3  Q    (By Mr. Wingate) Let me ask you this question, okay.  Would

4  the Lucas County Sheriff's Department be subject to a lawsuit if

5  Mr. Hobbs was acquitted of this?

6            MR. BOOS:  Objection.

7  A    I don't know about that, yeah.

8            THE COURT:  Overruled.  Bench trial.

9  Q    (By Mr. Wingate) He certainly would be entitled to his job

10  back?  You have to answer for the record.

11  A    I mean, that's up to the department.  I would assume so,

12  but.

13  Q    Okay.  And back pay?  As far as you know?

14  A    Yeah, it's above my pay grade.

15  Q    All right.  Now did you -- I know you talked to

16  Mr. McGovern.  Did you ever make an effort to talk to --

17  A    I did not.

18  Q    Did you ever talk to --

19  A    I didn't -- I didn't interview anybody else other than

20  McGovern.

21  Q    Okay.  You didn't talk to Gumpf and didn't talk to Meyers?

22  A    That's correct.

23  Q    And they both filed reports; is that correct?

24  A    That's correct.

25  Q    Did you talk to any of the other individuals in that pod?

1    A    I did not.

2    Q    And did you have -- did you have an opportunity to look

3    at -- let me ask this.  This is not the entirety of the

4    Mr. McGovern arriving and being in the booking area; is that

5    correct?  What was shown?

6    A    No, it is not.

7    Q    Okay.  And have you had an opportunity to look at --

8    A    It wasn't pertinent to the investigation.

9    Q    At any time that Mr. McGovern was in that area, the cell

10   seven, do you know how long he remained in there?

11   A    I do not.

12   Q    And if he remained, and that is an isolation cell; is that

13   correct?

14   A    I'm assuming so.

15   Q    From what you've been able --

16   A    From what I've been told.

17   Q    As you understand?

18   A    Yes.

19   Q    As part of your investigation, okay.  And if an individual

20   remained in there at least two days, that's because he is still

21   either disruptive or uncontrollable; is that right?

22   A    That's their policies.  I mean, I don't know.  I don't know

23   what his behavior was at that point.  Like I said, my

24   investigation was from that clip of the assault.

25   Q    So all that you looked at is that maybe 10 seconds of,

1  let's say 20 seconds of tape?

2  A    The -- what is it -- 15 minutes.  I watched pretty much the

3  whole 15 minutes or whatever Todd said it was.

4  Q    All right.  Now but the incident that took place at the

5  holding area wasn't 15 minutes?

6  A    No.

7  Q    Right.  That was very brief?

8  A    Right.

9  Q    And if you let me ask this, as you watched the tape and the

10  incident is taking place, do you recall that it was Mr. Hobbs

11  that stood up and allowed the other two officers to cuff and

12  take Mr. McGovern away?

13  A    I would have to see it again, but I believe so.  I mean, if

14  we didn't watch it that far in.

15  Q    All right.

16  A    Yeah, we did --

17  Q    I mean, you saw him when he was picked up?

18  A    Yeah.

19  Q    Yeah.

20  A    Yeah.

21  Q    And the part that you did see, that was a small segment.

22  It was not Mr. Hobbs that picked him up, took him to the

23  isolation room?

24  A    Yeah, I believe it was the other two that were there and he

25  stood up and he was catching his breath.

GB000366

1   Q    And although you indicate that Mr. Hobbs had his hand --

2   I'm sorry, Mr. McGovern had his hand out like this, that's what

3   you saw?

4   A    Right.

5   Q    All right.

6   A    And part of that, when they were on top of him there.

7   Q    All right.  And do you recall in Mr. or Officer Nathan's

8   statement, Nathan Meyers, he indicated that he was trying to

9   gain control of him, of his hands, specifically, which he had

10  clenched under his body.  Do you recall that in the report?

11  A    I would have to reread that part.

12  Q    Start here and end up down there.

13  A    Yeah, that's what he states.

14          MR. BOOS:  Understanding the Court's prior

15  ruling, just noting our continuing objection to the relevance of

16  the activity after the encounter.

17          THE COURT:  Thank you.  The Court does take note

18  that the other officers are not in the initial portion of the

19  scene and come in after the fact to act.

20          MR. WINGATE:  Your Honor, the purpose of that

21  question, though, was this officer testified that his arms were

22  out to his side like this.  And indicating that he had read all

23  of the reports, he has information in at least one of the

24  officer's reports, who was there and who actually put the cuffs

25  on him, telling him that they were trying to get his arms from

1    out from underneath his body.

2                    THE COURT:  Thank you.

3    Q    (By Mr. Wingate) Okay.  And just one final, just one

4    second.

5    A    Sure.

6    Q    One other question.  Once -- once Mr. -- if you recall on

7    the video, once Mr. Hobbs has stood up, there was Grant, Nathan

8    Meyers and Gumpf who were actually getting him with the

9    handcuffs on him and moving him?

10   A    Okay.

11   Q    I'm asking?

12   A    Yes, yes.

13   Q    Okay.

14                   MR. WINGATE:  Just one second, Your Honor.  No

15   further questions.

16                   THE COURT:  Thank you.  Mr. Boos.

17                       - - -

18                   REDIRECT EXAMINATION

19   BY MR. BOOS:

20   Q    Detective, can you take a look at State's Exhibit 6?

21   A    Yes, sir.

22   Q    And can you identify for the Court where in State's

23   Exhibit 6 it indicates or Officer Hobbs indicates that he

24   slipped and fell on top of inmate McGovern?

25   A    I do not see that in there.

1  Q   Detective, in your review of the video, review of the

2  reports, were any other officers witnesses to the actual taking

3  of the inmate to the ground?

4  A   Negative, nothing.

5  Q   So if you are a law enforcement officer and you hear

6  shouting and you see another officer on top of an inmate when

7  you are showing up, what is your assumption going to be?

8  A   That an altercation had occurred, and you got to help, you

9  know, secure the individual.

10  Q   And you are assuming --

11  A   You are assuming.

12  Q   -- that the individual is doing what if the other officer

13  needed to take him to the ground?

14  A   Correct, he was being resisting or resistive.

15  Q   So is it surprising that the other officers were shouting

16  stop resisting even though they didn't see the --

17  A   It is not.

18  Q   There were questions about the appropriate method to take

19  someone to the ground.  If someone is not resisting physically,

20  would there be a need to take a person to the ground?

21  A   No, there would not be.

22  Q   Was Mr. McGovern's behavior ninety minutes earlier

23  pertinent to your investigation?

24  A   It was not.

25  Q   Was his level of intoxication ninety minutes earlier

1  relevant to your investigation as to what happened at 5:32 a.m.?

2  A    It was not.

3  Q    Was how long he remained in single cell seven after this

4  offense occurred relevant to your investigation or pertinent to

5  whether an assault occurred?

6  A    It was not.

7         MR. BOOS:  No further questions, Your Honor.

8                        - - -

9                  RECROSS EXAMINATION

10 BY MR. WINGATE:

11 Q    Just a couple of questions relative to the prosecutor's

12 asking you about officers coming upon an officer on top of an

13 individual.  That's not uncommon or not unusual to say stop

14 resisting.  Do you recall asking and answering that question?

15 A    Correct.

16 Q    Right, but the reports that you have from both Meyers and

17 Gumpf didn't say that they were -- they were actually involved?

18 They indicated they were involved in trying to get his hands

19 behind his back, didn't they?

20 A    They state that.

21 Q    And that's when they were saying stop resisting?

22 A    Correct.

23 Q    Okay.  So then it had nothing to do with Mr. Hobbs on the

24 ground with the individual, right?

25 A    I can't say one way or another.  I think if you see an

1   officer saying stop resisting, you are all going to be saying

2   stop resisting.

3   Q    All right.  And when an officer says I join Hobbs in giving

4   inmate McGovern orders to place your hands behind your back, the

5   inmate resisted officers who were trying to regain control of

6   his hands, which were clenched under his body?

7   A    Okay.

8   Q    That's talking about officers, right?  Not just Mr. Hobbs?

9   A    That's three reports they wrote after the fact.

10  Q    That is Mr. Meyers?

11  A    Correct.

12  Q    Right.  And for Gumpf, he said the inmate was resisting the

13  officers, officers' efforts to handcuff him?

14  A    Correct.

15  Q    Same scenario, right?

16  A    Yes.

17  Q    More than one.  Not just Hobbs, right?

18  A    That's what it says, yes.

19             MR. WINGATE:  No further questions.

20             THE COURT:  Mr. Boos, any questions off this line

21  of questioning?

22             MR. BOOS:  No, Your Honor.

23             THE COURT:  Don't leave yet.  I'm trying to

24  think.

25             THE WITNESS:  Oh, sure.

1          THE COURT:  With regard to the video, as you

2    watch it, at the point that Officer Hobbs and Mr. McGovern are

3    not in touching distance, they are, in fact, Mr. Hobbs is

4    somewhat closing the door --

5          THE WITNESS:  Correct.

6          THE COURT:  -- to the room.  Is there any

7    activity by Mr. McGovern, verbal or anything witnessed on the

8    screen, that allows an officer to make physical contact in that

9    moment?

10          THE WITNESS:  There is not.

11          THE COURT:  So policy doesn't allow for it on the

12    verbal?  Is there an egregiousness as to what level of verbal

13    egregiousness an inmate can say to an officer that allows the

14    next contact?

15          THE WITNESS:  You got to have thick skin.  If

16    someone is calling, saying stuff to you or flipping you off,

17    it's not enough to snatch him up, so.

18          THE COURT:  Questions off my line of questioning?

19          MR. BOOS:  No, Your Honor.

20                          - - -

21          FURTHER RECROSS EXAMINATION

22    BY MR. WINGATE:

23    Q    The Court was asking the question, specifically, was there

24    any activity by McGovern as the door is closing that would

25    warrant Mr. Hobbs putting the hands on him, right?

1   A     Correct.

2   Q     And there is no audible on this video?

3   A     Just what Todd was able to pick up. I mean, he, you know,

4 Todd pointed out earlier in his testimony he was able to hear

5 them talking.

6   Q     Not at that point?

7   A     Well, they are talking about making a phone call or

8 something along those lines.

9   Q     That's prior to the door being closed and McGovern turning

10 away?

11   A     I'm confused with your question then.

12   Q     My question was at the point that the -- flipped off?

13   A     Okay.

14   Q     Whatever is said is said. McGovern turns, the door is

15 closing. Do you know if there was any other activity, is what

16 the Court was saying, by McGovern that would warrant him putting

17 his hands on him?

18   A     He was walking back to his bunk.

19   Q     Okay. But you don't know if anything else was said?

20   A     No.

21           THE COURT: And, for clarification, the Court

22 asked is there any level of egregious statement that allows the

23 contact.

24           MR. WINGATE: Okay.

25           THE COURT: Do you want to question off of that?

1           MR. WINGATE:  Yes, I have a question off of that.

2  Q   (By Mr. Wingate) Quick question.  And I'm asking this

3  because I'm hoping you can answer it.  All right.  The Court's

4  last question was relative to policy, correct?

5  A   Correct.

6  Q   And I guess what I'm asking is can or can verbal activity

7  warrant an individual being removed and put in isolation?

8  A   They can warrant where they got to go be moved into another

9  cell.  I would, yeah, absolutely.

10  Q   And, in this case, number seven was the isolation cell?

11  A   Correct.

12  Q   Okay.

13  A   But that's not necessarily saying let's grab you by the

14  back of the collar and yank you out, so.

15  Q   But you are saying it could warrant that?

16  A   It could make him have to be removed.

17  Q   Right.  And if you are removed that way, it may be a

18  violation of policy, right?

19  A   And ORC.

20  Q   And or what?

21  A   Ohio Revised Code.

22  Q   Okay.  And or assault, depending?

23  A   Right.

24  Q   Okay.  And you've concluded that it's violation of ORC?

25  A   Actually, the prosecutor's office concluded it.

1  Q    Wasn't it Officer Gumpf that filed the criminal charge?

2  A    No.

3  Q    I'm sorry.  I misspoke.  The police report, the police

4  supplemental, wasn't that filed by Sergeant Gumpf?

5  A    You are talking about the injured officer report or the

6  injured inmate report?

7  Q    No, I'm talking about the inmate report.  The police

8  report?

9  A    I filed -- I filed the criminal report.

10 Q    May I approach?  Isn't that the police report?

11 A    That's an injured inmate report.

12 Q    Okay.

13 A    That's -- that's not my police report.

14 Q    Okay.  Where is your police report?

15 A    It should be in the packet there.

16 Q    That's the one that contains all of the police reports from

17 the Toledo Police Department?

18 A    It contains everything.

19 Q    Okay.

20 A    Everything that we had.

21 Q    All right.  And includes this?

22 A    Correct.

23 Q    All right.  And you said that this is a -- let me be sure.

24 It's just called an incident report?

25 A    Right, or police report.  They are all called incident

1  reports.

2  Q    Okay.

3  A    Sometimes --

4           MR. WINGATE:  All right.  No further questions.

5           THE COURT:  Mr. Boos, anything?

6                          - - -

7              FURTHER REDIRECT EXAMINATION

8  BY MR. BOOS:

9  Q    Officer, or I'm sorry, detective, you indicated, I just

10  want to clarify that words or abusive language can justify

11  removal from the cell?

12  A    Yeah, it can have him put into another cell.

13  Q    Do they justify slamming one on one's head?

14  A    Negative, no.

15  Q    Or placing someone in a chokehold?

16  A    No, it does not.

17           MR. WINGATE:  I would object, Your Honor.  This

18  officer said that it was not -- he can't say it was a chokehold.

19           MR. BOOS:  I still can ask the question and

20  absent --

21           MR. WINGATE:  Well then I'm objecting to the

22  leading nature of your question.

23           THE COURT:  I'll allow you to ask the question.

24  You can clarify, Mr. Wingate.

25           MR. WINGATE:  Sure.

1           MR. BOOS:  And the State has no further

2   questions.

3           THE COURT:  So with regard to the Court's

4   question, and I'll let you gentlemen follow up, where there are

5   policy levels where, internally, you can decide that someone is

6   to be removed out of the general population and put into an

7   isolation room, when that occurs, what is the level of contact

8   first?  Is there supposed to be some form of verbal command?

9           THE WITNESS:  It should be able to start with

10  verbal, absolutely.

11          THE COURT:  So verbal command is your first

12  request?

13          THE WITNESS:  Uh-huh.

14          THE COURT:  The person doesn't abide by the

15  verbal command, what's the next level?

16          THE WITNESS:  Then, I mean, then you would

17  possibly do where he originally states that he put his arm there

18  and tried to guide him out.  You know, he's got a whole group of

19  guys in there and being other officers, he should have called

20  for someone to come over with him, but.

21          THE COURT:  But the first thing that we should

22  have seen was a verbal command?

23          THE WITNESS:  Correct.

24          THE COURT:  Mr. Boos, questioning?

25

1  Q  (By Mr. Boos) Do you see any attempt to guide the

2  individual out in a way that Officer Hobbs describes in the

3  report?

4  A  I do not.

5         MR. WINGATE:  I'm going to object, because that

6  is outside of the scope of the question posed by the Court.

7         THE COURT:  I think it will go to the language of

8  whether or not there is a verbal command or anything else that

9  goes out that follows policy, procedure.

10  Q  (By Mr. Boos) Do you see any of that at all?

11  A  I do not.

12         THE COURT:  Thank you.

13     Mr. Wingate, questions off of that?

14         MR. WINGATE:  Yes.

15               - - -

16            FURTHER RECROSS EXAMINATION

17  BY MR. WINGATE:

18  Q  And in response to the Court's question about words can

19  warrant removal to isolation, you said at first there is a

20  verbal command, then there is the possibility of physical

21  contact?

22  A  Possibly.

23  Q  Okay.  And my question is this.  Now, that is policy,

24  correct?

25  A  Well, you know, it's booking.  I know that they can remove

 1   them.  I don't know exactly like how their policies read in

 2   booking, so.

 3   Q    Right.  Because even though there is a policy, there may be

 4   a different --

 5   A    May be a directive to move him out.

 6   Q    I understand, but just hold off for my question.

 7   A    Sure.

 8   Q    That's the policy that you are saying should be followed?

 9   A    Right.

10   Q    But, in actuality, what happens in that booking area could

11   be something different; is that correct?

12   A    But it wouldn't warrant grabbing a guy by the back of his

13   collar and yanking him down.

14   Q    I'm sorry, what?

15   A    It would not warrant grabbing a guy by the back of the

16   collar.

17   Q    But you don't know that, do you?

18   A    Oh, yeah, I do.

19   Q    Do you?

20   A    Yeah.

21   Q    You've never been in booking?

22   A    Even in 23 years on the streets, I've never grabbed

23   somebody by the back of the neck like that.

24   Q    I understand that, but we are not talking about you.  We

25   are talking about somebody who is working in booking and dealing

1   with these individuals on a daily basis.   You have never done

2   that?

3   A    I have not worked there.

4   Q    Okay.  So you can't speak on it from any authority as to

5   what happens in booking, can you?

6   A    I cannot see that that would be appropriate.

7   Q    I understand, but that wasn't my question.

8   A    Okay.  Then --

9   Q    Then you don't have the expertise?

10   A    Then...

11              MR. WINGATE:  All right.  No further questions.

12              MR. BOOS:  Nothing additional from the State,

13   Your Honor.

14              THE COURT:  Question with regard to the

15   difference for an officer in this case where there is,

16   obviously, rules and regulations that are put in place for

17   officers that follow more the administrative code.  How does it

18   get reviewed when you are looking at that component for use of

19   force in the administrative code?  Because, obviously, we have

20   the definition of the use of force in an assault or the contact,

21   but there is also some leeway for an officer in a correction

22   setting.

23              MR. BOOS:  Right, and I think Detective Carter,

24   whether it's a correction setting or any law enforcement

25   setting, before use of force is even -- before we even get to

1 use of force, there has to be a justification for use of force.

2 And as the detective indicated, in any law enforcement capacity,

3 someone that is turned and walking away from another person,

4 there is no need or requirement to even necessitate a use of

5 force, and if there is no necessitate -- necessitation for use

6 of force, it is an assault. It is not anything other than an

7 assault if it's simply an attack, which is the State's position.

8 And I think the detective clarified that as well.

9        THE COURT: All right. Thank you.

10 Mr. Wingate, any additional questions?

11        MR. WINGATE: No.

12        THE COURT: Thank you, detective.

13 Thank you. Next witness.

14        MR. BOOS: State does not intend to call any

15 additional witnesses at this time.

16        THE COURT: Thank you. Any motion practice?

17        MR. BOOS: Just concerning State's Exhibit's 1,

18 2, 3, 4, 5, 6 and 7, confirming that those exhibits have been

19 admitted at this time.

20        THE COURT: They are moved and admitted into

21 evidence without objection at this time.

22        MR. BOOS: State would be resting at this time,

23 Your Honor.

24        THE COURT: Thank you.

25 Mr. Wingate.

1         MR. WINGATE:  Yes, Your Honor.  I have officer --

2    I'm sorry -- Sergeant Gumpf as a potential witness.  He worked

3    from 12, he goes to work at 12:00, and I spoke with him by phone

4    over the lunch break.  He could not be here this afternoon.  He

5    said he could be here in the morning.

6         MR. BOOS:  And we would just note, Your Honor, I

7    don't know if -- we have no issue with hearing the testimony of

8    that officer.  I don't think a witness list was filed in this

9    case.  He may have been on the State's witness list, but.

10         MR. WINGATE:  He was the sergeant who provided

11   the report.

12         MR. BOOS:  He is not, was not subpoenaed by the

13   State.

14         MR. WINGATE:  Right.

15         MR. BOOS:  But we would have no issue hearing

16   that testimony if the Court's --

17         THE COURT:  We have full docket tomorrow morning.

18   What time is he available?

19         MR. WINGATE:  What time do you want to start?  I

20   can call and see.

21         THE COURT:  He goes on at midnight or he's --

22         MR. WINGATE:  He was on at midnight.

23         THE COURT:  Okay.

24         MR. WINGATE:  That's when he said he went in at

25   midnight.

1          THE COURT:  Are we late enough in the day that

2     he's awake again?  I'm sorry, just --

3          MR. WINGATE:  I can call.

4          THE COURT:  I would just assume, at this point,

5     if there's just a check to see what we are looking at

6     scheduling-wise.  I have a full docket scheduled for tomorrow.

7          MR. WINGATE:  I have to use the Court's phone.

8          THE COURT:  That's fine.

9          MR. WINGATE:  Because mine is restricted and he

10    won't answer.

11         THE COURT:  Oh, no.  You are fine.

12         (Discussion held off record.)

13         THE COURT:  Detective Carter, are you okay for

14    2:30 tomorrow afternoon?

15         DETECTIVE CARTER:  Yeah, just --

16         THE COURT:  All right.  It's my understanding,

17    Mr. Wingate, you have additional witnesses that you need to

18    call.  The officer is not available by phone.  You'll be able to

19    secure him for 2:30 tomorrow?

20         MR. WINGATE:  Yes.

21         THE COURT:  Any additional witnesses after that?

22         MR. WINGATE:  No.

23         THE COURT:  Any add --

24         MR. WINGATE:  At most, there are two witnesses.

25         THE COURT:  And any additional witnesses that you

 1  wish for me to hear today that are already here?

 2              MR. WINGATE:  No.

 3              THE COURT:  All right.  Thank you.  We'll be in

 4  recess then until the trial tomorrow at 2:30.

 5              MR. BOOS:  Unless the Court would care to do the

 6  motion by Defense counsel at this time regarding --

 7              THE COURT:  Yes, that's why I asked motion

 8  practice for you when you rested.

 9              MR. WINGATE:  See you never asked.

10              MR. BOOS:  At the bench or.

11              THE COURT:  I already considered his exhibits in,

12  so when he rested and then he readmitted them, but at that

13  point --

14              MR. WINGATE:  All right.

15              THE COURT:  -- do you have any motion practice?

16              MR. WINGATE:  Yes, Your Honor.  At this time, we

17  would make a Rule 29 Motion for Judgment of Acquittal.  We do

18  not believe the State of Ohio has met its burden of proof, and

19  we would ask the Court to grant the Defendant's Motion for Rule

20  29, Motion for Acquittal, without further argument.

21              THE COURT:  Thank you.

22      And Mr. Boos?

23              MR. BOOS:  We would ask the Court to overrule the

24  motion at this time regarding the elements that the State is

25  required to prove.  The defendant was identified by each of the

1   witnesses in question, was identified by each of the witnesses
2   November 10th, 2017.  Certainly, the Lucas County Corrections
3   Center is in Lucas County, Ohio.  Regarding physical harm, the
4   State has admitted photographs of physical harm.  The defendant
5   testified that was caused by the police officer pulling him and
6   slamming him to the ground.  There are injuries to both the arm
7   and head, which are consistent with the right side of his body.
8           And for those reasons, Your Honor, in viewing the evidence
9   in a light most favorable to the State, which involves the
10  exhibit and video footage, which depict an individual walking
11  away from Officer Hobbs and then being grabbed and slung to the
12  ground, we would ask the Court to overrule the motion.
13          THE COURT:  Thank you.
14      Any additional argument, Mr. Wingate?
15          MR. WINGATE:  No.
16          THE COURT:  Motion for Rule 29 is found not
17  well-taken, same is hereby denied.  I do believe the State has
18  met its prima facie burden to present the case and continue.
19  Thank you.
20          MR. WINGATE:  Thank you.
21          THE COURT:  All right.  We are in recess.
22      (Proceedings concluded at 4:13 p.m.)
23                  - - -
24
25

1

2

3

4          C E R T I F I C A T E

5

6          I, THE UNDERSIGNED, HEREBY CERTIFY

7   THAT THE ABOVE AND FOREGOING IS A TRUE

8   AND COMPLETE TRANSCRIPT OF THE PROCEEDINGS

9   HAD IN THE TRIAL OF THE ABOVE-ENTITLED CAUSE.

10

11

12

13         _____
           Diana M. Ziegelhofer, RPR
14         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

# IN THE COURT OF COMMON PLEAS OF LUCAS COUNTY, OHIO

STATE OF OHIO,          )

        Plaintiff,     )

      vs.          ) Case No. CR0201703023

LAMONTE HOBBS,      ) Hon. Stacy L. Cook

        Defendant.    )

- - -

## TRANSCRIPT OF PROCEEDINGS

BE IT REMEMBERED, that the above-entitled cause came on for bench trial before The Honorable Stacy L. Cook, in Courtroom Number 6, in the Lucas County Court of Common Pleas, on the 26th day of June, 2018. The following proceedings were had, to wit:

## VOLUME II OF IV

APPEARANCES:

          On behalf of the State of Ohio:

            JULIA R. BATES, Prosecuting Attorney
          By: Brian O. Boos, Assistant Prosecuting Attorney

          On behalf of the Defendant:

            Ronnie L. Wingate, Esquire

GB000388

1                           I N D E X

2

3    WITNESS                    DX        CX        RDX       RCX

4    State's case in chief:

5      TODD REED                7/3       21/14     32/20     33/21
                                                    35/24     --
6      TIMOTHY MCGOVERN         39/17     48/24     72/13     74/6
       DAVE CARTER              76/12     80/19     97/21     99/12
7                                                   --        101/24
                                                    105/11    107/19
8    Rebuttal witness:

9      DAMON SMITH              206/22    212/7     220/13    222/1
                                                    223/5     223/14
10                                                  226/8     --

11   Defendant's case in chief:

12     MARK GUMPF               118/24    131/6     139/19    145/22
                                                    147/19    148/20
13                                                  149/10    --
       LAMONTE HOBBS            156/14    170/13    187/16    194/14
14                                                  198/6     201/23
                                                    203/25    --

15

16                             - - -

17                    E X H I B I T S

18   State's Exhibits           ID        OFF       OBJ       ADM

19     1  (photograph)          30/13     44/25     --        45/6
       2  (photograph)          30/14     44/25     --        45/6
20     3  (photograph)          30/14     44/25     --        45/6
       4  (photograph)          44/20     44/25     --        45/6
21     5  (photograph)          44/20     44/25     --        45/6
       6  (report)              8/18      9/6       --        9/11
22     7  (DVD)                 12/12     13/4      --        13/7

23   Defendant's Exhibits

24     (No defense exhibits)

25                             - - -

1          (Proceedings commenced at 2:36 p.m.:)

2          THE COURT:  We are back on the record today.

3    State of Ohio versus Lamonte Hobbs.  My understanding that --

4    you can be seated, Mr. Hobbs.  My understanding is that we have

5    an additional witness that we'll put on today since we brought

6    him down.

7        How are you?  And come forward and be sworn in.

8          THE WITNESS:  Okay.

9          THE COURT:  We'll just put on your testimony

10   today since we already brought you down here today.  I don't

11   want to have to do this twice.

12          THE WITNESS:  Okay.

13                    - - -

14        Thereupon, the Defense, in order to maintain the

15   issues on their part to be maintained, called as a witness,

16                    MARK GUMPF,

17   who, having been duly sworn as provided by law, testified and

18   said as follows:

19                    - - -

20          THE COURT:  Thanks for coming down on such short

21   notice.  I appreciate it.

22          THE WITNESS:  That's okay.

23                    - - -

24              DIRECT EXAMINATION

25

1  BY MR. WINGATE:

2  Q    Would you state your name for the record, please.

3  A    Mark Randall Gumpf.

4  Q    And how do you spell the last name?

5  A    G-U-M-P-F.

6  Q    All right, and Sergeant Gumpf?

7  A    Yes, my position at Lucas County is I'm Sergeant at

8  midnight booking.

9  Q    All right.  So you are employed by Lucas County Sheriff's

10  Department?

11  A    Yes, sir.

12  Q    And how long have you been employed with the Lucas County

13  Sheriff's Department?

14  A    Almost 24 years.

15  Q    All right.  And are you currently -- where are you

16  currently assigned?

17  A    I am the midnight booking sergeant, the third shift.

18  Q    Okay.  And how long have you been a sergeant at the booking

19  assignment?

20  A    Almost six years.

21  Q    Now are you familiar with an individual by the name of

22  Lamonte Hobbs?

23  A    Yes.

24  Q    Okay.

25  A    Lamonte Hobbs, yes.

1   Q    And how are you familiar with Mr. Hobbs?

2   A    I've known Lamonte for 24 years through his brother, and he

3 was an officer in the booking section.

4   Q    Now as it relates to Mr. Hobbs, did you have -- were you

5 employed as night sergeant on November the 10th of 2017?

6   A    Yes, I was.

7   Q    All right. And did you have an occasion to see Mr. Hobbs

8 on November the 10th, 2017?

9   A    Yes, all night.

10   Q    All right. And was there an incident that occurred at the

11 Lucas County Correctional Center that night in the booking area?

12   A    Correct. Roughly, this would be in the morning, but yes,

13 on the 10th. Yes, sir.

14   Q    All right. The morning of the 10th?

15   A    Yes, that would be the morning on the 10th.

16   Q    November the 10th, 2017. Approximately, do you recall the

17 time?

18   A    About 0530. And the only reason I bring it up is because

19 our shift, technically, is considered the 9th.

20   Q    All right.

21   A    But it was the morning of the 10th, so.

22   Q    All right. Would you tell the Court -- strike that. Did

23 you have an occasion to observe any part of this incident?

24   A    I saw the end of the incident that you are talking about

25 with --

1    Q    All right.

2    A    -- with Officer Hobbs.

3    Q    All right.  And would you -- are you familiar with an

4    individual by the name of Timothy McGovern?

5    A    Very much so.

6    Q    All right.  And how are you familiar with him?

7    A    He was an inmate that was -- well, became an inmate that

8    was brought into the jail for, I believe, DC intox and a few

9    other things.

10   Q    All right.

11   A    And the whole time, he was very disruptive and a very

12   agitated individual.

13   Q    All right.  Now as it relates to the incident that

14   occurred, who was involved in the incident that you witnessed?

15   A    When I saw the incident, it was the inmate, himself, CO

16   Hobbs, CO Meyers and I believe DS Grant, Deputy Sheriff Grant.

17   Q    And as it relates to the incident, what did you observe?

18   What did you see?

19   A    As I came around the corner, I turned to the right because

20   I could hear the commotion and the yelling.  I saw the CO Hobbs

21   and Meyers on the ground trying to handcuff the inmate, Timothy,

22   who was resisting their efforts to handcuff him.

23   Q    Now as it relates to that incident, was the individual

24   handcuffed, Mr. McGovern, subsequently handcuffed?

25   A    Eventually, he was handcuffed.

1  Q    And where was he taken?

2  A    To a single cell.

3  Q    All right.  Now as it relates to that incident, did you

4  have an occasion to review a video of that incident?

5  A    Yes, I -- I was actually able to review the incident.

6  Q    And as a result of that incident, were the officers

7  involved required to follow a report, an incident report?

8  A    Yes, they had what we would call a CO report, a corrections

9  officer report.

10 Q    Now as it relates to your responsibilities as a sergeant in

11 the booking area, what are your responsibilities and duties?

12 A    I am to insure that the officers, you know, one, perform

13 their duties, and I'm responsible, I'm overall responsible for

14 the safety and welfare of the inmates in insuring that no inmate

15 escapes or harms other inmates or officers while they are there.

16 Q    All right.  Now as it relates to your being the sergeant of

17 the night shift, and specifically, we are talking about November

18 the 10th of 2017, did you allow your officers to remove a

19 disruptive or uncooperative or disrespectful inmate to be placed

20 in an isolation cell?

21 A    Into a single cell, that is correct.

22 Q    Yes.  Now as it relates to the report, we are going to --

23 A    Okay.

24 Q    -- back to the report of Mr. Hobbs, the incident report

25 that he filed.  You indicated that you did see the incident on

1   the video, correct?

2   A    I did review it later, yes.

3   Q    All right.  And was that report consistent with what was

4   seen on the video?

5               MR. BOOS:  Objection with respect to which

6   report.

7               MR. WINGATE:  The incident, the report of --

8   incident report of Mr. Hobbs.

9               MR. BOOS:  Okay.  So the question is is

10  Mr. Hobbs' report consistent with what this witness has seen on

11  the video?

12              MR. WINGATE:  That is correct.

13              THE WITNESS:  Correct.

14              MR. BOOS:  Okay.  He's answered that he read

15  Hobbs' report?

16              MR. WINGATE:  Yes.

17              THE WITNESS:  Yes.  Okay, now, they didn't match

18  up correctly.

19  Q    (By Mr. Wingate) All right.  And as a result of that, did

20  you take a statement from Mr. Hobbs?

21  A    When I -- well, you've got me a little confused.  I had his

22  report prior to reviewing the incident.

23  Q    All right.  You had his report.  Did you ask -- did you

24  write a report as a matter of fact?

25  A    Yes, I did write a report.

GB000395

1    Q    Okay.  And, in that report, did you take a statement from

2    Mr. Hobbs as to what happened?

3    A    I took his report, yes.

4    Q    All right.  And what did he tell you had occurred?

5              THE COURT:  Let me just get clarification.  Did

6    you take a separate statement or did you just read his report?

7    A    It's not -- I'm a little confused.  I read his report.  I

8    had already -- he had already explained the incident to me, and

9    then, that night, because it was a three-day weekend, I took his

10   report that night.  I did not review any of the stuff until

11   later in the weekend.  It sounds like I reviewed it that night.

12   I did not review the tape that night.

13   Q    (By Mr. Wingate) Okay.  I understand.

14             THE COURT:  So there is a verbal and a written?

15             MR. WINGATE:  Yes, exactly.

16             THE WITNESS:  Yes, they are both, Your Honor.

17             MR. WINGATE:  Yes.  That was my question.  That

18   would have been my next question.

19             MR. BOOS:  We can clarify.  There is a written

20   report by Hobbs, and there is a -- your summary, I apologize, of

21   Hobbs, what he told you?

22             THE WITNESS:  Correct.

23             MR. BOOS:  That's in your report?

24             THE WITNESS:  That is correct.

25   Q    (By Mr. Wingate) And now, and when we talk about your

1    report --

2    A    Right.

3    Q    -- what I'm asking is you did a summary of what you saw --

4    A    Correct.

5    Q    -- in your report; is that correct?

6    A    Correct.

7    Q    And you also have a paragraph whereby you start by saying

8    when I asked Hobbs what happened.  So you took a verbal

9    statement from him?

10    A    Yes, I did.

11    Q    Okay.  All right.  Now and what did he tell you in that

12    verbal statement?

13    A    That he had -- was down, initially come down, because he

14    was assisting the rounds officer what he believed or thought was

15    going to be an unruly inmate, another inmate.  He was down

16    there.

17    Q    Now let me stop you.  When you say another inmate, you are

18    not talking about McGovern?

19    A    I am not talking about McGovern.

20    Q    All right.

21    A    Another inmate.

22    Q    All right.  And --

23    A    And he was down there and he was assisting her.  I believe

24    McGovern asked for a phone call or asked something from CO Hobbs

25    or what was going on.  He stated that he had been verbally

1  abusive and used the N word.  I quote.  I believed he said he
2  called him a nigger, and that he felt the tank, he was going to
3  disrupt the tank.  He was disruptive in the tank.  He was going
4  to remove him from the tank when the incident happened.
5  Q    All right.  And did he tell you what occurred as he was
6  removing him from the tank?
7  A    He told me he went to grab him and then they were pulling
8  him out of the tank and then he had fallen.
9  Q    All right.  Now, and if I gave you your report, would that
10  refresh your recollection as to --
11  A    Correct, it would be a lot better -- thank you -- to what
12  he told me.
13  Q    Yes.  Just read the report to yourself, though.
14  A    He said he tried to move -- correct.  He resisted his
15  efforts to pull him out of the tank.
16  Q    All right.  Now let me ask this question, all right.  When
17  you used the term fall, he fell?
18  A    Correct.
19  Q    Now that's not in your report; is that correct?
20  A    Correct.  It's not in there.
21  Q    All right.  Are you sure that that was the word, term, that
22  was used by Deputy Sheriff Hobbs that night talking to you?
23  A    All I can tell you is I believe that happened the morning
24  November 10th.  We are now in June.  So, I mean, yes, I believe
25  that's the term he used.

1  Q    All right.  Now and you've indicated that to the Court.

2  Now are you familiar with any other policy that governs physical

3  contact between a deputy sheriff and an inmate?  Are you

4  familiar with any written policy?

5  A    As in what are you trying to get at?  I mean, is this --

6  Q    Any policy that's written as it relates to over at the

7  Lucas County Corrections Center?

8  A    Correct, we have a use of force policy.

9  Q    Okay.  And now are you familiar with the policy?

10  A    I would say yes.

11  Q    All right.  Now let me ask this.  Do you consider a deputy

12  sheriff removing an inmate to the isolation cell a use of force?

13  A    As in if he touches them?

14  Q    Yes.

15  A    Actually grabs them, takes them.  It depends.  And I'm not

16  trying to be vague, but it depends on the situation.  If he

17  tells him and grabs him and pulls him over and the inmate walked

18  right over to him, I don't believe that's a use of force.  If

19  the inmate resists any time, I believe we are now into a force

20  issue.

21  Q    All right.  Now you stated earlier that, well, let me ask

22  this.  Do you require your deputy sheriffs to come to you when

23  they are going to remove an individual and take that individual

24  to isolation?  Do you require that they come to you?

25  A    No, not on every incident, no.  My point is, and I'll use

1    an example, if I'm in the back in my office, which is clearly in

2    the back, and a situation breaks out and they got to get him

3    moved, they need to move him.

4    Q    Okay.

5    A    We don't -- so it doesn't escalate.

6    Q    Okay.  Now as it relates to that policy that you just

7    stated, as far as they don't have to come see you?

8    A    Right.

9    Q    Had you conveyed this information to the deputy sheriffs

10   that would be under you on the night shift?

11   A    Yeah, the officers know this.

12   Q    Okay.  And would that include detective -- I'm sorry, not

13   detective, Deputy Sheriff Hobbs?

14   A    It would.  CO Hobbs, yes, it would have.

15   Q    Okay.  Now as it relates to the incident that you

16   witnessed, did you see any injuries on the person of

17   Mr. McGovern?

18   A    Yes.  On his --

19   Q    And how would you describe those injuries?

20   A    The term that I would use is strawberry rug burn.

21   Q    All right.  And do you know how you would receive a

22   strawberry or rug burn?

23                    MR. BOOS:  Objection.

24                    THE COURT:  I'll sustain the objection.

25

1  Q    (By Mr. Wingate) Have you ever had any rug burns on you?

2  I'm sorry, not a rug burn, strawberry on you?

3  A    Yes.

4  Q    Have you ever incurred any scrapes as was seen on

5  Mr. McGovern on you?

6  A    Yes.

7  Q    And how did you receive those scrapes on your person?

8  A    Sliding.

9  Q    Now you had an opportunity to look at that videotape; is

10  that correct?

11  A    That is correct.

12  Q    And based upon your review of that videotape, do you have,

13  did you come to a conclusion as to how Mr. McGovern received

14  those injuries on his head and forearm?

15              MR. BOOS:  Objection.

16              THE COURT:  I'll allow.  I'll allow just what he

17  saw.

18  A    What I saw is the other officers jumping in to help him and

19  they slid.

20  Q    All right.  And what is the floor made of in the booking

21  area?

22  A    Concrete, I believe.

23  Q    And you are saying you observed a slide when the other

24  officers became involved in this?

25  A    I saw when the last officer, I believe, came in.

1  Q    Now as a result of the injuries that you observed, did you
2  require anything to be done?

3  A    The nurse was called to come and check him.

4  Q    And do you know what medical assistance was applied by the
5  nurse?

6  A    I believe cream and a Band-Aid or, I mean, a bandage.  I
7  can't remember.

8            MR. WINGATE:  Just one second.

9  Q    All right.  All right, sergeant, after reviewing, how many
10  times have you seen that video?

11  A    I have seen it at least four times.

12  Q    All right.  And on the night of November 10th, this would
13  be after Mr. Hobbs has left for the day and returned, all right.
14  You had an opportunity to review the tape?

15  A    I didn't review it that day at all.

16  Q    All right.  When you did review it, did you have an
17  opportunity to talk to Mr. Hobbs?

18  A    He was still working with us.

19  Q    All right.  And my question is this.  Based upon your
20  review of that tape, did you indicate to Mr. Hobbs that he had
21  done nothing wrong?

22  A    I don't feel -- is what I was trying to explain to you -- I
23  don't feel that his intent was ever to hurt or harm that inmate
24  at all.

25            MR. WINGATE:  No further questions.

MR. BOOS:  I would object to the relevance of this officer's --

THE COURT:  I will sustain the objection. Mr. Boos.

- - -

CROSS EXAMINATION

BY MR. BOOS:

Q    How do you know, sergeant, how do you know Officer Hobbs outside of work?  You said you have known him 24 years?

A    Through his brother.

Q    All right.  What does it mean through his brother?  Are you friends with his brother?

A    His brother was a deputy at our department who eventually passed away I think in '98 or '99.

Q    Are you a friend of officer, Corrections Officer Hobbs?

A    I've known -- I would say friends, but I don't -- we don't hang out out of work or anything.

Q    You talked about McGovern, inmate McGovern, being disruptive, combative the entire time he was there.  Is that accurate?

A    Yes, I would say he's a very aggressive inmate.

Q    What happens when inmates are aggressive, disruptive, combative?  What needs to be done with those inmates as would be contrasted with normal inmates?

A    We can put him into single cells.

1  Q    Okay.  But inmate McGovern was not in a single cell at

2  5:32?

3  A    No.

4  Q    And if he was combative and disruptive, wouldn't he have

5  already been in a single cell at 5:32 a.m.?

6  A    Correct.

7  Q    Okay.  So at 5:32 a.m., he was not combative and disruptive

8  enough to already be in a single cell; is that correct?

9  A    Correct, correct.

10  Q    Okay.  Because you testified the entire duration he was

11  there he was combative, disruptive?

12  A    Okay.  Let me clarify that because, clearly, I didn't do it

13  well enough.  When he came into the booking counter, he was

14  aggressive and very --

15  Q    But you testified the entire time he was there?

16              MR. WINGATE:  Your Honor, I'm going to object.

17  A    Okay.

18              MR. WINGATE:  I'm going to object and ask that he

19  be allowed to finish.

20              THE COURT:  I understand your line of

21  questioning, Mr. Boos.  I'll let you go ahead with that and let

22  you just go ahead with your statement.

23  A    Yes, he was put in right after.  He was in the detox

24  because he was drunk, the detox tank, tank number one, where he

25  was banging and stuff, but he was calming down and put back in

1   the de-- in tank number or west D.  I would clarify that he

2   was -- let's just say that he was loud and into the night and,

3   at points, he did calm down.  So I need to clarify that.  I was

4   incorrect what I was saying.  He had calmed down.

5   Q    Okay.  Thank you for clarifying that.

6   A    Yes.

7   Q    You talk about an inmate.  There is an officer force issue

8   you characterize, and that occurs when an inmate resists an

9   officer?

10  A    Correct.

11  Q    Okay.  You've reviewed the video four times at just before

12  5:33 a.m.  Do you see any point where the inmate physically

13  resists the officer?

14  A    No.

15  Q    So, based on your characterization, this would not be an

16  officer force issue because you've acknowledged you viewed this

17  video and you don't see a single moment prior to being on the

18  ground where the inmate resists the officer?

19  A    Correct.

20  Q    Are you a medical expert?

21  A    Am I?  No, I'm not a doctor or a nurse.

22  Q    Okay.  And can you direct your attention to State's

23  Exhibit's 2 and 3.  Do you see the person depicted in those

24  exhibits?

25  A    Correct, I do.

1  Q    And you're -- who is the person in those exhibits?

2  A    This is Mr. McGovern.

3  Q    Okay.  Your testimony is that that injury is a result of

4  rug burn?

5  A    Yes, in my opinion, yes.

6  Q    Your opinion?

7  A    My opinion.

8  Q    Okay.  And not the -- not a result of his head slamming

9  against a doorjamb?  That's your opinion?

10 A    Correct.

11 Q    Is that -- that's a rug burn?

12 A    Correct.

13 Q    Okay.  And, officer, I'll play the video.  If you don't

14 mind, can you see the screen here, and I'll ask you to identify

15 the portion where you are able to see.

16 A    Can I come over here?

17 Q    Yes, absolutely.  I'll ask you to identify the portion

18 where you are able to identify with confidence that you see his

19 head scrape the ground in a fashion that would cause rug burn.

20 Are you comfortable watching the exhibit again?

21 A    Yeah, I'm fine with it.

22 Q    Okay.

23           MR. BOOS:  And while we are waiting for the disk

24 to cue up, may I question the witness while he's seated over

25 here, Your Honor?

GB000406

1          THE COURT:  Yes, go ahead.

2   Q   (By Mr. Boos) While we are waiting for this, you testified

3   today that Hobbs told you he fell to the ground.  That's what he

4   told you?

5   A   Correct.

6   Q   But that's not what you put in your report.  You

7   acknowledge that's not in the report you wrote --

8   A   Correct.

9   Q   -- about what Hobbs told you.  Okay.

10          (DVD exhibit played in open court.)

11  Q   Okay.  I'll start it over because it didn't sync up.

12          (DVD exhibit played in open court.)

13  Q   And, again, when you see, when you are able to see the part

14  where he gets the rug burn on his head, please note that.

15          (DVD exhibit played in open court.)

16  Q   Okay.  So, again, you can resume the witness stand.  Did

17  you have an opportunity to view the video?

18  A   Correct, the only time I believe it could happen is they

19  are sliding outside the door.  But like you said, I'm not a

20  medical expert.

21  Q   So you are opining now that it could have possibly happened

22  as they are sliding outside of the door?

23  A   Yes, it could have.

24  Q   Okay.  You were not present when the physical contact was

25  initiated between Hobbs and McGovern?

1  A    No, sir.  I was not.

2  Q    Okay.  You came in the aftermath?

3  A    Correct.

4  Q    Okay.  Well you were asked a question about if you thought

5  you were asked a question if you -- you told, is that accurate,

6  you told Officer Hobbs you didn't think he did anything wrong.

7  And, as a corrections officer, is that your testimony that you

8  don't believe Hobbs, in this manner, did anything wrong?

9  A    No, that's not what I said.  I'm talking about his intent

10  to harm the inmate is what I'm talking about.  That's not what I

11  was talking about.

12  Q    The question was did you believe he did anything wrong I

13  believe was what you were asked.

14  A    Okay, then --

15  Q    You told him you didn't think he did anything wrong?

16  A    What I'm saying is was it his intent to take the inmate

17  down or anything?  Do I believe he was trying to hurt the

18  inmate?  No, that's what I'm trying to relay.  I'm not saying

19  the whole situation is -- I think what you are trying to get

20  out.

21  Q    And you are basing that intent on what?  What are you

22  basing this opinion on?

23  A    It's based on experience and seeing other officers dealing

24  with inmates who have gotten in trouble.  What I'm saying is

25  he's -- did he need to pull him out, probably not, but I'm not

1 saying he's trying to slam him to the ground, bang his head or
2 punch him or do anything to cause physical harm is what I'm
3 trying to get at.

4 Q    Okay.  So we are clear, your testimony is that you believe
5 he did not need to get him out of the pod that he was in?

6 A    Based on the video that I've seen, and now this is the
7 fifth time, you could have just shut the door.

8 Q    Okay.

9 A    I understand what his intent was, but he could have just
10 shut the door and walked away.

11 Q    Okay.  That's number one.  Number two, it's your testimony
12 that grabbing someone from the collar and slamming them onto the
13 concrete floor, there is no intent to cause physical harm?
14 That's your opinion?

15 A    I feel like I'm getting worse.  I don't -- what I'm trying
16 to say is I believe he's trying to pull him out.  From there,
17 they slammed onto the ground.  I don't think, in his mind, he is
18 going to try to slam his head on the ground and hurt him is what
19 I'm trying to say.  Maybe I can't get into his mind.  I'm
20 thinking with his mind.  I'm not saying it correctly.

21 Q    Thank you.  You can't get into his mind?

22 A    Thank you.  That's correct.

23            MR. BOOS:  Thank you.  No further questions.

24            THE COURT:  Let me just ask you a question with
25 regard to the grabbing by the collar.  Do you see that -- you

1  see that as part of policy?

2        THE WITNESS:  No, Your Honor.

3        THE COURT:  So let's forget the head.  Let's

4  forget the cement.

5        THE WITNESS:  Right.

6        THE COURT:  Let's go with the first physical

7  contact with the body.

8        THE WITNESS:  No, and, in the policy, is he could

9  have, because he moved away from him, he wasn't aggressive, he

10  could have just shut the door and let it go.  That's the point

11  we are saying it didn't sync up and that's -- and I see that's

12  where he's coming from.  That's what I'm trying to get at.

13        THE COURT:  Yes, and but that's the first

14  contact.

15        THE WITNESS:  Correct.

16        THE COURT:  When you have the ability as a

17  correction officer or guard, which clearly you are in situations

18  that you do have to make contact with inmates, there's a

19  timeframe.  And, obviously, sometimes, in a quick scenario, you

20  have to make a decision as to making that physical contact with

21  the person.  So I understand the policy accounts for that.

22        THE WITNESS:  Yes, Your Honor.

23        THE COURT:  But, in this situation, that physical

24  contact, did it meet any of the standards for a corrections

25  officer for that initial contact?  Don't take me to the

1   slamming.  Don't take me -- get me to that initial contact.

2                   THE WITNESS:  No, based on the thing, you would

3   just shut the door and walk away.  And I'm not --

4                   THE COURT:  And I guess --

5                   THE WITNESS:  -- trying to read into anything.

6                   THE COURT:  I know we are putting you in an

7   awkward situation, but when you are reviewing just step-by-step

8   elements, and not to take away from the fact that people

9   probably had their level of dealing with this guy on that

10  particular night, but in terms of what when the first contact is

11  made?

12                  THE WITNESS:  Correct.  The door could have been

13  shut and walked away.

14                  THE COURT:  All right.

15      Line of questioning off of that line of questioning,

16  Mr. Wingate?

17                  MR. WINGATE:  Yes.

18                      - - -

19                  REDIRECT EXAMINATION

20  BY MR. WINGATE:

21  Q    Now, as it relates to that, what the Court is asking of you

22  about the initial contact, now you are looking at it from the

23  video; is that correct?

24  A    That's correct.

25  Q    And based upon what you've told us through your testimony,

1   you've given the officer the discretion as to when an individual

2   should be removed for being disruptive or being disruptive,

3   uncooperative, or disrespectful; is that correct?  You give that

4   option to the officer whereby an individual officer could remove

5   a person and put him in isolation?

6   A    Correct, if he's being disruptive and causing a problem.

7   Q    All right.  And as far as you can see, under the

8   circumstances of the video, you can conclude that he could have

9   just closed the door; is that correct?

10  A    That is correct.

11  Q    All right.  But you also told the prosecutor that, hey, I

12  can't look into his mind; is that correct?  What you told the

13  prosecutor?

14  A    I did.  I told him that.

15  Q    And you don't know the circumstances that were going on

16  between Mr. Hobbs and Mr. McGovern; is that correct?

17  A    Correct.

18  Q    And based upon what you've said, if, in his discretion, he

19  determined that this individual was being disrespectful,

20  uncooperative, disruptive, then he had the -- within his

21  discretion -- the right to remove that individual and put him in

22  isolation; is that correct?

23  A    Correct.

24              MR. BOOS:  Objection.  I'd say that's a fairly

25  leading question.

```
 1              THE COURT:  Let me just review the question.
 2              MR. BOOS:  He's testifying for the witness.
 3              THE COURT:  With the bench trial, I can make it
 4    through it.  I'll overrule.
 5    A    If the inmate is being disruptive?
 6    Q    Yeah.
 7    A    As in what you are trying to tell me, yes.  He has the
 8    discretion to remove him without asking me if it's going to
 9    cause a problem.
10    Q    All right.  Now the prosecutor asked you about whether or
11    not you had any medical training; is that correct?
12    A    That is correct.
13    Q    All right.  Did you have any medical experience while in
14    the military?
15    A    Correct.  When I was with the paratroopers and the rangers,
16    I was certified as a combat medic lifesaver.
17    Q    Okay.  And as it relates to a football player, you've had
18    experiences with what we call strawberries and or rug burn?
19    A    That is correct.
20    Q    All right.  And when you talk, even though you use the term
21    rug burn, are you making -- are you making reference to the
22    floor of the Lucas County booking area?
23    A    Correct.
24    Q    All right.  And that floor, as you testified earlier, is
25    concrete?
```

1  A    Correct.

2  Q    All right.  So it wouldn't be a rug burn, but it would

3  be -- is the term rug burn generic?

4  A    Correct, I -- I do believe it was first similized for

5  artificial turf, but yes, it's for anything rubbing on a carpet

6  or anything like that, I believe.

7  Q    All right.  And based upon your opinion, if skin rubbed on

8  the concrete, it would create this scraping or strawberry or rug

9  burn that you see on Mr. McGovern?

10  A    I believe it could.

11  Q    Now you said you watched the video at least five times?

12  A    This is the fifth time.

13  Q    With today, right.  Did you ever see Mr. McGovern's head

14  hit the doorjamb at any time of viewing those five showings?

15  A    I know he was taken to the ground.  What I'm trying to say

16  is at any time the head could have hit the ground.  I'm not one

17  hundred percent sure, even watching.  I mean, I would have to go

18  down and break it down slow motion.

19  Q    Okay.  I understand that, but the question I'm asking, the

20  prosecutor referenced his head banging against the door.  Did

21  you ever see that, the doorjamb?

22  A    I believe the prosecutor asked me did I see it hit the

23  doorjamb, could it hit the doorjamb.  I'm not one hundred

24  percent.

25  Q    No, I don't think he said could, okay.  He said that the

GB000414

1  injuries were not from his head banging on the doorjamb.  Do you

2  recall him asking you that question?

3  A    Correct.

4  Q    All right.  Now my question to you is did you ever see, of

5  those five times, his head hit the doorjamb?  That's what I'm

6  asking.

7  A    No, they are close to it, but I didn't see it.

8  Q    All right.  Now the prosecutor asked you questions about

9  the report that Mr. Hobbs had given you, CO Hobbs had given you;

10  is that correct?

11  A    Correct.

12  Q    Do you recall him asking you those questions?

13  A    Correct.

14  Q    When did you tell Mr. Hobbs to write an incident report?

15  A    I told him we'll come back in tonight.  We are not staying

16  overnight to write the report, because I can't turn them in

17  until Monday.

18  Q    All right.  So that would have been in the morning when he

19  was leaving?

20  A    Correct.

21  Q    You told him write it when he came back?

22  A    Correct, we are going to be writing reports.

23  Q    The prosecutor also asked this question about officer

24  force, and he said to you that you had reviewed the tapes, and

25  at no time prior to him being pulled out of the cell or that

1  holding area did you see any resistance.  Do you recall the

2  prosecutor asking you that question?

3  A    He was asking me why wasn't he in a single cell if he was

4  combative and aggressive all night.  That's not correct.  Am I

5  correct on that?

6  Q    He asked you all of that?

7  A    Right.

8  Q    But then he also asked about resisting, okay.  And he said

9  to you that at no time prior to him being yanked or pulled out

10  of the cell did you see any resisting; do you recall that

11  question?

12  A    Yeah, I -- I'm not quite grasping what you are trying to

13  get at.

14  Q    Well, I haven't asked my question.  I'm just trying to ask

15  you --

16  A    Okay.

17  Q    -- do you remember him talking to you about that?

18  A    Okay.

19  Q    All right.  Now at the time that he was yanked out of the

20  cell, at that moment, did you see resisting?

21  A    When he pulled him out?

22  Q    Yes.

23  A    No, he pulled him out.

24  Q    And he was walking away?

25  A    He turned his back and was walking.

1  Q    All right.  And, again, as it relates to the determination

2  to pull him out, that would have been the discretion of

3  Mr. Hobbs under those circumstances at that time?

4  A    Under the circumstances that you and I related.

5  Q    Okay.

6  A    That's he's being --

7  Q    Let me ask this question.  Did -- are you aware if

8  Mr. Hobbs had watched the video any time before writing his

9  report, if you know?

10  A    I don't believe he did.  I'm not one hundred percent sure.

11          THE COURT:  Mr. Boos, is there a way to hear the

12  actual language that's being said or is that not something that

13  we can hear on the tape?

14          MR. BOOS:  Your Honor, no.  I think the audio you

15  can hear some of the shouting, but the conversation that led up

16  to, as the first witness testified to, bits and pieces, but not

17  the -- and it may have to do with him going back in as to what

18  was ultimately said.

19          THE COURT:  Thank you.

20          MR. WINGATE:  No further questions.  I'm sorry.

21                    - - -

22              RECROSS EXAMINATION

23  BY MR. BOOS:

24  Q    Sergeant, are you familiar with a, if you know, is there

25  any policy regarding retreat in existence for corrections

1 officers at the county jail?

2 A    Very much so.

3 Q    What is that policy?

4 A    The policy says you can, for an incident, the best thing is

5 to retreat out of the situation instead of having a

6 confrontation is basically what it is.

7 Q    Okay.  So would an example of that be when an inmate is

8 walking away, back turned, walking back into a pod?  That would

9 be an example of a time where a retreat should be used?

10 A    Yes, sir.

11 Q    Okay.  And that's the policy that is in existence at the

12 Lucas County Jail?

13 A    That is correct.

14          MR. BOOS:  No further questions.

15          MR. WINGATE:  No further questions.

16          THE COURT:  Thank you.

17 Officer, with regard, and somewhat in a follow-up of that

18 statement.  Obviously, there are times when correction officers

19 and deputy sheriffs have to give a directive for an inmate to do

20 something.  Is there some directive or policy that says if they

21 give a verbal directive, and I'm not talking about in situations

22 of acts of violence, protecting self or others, but just a

23 verbal directive, if the person ignores the verbal directive, is

24 there something told to the officers that they can make physical

25 contact at that point?

1            THE WITNESS:  If they -- and I know this is what

2   happens a lot upstairs in the jail that you are supposed to.  If

3   they don't, at that point, if they are not being aggressive or

4   anything and not following directive, orders, you are supposed

5   to get a hold of sergeant and, at that point, he'll do the

6   lockdown if he has to.  He'll make the determination what kind

7   of force is needed at that time.

8            THE COURT:  So if somebody is being verbally

9   disrespectful, they are told to cease and desist that behavior,

10  the next contact wouldn't be physical contact?

11           THE WITNESS:  Unless if they made it a physical

12  contact situation.

13           THE COURT:  Right.

14           THE WITNESS:  Like you said, doesn't pertain to

15  it.

16           THE COURT:  Questioning off my line of

17  questioning?  Mr. Wingate first.

18                      - - -

19           FURTHER REDIRECT EXAMINATION

20  BY MR. WINGATE:

21  Q    Now, as it relates to the question that the Court just

22  asked you, about a verbal directive that's being ignored,

23  correct?

24  A    Correct.

25  Q    Do you recall her asking you that?  Your response was up on

1   the floor.  That's the way you responded to her question as to

2   what would occur upon second, third, fourth, fifth, sixth floor;

3   is that correct?

4   A    Correct.

5   Q    All right.  As far as booking, if a verbal command is given

6   and the inmate is uncooperative, the inmate is disruptive, and

7   the inmate is disrespectful, you said that a CO could then put

8   his hands on that inmate to take them to isolation; is that

9   correct?

10  A    In booking, if an inmate is, like you said, disruptive,

11  being aggressive --

12  Q    Uncooperative?

13  A    -- uncooperative, he would be moved to a single cell.

14  Q    Okay.  And that is within the discretion of that officer at

15  that time?

16  A    If it needs to be, because you've got to make a snap

17  decision, and I'm not there.  Yes, you can.

18  Q    Okay.  Thank you.

19                            - - -

20                  FURTHER RECROSS EXAMINATION

21  BY MR. BOOS:

22  Q    Correct me if I'm wrong.  I don't remember you saying there

23  was a discretion to put his hands on someone.  Mr. Wingate said

24  put his hands on, but the first step would be to order someone

25  to go into single cell seven.

GB000420

1  A    That is correct.

2  Q    Okay.  And you also testified that if someone is not

3  compliant with an order, but is not in any way physically

4  aggressive or threatening, the protocol is to get a sergeant?

5  A    That is correct.

6              MR. BOOS:  No further questions.

7              THE COURT:  Thank you.

8      Mr. Wingate.

9                   - - -

10           FURTHER REDIRECT EXAMINATION

11  BY MR. WINGATE:

12  Q    Whether to get the sergeant or whether to remove, the

13  prosecutor is talking about protocol with that officer, whether

14  to get the officer, which would be you, or whether to remove is

15  within that officer's discretion at that time under those

16  circumstances; is that correct?

17  A    Correct.  The circumstances that you relay to me of being

18  aggressive and unruly.

19              MR. WINGATE:  I have no further questions.

20              THE COURT:  Thank you.

21      Mr. Boos.

22              MR. BOOS:  (Nonverbal answer.)

23              THE COURT:  We are all set.  Thank you so much

24  for coming in.

25              THE WITNESS:  No problem, Your Honor.

1                    THE COURT:  I appreciate it.

2                    MR. WINGATE:  Your Honor, at this time --

3                    THE WITNESS:  Oh, you are done with me?

4                    MR. WINGATE:  Yes.

5                    THE COURT:  Thank you.  Watch the gate when you

6    go out.  It slams backward.

7                    THE WITNESS:  It hasn't changed.

8                    THE COURT:  No, not at all.

9        Just, at this point, I do have a board meeting that I do

10   need to get to.

11       Mr. Wingate, you do still wish to call additional

12   witnesses?  Is that my understanding?

13                   MR. WINGATE:  I do, yes.

14                   THE COURT:  Timeframe, Amy, did you get anything

15   clarified for me tomorrow afternoon?

16                   (Discussion held off record.)

17                   THE COURT:  All right.  I'm trying to get a date,

18   folks, for tomorrow.

19                   MR. BOOS:  Right.  Speaking off the record

20   regarding scheduling?

21                   (Discussion held off record.)

22                   THE COURT:  Are you available in the morning?

23                   MR. WINGATE:  Yes.

24                   THE COURT:  Are you available in the morning,

25   Mr. Boos?

1          MR. BOOS:  I do have witness prep for the

2    Thursday trial tomorrow, but I can attempt to move the officers.

3          THE COURT:  What time is your witness prep?

4          MR. BOOS:  I believe it's at 9 or 11.  I would

5    have to check my calendar downstairs, but I would.

6          THE COURT:  Do you want to run and do that so I

7    can figure out a time?

8          MR. BOOS:  Yes.  Thank you, Judge.  I will run

9    downstairs.

10          MR. WINGATE:  And I just have a pretrial with

11    Judge Zmuda tomorrow morning.  Then I'm done.

12          THE COURT:  I would certainly wait for that.

13          (Discussion held off record.)

14          MR. BOOS:  Judge, the witnesses are scheduled at

15    9:30 to 10:30 tomorrow.

16          THE COURT:  Do you want me to just start this

17    back up at 11:00?

18          MR. BOOS:  That would be fine.

19          THE COURT:  Or would that give you enough time?

20          MR. BOOS:  10:30 would be enough time if it helps

21    to be here earlier, but 11:00 is fine, also.

22          THE COURT:  What was the other time you told me?

23          MR. BOOS:  10:30.  I'll be done 10:30 and could

24    come right up, so.

25          THE COURT:  Okay.

1           MR. WINGATE:  Either one is fine.

2           THE COURT:  So why don't you just come when you

3    finish, and we'll shoot between 10:30 and 11:00.

4           MR. BOOS:  Yes, that works.  Thank you, Judge.

5           THE COURT:  All right.

6        Detective Carter, are you available?

7           DETECTIVE CARTER:  Yes, Your Honor.

8           THE COURT:  Then I'll see you guys tomorrow

9    morning.  Thank you.

10          MR. WINGATE:  Thank you.

11          (Proceedings concluded at 5:12 p.m.)

12                        - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9              I, THE UNDERSIGNED, HEREBY CERTIFY

10     THAT THE ABOVE AND FOREGOING IS A TRUE

11     AND COMPLETE TRANSCRIPT OF THE PROCEEDINGS

12     HAD IN THE TRIAL OF THE ABOVE-ENTITLED CAUSE.

13

14

15

16                    _____
                      Diana M. Ziegelhofer, RPR
17                    Official Court Reporter

18

19

20

21

22

23

24

25

## IN THE COURT OF COMMON PLEAS OF LUCAS COUNTY, OHIO

STATE OF OHIO,                )

       Plaintiff,         )

     vs.                    ) Case No. CR0201703023

LAMONTE HOBBS,                ) Hon. Stacy L. Cook

      Defendant.        )

- - -

### TRANSCRIPT OF PROCEEDINGS

BE IT REMEMBERED, that the above-entitled cause came on for bench trial before The Honorable Stacy L. Cook, in Courtroom Number 6, in the Lucas County Court of Common Pleas, on the 27th day of June, 2018.  The following proceedings were had, to wit:

### VOLUME III OF IV

APPEARANCES:

On behalf of the State of Ohio:

JULIA R. BATES, Prosecuting Attorney
By: Brian O. Boos, Assistant Prosecuting Attorney

On behalf of the Defendant:

Ronnie L. Wingate, Esquire

GB000426

1                    I N D E X

2

3  WITNESS                    DX      CX      RDX      RCX

4  State's case in chief:

5    TODD REED                7/3     21/14   32/20    33/21
                                              35/24    --
6  TIMOTHY MCGOVERN           39/17   48/24   72/13    74/6
   DAVE CARTER                76/12   80/19   97/21    99/12
7                                             --       101/24
                                              105/11   107/19
8  Rebuttal witness:

9    DAMON SMITH              206/22  212/7   220/13   222/1
                                              223/5    223/14
10                                            226/8    --

11 Defendant's case in chief:

12   MARK GUMPF               118/24  131/6   139/19   145/22
                                              147/19   148/20
13                                            149/10   --
     LAMONTE HOBBS            156/14  170/13  187/16   194/14
14                                            198/6    201/23
                                              203/25   --
15

16                     - - -

17               E X H I B I T S

18 State's Exhibits           ID      OFF     OBJ      ADM

19   1 (photograph)           30/13   44/25   --       45/6
     2 (photograph)           30/14   44/25   --       45/6
20   3 (photograph)           30/14   44/25   --       45/6
     4 (photograph)           44/20   44/25   --       45/6
21   5 (photograph)           44/20   44/25   --       45/6
     6 (report)               8/18    9/6     --       9/11
22   7 (DVD)                  12/12   13/4    --       13/7

23 Defendant's Exhibits

24   (No defense exhibits)

25                     - - -

1        (Proceedings commenced at 10:54 a.m.:)

2            THE COURT:  We'll go back on the record, State of

3   Ohio versus Lamonte Hobbs.

4        And, Mr. Wingate, I think we were still on your witnesses.

5            MR. WINGATE:  Yes.  Your Honor, at this time, we

6   would call Mr. Hobbs to the stand.

7                        - - -

8        Thereupon, the Defense, in order to maintain the

9   issues on their part to be maintained, called as a witness,

10                  LAMONTE HOBBS,

11  who, having been duly sworn as provided by law, testified and

12  said as follows:

13                       - - -

14                DIRECT EXAMINATION

15           THE COURT:  Thank you.  And, Mr. Hobbs, just so

16  the record is clear, you absolutely have no duty to have to

17  testify.  If you choose to testify today, it's at your own full

18  choice.  Are you comfortable with going forward with testifying

19  today?

20           THE DEFENDANT:  Yes, Judge.

21           THE COURT:  Thank you.

22  BY MR. WINGATE:

23  Q    Would you state your name for the record, please.

24  A    Lamonte Hobbs.

25  Q    And, Mr. Hobbs, are you -- were you employed?

1   A      Yes.

2   Q      Let me rephrase that.  Are you employed now?

3   A      No, sir.

4   Q      Were you employed?

5   A      Yes.

6   Q      And I'm going to call your attention to November the 10th

7   of 2017.  Were you employed at that time?

8   A      Yes.

9   Q      And where were you employed?

10  A      At the Lucas County Corrections Center.

11  Q      And how long had you been employed there?

12  A      Twelve years.

13  Q      And in what capacity were you employed?

14  A      I was assigned to the Lucas County Jail, booking section.

15  Q      Okay.  Were you a deputy sheriff?

16  A      Corrections officer.

17  Q      Okay.  Corrections officer.

18  A      Yes.

19  Q      That's what they are called?

20  A      Yes.

21  Q      Okay.  Now as a corrections officer, were you given certain

22  assignments at the Lucas County Jail?

23  A      Yes.

24  Q      And what were some of the assignments that you had as a

25  Lucas County Sheriff's Deputy?

1    A    Worked with -- worked the floors, but most mainly, I worked

2    the sixth floor, which is a maximum security floor, and then I

3    was transferred to the booking section in 2012.

4    Q    All right.  And what, in 2012, when you were transferred to

5    the booking floor, what were your duties and responsibilities in

6    booking?

7    A    You process inmates in, you run them for warrants, you

8    fingerprint them, you take their photographs, you do rounds and

9    checks on them, give them their meals, things of that nature.

10   Q    All right.  And as a corrections officer for the Lucas

11   County Correctional facility, did you have any special education

12   or training, background?

13   A    I went to OPOTA Police Academy in 2004 and 2008 and I also

14   have my criminal justice degree.

15   Q    All right.  Now I'm going to call your attention back to

16   November the 10th of 2017.  Where were you assigned at the Lucas

17   County Corrections Center at that time?

18   A    The booking section.

19   Q    And on November the 10th of 2017, did you have an occasion

20   to come into contact with a Mr. Tim, Timothy McGovern?

21   A    Yes.

22   Q    And would you tell the Court how you came into contact with

23   Mr. Timothy McGovern?

24   A    He was brought into the booking section by four Toledo

25   police officers.

1  Q    Is there any significance to an individual being brought in

2  with -- by four Toledo police officers?

3  A    Yes.

4  Q    And what is that significance?

5  A    A normal person is brought in by one or two people, but

6  when you see four officers, one inmate, that normally indicates

7  that he has been a problem with the officers.

8  Q    All right.  So now what happened when Mr. McGovern was

9  brought in?

10  A    He was brought up to the booking counter.  We started to

11  ask him a series of questions to process him in.

12  Q    Did he respond to questions?

13  A    He became uncooperative.

14             MR. BOOS:  And, Your Honor, we would just

15  respectfully renew our objection.  I understand the Court's

16  ruling, but again, making a record of our renewing objection to

17  the relevance of this portion of the testimony.

18             THE COURT:  Thank you.  And I will accept your

19  objection at this time.  I am just looking to this as just a

20  pattern of the night, not necessarily elements to the charge.

21  Q    (By Mr. Wingate) All right.  Now inasmuch as you said he

22  was uncooperative, what happened at that point?

23  A    He was taken to the dress out room.

24  Q    And what is the dress office?

25  A    Dress out.  He was taken to the room, put a Lucas County

1 uniform on, then he was taken to the west D module tank.

2 Q    All right.  Now is that the usual process for booking over

3 at the county jail?

4 A    No, it is not.

5 Q    What is the usual or normal process that one would go

6 through?

7 A    You are brought up to the counter.  You are asked a series

8 of questions.  You are then dressed out.  Once you receive a

9 uniform, you proceed to the ID section.  Once you leave the ID

10 section, you get your fingerprints, your photograph, and then

11 you are put on the phone and then you are put up in a tank.

12 Q    All right.  Now as it relates to Mr. McGovern, did he go

13 through the normal process?

14 A    No.

15 Q    Now after Mr. McGovern is put in the holding area or

16 holding cell, did you have any further contact with him?

17 A    Yes.

18 Q    And could you describe the contact that you had with him to

19 the Court.

20 A    I was putting another uncooperative inmate up.  When I was

21 done dealing with that inmate, Mr. McGovern approached the door.

22 Q    All right.  And what happened?

23 A    He started talking to me and saying that he needed a phone

24 call.  I explained to him he couldn't get a phone call because

25 he was uncooperative.  He was disrespectful towards staff.  He

1   was intoxicated and he could -- he couldn't get a phone call.

2   He went on to keep saying he needed a phone call.  And I

3   explained to him that it was a phone on the wall to use if he

4   wanted to use the phone.

5   Q   All right.  Now let me just stop you here.  You've had an

6   opportunity to view what's marked as State's Exhibit 7; is that

7   correct?

8   A   Yes.

9   Q   And what was State's Exhibit 7?

10   A   It's a recording of the incident.

11   Q   All right.  And what you just related to the Court, was

12   that shown on the video?

13   A   Yes.

14   Q   Now after you had told Mr. McGovern that there was a phone

15   on the wall, what happened next?

16   A   He didn't like my answer and he threw up his middle finger,

17   said fuck you, nigger.

18   Q   All right.  And when he said this, what did you do?

19   A   I removed him.  I'm sorry, I grabbed him by the back of his

20   jumpsuit and tried to remove him from the module.

21   Q   And why were you trying to remove him from the module?

22   A   Because he was being disrespectful and uncooperative and he

23   was intoxicated.

24   Q   Now when you grabbed him, were you following policy?

25   A   No.

GB000433

1  Q    And are you aware of the policy?

2  A    Yes.

3  Q    And you didn't follow it?

4  A    That's correct.

5  Q    And why didn't you follow the policy?

6  A    He was being disrespectful and uncooperative, and I used my

7  discretion at that time to remove him from that module.

8  Q    How long have you worked in booking?

9  A    Five years.

10  Q    And how long, and when you say you used your discretion,

11  where did you get the idea that you had any discretion?

12  A    Sergeant Gumpf gave us authority to use discretion if we

13  have an uncooperative, disrespectful inmate that poses any kind

14  of risk to the tank or the module, module, he gives us authority

15  to remove them from the tank.

16  Q    And is this a written policy?

17  A    No, sir.

18  Q    And how long has this unwritten policy been in effect?

19  A    Ever since I've been in booking, that's five years.

20  Q    All right.  What were your intentions when you grabbed or

21  made physical contact with Mr. McGovern?

22  A    To remove him from the module and put him directly into the

23  west seven isolation tank right across the hall.

24  Q    Were you able to do that?

25  A    No, I was not.

1 Q    Why not?

2 A    We fall to the ground, a struggling, and we get into a

3 brief struggle.  At that point, I still didn't have control of

4 him.  Other officers showed up.  At some point, they were able

5 to gain control of him, and he was handcuffed and then he was

6 put into west number seven.

7 Q    All right.  Now let me ask you this.  Now you said when you

8 fell that you were trying to get control of him.  What exactly

9 do you mean by getting control of him?

10 A    Well, when I fell, I had no control of him at all.  So when

11 I was trying to get control of him, I was trying to get

12 handcuffs on him.

13 Q    Were you saying anything to him?

14 A    Yes.

15 Q    What were you saying to him?

16 A    I was hollering at him don't throw your finger in my face.

17 Q    Did you say anything else?

18 A    Stop resisting.

19 Q    All right.  Now let me ask this question.  As it relates to

20 you and Mr. McGovern falling, do you recall him testifying in

21 this matter, Mr. McGovern?

22 A    Yes, I do.

23 Q    Do you recall him testifying that you slammed him on his

24 head?

25 A    Yes, I do.

1  Q    Did you slam him on his head?

2  A    No, I did not.

3  Q    Now, you also heard him testify, did you not, that you

4  choked him; do you recall him testifying to that?

5  A    Yes, I do.

6  Q    All right.  Did you choke him?

7  A    No, I did not.

8  Q    What happened?

9  A    When the struggling -- when the struggling occurred, when I

10  pulled backwards, I fell.  We both fell to the ground.  My hand

11  went around his upper body and, in the process, I'm trying to

12  hold and I'm trying to control him, because I don't have any

13  control of him.  So I'm trying to get handcuffs on him and get

14  him in the west seven single cell.

15  Q    All right.  As it relates to other officers coming up, you

16  did say other officers did come to help?

17  A    Yes.

18  Q    To your assistance?

19  A    Right.

20  Q    All right.  And were they able to get him cuffed?

21  A    Yes.

22  Q    What happened when they arrived?  What did you do?

23  A    Stood directly up.

24  Q    All right.  And when you stood up, what happened?

25  A    They continued.  When I stood up, I start telling him to

1  stop resisting because I still seen they were having a struggle

2  getting him under control.  I start yelling stop resisting, stop

3  resisting.  So, at that point, they were able to get handcuffs

4  on him, stand him up and put him in the west seven single cell.

5  Q    Now what is the floor in the booking area consist of?

6  A    Concrete.

7  Q    And when you say struggle, how do you describe this

8  struggle?  What exactly was going on on the floor?

9  A    I remember trying to brace myself with my arm, and I'm

10  holding him because I couldn't control him.  I had -- I had no

11  control of him at that point.  And when you hit the floor, as an

12  officer, your first instinct is to gain some type of control.

13  And I at no point did I have control over him.  And that's what

14  I was trying to do, control him, and I couldn't.  And that's

15  when the other officers came in and they assisted and they were

16  able to get handcuffs on him and put him in the cell.

17  Q    Now let me ask this question.  When they came to assist

18  you, were they able to immediately gain control of him at that

19  point?

20  A    No, they were not.

21  Q    All right.  Now after this incident occurred, did you have

22  an occasion to write an incident report?

23  A    Yes, I did.

24  Q    And what is an incident report?

25  A    An incident report is any time you have an interaction with

1   an inmate, when they have to be single cell, you have to write

2   up what they call an incident report of what happened of the

3   events.

4   Q    All right.  Now you did write an incident report?

5   A    Yes.

6   Q    When did you write an incident report?

7   A    The next shift.

8   Q    All right.  And when you say the next shift, when did the

9   incident occur?

10  A    The incident occurred around 5:30 in the morning.  I didn't

11  write the report until maybe 11:00 that night.

12  Q    And that is when you came in for the next shift?

13  A    When I came in for the next shift.

14  Q    As it relates to that incident report, what you just

15  testified to, is that contained or reflected in that incident

16  report that you wrote?

17  A    I'm sorry.  Can you repeat the question, please?

18  Q    What you've testified to today, is that contained in the

19  incident report that you had written that night when you came in

20  for the second shift?

21  A    Yes.

22  Q    Was that incident report truthful?

23  A    No.

24  Q    What in that incident report was not truthful?

25  A    I said I grabbed him by the back, I believe, left shoulder

1   and arm, which I grabbed him by his top collar.

2   Q    All right.  Now let me ask another question.  You've

3   indicated that you've been on the booking, assigned to the

4   booking area for approximately five years?

5   A    Yes.

6   Q    Is that correct?

7   A    Yes.

8   Q    And are you aware of some of the security devices that they

9   have there?

10  A    Yes.

11  Q    And what are some of those devices?

12  A    They, in the booking section, they have over 40 cameras and

13  at least five or six microphones at different points.

14  Q    As it relates to the cameras, what are the purposes of the

15  cameras?

16  A    The purposes of the cameras is to capture all the incidents

17  in booking, capture the movement, capture anything that goes on

18  in booking.

19  Q    On November the 10th and, more importantly, the following

20  evening, the following evening of November the 10th, were those

21  cameras operational?

22  A    Yes.

23  Q    All right.  And was there -- did you, as a booking officer,

24  have an opportunity to review that incident that occurred?

25  A    Yes.

1    Q    Did you, in fact, review that incident on video?

2    A    Not at that time, I didn't.

3    Q    Prior to you writing that report, did you review the video

4    of that incident?

5    A    I never looked at it.

6    Q    When is the first time that you wrote or saw the video?

7    A    I would say probably two weeks after the incident.

8    Q    Are you aware of any process whereby in writing the report,

9    an officer, in writing the incident report, could review the

10   videos?

11   A    Yes.

12   Q    But you didn't do that?

13   A    No, sir.

14   Q    Was that incident report after you had seen the video

15   consistent with what you had put in your report?

16   A    No.

17   Q    Now, as a result of this matter and as part of the

18   investigation of this incident, did you talk to any other

19   authorities?

20   A    Yes.

21   Q    And what authority did you talk to?

22   A    Agent, Agent Shawn from the FBI called me, and I had to

23   interview with him.

24   Q    And after that interview, have you had any subsequent

25   follow-up or contact with the FBI?

1  A    No.

2  Q    Now, do you recall Sergeant Mark Gumpf's testimony?

3  A    Yes.

4  Q    And do you recall him testifying to -- let me make sure I

5  get it right -- that he had told correction officers that they

6  had the discretion in removing an inmate that was disruptive,

7  that was uncooperative, and was disrespectful; do you recall him

8  testifying to that?

9  A    Yes.

10  Q    And did you believe you had that authority?

11  A    Yes.

12  Q    When you -- strike that.  Relative to Mr. Timothy McGovern,

13  do you know when he sustained the injuries, scrape to his

14  forehead and to his elbow?  Do you know when he received those?

15  A    No, I do not.

16  Q    Do you know if it occurred when you two were struggling on

17  the floor?

18  A    No, I do not.

19  Q    Do you know if it occurred when he was struggling with the

20  other two officers, Grant and Meyers?

21  A    No, I do not.

22  Q    Was it your intention to cause any harm to, physical harm,

23  to Mr. Meyers when you grabbed him?

24  A    Mr. McGovern, no.

25  Q    I'm sorry, not Mr. Meyers.  I apologize.  Mr. McGovern when

GB000441

1   you assault --

2   A    No.

3   Q    -- when you grabbed him?

4   A    No, it was not.

5   Q    And as it relates to that, why did you grab him?

6   A    I was using my discretion at that time to remove him from

7   the module.

8                MR. WINGATE:  I have no further questions at this

9   point.

10                THE COURT:  Thank you.

11       Mr. Boos.

12                      - - -

13                CROSS EXAMINATION

14   BY MR. BOOS:

15   Q    Officer Hobbs, I'll direct your attention to State's

16   Exhibit 7.  I'll pull that up.

17                THE COURT:  Mr. Boos, do you mind if I come out

18   and look at it so I can see it straight on?

19                MR. BOOS:  No, Your Honor.

20                THE COURT:  And just from a point of reference,

21   is there a way to slow it down on this system?

22                MR. BOOS:  There is, Your Honor.  We would intend

23   to do that as we are examining the witness.  And Lieutenant

24   Carter may assist me in slowing it down and using the slow

25   motion.

1      THE COURT:  I'm glad to see that's Word Perfect

2  Lightening.  I thought you had Pokemon up there.

3  Q    (By Mr. Boos) Officer, starting with your conversation with

4  inmate McGovern, at the initial point when inmate McGovern comes

5  to you, and can you see the screen okay from where you are

6  seated?

7  A    It's a little obstructed, but.

8  Q    Would it help if you moved to a different location to see

9  the screen?

10      THE COURT:  If you need to see straight on, you

11  are welcome to.

12  Q    First, officer, about how many people are in that pod at --

13  other than inmate McGovern -- if you know approximately how many

14  other inmates would be in the pod at this point?

15  A    I would guess probably ten.

16      (DVD exhibit played in open court.)

17  Q    Okay.  And, this point, you are talking to inmate McGovern

18  now.  How would you characterize the discussion with inmate

19  McGovern at this point?

20  A    He's asked, talking to me about a phone call.

21  Q    Okay.  At this point, is he combative, disrespectful as

22  this conversation is going on?

23  A    No.

24  Q    Okay.  And it appears that you are trying to close the

25  door, so he goes back into his pod; is that accurate to say --

1    A    Right.

2    Q    -- at this point?  And the gesture you made right there,

3    what are you gesturing at?

4    A    The phone on the wall.

5    Q    Okay.  And you are telling him if you need to use the

6    phone, it's right there.  At that point, you've indicated inmate

7    McGovern said what to you?

8    A    Fuck you, nigger.

9    Q    Okay.  Now you said there is approximately ten inmates in

10   the pod?

11   A    Correct.

12   Q    If you know, approximately how many of the inmates were

13   African American?

14   A    I would say a good population of it.

15   Q    Okay.  So five or six?

16   A    I can't recall how many were, but I know there was African

17   Americans in there.

18   Q    Okay.  So it's your testimony that inmate McGovern used

19   that word and then willingly walked back into the pod with

20   several African Americans?

21   A    Yes.

22   Q    Okay.  At this point, now, after what we witnessed prior

23   to, would you agree at this point your arm is around the neck

24   area of inmate McGovern?

25   A    Yes.

1          MR. BOOS:  Okay.  I don't intend to use the video

2    any more with this witness, Your Honor.  If the Court would

3    prefer to resume the witness stand?

4          THE COURT:  Could I just see so I can watch the

5    whole pulling back process?  So I don't know how you can slow it

6    down.  I just want to be able to see it closer.

7          DETECTIVE CARTER:  It's just we can't slow it

8    down on that copy, so.

9          MR. BOOS:  Okay.  Okay, on the enlarged version

10   or can't slow it down at all?

11          DETECTIVE CARTER:  On that copy period.  So if

12   you just want to, right, to scan it frame-by-frame with that

13   bar, but.

14          MR. BOOS:  What I'll do is go back.

15          THE COURT:  And then does the sound not go at

16   this point?  Like --

17          MR. BOOS:  Correct.

18          THE COURT:  You can only hear the sound if it's

19   smaller?

20          MR. BOOS:  So I'm pressing the button.

21          THE COURT:  Thanks.

22   Q    (By Mr. Boos) And you would agree, at this point, inmate

23   McGovern is not -- his head has not come into contact or at

24   least it has not dragged across the ground at this point because

25   your arm is around his neck area?

1    A    Not at this point.

2              THE COURT:  Can you show me, Mr. Boos, where you

3    think in the slow motion, because I see his head in view the

4    whole time.  Can you show me where it hit the side?

5              MR. BOOS:  Your Honor, I will play that in the

6    smaller version, and it would be when the State described an

7    audible thud.

8              THE COURT:  Well I know the --

9              MR. BOOS:  I don't think there is a visual

10   because the State's -- there's a black bar blocking that, but.

11             THE COURT:  I understand the sound part, but when

12   you just --

13             MR. BOOS:  Right.

14             THE COURT:  -- went screen for screen --

15             MR. BOOS:  Okay.

16             THE COURT:  -- I didn't see his head come out of

17   view.  So that's what I was asking.

18             MR. BOOS:  Okay.

19             THE COURT:  And I'll let you look at each screen,

20   too, because I know the sound you are hearing.  I just need to

21   see, because I don't know if it's when the door slams the wall

22   that we hear the noise.

23             MR. BOOS:  It would be right there.  At least the

24   State's position is that it's briefly out of view.

25             THE COURT:  So just back me up each screen.

1           MR. BOOS:  There's a brief moment.

2           THE COURT:  Boom.

3           MR. BOOS:  That we feel it's out of view.

4           THE COURT:  Okay.  Go slow here.

5           MR. BOOS:  Does the Court have any --

6           THE COURT:  Yeah, I'm just --

7           MR. BOOS:  -- before I resume?

8           THE COURT:  I'm just watching the pull back

9    angle, so I will watch it on the little screen, too, when you

10   are ready.

11          MR. BOOS:  Okay.  And I don't intend to utilize

12   this device, if we want to turn the lights on.

13          THE COURT:  Thank you.

14          MR. BOOS:  And have the witness resume the

15   witness stand.

16   Q    (By Mr. Boos) Officer Hobbs, so you acknowledge the

17   decision you made to pull him by the collar is not following

18   policy?

19   A    That's correct.

20   Q    Okay.  And you acknowledge you never grabbed his arm as you

21   claimed in the report?

22   A    Correct.

23   Q    You also knowledge, in your report, you never state that

24   you fell to the ground?

25   A    That is correct.

1    Q    Okay.  Is that your assertion today is that you fell on top

2    of inmate McGovern?

3    A    We both fell.

4    Q    Okay.  At any point, prior to being on the ground with

5    inmate McGovern, was there a risk to your physical safety as an

6    officer?

7    A    Not -- not to my physical safety.

8    Q    Okay.  And you said if -- you asserted there's a discretion

9    to remove someone if there is a risk to the tank or a module?

10   A    That's correct.

11   Q    Okay.  And you believed he was a risk to the tank or module

12   at that point?

13   A    Yes, yes, yes.

14   Q    Okay.  You didn't note that in your report that he was a

15   risk to the tank or module, though, did you?

16   A    No, I did not.

17   Q    Okay.  Prior to being on the ground with you, is there any

18   point where you are asserting that inmate McGovern physically

19   resisted you?

20   A    Yes, when I remember when I pulled him, he lunges forward.

21   That's where my resistance come and we -- we fall to the ground

22   and a struggle occurs.  So when I grabbed him from the back to

23   pull him backwards, I'm trying to go just directly across the

24   hall.  When I'm pulling him backwards, I feel him lunge forward

25   and we fall to the ground.

1    Q    And you agree he's walking away from you at that point when

2   you grabbed him?

3    A    Yes. Yes, I agree to that. Yes, sir.

4    Q    And you are sure that he lunged forward as opposed to just

5   walking in that direction so his momentum is already going in

6   that direction?

7    A    No, I felt resistance.

8    Q    But, again, that's not the kind of resistance you

9   documented in the report? You documented he resisted when you

10   tried to guide him by the arm?

11    A    That's correct.

12    Q    Okay. Are you asserting that you ever gave him a verbal

13   command to go to single cell seven?

14    A    No. No, it was my decision, at that point, that he needed

15   to be removed immediately.

16    Q    Okay.

17    A    At that point, I -- I made a determination of my discretion

18   that he needed to come out right away. We have a split second

19   to make decisions before it just blows up in your face. And

20   Mr. McGovern had continually posed risks to that module during

21   me and his interaction, and it was at that point where I just

22   tried to pull him backwards out of the tank and go directly

23   across to the west seven module. That's it.

24      I never tried to harm the guy. You never see me take any

25   malicious hits on him. I never elbow him. I never kick him. I

1    never tried to do anything.  I pull him back, we fall.  We

2    struggle.  Yes, my hand might have been around his throat, but I

3    didn't intend to do that.  That's just how I feel.

4        At that point, as an officer, you are just trying to

5    maintain control.  That's it, sir.  You have an inmate on top of

6    you.  You don't know what's going to happen.  And I never gained

7    control of him.

8    Q    Was at any point the inmate on top of you?

9    A    He could have been.  That's -- if I'm -- go ahead,

10   Mr. Boos, I'm sorry.  I'm sorry.

11   Q    Okay.  You indicated that he consistently was a threat to

12   the module?

13   A    I said a potential risk.

14   Q    Potential risk to the module?

15   A    Potential risk.

16   Q    But, again, that's not documented anywhere in the report?

17   A    That's correct.

18   Q    So you are acknowledging today your reason for removing him

19   is not, in fact, officer safety, but, in fact, because now you

20   are saying he's a risk to the module?

21   A    I said I -- we -- he's handcuffed for officer's safety.

22   That's what I said.  I said he was handcuffed for officer's

23   safety.

24   Q    He was taken to the ground and handcuffed for officer

25   safety?

 1    A    Correct.  When you are struggling with an inmate, handcuffs

 2    go on so everyone's secure.

 3    Q    But not for module safety?  Not for safety of other

 4    inmates?

 5    A    You -- for officer's safety.

 6    Q    But you acknowledge, prior to taking him to the ground, he

 7    wasn't a threat to your safety?

 8    A    I wasn't trying to take -- we fell to the ground.  I wasn't

 9    trying to take him to the ground.

10    Q    And your report says he was actually taken to the ground?

11    A    Correct.

12    Q    Okay.  Mr. Wingate asked you if your report was consistent

13    with what actually happened and you indicated it's not

14    consistent?

15    A    Correct.

16    Q    Are you acknowledging that you willingly lied in the

17    report?

18    A    No, sir.  What I'm -- what I'm testifying to is that when I

19    wrote the report, it was the next shift.  My memory wasn't as

20    fresh as it should have been.  I never went back to review a

21    tape to try to cover any tracks that might have been mistakenly

22    or whatever.  I just wrote the report off of pure memory.  You

23    don't remember everything with a struggle with an inmate.  You

24    just don't.  So it was never my intentions to deceive anybody,

25    lie.  I know there's cameras all around that place that can

1  dictate and watch you at any given time, your audio and video.

2  I know this.  I've been in this area.  I know this.  When I

3  wrote the report, it was -- it was later on.  My memory just

4  wasn't fresh.  It just was not fresh.

5  Q    It was fresher than it is today, though?

6  A    Yes, because I had a chance to view the videotape, sir.

7  Q    Do you remember the reason you were terminated?

8  A    Yes, sir.

9           MR. WINGATE:  Your Honor, I will object as to

10  relevancy.

11           THE COURT:  Is it an administrative proceeding?

12           MR. BOOS:  May we approach?

13                    - - -

14  (Following discussion held at the bench:)

15           MR. BOOS:  It would be the State's intent to

16  impeach the witness as a result of two rule violations that were

17  cited by a three-officer committee involving dishonesty.

18           MR. WINGATE:  I would object.

19           MR. BOOS:  And use this.  We would mark this.  We

20  would not admit it.  We would mark it for the record.

21           MR. WINGATE:  Well --

22           THE COURT:  In terms of the document, since

23  that's an administrative finding, I don't have the same

24  threshold to work with what they have because it's an employment

25  issue.  I think that's not relevant, but questioning in terms of

1   impeachment on statements, and if you have any other statements

2   that were made or with the report, I'll allow you the latitude

3   on the impeachment.

4           MR. BOOS:  Okay.

5                            - - -

6   (Proceedings continued in open court as follows:)

7   Q    (By Mr. Boos) You received a document advising you of your

8   termination?

9   A    Correct.

10  Q    And there were several, at least six, rule violations?  Do

11  you remember some of those rule violations?

12          MR. WINGATE:  Your Honor, I'm going to object

13  because I think the Court stated to the State that that was an

14  administrative process that he went through.  And you can

15  question on impeaching statements, but that is not relevant.

16          THE COURT:  I'll allow questioning on the report

17  on the incident that we already have part of it, his incident

18  report, and any statements that were made to the detective that

19  would be differing if there is using -- so if there is, to that

20  extent.

21          MR. BOOS:  So the Court does not intend to allow

22  the State to go into the findings in terms of the findings of

23  the committee regarding honesty and accuracy of reports?

24          MR. WINGATE:  Your Honor, I would object.

25          THE COURT:  What would be the basis?  Just a

1   second, Mr. Wingate.  What would be the basis that would be

2   relevant to this Court on these elements?

3             MR. BOOS:  To he's indicated that he's been --

4   that he did not willingly falsify the reports and that it was

5   simply a mistake.  That is inconsistent with dishonesty and

6   false or improper reports.

7             MR. WINGATE:  Your Honor, I -- if he's going to

8   read the report to the Court, he might as well have it

9   presented.  He can just say based upon the report he has.  But

10  irrespective of what he is trying to get into court, this is an

11  administrative proceeding that has a much different standard

12  than what is here in this court and what has to be applied, and

13  I don't believe it is relevant and he can use it.

14            THE COURT:  With regard to is he under oath and

15  represented during those hearings?

16            MR. BOOS:  I believe he either has an attorney or

17  a union representative present for the hearings.

18            THE COURT:  But I guess are we looking at

19  transcribed hearings?  The difference would be impeaching on a

20  statement, not a finding.  So if we are working off of

21  transcripts that are under oath and said in similar in terms of

22  impeachment, I can accept those, but I don't think I can accept

23  their findings.

24            MR. BOOS:  State would move on, Your Honor.

25            THE COURT:  Thank you.

1  Q    (By Mr. Boos) So it's your testimony that a day or two

2  later, when you wrote this report, you had forgotten that you

3  fell?

4  A    I didn't remember that I fell.

5  Q    Okay.  You remember today now that you fell?

6  A    I -- I told Sergeant Gumpf that right away.  It might not

7  be in my report, sir, but I told Sergeant Gumpf right away that

8  I had fell.

9  Q    And Sergeant Gumpf's report didn't say that you fell

10  either?

11  A    That's correct.

12  Q    Okay.  In fact, Sergeant Gumpf's report says CO Hobbs then

13  took the inmate to the ground and tried to handcuff him.  Not CO

14  Hobbs and inmate McGovern fell to the ground.  So that doesn't

15  appear in your statement and it doesn't appear in Sergeant

16  Gumpf's statement that you said right away what you are claiming

17  today that you fell to the ground?

18  A    I understand that, Mr. Boos, and that's -- that's what

19  happened.

20  Q    And in neither of the statements does it appear that you

21  say he was removed for safety of the module.  Are you

22  remembering differently today now that you are claiming he was

23  removed for the safety of the module?

24  A    Oh, I remember then, sir.  It's just that we are in court

25  today.  We are in court today.  My memory is refreshed before

1    today's date.  So I didn't just --

2    Q    But you didn't remember to put it in your report?

3    A    Sir, again, I wrote the report later.  I didn't remember

4    everything detail for detail, sir.  You do not, when you are in

5    a fight for your life, which is what I feel I was doing, trying

6    to stay in control of the situation, you don't remember detail

7    for detail.  You just don't, unless you are to refresh your

8    memory.

9    Q    And this was a fight that you initiated?

10   A    No, I didn't initiate a fight, sir.

11   Q    You initiated physical contact with a man who was walking

12   away from you?

13   A    I initiated to remove an inmate from a cell to go to

14   isolation cell.  That's what I did.

15   Q    And you agree he was walking away from you when you did

16   that?

17   A    Yes, sir.

18   Q    And he was not a threat to your physical safety at that

19   point?

20   A    I was removing him from the module, sir.  That's what I was

21   doing to go into isolation cell.  That's it.

22   Q    And he was not a threat to your safety at this point?

23   A    I never said he was a threat.  I never said that.  I said I

24   removed him for being uncooperative, intoxicated and

25   disrespectful.  I told them that right away.  Right away.  You

1   lose control.  And that's all I was trying to do, grab him.

2   That's why you see me pull back, sir, and try -- I'm trying to,

3   in my visual, before I -- I'm seeing that west seven cell is

4   unoccupied.  I see that.  So I'm just trying to pull him back

5   and go into the single cell.  That's it.

6   Q   Do you agree that forgetting something is different than

7   actually remembering and reporting something that did not

8   actually occur?

9   A   Repeat that, sir?

10  Q   Do you agree that just forgetting and leaving something out

11  of a report is a little bit different than putting something in

12  the report that completely did not occur such as trying to guide

13  him by his arm and remove him to single cell seven?

14  A   When I wrote the report, sir, the events that I wrote on

15  there is what I believe and remember what happened.

16  Q   And you agree now, today, that you never tried to guide him

17  by his arm into single cell seven?

18  A   When I was questioned, I told everyone that right away.  It

19  was clear that when I was shown the video, I admitted that my

20  report did not align with the video.  At no point, sir, did I

21  try to avoid it.

22  Q   Are you familiar with a retreat policy at the Lucas County

23  Sheriff's Office?

24  A   Yes, sir.

25  Q   And do you agree that your actions were consistent with the

1   retreat policy?

2   A    No, I was not.

3   Q    Do you recall the inmate testifying that he received a butt

4   whooping?

5   A    Yes, sir.

6   Q    Okay.  And we can agree flipping the bird to a police

7   officer, using abusive language, he probably deserved a butt

8   whooping, didn't he?

9   A    No, sir.

10  Q    Okay.  So middle finger and abusive language is not a

11  reason to assault an inmate; do we agree with that?

12  A    I didn't assault him.

13  Q    But we can agree, then, that's not a justification to

14  assault an inmate?  Regardless of whether you are saying you

15  assaulted the inmate, abusive language, flipping the bird is not

16  a justification for assaulting an inmate?

17  A    I did not assault him, sir.

18  Q    Isn't it true you just snapped and --

19  A    That's --

20  Q    -- you were angry and irate at being sworn at, middle

21  finger, and that's the reason you dragged him to the ground and

22  put him in a chokehold?

23  A    No, sir.  That is incorrect.

24  Q    And would the State be able to find anywhere where you are

25  back by booking saying nobody is going to flip the bird at me?

 1  If that's on that exhibit, would that be accurate if you made

 2  that statement?

 3  A    I don't know.

 4            MR. WINGATE:  On what exhibit?

 5  Q    State's Exhibit 7.  If there is audio of you saying nobody

 6  is going to flip the bird at me back by the booking desk, is

 7  that an accurate depiction of what you did?

 8  A    I haven't been presented that.

 9  Q    Okay.  Do you believe you said that that night?

10  A    I don't believe I did.

11  Q    Okay.

12            MR. BOOS:  No further questions.

13            THE COURT:  Thank you.

14      Mr. Wingate.

15                      - - -

16              REDIRECT EXAMINATION

17  BY MR. WINGATE:

18  Q    I want to start a little bit where the State left off.  Do

19  you recall the prosecutor asking you the question flipping the

20  bird, abusive language is not justification for an assault?  Do

21  you recall the prosecutor asking you that?

22  A    Yes, I do.

23  Q    All right.  Would flipping the bird, abusive language,

24  uncooperative, intoxication and disrespectful, does that justify

25  removing an individual to an isolation cell?

1   A    Yes, it does.

2   Q    And when you grab Mr. McGovern, why, what was your reasons

3   for grabbing him and what were your intentions?

4   A    My reason for grabbing him was to remove him swiftly from

5   the tank and to go into west seven, in the west seven module.

6   Q    And what is west seven?

7   A    That's an isolation tank.

8   Q    And did you have the authority to do that?

9   A    Yes, I did.

10  Q    As it relates to the prosecutor talking to you about the

11  inmate receiving a butt whooping, do you recall him asking you

12  questions about that?

13  A    Yes, sir.

14  Q    Did Mr. McGovern receive a butt whooping that day?

15  A    No, sir.

16  Q    On November the 10th of 2017?

17  A    No, sir.

18  Q    Did you punch him?

19  A    No, sir.

20  Q    Hit him?

21  A    No, sir.

22  Q    Kick him?

23  A    No, sir.

24  Q    Headbutt?

25  A    No, sir.

1   Q      Did either Meyers or Grant punch him?

2   A      No, sir.

3   Q      Kick him?

4   A      No, sir.

5   Q      Strike him in any form or fashion?

6   A      No, sir.

7   Q      Headbutt him?

8   A      No, sir.

9   Q      At the very least, what were you, Grant and Meyers trying

10  to do?

11  A      Just put him in an isolation cell.

12  Q      And how were you going to do that?

13  A      We handcuffed him and were standing him up and put him --

14  put him in the --

15  Q      And what is that called?

16  A      Controlling him.

17  Q      What were you trying to do?

18  A      Control the situation.

19  Q      As it relates to the prosecutor asking you questions about

20  Mr. McGovern being a threat to you, do you recall him asking you

21  those questions?

22  A      Yes.

23  Q      Did you ever indicate in your report at any point that

24  Mr. McGovern was a threat to you?

25  A      No, sir.

1   Q    Did you ever -- and that was the reason he was grabbed to
2   be removed?  Did you ever tell anyone that?
3   A    Did I?  Did I tell anyone?
4   Q    That he was a threat and that's why you were removing him
5   in the module?
6   A    No, sir.  Never told anyone that.
7   Q    What did you tell them the reason for being -- remove
8   Mr. McGovern was?
9   A    He was disrespectful, intoxicated and uncooperative.
10  Q    And as it relates to the retreat policy, the prosecutor
11  asked you questions about your report not being consistent with
12  the retreat policy?
13  A    Correct.
14  Q    Do you recall him asking you that question?
15  A    Yes, sir.
16  Q    Now is the retreat policy one that's taught to you or given
17  to you by Sergeant Gumpf as it relates to uncooperative,
18  disruptive, and disrespectful inmates?
19  A    Yes.
20  Q    And as far as that goes, does he also give you discretion?
21  A    Yes.
22  Q    And that discretion is to do what?
23  A    Remove someone if they are uncooperative, disrespectful,
24  intoxicated.  We are told to remove him.
25  Q    And when you say remove him, what are you talking about?

1   What exactly are you doing?

2   A    Taking him out of the module.

3   Q    Taking him where out of the module?

4   A    We are taking him out of the module, putting him in an

5   isolation module.

6   Q    Now the prosecutor also asked you a question about not

7   putting fell in your report; is that correct?

8   A    Correct.

9   Q    And he further asked you a question about the word fell not

10   being in the report of Sergeant Gumpf; is that correct?

11   A    Correct.

12   Q    Do you recall Sergeant Gumpf testifying?

13   A    Yes.

14   Q    Do you recall him testifying to you stating that you

15   fell --

16   A    Yes.

17   Q    -- to him?  And do you recall the prosecutor talking to you

18   about, and this had to do with a fight for your life.  I think

19   you used the term when an officer is in a fight for his life.

20   Were you fighting with Mr. McGovern?

21   A    Yes.

22   Q    And fighting to do what?

23   A    Maintain control.

24   Q    Now although you used the term fighting, what did that

25   fighting consist of?

1   A      Just a struggle, just a brief struggle.

2   Q      And when you say struggle, what do you mean by that? We do

3 not work in the Lucas County Sheriff's Office. What is the

4 struggling that you are making reference to?

5   A      I could not gain control of the inmate.

6   Q      What does that mean?

7   A      I could not put handcuffs on him and I could not put him

8 into the single cell.

9                MR. WINGATE: Just one second, Your Honor.

10   Q      (By Mr. Wingate) As it relates to -- as it relates to

11 Mr. McGovern, you wrote in your report that after he had been

12 removed without further incident, he was seen by someone; is

13 that correct?

14   A      Correct.

15   Q      Who was he seen by?

16   A      Seen by the nurse.

17   Q      And you put in your report that he was treated by the

18 nurse; is that correct?

19   A      That's correct.

20   Q      And do you recall what you put in your report that he was

21 treated for?

22   A      I believe he had a scrape on his forehead and scrape on his

23 elbow.

24   Q      At any time, to the best of your knowledge, was he treated

25 for any lumps or any bruising or any cut to his head?

```
 1   A     No, he was not.

 2   Q     Based upon the struggle, the testimony and your review of

 3   this videotape, did you ever see Mr. McGovern strike his head on

 4   the doorjamb?

 5   A     No, I did not.

 6   Q     You borrowed -- have you had an opportunity to look at the

 7   disk alone?

 8   A     Yes.

 9   Q     Did you take any, any steps in looking at that video?

10   A     Yes, sir.

11   Q     What did you do?

12   A     I, frame by frame, studied it.  Yes, I did look at it

13   independently, yes.

14   Q     Did you slow it down?

15   A     Yes, sir.  I slowed it down.

16   Q     And in looking at it, did you ever see Mr. McGovern's head

17   strike that doorjamb?

18   A     No, I did not.

19   Q     Did you ever see, during this struggle, as you look at this

20   frame here, can you see your complete arm, forearm of your left?

21   I'm sorry.  Can you see your complete left forearm in this

22   photograph that's on the billboard now?

23   A     Yes.

24   Q     It depicts you and Mr. McGovern on the floor?

25   A     Yes.
```

1    Q    As you see his -- your forearm, is it clenched around his

2    neck?

3    A    No, it is not.

4    Q    Did you ever choke Mr. McGovern?

5    A    No, sir.

6    Q    Your hand being in that position that's depicted on that

7    photograph, what are you trying to do?

8    A    I'm trying to control him.

9              MR. WINGATE:  No further questions at this time,

10   Your Honor.

11             THE COURT:  Thank you.

12        Mr. Boos.

13                        - - -

14                  RECROSS EXAMINATION

15   BY MR. BOOS:

16   Q    We keep hearing disrespectful, intoxicated and

17   uncooperative.  What do you mean when you say uncooperative?

18   A    Any questions that someone is asking you, they are not,

19   when you ask them a question, they are not giving you the

20   answer.

21   Q    So when you say McGovern was uncooperative, you asked him a

22   question that he did not answer and that's why you are citing

23   that he's uncooperative?

24   A    No, I'm telling him that he cannot use the phone and he

25   keeps going on about using the phone.

1 Q    Okay.  But when he walked away from you and ended the

2 conversation and walked away, was he being uncooperative at that

3 point?

4 A    When he, no.  When he walked away, when he turned --

5                MR. WINGATE:  Finish your answer, please.

6 A    When he turned and walked away, I removed him from the

7 module.

8 Q    But he was not being uncooperative when he turned and

9 walked away?

10 A    He was being disrespectful.

11 Q    Right.  I'll give you disrespectful, but he was not being

12 uncooperative.  You repeatedly said he was removed, even though

13 it's not in your report, you repeatedly said intoxicated,

14 disrespectful, and uncooperative.  But you are acknowledging now

15 he's actually not uncooperative when you removed him from the

16 module?

17 A    He is being uncooperative.

18 Q    At what point is he uncooperative prior to grabbing him?

19 A    It's just a whole continuous incident, sir.

20 Q    If he was intoxicated, why would he have been in that pod

21 with all the individuals to begin with?

22 A    Oh, that tank, particular tank right there, that's where

23 all the drunks are at.

24 Q    Okay.  So everybody that's intoxicated, everybody that's in

25 that tank is intoxicated?

1  A    They are either intoxicated -- that tank is specifically

2  used for intoxicated people that are on drugs.  Any kind of

3  behavior issues, we put them as far away from the booking

4  counter as possible, and that's what that tank is designed for.

5  Q    You talked about Sergeant Gumpf.  He told you you had

6  authority, you had discretion to remove someone from a pod if

7  you felt that they were disrespectful; is that your

8  understanding of his policy?

9  A    Yes.

10  Q    Okay.  Did you also hear Sergeant Gumpf testifying?  Do you

11  remember him testifying that if a verbal command is ignored, you

12  are to go get a sergeant?  If a verbal command to do something

13  is ignored by an inmate, you are to go get a sergeant?  Do you

14  remember him testifying to that?

15  A    Yes.

16  Q    Okay.  You did not give any verbal command to inmate

17  McGovern, did you?

18  A    No, I did not.

19  Q    Okay.  So he didn't have an opportunity to be uncooperative

20  because you never commanded him to do anything, correct?

21  A    You don't -- correct.

22  Q    You talked about a fight for your life as this is going on,

23  but you agree this is a fight and physical contact that you, in

24  fact, initiated with a man that was walking in a direction away

25  from you, correct?

GB000468

1          MR. WINGATE:  I'm going to object --

2          THE COURT:  I'll over --

3          MR. WINGATE:  -- as to the term fight.

4          THE COURT:  I'm overruling.

5          MR. WINGATE:  Sure.

6    Q    (By Mr. Boos) This was a fight.  I think the witness' words

7    were this was a fight for his life.  This is a fight that you

8    initiated, correct?

9    A    I tried to remove him from the module.

10   Q    And you did that while he was walking away from you?

11   A    Yes.

12   Q    I believe you testified to you were trying to maintain

13   control and that's the reason, the basis, for removing the

14   inmate from the module.  Prior to you jerking him from the

15   collar, at what point was he out of control?

16   A    I don't mean not control there.  I mean control over the

17   overall situation.

18   Q    When did you review this video?  How long after?  So you

19   wrote the report before reviewing the video; is that correct?

20   A    Correct.

21   Q    When did you review the video?

22   A    I want to say maybe it was a week or two later.

23   Q    Okay.  And at what point did you update or correct your

24   report after seeing the video?

25   A    I never updated my report.

1   Q     Okay.

2                 MR. BOOS:  No further questions.

3                 THE COURT:  Thank you.

4     Mr. Wingate.

5                       - - -

6            FURTHER REDIRECT EXAMINATION

7   BY MR. WINGATE:

8   Q     Why didn't you update your report?

9   A     I was already -- it was -- I was already terminated.  It

10  was nothing to update.  I was already terminated, sir.  So I

11  never had an opportunity to update it.

12  Q     Now let me ask this question, all right.  As it relates to

13  the prosecutor questioning you about Sergeant Gumpf, he said

14  that Sergeant Gumpf testified that if you give a verbal command

15  and it's not followed or not heeded, you then are to come and

16  get the sergeant; is that correct?  Do you recall him testifying

17  to that?

18  A     Correct.

19  Q     Do you recall the prosecutor asking you that question?

20  A     Yes.

21  Q     All right.  Now that's one situation; am I correct?

22  A     That's correct.

23  Q     As it relates to an individual that is disruptive,

24  uncooperative, disrespectful, do you recall Sergeant Gumpf

25  testifying that it was within your discretion to remove that

1  individual to an isolation tank?

2  A    Yes.

3  Q    Did he testify to that?

4  A    Yes, he did.

5           MR. WINGATE:  I have no further questions.

6           THE COURT:  Mr. Boos.

7           MR. BOOS:  Nothing, Your Honor.

8           THE COURT:  While I'm not necessarily asking

9  these questions to determine whether or not it meets the burden

10  of a defense, with the activity that we saw on this video, would

11  you say that there's a culture in booking that you are allowed

12  to just yank somebody because of what they said was offensive?

13           THE WITNESS:  It's -- it's when you have a

14  situation, ma'am, and an inmate is being disrespectful and he's

15  being disruptive or anything that's out of the norm, because

16  it's such a small section, you have other inmates watching.  The

17  minute you lose, and when I say control, the minute you lose

18  control of a situation, then other inmates think they can do it

19  and --

20           THE COURT:  Let me just question here.  Is it

21  lose control or lose respect?

22           THE WITNESS:  No, you lose control, because it's

23  other inmates in the tank.  And I'm just giving you scenarios

24  since you asked, Judge.  It's other inmates in the tank.  It's

25  other inmates around.  It's different things that go on at that

1   time that happen, and you -- you just don't know.  So to stop

2   any confusion or to stop something from happening, you just

3   remove the potential risk to the tank to keep everything stable.

4            THE COURT:  But didn't, in this scenario, would

5   your first inclination have been to verbally command him to walk

6   over to the other cell?

7            THE WITNESS:  No, ma'am.  No, ma'am.  In my -- in

8   my experience, in that booking area, ma'am, you get the people

9   out of there right away.  You don't give them a chance to react

10  to potentially hurt you.  And my -- and I mean, a thousand

11  things could happen at any given time, and you just don't know.

12  So before you let that happen, that's why you see me grab and

13  pull back, because I'm just trying to go into a single cell.

14  That's it.

15           THE COURT:  When we use the words uncooperative

16  or disrespectful, I think when we start the tape, we see you

17  with another inmate that you are putting into the tank, and you

18  use the same words with him that this inmate, through the

19  booking process, had been uncooperative and disrespectful.  But

20  he looks like a person who's moving on his own volition into the

21  pod.  Is this such a, because of the environment that you are

22  all in, and, obviously, you are seeing people at their worst

23  coming in in these booking scenarios, are the majority of the

24  people that you are dealing with uncooperative and

25  disrespectful?

1         THE WITNESS:  Judge, yes.  You are getting them

2   hot off the press, and it's a whole different separate scenario

3   down there.  I understand we have policies and procedures.  I

4   get it.  I get it.  But you don't have a lot of times a chance

5   to make that choice at that time, Your Honor.  You just don't.

6   You have to do what's best for the situation.  And when he

7   continued to do what he did, I was just trying to put him in a

8   single cell, nothing more.  I never tried to hit him.  I never

9   tried to kick him.

10        THE COURT:  But you were fed up with him?

11        THE WITNESS:  Because we had exhausted all means.

12  And the reason for the isolation, that's the highest level of

13  isolation at that point.  It's the highest level.  So you put

14  him there so everything stops at that point.  And even the guy,

15  later on, I give him a blanket.  I didn't have nothing personal

16  against him or hold it, because that comes with the job.  That

17  comes with the job.  You don't -- you don't snap.  You -- you --

18  you -- that comes with the job.  When he testified he asked me

19  for a blanket, I gave him a blanket.  It was no big deal to me.

20  Business as usual and we move on.

21        THE COURT:  Mr. Boos, questions.

22                     - - -

23            FURTHER RECROSS EXAMINATION

24  BY MR. BOOS:

25  Q    The other inmate you said was uncooperative, disrespectful?

1 The prior inmate that was standing there, is that accurate?

2 A    That's correct.

3 Q    He was not jerked from behind in the collar and spiked to

4 the floor?

5 A    And that inmate didn't also throw his hand in my face,

6 either.

7 Q    Okay.  So there is levels of uncooperative and

8 disrespectful?

9 A    When you throw, from an officer, when you throw your hand

10 up in an officer's face, that, to me, that is removal

11 immediately to an isolation tank.

12 Q    You acknowledge grabbing him by the collar and yanking him

13 back is not consistent with the policy of the Lucas County

14 Sheriff's Office?

15 A    I previously stated that, sir.

16 Q    Okay.  And would you agree that it's also not consistent

17 with some unwritten or understood culture in the booking

18 facility?  The Judge asked you about a culture in the booking --

19 A    No, that --

20 Q    -- facility.  Is there a culture then of jerking people

21 from behind if they are uncooperative and disrespectful by the

22 collar?

23 A    The -- the -- when she's talking about culture, she's not

24 talking about jerking.  I don't believe I took it as that.  I

25 meant overall of handling of the situation.  I'm sorry it

1  doesn't look pretty.  I'm sorry of that.  But my intentions was

2  never to hurt him.  Never, never.

3  Q    I understand that.  What I'm asking you is there a culture

4  of jerking someone from behind by the collar?

5  A    We have -- it's a culture that when a situation arises,

6  when people is acting like Mr. McGovern, you are to handle the

7  situation immediately.

8  Q    And the conversation ended.  You said, at that point, you

9  had exhausted all means.  What do you mean exhausted all means?

10  A    He had been booked in, I listened to him, I stand at the

11  door and listened to him.  He still wasn't happy.

12  Q    But he accepted your answer and he walked away?

13  A    But he also threw up his hand, also.

14  Q    All right.  When you say exhausted all means, you didn't

15  give a verbal command to go to single cell seven?

16  A    Sir --

17  Q    So you didn't actually exhaust all means?

18  A    You don't think about that, sir.  You really don't.

19  Q    Not when you are angry?

20  A    I wasn't angry, sir.

21           MR. BOOS:  No further questions.

22           THE COURT:  Thank you.

23  Mr. Wingate.

24              - - -

25           FURTHER REDIRECT EXAMINATION

GB000475

1  BY MR. WINGATE:

2  Q    Why weren't you angry, Mr. Hobbs?

3  A    I get called names on a daily basis.  I get treated and

4  swung every which way possible every single day.  That comes

5  with the job.  I've been -- I've been in that booking section

6  five years.  I don't have incidents with anything because I

7  don't mistreat people.  The only thing I do is use enough

8  knowledge, based on my training, my experience in that booking

9  area.  Yes, the jail in the booking section is a totally

10  different -- it's different.  It's totally different.  And

11  that's all I'm trying to get the Court to understand.

12      In a typical situation, yes, you would.  But you are in a

13  booking area where these people are hot off the press.  And all

14  I tried to do was simply just remove him.  That's it.  Nothing

15  more, nothing less.  I never tried to strike him.  I never tried

16  to kick him.  That shows that I'm angry, I'm mad, I'm trying to

17  get a cheap shot.  You never see that in the video.  When my

18  backup arrives, I immediately stand up because I had help.  And

19  I had released him prior to that because I didn't feel I had

20  control of him.  So I did release him.  When my backup arrives

21  in seconds, Mr. Boos, you see me standing directly up.  I do

22  nothing else.  Nothing.

23                  MR. WINGATE:  No further questions.

24                  THE COURT:  Mr. Boos.

25                  MR. BOOS:  No further questions.

1          THE COURT:  All right.

2      You are all set, thank you.

3          THE WITNESS:  Thank you, Judge.

4          MR. WINGATE:  Your Honor, we have no further

5  evidence at this time, and, prior to resting, we will renew our

6  Rule 29 Motion.

7          THE COURT:  Thank you.  I'm going to deny the

8  Rule 29 Motion, finding that the State has still met its burden

9  with the prima facie case.

10     Can I have legal argument from each of you with regard to

11  the elements of assault.  A lot of -- a lot of inference or

12  reference has been made to the head hitting the doorjamb, but I

13  think assault is broader than that.  So I don't want to just

14  focus on whether or not the elements are met based on the

15  doorjamb.  So if you could, when you are arguing your legal

16  rationale with the elements of where the elements of assault are

17  met, I would accept some legal argument on that.

18          MR. BOOS:  And we intend to do that, Your Honor.

19  Thank you.

20          THE COURT:  Thank you.

21     Mr. Wingate, you want to do -- are you prepared today to do

22  a closing?

23          MR. WINGATE:  I'm sorry?

24          THE COURT:  Are you prepared today to do -- do

25  you want a rebuttal witness, Mr. Boos?

1           MR. BOOS:  If we may have just three minutes,

2    Your Honor, to confer and make a determination?

3           THE COURT:  Sure.

4           MR. BOOS:  Of very, very brief rebuttal

5    testimony.

6           THE COURT:  Sure, no problem.

7           MR. BOOS:  If we could just have that.

8      (Recess taken and proceedings continued as follows:)

9                         - - -

10          THE COURT:  All right, guys.  Calling a rebuttal?

11          MR. BOOS:  Yes, Your Honor.  We will call Deputy

12   Sheriff Damon Smith.

13          THE COURT:  All right.  Mr. Smith, if you would

14   just come up here and be sworn in, sir.

15                        - - -

16       Thereupon, the State, in order to maintain the issues

17   on their part to be maintained, called as a witness,

18                     DAMON SMITH,

19   who, having been duly sworn as provided by law, testified and

20   said as follows:

21                        - - -

22                  DIRECT EXAMINATION

23          THE COURT:  Hi, how are you?

24          THE WITNESS:  Good.

25          THE COURT:  Thank you.  Mr. Boos.

1  BY MR. BOOS:

2  Q    Thank you.  Deputy, could you state your name for the

3  record.

4  A    Damon Smith.

5  Q    And where are you employed?

6  A    Lucas County Sheriff's Office.

7  Q    What is your current job title?

8  A    I'm in our civil section.

9  Q    Okay.  What are some of your responsibilities in the civil

10 section?

11 A    I handle the subpoenas, protection orders, foreclosures and

12 warrants.

13 Q    What type of training are you responsible for as a deputy

14 sheriff?

15 A    I train the officers in self-control and self-defense.

16 Q    Okay.  What officers do you train?

17 A    The officers -- all the officers, the ones that work the

18 jail, the road, of course, and booking.

19 Q    Okay.  So that would include the officers working in

20 booking?

21 A    Yes.

22 Q    As someone that has trained officers in the use of force,

23 are sheriff's deputies trained in how to escort an individual?

24 A    Yes.

25 Q    And, typically, let's talk about an individual that is not

1  presenting any physical threat to an officer.  How would you go

2  about attempting to escort an individual?  How do you train

3  people to escort an individual?

4  A    We'll demonstrate it.  We'll show them how to do it.  We'll

5  demonstrate and have them demonstrate it to us.  Would you like

6  for me to show?

7  Q    Yes, you can demonstrate on me, deputy, as I -- if I'm an

8  individual that you intend to escort, how would you go about

9  initiating an escort of me?

10  A    Well, my hand would go right above the elbow, the other

11  hand above the wrist, get a good grip on it, and pull the person

12  close and you are walking with them like this.

13  Q    Okay.  And, deputy, with respect to use of physical force,

14  can you tell the Court about the retreat policy in effect at the

15  Seneca County Sheriff's Office?  First, do you train officers on

16  a retreat policy?

17  A    We tell them about the retreat policy and we tell them how

18  they are expected of them that if there is not a threat or if

19  there is an altercation that happens with inside, any sort of

20  thing, they need to step away and call for backup, create

21  distance and call for backup.

22  Q    And you've seen the video in this case depicting the

23  interaction between inmate McGovern and Officer Hobbs?

24  A    Yes.

25  Q    Okay.  Is that consistent, are Officer Hobbs' actions

1   consistent with the retreat policy in effect at the Seneca

2   County or, I'm sorry -- old habits -- Lucas County Sheriff's

3   Office?

4   A   No.

5   Q   Okay.  Is the -- what's purported to be an attempted escort

6   consistent with the training you provide on how to escort an

7   individual?

8   A   No, that's not.

9   Q   Is the physical contact that's initiated in this case

10   consistent with the times you would -- I'll withdraw that.  If

11   you are attempting to escort someone from behind, is there an

12   updated way that officers are now grabbing someone that's

13   walking away or moving away from an officer?

14   A   Yes.

15   Q   And you train officers on that policy?

16   A   Yes.  Yes, we do.

17   Q   Does that involve grabbing them by the collar?

18   A   The only way you might, may end up grabbing somebody by the

19   collar if they are fighting with you, trying to get away and you

20   are just trying to get a hold of them, but there is no teaching

21   grabbing anyone by the collar.

22   Q   Okay.  And do you, at any point prior to them being on the

23   ground, since you've reviewed this disk, see inmate McGovern

24   fighting with Officer Hobbs?

25   A   No, I don't.

1  Q    Can you demonstrate on me the method for gaining control of

2  someone that's walking away or from behind?  Again, if someone

3  that's not necessarily fighting.

4  A    If they are walking away from me, you need to get control

5  and escort them out.  You can, one arm go up on, one hand under

6  their arm and the other one come across here.  You can turn and

7  walk them this way.  If you have to take them down, you can take

8  them down.

9  Q    Okay.

10           THE COURT:  All right.  Let me just ask a line of

11  questioning off of that.

12           MR. BOOS:  Sure.

13           THE COURT:  So you are saying, while the physical

14  grabbing of the collar may not have been appropriate, if he had

15  thrown his arms around him, would I have looked at it as an

16  actually more aggressive move?  He can remove him then and take

17  him down to the ground?

18           THE WITNESS:  You can control the person while

19  taking them down so you can transition to an escort from here.

20           THE COURT:  No, this is a really critical

21  question here.  So you are saying the policy would be that a

22  person walking away --

23           THE WITNESS:  If they are walking away from you,

24  there is no reason for you to have to do that.  There's no

25  threat.

1          THE COURT:  Okay.  So the verbal disrespect or

2     the verbal never allows you to make contact?

3          THE WITNESS:  Right.  There is no reason, if he's

4     walking away, there is no threat, then there is no reason for

5     you to have to.  If he's walking away, you need him to come out

6     of that tank for a reason and you told him plenty of times to

7     come out, you can actually wait for backup and go in and get

8     him.  But there's no reason to go in after that person.

9          THE COURT:  So if there is a verbal statement and

10    a gesture, and the officer is reacting to the verbal statement

11    and the gesture of as disrespect and uncooperative in the

12    tank --

13         THE WITNESS:  Once he really turns his back and

14    walks away, there is really not a threat, so there is no reason

15    to even pursue that.

16         MR. WINGATE:  I'm sorry.  What was that last

17    part?  No reason to what?

18         THE WITNESS:  There is no reason to touch him or

19    pursue him.  There is no threat.  Unless you see him going after

20    someone in the tank, they have a confrontation, then you would

21    probably go after and grab him and get him out of there.  But

22    other than that, there is no reason to grab him.

23    Q    (By Mr. Boos) And, deputy, again, in reviewing this

24    exhibit, did it appear as though inmate McGovern was going after

25    anyone?

1    A    No.

2              MR. BOOS:  No further questions.

3              THE COURT:  Thank you.

4         Mr. Wingate.

5              MR. WINGATE:  Sure.

6                        - - -

7                   CROSS EXAMINATION

8    BY MR. WINGATE:

9    Q    Deputy Smith, you said that you began or you teach booking

10   or you taught the booking area?

11   A    Yes.

12   Q    When did that occur?

13   A    We taught booking officers --

14   Q    No, I just want to talk about you.  When did you do it?

15   A    Me?

16   Q    Yes.

17   A    A few -- last three to four years.

18   Q    Okay.  When was the first time that you taught it?

19   A    The first time I taught?

20   Q    Yes.

21   A    Booking?  Probably about maybe around the time three to

22   four years ago.

23   Q    And would it be fair to say you've never taught Mr. Hobbs?

24   A    No, I don't think I've ever taught Mr. Hobbs.  I don't.

25   Q    All right.  And when you say that because the individual is

1  walking away, you told the Court that verbal and walking away is

2  no reason for physical contact; is that correct?

3  A    Correct.

4  Q    Now are you talking about in a setting whereby you are

5  confronting an individual?

6  A    If he's facing me?

7  Q    Yeah, you just talking to someone?

8  A    If he's just talking to me and he's not showing any threat

9  towards me, there is no reason.

10  Q    Well, he's verbalizing, flips you off, calls you a

11  derogatory name, turns around and walks away?

12  A    That comes with the job.

13  Q    Understood.  Now this is the question.  You've never worked

14  in booking, have you?

15  A    No.

16  Q    All right.  And even though you say there are these

17  policies you should never touch or when you should touch or how

18  you should touch, all right, you've never had to employ these

19  practices in the booking setting, correct?

20  A    Correct.

21  Q    And if a sergeant, who is a supervisor, indicates that I

22  give my COs permission to remove to isolation an individual that

23  is uncooperative, disrespectful, and disruptive without coming

24  to get me, okay.

25  A    Okay.

1  Q    Would that justify an individual CO in grabbing an inmate

2  to remove him to isolation?

3  A    Not if he's not showing any threat.  I can't -- I can't

4  answer that question of what a sergeant tells his own officer

5  what to do.

6  Q    All right.  Let's -- I'll give you a hypothetical.  If

7  Sergeant Gumpf testifies that I have told my COs to handle a

8  situation whereby an individual, in their discretion, has been

9  disrespectful, disruptive, uncooperative, you don't have to come

10  get me.  You can remove that individual to isolation, all right.

11  A    Okay.

12  Q    And you don't know anything about that, do you, because

13  you've never worked in booking?

14  A    I have never worked in booking.

15  Q    All right.  So but that is what this sergeant has said that

16  you can do as an individual officer, okay?

17  A    Okay.

18  Q    That would give you the right to physically take an

19  individual from wherever they are into an isolation tank; is

20  that correct?

21  A    Correct.

22  Q    And as far as the video that you saw and the struggle and

23  everything that took place between Mr. Hobbs and Mr. McGovern,

24  no punches were ever thrown?  You never saw any punches when you

25  looked at that video; is that correct?

1   A    Not that I recall.

2   Q    You never saw any kicking or anything by either Mr. Hobbs

3   or any of the other two officers that came in?

4   A    Not that I recall.

5   Q    Okay.  And you never saw any headbutts or anything like

6   that; is that correct?

7   A    Not that I recall.

8   Q    All right.  Do you recall the officers yelling stop

9   resisting?

10  A    There were some verbal going on, but I can't remember what

11  they were actually saying because when I watched the tape, I

12  don't think there was any -- there was no sound when I saw the

13  video.

14  Q    Okay.

15  A    So I can't.

16  Q    If I said to you that the video contains sounds stop

17  resisting, okay?

18  A    Okay.

19  Q    When an officer tells an individual to stop resisting, what

20  does that mean?

21  A    It means for an individual to stop resisting.

22  Q    All right.  And if you are trying to get control of an

23  individual and you are telling them to stop resisting, what does

24  that mean?

25  A    It means, when stop resisting, you are trying to get

1   control of him to get his hands cuffed and around his back.

2   Q    And would it mean that the individual is not cooperating?

3   A    Correct.

4   Q    And would it be fair to say that as an individual that is

5   involved in trying to get that individual under control, as a

6   CO, I make the determination as to whether or not the individual

7   is resisting or not resisting; is that correct?

8   A    That's correct.

9   Q    All right.  And it doesn't matter what you may look at on

10   the videotape later, it's the individuals at that time at that

11   moment involved in the incident --

12   A    That's correct.

13   Q    -- is that correct?  Now let me ask you this.  The

14   prosecutor, you showed one method of taking down an individual;

15   is that correct?

16   A    Correct.

17   Q    All right.  And you said that you grab onto the arm and

18   then across the chest area, the upper body parts?

19   A    Away from the neck.

20   Q    Away from the neck, okay.  Now I'll ask you to look at this

21   photograph that you can see here.  All right.  Do you see the

22   forearm of Mr. Hobbs there?  Can you -- do you want to come

23   closer?

24   A    Yes, can I come closer?

25   Q    Sure.

```
 1                    THE COURT:  Do you want the lights off,
 2   Mr. Wingate?
 3                    MR. WINGATE:  No, I don't think we need it, Your
 4   Honor.
 5   Q    (By Mr. Wingate) All right.  You see one of his arms braced
 6   on the floor?
 7   A    (Nonverbal answer.)
 8   Q    The other arm is across here; do you see that?
 9   A    Right.
10   Q    All right.  You can go back to your seat if you want.  Now
11   in looking at that photo, that, and the positioning of his arms,
12   is that consistent with trying to gain control of an individual?
13   A    His arm appears to be across the neck as he took him down.
14   So we -- we would not put an arm up there.
15   Q    Okay.  You said it appears to be across the neck?
16   A    Right.
17   Q    Is that his hand?
18   A    The one hand is on the ground.
19   Q    That's here?
20   A    And the other arm seems to be across right here.
21   Q    Across the upper body part?
22   A    Up in this area.
23   Q    But now you see where his head is?
24   A    Correct.
25   Q    All right.  And if his arm were under his neck, you
```

1  wouldn't be able to see that arm, would you agree?

2  A    You would still be able to see the arm.

3  Q    Not the entirety of the arm, correct?

4  A    Correct.

5  Q    You see the entirety of his arm, don't you?

6  A    That's -- I see the arm, yes.

7  Q    Okay.

8              THE COURT:  And just a follow-up question.

9  Obviously, depending on size of your people, you, at a height

10 difference with somebody would come across a body at a different

11 space?

12             THE WITNESS:  Correct.

13             THE COURT:  Correct.  And depending on where you

14 are with a specific inmate, body placement is different?

15             THE WITNESS:  Right.

16             THE COURT:  Based on your own two different

17 sizes, correct?

18             THE WITNESS:  Yes.

19 Q    (By Mr. Wingate) And would you agree with me that

20 Mr. McGovern and Mr. Hobbs are approximately the same height

21 with Mr. McGovern?  Maybe a little taller?

22 A    He seems to be a little taller.

23 Q    Okay.  All right.  And you indicated that if a person is

24 walking away, there is no reason to touch that person because

25 that person does not represent a threat; is that correct?

1  A    Correct.

2  Q    All right.  Now that's one scenario, correct?

3  A    Correct.

4  Q    But, by the same token, if that person had been disruptive,

5  uncooperative, disrespectful, and you are going to remove that

6  person to an isolation tank, that would justify touching that

7  individual; is that correct?

8  A    That's correct.  You, and that's when you have to wait for

9  backup.

10  Q   If you are given an instruction that you can handle the

11  situation, don't come get me, you can remove an individual to

12  isolation, you don't have to go get backup; is that correct?

13  Under those circumstances?

14  A    Under that circumstances.

15  Q    Okay.

16            THE COURT:  Could you rephrase your, or not

17  rephrase it, could you restate your question?  If you are given

18  an instruction to come get me, could you say that?

19            MR. WINGATE:  Not to come get me.  This would be

20  Sergeant Gumpf.  You don't have to come get me.

21            THE COURT:  Got it.  Okay.

22  Q    (By Mr. Wingate) Basically, you are giving the officer the

23  discretion to handle the situation, correct, based upon if what

24  I told you was true as to the testimony of Sergeant Gumpf?

25  A    Correct.

```
 1   Q    Okay.  The officer then has -- the CO then has the
 2   discretion; is that correct?
 3   A    And but we also have a policy that they are supposed to
 4   follow, also.
 5   Q    I understand that.  I understand that.  And you can say
 6   that he may have violated a policy, but he still was acting
 7   within the scope of his authority as given by Sergeant Gumpf; is
 8   that correct?
 9   A    That's correct.
10   Q    Okay.
11                    MR. WINGATE:  No further questions.
12                          - - -
13                    REDIRECT EXAMINATION
14   BY MR. BOOS:
15   Q    Let's assume that a policy exists, okay, about discretion
16   and removing someone if they are intoxicated, disruptive and
17   uncooperative.  How would you characterize someone being
18   uncooperative?
19   A    Not listening, not doing as they are being, what they are
20   told.
21   Q    Okay.  Is there any indication of a verbal command that
22   inmate McGovern refused in this case?
23                    MR. WINGATE:  I would object, Your Honor.
24                    THE WITNESS:  No.
25                    MR. WINGATE:  Unless he has knowledge.
```

```
 1              THE COURT:  I think there was already testimony
 2   that there was no verbal.  There was no audio given to them, so
 3   just ask him what he saw on the video.
 4   Q    (By Mr. Boos) So can you characterize someone being
 5   uncooperative if there's been no verbal command that's been
 6   refused?
 7   A    It didn't look like he was being uncooperative from the
 8   video.
 9   Q    If you needed to remove him from the cell, would the verbal
10   command be a first step?
11   A    Yes.
12   Q    Is grabbing someone by the collar and jerking them to the
13   ground consistent with any method that is trained on at the
14   Lucas County Sheriff's Office?
15   A    No.
16   Q    And even to get to this method of around and the method you
17   described, there would be a need first to take an individual
18   down to the ground?
19   A    Correct.
20   Q    An inmate that's walking away, not refusing orders, is
21   there a need to take that inmate to the ground?
22   A    No.
23              MR. BOOS:  No further questions.
24              THE COURT:  Mr. Wingate.
25                   - - -
```

1               RECROSS EXAMINATION

2    BY MR. WINGATE:

3    Q     Just maybe one or two.  And the first question is the

4    responses that you were giving to the prosecutor relate to

5    policy; is that correct?

6    A     Correct.

7    Q     They do not, your answers, correspond to a different order

8    that's given in booking by the sergeant; is that correct?

9    A     That's correct.

10                   MR. WINGATE:  No further questions.

11                   THE COURT:  Mr. Boos.

12                   MR. BOOS:  Nothing, Your Honor.

13                   THE COURT:  And just, again, for clarification,

14   policy is taught and there is, obviously, best practices?

15                   THE WITNESS:  Yes.

16                   THE COURT:  That you would hope.  In this

17   scenario and in the culture that you work in in the jail, are

18   best practices followed all the time?

19                   THE WITNESS:  They try.  We teach them.  We try

20   to teach them and we try to tell them to retreat, call for

21   backup, if needed, but it depends on the situation that's going

22   on.  I can't really speak on what -- I haven't been -- I haven't

23   worked the jail for seven years.

24                   THE COURT:  Okay.

25                   THE WITNESS:  But I still go in there and train

1  the officers.

2          THE COURT:  Thank you.

3      Anything off my line of questions?

4                    - - -

5          FURTHER REDIRECT EXAMINATION

6  BY MR. BOOS:

7  Q    So you are not able to speak to any unwritten or whether

8  policies are consistently followed or not consistently followed

9  in the jail?

10 A    Correct.  We teach them.  We show them policies, but unless

11 we are called in, we don't.

12         MR. BOOS:  Nothing further, Your Honor.

13                   - - -

14         FURTHER RECROSS EXAMINATION

15 BY MR. WINGATE:

16 Q    And just one question.  When you are talking about the

17 policies, you are talking about generally on the floors two,

18 three, four, five and six; is that correct?

19 A    Just general for the whole jail.  We teach -- we teach them

20 all.

21 Q    I'm going to get to that, but go ahead.  I'm sorry.

22 A    We teach them all the same policies, all the same

23 procedures, and all the same tactics to use.

24 Q    Okay.  I understand that, but what I'm getting at is

25 booking is different than the second, third, fourth, fifth or

1  sixth floor; isn't that correct?

2  A    Each floor is different, if you --

3  Q    Fine.  And booking is different from --

4  A    But there --

5  Q    -- that whole setup in the jail as to each floor?

6  A    Each floor is different, but they all still have tanks and

7  modules, which are pretty much ran the same.

8  Q    I'm sorry, what?

9  A    They all have tanks and modules, which that would be a

10 module.

11 Q    I understand that, but when I say booking is different,

12 booking is when you first receive the individual --

13 A    That's correct.

14 Q    -- off the street whether they are drunk, intoxicated,

15 whether they are high, whether they are belligerent on drugs,

16 that is where they are first received, correct?

17 A    Correct.

18 Q    You are usually down in the booking area, if you know this,

19 at least two or three days before you go upstairs; isn't that

20 correct?

21 A    That could be correct.

22 Q    And, normally, when you go upstairs, you have calmed down

23 or the drugs are going out of your system before you even hit

24 the floors on second, third, fourth or fifth floor; is that

25 correct?

1    A      No.

2    Q      No?

3    A      No.

4    Q      The drugs aren't out of your system?

5    A      Not all the time, no.

6    Q      All right. Well and I want to knock off the second floor

7    anyways because that's the health, mental health floor, right?

8    A      Yes.

9    Q      All right. Okay, now when you say the drugs aren't out of

10   the system?

11   A      There are guys that will -- there are individuals that are

12   still kind of out of it when they get moved up to the other

13   floors.

14   Q      Okay. And I understand that, but all I'm trying to get you

15   to understand is even though it may be still in their system,

16   they are not at the level they were when they entered the

17   booking area, right?

18   A      Not all the time.

19   Q      Well if you don't have access to drugs, it burns out of

20   your system?

21   A      Sometimes they are moved out of booking because they are

22   being combative. They are moved upstairs right away.

23   Q      Okay, that's fine, all right. And there are certain

24   policies, rules and regulations that govern that situation,

25   correct?

1  A    Correct.

2  Q    And it's not the same as it relates to removing an

3  individual to isolation; is that correct?

4  A    Correct.

5                MR. WINGATE:  I have no further questions.

6                THE COURT:  Mr. Boos.

7                        -  -  -

8                FURTHER REDIRECT EXAMINATION

9  BY MR. BOOS:

10 Q    Your training is the same regardless of whether it applies

11 to booking or second floor through the sixth floor?

12 A    That's correct, yes.

13                MR. BOOS:  No further questions.

14                MR. WINGATE:  Nothing further.

15                THE COURT:  Thank you.

16 You are all set.  Thank you very much.

17 Gentlemen, would you like to go into -- are you resting at

18 this point, Mr. Wingate, or you've rested?

19                MR. WINGATE:  Yes, I've rested.

20                THE COURT:  Mr. Boos?

21                MR. BOOS:  State rests.

22                MR. WINGATE:  Renew my Rule 29.

23                THE COURT:  I'm going to deny it, again.

24 Are you prepared to go into closing at this time?  Do you

25 need a few minutes?

1          MR. BOOS:  State would just need one minute.  Is
2    Defense counsel ready?

3          MR. WINGATE:  That's fine.

4          MR. BOOS:  Okay.  Okay, we are ready, Your Honor.

5          THE COURT:  All right.  Mr. Boos.

6          MR. BOOS:  Your Honor, the State was required in
7    this case to prove cause or attempt to cause physical harm.
8    Okay, so that's important first to note physical harm caused is
9    not required.

10   Now what we see in this case, State's Exhibit 7, a video
11   that depicts Officer Hobbs grab an inmate, who was walking away,
12   grab him from behind, admittedly, by the collar, and slam him to
13   the ground.  You hear an audible thud in this case.  As the
14   officer testified, it appears to be his head hitting the
15   doorframe.  Now there's been questions about can you see it.
16   There is a portion where the head goes behind the doorframe and
17   is consistent with when that audible thud occurs.  Audible thuds
18   just don't come out of nowhere.  There's not -- it didn't
19   magically get into this video.  There is an audible thud that is
20   consistent with him being pulled and pulled past that doorjamb
21   when he came in here.

22   You are left with two injuries consistent with being swung
23   and slammed on one's right side, an injury to the right arm you
24   see lands on the right side, and an injury to the right side of
25   his head, which would have passed by that doorjamb.  All of this

 1    talk about dragging on the floor, rug burn, is not consistent

 2    with the injuries.  We see injuries on the right side.  There

 3    were no photographed injuries on the left side of his head, no

 4    photographed injuries on the left arm, just on the right side of

 5    the body.  Again, Timothy McGovern testified that Hobbs was the

 6    cause of those injuries, the cause of the physical harm.  You

 7    have photos of the right side injuries.

 8         But set that aside momentarily, Your Honor.  The Court

 9    asked the State to discuss and consider the assault and the

10    elements of this offense, cause or attempt to cause physical

11    harm.  If you grab someone by the collar and slam them to the

12    ground, at a minimum, you are attempting to cause physical harm.

13    That would be an assault in this instance, and it would be an

14    assault if it happened on the street.  So even if the injuries

15    were caused by scraping on the floor, which is not consistent

16    with what we see on the video, and again, not consistent with

17    McGovern's testimony, again, you are, at a minimum, attempting

18    to cause physical harm when you are swinging someone onto the

19    ground onto a cement floor, Your Honor, onto a cement floor.

20         So you have the assault elements before you.  And this is,

21    sure, there is conflicting testimony, Your Honor, about what was

22    said, who did what, whether there was resistance or no

23    resistance.  But you know what doesn't lie, a video.  A video

24    cannot be impeached in this case.  The video speaks for itself.

25    And that video depicts inmate McGovern walking away from an

1  officer, returning to the pod, not charging at other inmates,

2  not screaming at other inmates, not creating any danger to the

3  officer or any other inmates.  And as he's walking away, as he

4  has his back turned, the officer grabs him by the collar and

5  spikes him onto the concrete floor.

6      And most troubling, Your Honor, is the aftermath of this

7  case.  You hear the defendant yelling don't F'ing grab at me,

8  don't F'ing grab at me.  The video doesn't depict that.  So you

9  hear officers running to the scene that did not see this offense

10  occur, Your Honor.  Of course they are going to say stop

11  resisting, because they see a corrections officer on top of an

12  inmate on the ground struggling.  So of course those officers

13  are going to assume the inmate is resisting.  So the fact that

14  they are saying that is not really surprising.  And we hear

15  inmate McGovern pleading I wasn't resisting, I wasn't resisting,

16  which is consistent with him walking away from the officer.

17      Then you have a report.  So in addition to the don't F'ing

18  grab at me, which is not consistent with what we see on the

19  video, which is what Hobbs says when the other officers are

20  coming, you have a report that is completely false.  Quote, I

21  then grabbed the inmate by his left arm and shoulder to escort

22  him to single cell seven.  Inmate McGovern began to resist my

23  escort to single cell seven.  You can watch that video one

24  hundred times.  You will not see one instance where there is any

25  attempt to grab by the arm or escort into single cell seven.

1     It's one thing, Your Honor, to forget facts or mistake

2   facts, leave things out, but to completely put something in a

3   report that did not occur, again, benefit of the doubt, okay,

4   forgot to put fell to the ground.  But that doesn't explain how

5   something that did not in any way occur gets into that report.

6     So we have two things.  We have both the assertion that is

7   false, totally inaccurate, that he was trying to guide him by

8   the arm into single cell seven.  That's first.  Second, we have

9   the resisting that escort into single cell seven.  Neither of

10   those things happened because inmate McGovern didn't even have

11   an opportunity to resist.  His back is turned, and he's walking

12   away from the officer.  No evidence of resistance.  No evidence

13   of even an opportunity to resist.  Every officer that testified

14   and took that stand in this case testified that there was no

15   threat of physical harm at the time the contact was initiated.

16   There was no threat of physical harm to the officer.  Taken to

17   the ground and handcuffed for officer's safety.  Again, not a

18   single person has identified where there was a threat to officer

19   safety.  Now you can read that sentence and you can break it

20   down, but he was taken to the ground and handcuffed for

21   officer's safety.  Nobody, even Officer Hobbs, has indicated any

22   existence or issue with officer safety.  A man walking away with

23   his back turned cannot and should never be construed as a threat

24   to officer's safety.

25     So what these statements by Officer Hobbs are indicative

1    of, both the don't F'ing grab at me when other officers are

2    showing up and seeing this, as well as the report itself, are

3    evidence of a consciousness of guilt in this case.  There is no

4    resistance, there is no escort, and it's a consciousness of

5    guilt and an effort to mislead because, again, Your Honor, the

6    video doesn't lie.

7         As much as Mr. Wingate would like to speculate about what

8    happened ninety minutes earlier, ten minutes earlier, ninety

9    minutes after, that's not relevant to the exact moment this

10   offense occurred.  And that's at the 5:32 mark when we see an

11   inmate with his back turned, walking away from this officer.

12        When this Court or any court sends someone in the county

13   jail, it should be confident that person would not be subjected

14   to that type of physical abuse that occurred in this case.  And

15   that's regardless of whether we are dealing with the worst type

16   of sex offender or someone like Mr. McGovern who was arrested

17   for O.V.I. and menacing.

18        The conduct displayed in State's Exhibit 7 is not

19   acceptable and, in this case, it's criminal conduct.  And this

20   is why, Your Honor.  There's no policy in place by any of the

21   witnesses that testified, including Sergeant Gumpf, that would

22   justify this type of behavior.  What we have is an assault.

23   Every witness testified about a retreat policy.  Again, nobody

24   is even disputing that there's not a threat to officer safety,

25   okay.  So the first step, we throw out any issue of officer

1  safety even though it's asserted in the report.

2        Second, all the officer had to do was close the door.  Now

3  Mr. Wingate keeps bringing up Sergeant Gumpf's testimony

4  regarding uncooperative, abusive language or intoxicated.  I

5  don't see any point, and Officer Hobbs could not articulate a

6  situation where the inmate was uncooperative.  In fact, he was

7  upset about the phone situation and he walked away from the

8  officer.  That is not being uncooperative.  Sergeant Gumpf also

9  testified, and this was his testimony, that the officer's

10 conduct was not consistent with the duty to retreat policy in

11 place at the Lucas County Sheriff's Office and the jail.  He

12 testified that conduct not consistent with the overall policy to

13 retreat in those situations.  He also testified that if a verbal

14 command is given to move to another cell or a verbal command is

15 refused, but there is not a threat of physical harm, the policy

16 is to go get a sergeant.  But what happened here is there was

17 never even a verbal threat.  He didn't.  And as Officer Smith

18 testified, first thing would be order the person into another

19 cell.  Guide, escort the person into another cell.  Officer

20 Hobbs didn't do any of that.

21       So even if we take Sergeant Gumpf's testimony as accurate

22 regarding a policy where he has some discretion to move an

23 inmate alone to another cell, even using or exercising that

24 discretion, he did not follow the policies and procedures in

25 place at the Lucas County Jail.  He did not give a verbal

1  command.  He did not attempt to escort in the proper method.

2  Although he alleged that in his report, he did not attempt to

3  escort in a proper fashion.  He simply slams a man with his back

4  turned, walking away, to the ground.

5      So, again, in no way is grabbing someone by the collar

6  consistent with any procedure, any applicable procedure that

7  anyone testified to.  So, again, what you are left with is an

8  assault if there is no need for a use of force, which Sergeant

9  Gumpf testified to use of force, and use of force is necessary

10  when there is a threat to the officer.  The only person that is

11  alleged that there was somehow a threat to the module was

12  Officer Hobbs.  I don't see a threat to the module in that

13  video, Your Honor.  I see a man who was frustrated about not

14  being able to use the phone, walking back into the module.  He's

15  not charging back into the module.  He's not -- there is no

16  indication he's angry with someone in the module.  He comes from

17  the back, if the Court watches the video, and casually walks up

18  and initiates a discussion with the officer.

19      So yes, Timothy McGovern was acting like a jerk, foul

20  language, obscene gesture to a CO, but that's not conduct you

21  can assault someone for on the street, and it's certainly not

22  conduct you can assault someone for in what is supposed to be a

23  secure facility.

24      We are talking about, and Officer Hobbs testified that he

25  was in a fight for his life at this point, that this struggle is

1  a fight for his life, but it is a fight that Officer Hobbs and

2  no one else initiated.  McGovern didn't initiate this fight.

3  This entire situation was caused by Officer Hobbs initiating

4  physical conduct, contact, and not only initiating physical

5  contact, but initiating physical contact in a way that is not

6  consistent, Your Honor, with any policy of escorting, with any

7  policy on use of force that any witness in this trial testified

8  to.

9      So we have, A, there shouldn't even be a use of force in

10 this case.  There was never even a verbal command.  A, there

11 shouldn't be a use of force and, B, the use of force was

12 improper.  Even if there -- we assume there was a need for this,

13 which there was not, this was not the proper way to do that.  So

14 there is sometimes this notion, Your Honor, that law enforcement

15 officers should be held to a higher standard.  We are not asking

16 you to do that, Judge.  We are asking you to hold this officer

17 to the same standard that any other citizen would be held to.

18 If this conduct occurred on the street and someone mouths off

19 and is walking away and is then slammed to the ground, that is

20 an assault.  The Revised Code applies to Officer Hobbs the same

21 way it applies to anyone else.  And without any justification or

22 any policy that would condone this behavior, and, again, even

23 with Sergeant Gumpf's testimony, this conduct, there's maybe

24 some discretion to remove him, but this conduct is not

25 consistent with the physical policies in place in the Lucas

1  County Jail or any policy.

2      Absent a justification for use of force, we are simply left

3  with an assault.  And that's what this was.  Grabbing someone,

4  slamming them to the ground, physical injuries, that is an

5  assault.  And for that reason, again, Your Honor, we would ask

6  the Court to enter a finding of guilty.

7                THE COURT:  Thank you.

8      Mr. Wingate.

9                MR. WINGATE:  Yes, Your Honor.  Let's start off

10  by saying that I, even though this matter was tried to the

11  Court, the Court is well-aware, and I just, by habit, will just

12  remind the Court that it is still bound, not that it needs it,

13  is still bound by the same burdens that it would have if there

14  were a jury listening to this matter.  And that being, the State

15  must meet the burden of proof beyond a reasonable doubt.

16      Now the prosecutor talks about this video, but in talking

17  about this video, we are sitting here in excess of six months

18  later.  And we are, as far as the prosecutor is concerned, given

19  his interpretation, because the video is subject to

20  interpretation.  It all depends on who is looking at it and what

21  you are looking at it for.

22      Now I'm not going to stand here and tell this Court that

23  Mr. Hobbs did not violate the written policy that's there, as

24  officers have testified to.  There is a certain written policy.

25  But in making this determination, I know the prosecutor has said

1   that you don't need to know about the conduct of Mr. McGovern 90

2   minutes earlier, 60 minutes earlier, 25 minutes earlier, 15 or

3   5, 10, 1 second or 1 minute earlier, and he's right.  But what

4   you have to look at is that this is over in the booking area.

5       This is an area where certain procedures, certain

6   encounters take place, certain interactions between the

7   individuals and the COs that are there.  And you have an

8   individual that has come into the Lucas County Jail that is

9   escorted, and this is from the testimony of the State's witness,

10  escorted by four police officers, which is indicative of an

11  individual that is troublesome, that is uncooperative, but

12  basically signifying that it is a troublesome individual.  We

13  have an individual that at the booking desk creates problems,

14  that because of the issues with this young man, Mr. McGovern, he

15  doesn't go through the normal booking process, that is, being

16  photographed, being allowed to dress out, and then taken to the

17  tank.  He is moved from booking with uncooperative written on

18  his form.  He's taken directly to the photo, photographer, and

19  from there, photograph is not taken, he's taken to dress out and

20  then taken to the cell.

21      So this is an individual that, at best, had entered the

22  jail with a certain attitude, and you have to look at that,

23  because these individuals are dealing with this particular --

24  this specific individual.  Once he's taken into the cell, this

25  is where the Court has to look and make a determination.

GB000508

1    The State, in its rebuttal or its argument in asking the

2  Court not to grant a Rule 29 Motion, said that Mr. Hobbs had

3  knowingly caused or attempted to cause physical harm to another,

4  and that the physical harm was the injuries that you saw on the

5  forehead, the scrapes that you saw on the elbow.  And with that

6  being said, we are now talking about, well, he could have hit

7  his head on the -- on the door, doorjamb, and that would be an

8  assault.  But, Your Honor, it's not being viewed in the context

9  of a vacuum.  If you are going to suggest that he hit his head

10  on that doorjamb, then every report that was filed by any police

11  officer or any deputy sheriff in this case has said that he had

12  a scrape to his forehead and a scrape to his elbow to which the

13  nurse, who administered to him, applied medication and a

14  Band-Aid.  If you are going to argue that he hit his head with

15  such force that you heard the loud bang, there is no indication

16  of any bruising whatsoever on his head.  There is no indication

17  that he ever complained about having a headache or his head was

18  injured, nothing like that.  So we are left with the injuries on

19  his forehead and his arm as being the assault, and the only

20  assault that the prosecutor has addressed.

21    The Court can say, well, or the prosecutor can say, well,

22  he was being choked.  That, too, is even in question, because

23  you heard Mr. Smith testify that, you know, and the Court

24  inquired as to the size of the individuals, whether or not the

25  arm would be across the neck, and we discussed that.  And we

1    also know, since the State brought it up, that Mr. McGovern

2    indicated that I never told anyone that I had been -- that I had

3    been choked until this detective said were you being choked and

4    he said, oh, yes, I was.  But that's the only indication that we

5    have, Your Honor.  And even so, the State's not saying that that

6    was the assault.

7         So then the only thing that's left would be the scrapes and

8    the abrasions that the Court has heard about.  And we have a

9    scenario whereby, one, he's on the ground, and it was

10   Mr. McGovern who testified that I know I got these injuries when

11   I was attacked by Mr. Hobbs.  He picked me up and slammed me on

12   my head.  There were questions asked of witnesses in this case

13   that these abrasions on the head, forehead and elbow, were they

14   consistent with being slammed to that concrete floor at the

15   Lucas County Jail.  No one said that.  No one in the

16   prosecutor's case, and the prosecutor didn't even ask that

17   question.  I did as to whether or not these injuries were

18   consistent, and they are not, because Detective Gumpf -- I'm

19   sorry, Sergeant Gumpf said that they were consistent with we

20   call them strawberries.  We call them rug, rug burns, which

21   would be consistent with this.  I don't think you can find even

22   a coroner who would say that or medical expert who would say

23   that this scrape would be caused from anything except the flesh

24   being rubbed across a surface.  That's all that it was.

25        I only point that out because now we ask the question how

1  did he get these injuries.  Was it when he was struggling with

2  Mr. Hobbs or whether he received them when he was struggling

3  with Officer Grant and Officer Meyers.

4          THE COURT:  Well let me just ask you a question.

5  For your closing then, since part of what the cause or attempt

6  to cause for the physical harm is also going to be the natural

7  and foreseeable consequences that occur once the action was put

8  in motion, so even if the scrape comes in the secondary portion,

9  the removal, takedown starts with Defendant Hobbs.  The natural

10  sequence of these other officers entering, do you see that as is

11  that some form of intervening consequence?

12          MR. WINGATE:  Your Honor, I would argue that it

13  would be an intervening consequence because when these officers

14  arrive, Mr. Hobbs stood up.  These officers are now telling him

15  stop or, I'm sorry, yes, stop resisting.  Quit resisting.  They

16  are now asking him.  It's not as if he is just laying there and

17  they come and apply this.  They are saying to him, at this

18  point, an entirely different officer, and officers believed that

19  he should be controlled, so they are now trying to gain control

20  of him, not so much that Mr. Hobbs has put this into motion.

21      Yes, he's struggling with the individual.  Yes, they are

22  coming to his assistance, but once he stands up, then the

23  officers are now saying to him quit resisting.  They have the

24  authority to make that request, and if you are going to say that

25  was a verbal command, he was not complying with that verbal

1   command.  So now the officers are trying to physically gain

2   control of him.  So I do believe that it would be an

3   intervening -- an intervening incident that if those were the

4   injuries created at that time, that that would absolve Mr. Hobbs

5   of any responsibility.

6           THE COURT:  Those officers are entering into play

7   when they see an officer down on the ground with an inmate, and

8   they are not stopping to ask questions who caused it.  They are

9   entering into an already occurring sequence.

10          MR. WINGATE:  Absolutely, and in entering into

11  that sequence, it is their responsibility to gain control of the

12  individual and then to take him, if they are going to take him

13  to the isolation, he should go there.

14      But see, Your Honor, even you asking that question, then

15  you still have to go back to why is he in that position in the

16  first place.  And I know we have talked about administrative

17  policy through this and we have talked about policy that governs

18  over at the Lucas County Correctional Center, but we talk about

19  a policy that, although it is in existence, we have a sergeant

20  who clearly indicated that I allow my deputies to have

21  discretion in trying to remove an individual that has been

22  uncooperative, that has been disrespectful, and has been

23  disruptive taking that individual to an isolation cell without

24  coming to get me, that he has given them, in booking, that

25  discretion.  So, at that point, I understand that the policy is

1  still in place.  It governs everything that happens over there.

2  But you are talking about policy versus reality.  And in the

3  reality, and if the Court wants to call it culture, culture,

4  that is what is in existence in the Lucas County booking area.

5  Right or wrong.

6      I don't deny that he violated the written policy that's in

7  play over there, but I also say to the Court that, as an

8  employee under the sergeant, who is the supervisor in that area,

9  for him to give that authority to him or to any officer as it

10  relates to inmate interaction, then there is nothing that he has

11  done that would violate the policy under which he believes he

12  can operate.

13          THE COURT:  So let me just say while that may

14  have been an argument for him to keep his job or to argue

15  internally for why there shouldn't have been ramifications, how

16  does the overriding policy of how something gets to hand or

17  overwriting of the policy in a business or facility override the

18  law?

19          MR. WINGATE:  Well I -- and that's fine.  But we

20  are talking about the Ohio Revised Code, which says that no

21  person shall knowingly cause or attempt to cause physical harm.

22  From everything, if you are saying that he's acting under the

23  auspices of what Sergeant Gumpf has said to him, when Mr. Hobbs

24  entered this cell, he entered to remove an individual that, in

25  his discretion, he has determined to be uncooperative,

1  disrespectful, and a risk, as he testified, to be disruptive to
2  the other inmates in there based upon his training, education
3  and experience in the booking area based upon when Mr. McGovern
4  first entered that area.
5     So when he goes in there, he's going in under the auspices
6  of what this sergeant has told him.  He's not going in to
7  assault.  He goes in with the intent of removing him to the
8  isolation tank.  If you believe him, he said I fell.  If you
9  don't want to believe him, let's -- you are going to say he
10  threw him down.  But we don't know that beyond a reasonable
11  doubt because that standard is still applicable.  But, in any
12  event, in going in there and grabbing him, and that's another
13  matter that I do believe was talked about over the course of
14  this trial that could also constitute an assault, simply
15  grabbing him by the neck and pulling him down; however, Your
16  Honor, the fact of the matter is I'm going in to remove him from
17  that area, and I am going in to remove him to isolation.  It
18  says knowingly cause or attempt to cause physical harm.  The
19  actions of Mr. Hobbs is totally inconsistent with him trying to
20  cause physical harm.  He's not throwing any punches.  If you
21  want to argue --
22           THE COURT:  I got to take you back then on the
23  words.
24           MR. WINGATE:  Okay.  Take me back.
25           THE COURT:  It's knowingly, regardless of

1  purpose.

2          MR. WINGATE:  Okay.  I'm listening.

3          THE COURT:  So it's knowingly, so you got him

4  knowingly.  Let's say he goes in and he's knowingly going to,

5  you know, as far as he's concerned, he's still within Gumpf's

6  policy.  It may not be Ohio policy, but if he feels like he's

7  working that, but it's knowingly, regardless of his purpose,

8  when he is aware his conduct will probably cause a certain

9  result.  He knows his conduct is going to grab a human.  He

10  knows that there's going to be some contact, whether or not it's

11  with him, the floor, the wall, whatever.  But you are saying the

12  purpose changes, because his purpose is simply to remove him.

13          MR. WINGATE:  And what I'm saying, Your Honor,

14  and this is where I would disagree with the Court.  The purpose

15  in grabbing him, he doesn't know he's going to fall.  If we are

16  going to say let's accept what he's saying being true, he

17  doesn't know he's going to fall.  He's knowing I'm going to grab

18  him and, by grabbing him, I'm going to pull him out and I'm

19  going to take him to isolation.  That is my purpose.  That is my

20  goal.  This is my execution.  But when you fall, then, as he

21  testified, as we are now on the floor, it becomes I'm the deputy

22  sheriff.  I don't want to get hurt, so I want to control this

23  individual.

24          And, as I said, if you are going to say he was in there to

25  purposely assault him or to -- I'm sorry, purposely cause -- I'm

1   sorry, knowingly cause or attempt to cause physical harm, Your

2   Honor, the mere jerking him back, you can't say that that caused

3   physical harm.  You can't say that he would foresee that he

4   would fall, if that's what happened.  And I would argue that

5   that is exactly what happened, because it's inconceivable that

6   you would think that this close, between these door -- this

7   doorjamb in this doorway that I am going to take somebody down

8   and I would not expect to get hit, either him getting hit or me

9   getting injured.  It's just inconceivable that someone that has

10  worked there for six years would come to that conclusion, but,

11  nevertheless, I am going to take him down right here in this

12  area.  He said not only from that witness stand, but he said

13  that he went in there for one specific reason, to remove him to

14  the isolation cell for being disruptive and that trilogy that we

15  keep repeating.

16      But, even more so, the Court is also told in its

17  instructions you look at the actions of that individual.  You

18  talk about the initial act of him grabbing him and them going

19  down.  You then look at his actions.  If you are talking about

20  an assault, no punching, no kicking, nothing that would indicate

21  that he is causing or attempt to cause physical harm to

22  Mr. McGovern.  And I know the State disagrees with this, but

23  even here, again, you can't say he's choking.  He's still trying

24  to gain control.  He was enabled to do it.

25      The State keeps using the term don't grab at me.  That was

1   never said.  If the Court will listen to this tape, this video,
2   he said don't flip your finger at me.  Don't stick your finger
3   up at me.  Something along those lines.  Not one time does he
4   say don't grab at me.  And after saying that, it becomes stop
5   resisting.  Stop resisting.  No punches, nothing of that nature.
6       And I know the Court is, again, inquiring as to, you know,
7   well, he still went in there and grabbed him.  And I'm saying to
8   the Court that that is a violation of policy, the written
9   policy.  However, not one time did Sergeant Gumpf say that with
10  my policy of going in and dealing with an individual that has
11  fallen on the trilogy that he enunciated, not one time did he
12  say you must first go in there and give a command.  You must
13  first go in there and escort them gently.  He said I told them
14  to handle the situation without coming to get me.  And it is
15  within their discretion as to when an individual is to be
16  removed.
17      I'm not saying that his conduct was correct only under the
18  auspices of the policy in place, but I am saying that there was
19  no intention to cause physical harm.  And if you are going to
20  say that, well, he should have foreseen this, there is such a
21  thing as negligent assault, Your Honor.  Knowingly cause
22  physical harm, no.  I do not believe that that has been
23  established by the State beyond a reasonable doubt.
24      The only other thing that I will say to the Court is that,
25  as it relates to Mr. Hobbs, statements made by the State as far

1  as him saying he's in a fight for his life, if you say that,

2  then I think the only thing you can say about him that as far as

3  fighting, all he appears to be doing is trying to control an

4  individual that he can't get cuffs on, as it relates to

5  Mr. Hobbs. And the only other thing that I will say to you is

6  that when the State indicates that this is a violation of the

7  policy, he did not follow the necessary policy as far as any

8  verbal commands, that none of that would be applicable under the

9  circumstances of the culture that has been established as talked

10 about through Sergeant Gumpf.

11     The defendant told you, Mr. Hobbs told you, that my report

12 was inconsistent with the video. He told you that, you know, he

13 was aware of the cameras there when he wrote the statement. He

14 knew that if he deliberately lied, the cameras could refute

15 anything that he said and he wrote the statement as he could

16 best recall. That video is subject to interpretation, but, Your

17 Honor, we have to look, as the terminology goes, at the totality

18 of the circumstances as they existed at that time. And I think

19 that after doing that, the State, the Court will realize that

20 the State has failed to meet its burden of proof, and that

21 Mr. Hobbs is entitled to a verdict of not guilty. Thank you.

22          THE COURT: Thank you.

23     Between the two of you, are you under the impression that

24 you don't want the Court to review any of the standards for use

25 of force under the Code Section 5120-901 with regard to how it,

1  specifically, is allowing the use of force during the Department

2  of Rehabilitation and Corrections or institutional rules?

3          MR. BOOS:  We have no issue if the Court desires

4  to use that code section.

5          MR. WINGATE:  I do, because he's charged under

6  section 2903.13(A) of the Ohio Revised Code, and I think that

7  section that the Court is relating to deals with administrative

8  procedures and policies.

9          THE COURT:  It does deal with the administrative,

10  it is just what allows them to actually put hands on because

11  they are ultimately in a situation where, different than the

12  general public, where we have, in many situations, no ability to

13  put hands on somebody else, in a correction facility, they have

14  a little more leeway as to when they are in standards.  So do

15  you want to review the code section to see whether or not you

16  want me to rely on it, or are you asking me to look at him not

17  from being in an institutional setting, but as a person directly

18  with assault?

19          MR. WINGATE:  Since you put it that way, I would

20  like to look at it.

21          THE COURT:  Can you print off a second since I've

22  written some notes on here?  Would be 5120-901.

23          MR. BOOS:  And, Your Honor, may I begin my

24  rebuttal close or would you be desirous to look at this?

25          THE COURT:  Well, no, I want to be able to leave

1  you an opening to be able to review it, if that's okay, and see

2  whether or not he has any reason to look at it.  I'll need two

3  copies.

4            (Pause in the proceedings.)

5            THE COURT:  And, gentlemen, I guess what I'd ask

6  for you, if you feel like there is a need to clarify whether or

7  not we use any portion of that code, because that may be

8  something that happens more in civil suits where they are

9  determining whether or not, and here we are, obviously, dealing

10 with a criminal code section.  So I just want you to make legal

11 argument one way or the other.

12            MR. BOOS:  Your Honor, the State's position is

13 that we would be content if the Court did desire to utilize this

14 in its deliberations.  We would certainly have no issue with

15 that, and we would encourage the Court to utilize it in its

16 deliberations and considerations.

17            THE COURT:  I'm sorry.  I didn't know.  I thought

18 you were still reading.

19            MR. WINGATE:  No, no.  No, Your Honor, I've

20 completed reading it, and I would be objecting to the Court

21 utilizing this inasmuch as even as it is captioned, it says

22 Department of Rehabilitations and Corrections, but that is not

23 what Lucas County Correction Center is considered.

24            THE COURT:  All right.

25            MR. WINGATE:  And they talk about prisoners, et

 1  cetera, and these are generally prisoners that have been

 2  convicted.

 3          THE COURT:  All right.  So, at this point, you

 4  would just ask me to apply the standards in just a misdemeanor

 5  assault?

 6          MR. WINGATE:  Yes.

 7          THE COURT:  Under the criminal code with no

 8  reference to 5120.

 9     Any objection to that, Mr. Boos?

10          MR. BOOS:  No, Your Honor.

11          THE COURT:  All right.

12          MR. BOOS:  We defer to the Court as to whether it

13  wants to consider that.

14          THE COURT:  Thank you.  Final close, Mr. Boos.

15          MR. BOOS:  Thank you, Your Honor.  Yes, and I'll

16  get to this in a minute as far as what happens.  There is a lot

17  of focus by Mr. Wingate as to what happens when the inmate is on

18  the ground.  The State's theory of the case is grabbing someone

19  by the collar and slamming them onto the concrete floor is an

20  assault.

21          MR. WINGATE:  Your Honor, I'm going to object,

22  because the State clearly said that the abrasions would

23  constitute the assault.

24          MR. BOOS:  That's not -- that's not what the

25  State said.  That doesn't preclude us from -- we never said we

1   are limited to that.  Yes, the abrasions are a result of that

2   cause or attempt to cause physical harm.

3              MR. WINGATE:  There was a Bill of Particular to

4   which the State did not respond.  In response to the Rule 29

5   Motion, you specifically said that the assault was the injuries

6   of the scrape on the head and the elbow.

7              MR. BOOS:  Is there any rule that the State is

8   limited to what it says in a Rule 29 Motion?

9              THE COURT:  All right.

10             MR. BOOS:  Responding to a Criminal Rule 29

11  Motion that the State is then limited to that evidence of that

12  element, Your Honor?

13             THE COURT:  None that I'm aware of, Mr. Boos.

14             MR. BOOS:  Okay.  So I don't know.  When the

15  Court is ready, I'll be able to proceed.

16             THE COURT:  So Mr. Wingate, let me just address

17  your objection.

18             MR. WINGATE:  Sure.

19             THE COURT:  With regard to what is before the

20  Court to make the determination, and certainly what would be

21  before the jury because, obviously, a jury wouldn't be privy to

22  a Rule 29 Motion or an argument or any elements that were used

23  in that, nor are they privy to what's in a Bill of Particular.

24  They are taking what they are viewing as a whole and fitting it

25  and applying it to the elements.  So I guess I'm trying to

1   understand how you think I would distinguish --

2           MR. WINGATE:  Your Honor, I, if I'm understanding

3   what the Court is saying, if there -- the State, the jurors

4   would not have or would not be privy to a Bill of Particulars;

5   however, the State would provide us in a response to a Bill of

6   Particulars what they believe they will prove.  They are not

7   going to give me an incident and say this is what we are trying

8   to prove, that we -- that he injured him by slamming him down on

9   the ground on his head.  That's what I would be arguing to the

10  jury.  I would not expect the State, during the pendency or the

11  trial of that matter, to then say to the jury in closing

12  argument since we have been arguing against that, well, no, that

13  was not the injury.  The injury or the assault took place when

14  he banged his head on the doorjamb.

15  Rule 7(B) of the criminal rules clearly states that, you

16  know, the Court may at any time before, during, or after trial

17  amend the indictment information or complaint.  This is not an

18  amendment.  Basically, the State is saying, well, we had an

19  assault that occurred with the banging of the head.  We had an

20  assault that could have occurred with the grabbing by the

21  collar, a second incident.

22          MR. BOOS:  We have him grabbing him by the collar

23  and slamming him encompasses the act itself, which is an

24  assault, slamming him to the ground, and it encompasses the

25  banging of the head.  I'm not sure why we are, in rebuttal

1   close, addressing a Bill of Particulars at this point of the

2   proceedings.  This is argument, Your Honor.

3           THE COURT:  Understood.  I have not had it

4   separated out in this manner before, Mr. Wingate, because,

5   obviously, there's a continuation of the action of what occurs.

6           MR. WINGATE:  I understand that, Your Honor, and

7   I guess what I'm trying to detail to the Court is that if there

8   are three or four instances that the State can allege that

9   are -- that an assault could have occurred, the State could have

10  filed three or four individual assault charges against the

11  defendant.

12          MR. BOOS:  And the State has never referenced

13  choking, Your Honor, or alleged.

14          MR. WINGATE:  Can I finish?

15          MR. BOOS:  I would like to finish my rebuttal

16  closing.  You were not interrupted in the middle of yours.

17          THE COURT:  We are in the middle of your

18  objection, Mr. Wingate.

19          MR. WINGATE:  Thank you.

20          MR. BOOS:  Again, the State has never said the

21  conduct on the floor is part of the assault.  The swinging and

22  slamming to the ground has been consistently testified to and

23  mentioned as the assault in the State's theory of the case.  So

24  I'm not sure what the issue is.  That is one act.  The State's

25  theory is that he sustained injuries during that act, but

GB000524

1    regardless, that is the act that has been repeatedly mentioned,

2    the act of pulling someone and slamming them on a concrete

3    floor.

4              THE COURT:  A significant amount of questioning

5    has occurred that has tried to distinguish that the abrasions

6    occurred during the scraping on the floor.

7              MR. BOOS:  Right.

8              THE COURT:  So and your continued, as I took it,

9    that's still up for me to determine whether or not that's part

10   of the assault.

11             MR. BOOS:  Right.  And that's -- and that's fine.

12   The State's theory of the case is the slamming to the floor.

13             THE COURT:  Correct.  And injuries and --

14             MR. BOOS:  And I'm going to explain the

15   significance of what happens on the floor if I can get to that

16   point momentarily --

17             THE COURT:  All right.  So your --

18             MR. BOOS:  -- why that becomes problematic.

19             THE COURT:  Your argument would be that if no

20   abrasions existed, we still have the assault.

21             MR. BOOS:  Yes.

22             THE COURT:  Just from the grabbing and the

23   slamming on the floor.

24             MR. BOOS:  Right.

25             THE COURT:  All right.

1     Mr. Wingate.

2          MR. WINGATE:  I'm sorry.  The Court said that the

3     State's contention is the grabbing and slamming on the floor

4     resulted in the abrasions?

5          THE COURT:  He's saying that even if the Court

6     doesn't find the abrasions happened at that exact moment, that

7     there still would have been a grabbing and the body hitting a

8     solid object that would constitute his infliction of injury.

9          MR. BOOS:  And that's what we said in our initial

10    closing argument as well.  Cause or attempt to cause physical

11    harm.

12         MR. WINGATE:  All right.

13         THE COURT:  All right.  I'll allow second close.

14    Overrule the objection.

15         MR. BOOS:  Regarding those injuries, Your Honor,

16    rug burn asserted by a photograph, we don't see rug burn on the

17    left side of the head.  We don't see rug burn on the left arm.

18    We see injuries on the right side, again, consistent with being

19    pulled down and slammed on one's right side.

20    Mr. Wingate talked about six months later this video is

21    subject to interpretation or things like that, but one day after

22    or two days after, Lamonte Hobbs filed a report that said I then

23    grabbed inmate McGovern by his left arm and shoulder to escort

24    him into single cell seven for being disruptive and

25    disrespectful.  He began to resist my escort.  That does not

happen, and that is not depicted in the video.  So forget about
six months later.  He was writing that in a report, something
that he acknowledged, and something that anybody that views that
video can see did not happen, and that was put into the report
by Hobbs himself.  It does not say I was following discretion
placed upon me by Sergeant Gumpf, and I made this decision to
remove someone from the cell.  It says I tried to escort him by
his arm.  He resisted.  The Court cannot overlook the
significance of that report two days after the fact and contrast
it with what Hobbs' testimony was in this case.

Mr. Wingate keeps talking about officers saying stop
resisting, conduct that occurred on the floor.  And that is
exactly why the conduct of Officer Hobbs is so dangerous.  If
you are an inmate and you are walking away, you are not
physically a threat to an officer and you are walking away and
you get slammed to the ground.  What you do on the ground after
being slammed to the ground, you may be, at that point,
resisting, but that doesn't matter.  That's not what he was
doing and he was not resisting prior to being slammed on the
ground.

When we -- when this kind of thing happens, it makes people
more dangerous.  It makes the other officers more, in more
danger, and it makes other inmates.  If they are fearful that
they are going to be slammed on the ground after walking away
from an officer, that's the conduct that is criminal in this

1  case, Your Honor.

2  And as far as Sergeant Gumpf, he talked about discretion to

3  remove someone from his cell.  He did not say that discretion

4  allows the officer, I gave them discretion to then abandon all

5  other procedures that are applicable in this case.  He did not

6  say he can abandon the retreat policy.  He did not say he can

7  abandon the use of force policy in this case.  He said

8  discretion.  He still then has to follow the other methods and

9  training, and there's been no justifiable -- the manner or the

10  fact that the contact was initiated at all, nothing that anybody

11  has testified to has justified that.  Sergeant Gumpf, himself,

12  testified that entering that cell, following that inmate into

13  the cell violated the retreat policy in place at the Lucas

14  County Jail.  He never testified that I gave my officers

15  authority to violate that retreat policy.

16  And no one testified, there was talks about a culture.  And

17  even Officer Hobbs testified that there's a culture.  Well

18  generically saying there's a culture doesn't mean that we now

19  violate all the rules.  No one said that there is a culture of

20  jerking someone from the back of the collar and slamming them

21  onto the ground.  Zero testimony consistent with that being

22  somehow an unwritten culture at the Lucas County Jail.

23  Again, Your Honor, where is the threat in this case.  We

24  don't see a physical threat.  And this notion today, now that we

25  hear for the first time that there was a threat to inmates,

1    there was somehow a danger to inmates, no officer identified

2    that as a reason for removal from the cell.  The majority of the

3    testimony said he could have just closed the door because you

4    don't see him threatening or being a danger to other inmates.

5         This Court has heard two versions or is aware of two

6    versions.  First, when the defendant writes a report two days

7    after the fact, when he's dealing with job security, writes a

8    report saying I tried to escort him and he resisted.  Now we are

9    in a criminal hearing, and he says no, that's wrong.  That

10   didn't happen.  Now, for the first time, he's saying I tried to

11   remove him for inmate safety.  The Court cannot reconcile those

12   two statements and the Court should take that very seriously in

13   this case.

14        And Mr. Wingate also talked about he didn't punch him or

15   continue assaulting him when he gets up.  Well we wouldn't

16   expect someone who writes in a report something that didn't

17   happen to then assault the inmate in front of the other officers

18   who are arriving to help.  So that is not really surprising in

19   this case.

20        And, frankly, Mr. Wingate mentioned that it's inconceivable

21   he would do this act, and that is somehow consistent with a

22   fall, because he wouldn't do this act, try to take someone in

23   that closed space.  That's the point, Your Honor.  He didn't

24   care who got hurt.  He was angry.  He snapped.  He lost his

25   cool, understandably, and that is all mitigation.  That is all

1  something the Court can take into account.  Certainly, the

2  middle finger in the face of an officer is appalling, the

3  language used disgusting; nonetheless, that's the reason this

4  happened.  The officer snapped, lost his cool.  The same way if

5  a person on the street, someone says something and is walking

6  away and then reaches back and slams him to the ground.  That is

7  what happened here, and that is an offense of assault because no

8  one testified to a policy that justifies this type of behavior.

9      So whatever code you are looking at, or if you are

10  considering testimony of the witnesses, there is no protocol and

11  no one testified that this is acceptable in that exact manner of

12  removal from a cell or that was even warranted in this case.  So

13  again, Your Honor, we'd ask for a finding of guilty.

14          THE COURT:  Thank you.  Gentlemen, I would just

15  like to be able to give you a decision tomorrow morning.

16      Are you available, Mr. Wingate, tomorrow morning?  I would

17  like to be able to view the video again, just watch it more

18  close up.

19          MR. WINGATE:  What time tomorrow morning?

20          THE COURT:  I have quite a few things in the

21  morning, so what's your availability?

22          MR. WINGATE:  I'm available.

23          THE COURT:  Let's go with 10:30.

24          MR. WINGATE:  That's fine.

25          THE COURT:  Oh, I'm sorry.  Mr. Neumeyer, do we

1  have our bench trial at 10:00?

2          MR. BOOS:  Yes, I think so.

3          (Discussion held off record.)

4          THE COURT:  Why don't you try to be here at

5  10:00, Mr. Wingate.  We have like seven things including

6  sentencings tomorrow, so I thought we probably wouldn't get done

7  until 10:30.  Just be here at 10:00 then, please.

8          MR. WINGATE:  That's fine.

9          THE COURT:  Can you move any of my things to

10  8:30?

11          (Discussion held off record.)

12          THE COURT:  All right.  And I'll just review

13  the -- review and try to listen to the sound a little bit

14  better.  That's the only thing I couldn't from here hear the

15  sequence of sound.

16      So, Mr. Boos, and can you leave this here so I can listen

17  to it?

18          MR. BOOS:  Yes, Your Honor.  I can leave the

19  speaker or the laptop and the equipment itself.

20          THE COURT:  Yes, if you can just leave it, I'll

21  do it.  As soon as we are finished with the things today, I'll

22  try to listen to it.  All right.  Thank you.

23          (Proceedings concluded at 1:34 p.m.)

24              - - -

25

1

2

3

4

5

6

7              C E R T I F I C A T E

8

9            I, THE UNDERSIGNED, HEREBY CERTIFY

10   THAT THE ABOVE AND FOREGOING IS A TRUE

11   AND COMPLETE TRANSCRIPT OF THE PROCEEDINGS

12   HAD IN THE TRIAL OF THE ABOVE-ENTITLED CAUSE.

13

14

15

16                    _____
                      Diana M. Ziegelhofer, RPR
17                    Official Court Reporter

18

19

20

21

22

23

24

25

# IN THE COURT OF COMMON PLEAS OF LUCAS COUNTY, OHIO

STATE OF OHIO,          )

      Plaintiff,    )

    vs.          ) Case No. CR0201703023

LAMONTE HOBBS,      ) Hon. Stacy L. Cook

      Defendant.    )

- - -

## TRANSCRIPT OF PROCEEDINGS

BE IT REMEMBERED, that the above-entitled cause came on for bench trial before The Honorable Stacy L. Cook, in Courtroom Number 6, in the Lucas County Court of Common Pleas, on the 28th day of June, 2018. The following proceedings were had, to wit:

## VOLUME IV OF IV

APPEARANCES:

        On behalf of the State of Ohio:

          JULIA R. BATES, Prosecuting Attorney
        By: Brian O. Boos, Assistant Prosecuting Attorney

        On behalf of the Defendant:

          Ronnie L. Wingate, Esquire

GB000534

1                          I N D E X

2

3

          (No witnesses sworn for State/Defense.)

4
                             - - -
5

               (No exhibits marked)
6

7                            - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB000535

1          (Case commenced at 10:35 a.m.:)

2          THE COURT:  Matter is before the Court, State of

3     Ohio versus Lamonte Hobbs.

4          Mr. Boos, Mr. Wingate, Mr. Hobbs, the Court did listen to

5     the testimony of the bench trial over the course of the last

6     several days.  I know that this case is slightly different in

7     the sense that, Mr. Hobbs, you have been a law-abiding citizen.

8     This was in the course of your employment, and certainly, from

9     the difference between maybe what was culture, policy, how

10    things occur in that everyday situation, the Court is not -- not

11    naive to the fact that that population that you are working with

12    in a jail setting is, and often in booking, is often a very,

13    very difficult population to work with.

14         As the Court is aware, and certainly you, as corrections

15    staff, you get people in various states of sobriety, whether or

16    not it's alcohol or other, other drugs.  You have people with

17    varying stages of anger and mental health issues.  And so I

18    don't in any way lightly disregard the work that you do and have

19    done for years.  And, obviously, we are inundated daily with

20    much more egregious acts of aggression and violence to inmates

21    or people being arrested, and the level of what the Court saw, I

22    didn't see that you exacerbated to a more violent -- I think as

23    your attorney put on the record, you know, we didn't have

24    kicking, we didn't have punching, we didn't have that next level

25    of what we attach to assaultive behavior.  But the elements that

1  the Court has to look at is it is not just how bad it got, it is
2  just, ultimately, the elements that meet the burden for assault.

3      I did go through the video, frame by frame, slowing it down
4  as I could.  I would have to say that with regard to whether or
5  not the head hit the doorjamb, the simultaneous noise that you
6  hear at that timeframe also comes into play three more times in
7  the sequence, and it's the door hitting the wall behind it.
8  It's that same noise on just a slightly lesser level is the door
9  bouncing against the wall behind Mr. Hobbs.  That still doesn't
10  mean the Court knows whether or not the head hit the doorjamb
11  during that time or not, but there is four times that that same
12  sound occurs on the video at a slightly lesser volume.

13      I do, however, have an inmate that is clearly walking away
14  in the pod, is clearly not meeting any of the standards that
15  were presented to the Court in which an officer was allowed to
16  act on making contact with an inmate.  Mr. Hobbs, that doesn't
17  mean that the Court does not understand that what was said to
18  you was absolutely offensive and disrespectful and you reacted.
19  And you didn't react to the worst of the level that you could
20  have reacted, but you quickly reacted and yanked him back by the
21  collar, yanking him through the door.  Your act, I did find, was
22  knowingly and purposeful.  Whether or not you had the purposeful
23  intent to cause him harm, you had the purposeful intent to cause
24  yourself to have physical contact with him yanking him back
25  through the door by the collar and wrapping your arm around his

1   upper torso, clavicle area.

2       Again, breaking it down frame by frame is different than

3   watching it in normal speed, and there's a portion of you

4   somewhat falling and losing your balance when you are pulling

5   him through, but you right yourself basically on his leverage as

6   the two of you twist and come back through the doorway.  And he

7   is under your control.  He hits the ground.  He, obviously, had

8   some abrasions on him, and the Court finds that that meets the

9   standard that you did knowingly cause or attempt to cause

10  physical harm in that there was no defense to that motion.  It

11  wasn't in self-defense of yourself.  It wasn't in defense of

12  others.  It wasn't stopping him at any point of destroying

13  property or creating other than a disruptive moment of being

14  disrespectful, which, unfortunately, and I don't -- I don't say

15  this on the pretense that I think that any officer deserves to

16  be talked to disrespectfully.  This meets the standard of an

17  assault without having any of the protections that are normally

18  given to a corrections officer in the areas of which he's

19  allowed to normally have contact with inmates.

20      And you clearly did not engage with choking him, and that

21  was not something that was put before the Court.  You did not

22  engage in kicking him or in creating any other undue harm to

23  him, Mr. Hobbs.  But, in that moment, it qualifies for the

24  knowingly making the contact with him, making a contact where

25  you didn't have a defense to that contact, and he was harmed.

1  And the harm that the Court has to measure is not how bad the

2  harm was or the gravity to the harm or the length of time that

3  he was harmed.  That's not before the Court.  And, you know,

4  it's not a decision that the Court takes lightly, because I do

5  think that our officers and correction officers are in a

6  difficult situation daily with the personalities that they are

7  dealing with at that time.  But, in this scenario, it did meet

8  the level of being a finding of guilty.

9      I can go forward with sentencing today, Mr. Wingate, and

10 allow you the appeal process.  How do you wish to go forward?

11          MR. WINGATE:  Your Honor, we'll proceed.

12          THE COURT:  Thank you.  I do have Mr. Hobbs'

13 adult record.  This is the only case before the Court that has

14 any criminal contacts.  Everything else is traffic.

15          MR. WINGATE:  That is correct.

16          THE COURT:  I will accept statements in

17 mitigation.

18          MR. WINGATE:  Yes, Your Honor.  As the Court

19 indicated, there is no prior criminal history.  More

20 importantly, he has been a correction officer at the Lucas

21 County Correctional Center for the past 12 years, has been

22 involved in the booking area for 6 of those 12 years.  To the

23 best of my acknowledge and from all the information that I've

24 gathered, there has been no incidents wherein Mr. Hobbs was

25 involved that led to any type of disciplinary actions.  It is

1  unfortunate that this has happened, but as the Court has noted

2  over the course of the trial that there may exist a culture over

3  there in the booking area that does not subscribe to the written

4  policy as is controlling of the entire Lucas County Jail.

5      Be that as it may, there was a great deal of latitude that

6  was given, and any contact that was made, clearly, it was with

7  the belief that he had the authority to make that necessary

8  contact in order to remove the individual, Mr. McGovern, to the

9  isolation area.

10     So with that being said, I would respectfully ask the Court

11  to impose a sentence as lenient as possible, and to also advise

12  him of his rights to appeal.

13              THE COURT:  Thank you.  I do believe,

14  Mr. Wingate, that there was testimony given that the culture and

15  directive of what internally may have been a policy or a leeway

16  certainly left for some gray area; unfortunately, that was not

17  the measuring tool or the way the elements had to be proved to

18  the Court, and that's certainly something to bring up more

19  administratively with the jail and employment because there were

20  certainly conflicting information as to what would have appeared

21  to have been some verbal policy or allowing of the officers in

22  their scenario, and but, again, that was not before the Court

23  with regard to that policy.

24     Mr. Hobbs, you've been nothing but polite and professional

25  through this whole process.  Do you wish to tell the Court

1 anything?

2          THE DEFENDANT:  Your Honor, I just -- I was not

3 trying to harm anybody.  I was just trying to control the

4 situation.  I worked hard to where I've been in life, and going

5 through college and being successfully employed.  It's been a

6 great deal on me and my family.  I'm sorry for anything that

7 happened.  It was unintended.  I was trying to control the

8 situation and I am before you.

9          THE COURT:  Thank you.  And, certainly, when the

10 Court is looking at the controlling of the situation part, and

11 this does affect citizens, whether or not they are correction

12 officers or police or just the general citizen, there's that

13 point where the stepping in in a situation versus retreating and

14 not making the situation worse.  And this is one of those split

15 second calls where you made a decision and that contact when he

16 was walking away, and there was no threat to you or no threat to

17 others.  There was -- there's that gap of what allows you to

18 work next.  And, moments before, you were calmly working with

19 the two inmates that were in the area that you were working in

20 right there, and then when it appears that he makes, by your

21 statements, a derogatory remark, which is completely derogatory,

22 and while he denied it on the stand, your reaction was so quick,

23 so visceral, that one would have to think that flipping you off

24 wasn't just enough, but the verbiage that we just couldn't hear

25 because it was inaudible caused that next level of reaction.

 1  Court -- State, or any additional requests from the State?

 2            MR. BOOS:  No, Your Honor.

 3            THE COURT:  Any requests for incarceration or any

 4  custody time?

 5            MR. BOOS:  Absolutely not, Your Honor.

 6            THE COURT:  Okay.

 7       Mr. Hobbs, I do find that you were found guilty by the

 8  Court on today's date to one count of assault, a misdemeanor of

 9  the first-degree.  You have absolutely no criminal record.

10  Certainly, the actions that the Court viewed were, while contact

11  was made and a fall occurred, I saw no additional exacerbation

12  by you with regard to kicking, spitting, harming, any of the

13  additional levels.  I didn't see any of that.

14       Court is going to place you on one year of probation

15  through the Lucas County Adult Probation Department.  You are to

16  show proof of employment or seeking employment.

17       Is the State requesting an anger management class?  I'm not

18  sure if you have any other background information that would

19  cause that to be a concern?

20            MR. BOOS:  No, Your Honor.  The State has no

21  additional requests.

22            THE COURT:  Mr. Hobbs, because I know that you --

23  your intentions are to do good by the community, I'm going to

24  give you an additional 30 hours of community service work to be

25  done through a service of your choice in the community, and

1  which I find that you're requesting the ability to pay court

2  costs off by additional community service work, Mr. Wingate, or

3  requesting that he be able to make payments?

4            MR. WINGATE:  Your Honor, he -- could he make

5  that decision later?  We were just discussing it and --

6            THE COURT:  What I will allow is that, if he

7  wishes, I'll place the language on he can work off his community

8  service work in additional community service work.  It would be

9  on top of the 30 hours or you can make the payments, whatever

10  works out best --

11            MR. WINGATE:  Thank you.

12           THE COURT:  -- for him.  And, Mr. Hobbs, you do

13  have a right to appeal my decision.  Any appeal that you file

14  must be filed within 30 days of today's date.  We can go ahead,

15  and you are not working at this time, correct?

16            THE DEFENDANT:  Everyone rejects me, Your Honor,

17  because of the assault.

18            THE COURT:  I can appoint counsel for the appeal.

19  Are you making a request for the appeal?

20            MR. WINGATE:  Yes.  Yes.

21            THE COURT:  Court will appoint Mr. McElroy.

22  Anything additional?

23            MR. WINGATE:  Nothing further at this time.

24            THE COURT:  Anything additional from the State?

25            MR. BOOS:  No, Your Honor.

1                 THE COURT:  Thank you.

2                 THE DEFENDANT:  Thank you, Judge.

3                 THE COURT:  Take care.

4           (Proceedings concluded at 10:50 a.m.)

5                         - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7            C E R T I F I C A T E

8

9            I, THE UNDERSIGNED, HEREBY CERTIFY

10   THAT THE ABOVE AND FOREGOING IS A TRUE

11   AND COMPLETE TRANSCRIPT OF THE PROCEEDINGS

12   HAD IN THE TRIAL OF THE ABOVE-ENTITLED CAUSE.

13

14

15

16                    _____
                      Diana M. Ziegelhofer, RPR
17                    Official Court Reporter

18

19

20

21

22

23

24

25