UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OHIO, WESTERN DIVISION

Timothy McGovern,                )
                                 )
        Plaintiff,               )
                                 )  Case No. 3:18-cv-2506
        vs.                      )
                                 )  Judge Zouhary
Lucas County Sheriff's Office,)
et al.,                          )
                                 )
        Defendants.              )

– – –

**DEPOSITION OF TIMOTHY McGOVERN**

Date taken:        June 6, 2019

Time:              9:04 a.m.

Location:          Lucas County Prosecutor's Office
                   711 Adams Street
                   Toledo, Ohio 43604

Court Reporter:    Lori Wozniak

1                    I-N-D-E-X

2     EXAMINATION:

3          Examination by Mr. Ranazzi              4
           Examination by Ms. Henderson          103
4          Re-examination by Mr. Ranazzi         118

5     OBJECTIONS:

6          By Ms. Hunt                            68

7     EXHIBITS:

8          Defendant's Deposition Exhibit A       40
           Defendant's Deposition Exhibit B       43
9          Defendant's Deposition Exhibit C       52
           Defendant's Deposition Exhibit D       56
10         Defendant's Deposition Exhibit E       57
           Defendant's Deposition Exhibit F      119

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    APPEARANCES:

2        ON BEHALF OF PLAINTIFF:

3            M. Caroline Hyatt
             Alphonse A. Gerhardstein
4            Gerhardstein & Branch
             Carew Tower
5            441 Vine Street, Suite 3400
             Cincinnati, Ohio 45202
6
         ON BEHALF OF DEFENDANT LUCAS COUNTY SHERIFF'S
7        OFFICE:

8            Andrew K. Ranazzi
             Elaine B. Szuch
9            Lucas County Prosecutor's Office
             Civil Division
10           711 Adams Street
             Toledo, Ohio 43604

11

12       ON BEHALF OF DEFENDANT LAMONTE HOBBS:

13           Kayla L. Henderson
             Peter N. Lavalette
14           Robison, Curphey & O'Connell
             Four Seagate, Ninth Floor
15           Toledo, Ohio 43604

16       ALSO PRESENT: Jeanine R. Young
                       Elizabeth Roka

17

18               * * * * * * * * * *

19               TIMOTHY MCGOVERN

20   being of lawful age, was by me first duly

21   sworn to tell the truth, the whole truth

22   and nothing but the truth, as hereinafter

23   certified, was examined and said as

24   follows:

25               * * * * * * * * * *
```

1           EXAMINATION

2    BY MR. RANAZZI

3        Q    Mr. McGovern, we have met, or we just met,

4    again, I'm Andy Ranazzi, together with Elaine Szuch

5    we represent Lucas County's interest in the matter

6    that you filed and so you're here today to answer

7    questions regarding that.  You're going to be asked

8    questions by me and then Ms. Henderson, who

9    represents Lamonte Hobbs, Hobbs will ask you

10   questions as well.

11        We have a court reporter, so when I ask

12   you a question it's important that you verbalize

13   your answer so that an accurate record can be

14   taken.  I'm going to try and ask those questions in

15   as clear and concise manner as I possibly can.  If

16   you give me an answer to that question I'm going to

17   presume that you understood the question.  If I

18   don't ask the question in a clear and concise

19   manner or you don't understand the question, please

20   ask me or tell me that and I'll rephrase the

21   question.

22        Have you ever had your deposition taken

23   before?

24        A    I have.

25        Q    So you understand the drill?

1    A    Yes.

2    Q    Okay.  And before we get started in

3  earnest, are you taking any medication or on any

4  prescription medication that would alter your

5  sense --

6    A    I'm not.

7    Q    -- of reality or not be able to perceive

8  the questions that I ask?

9    A    I'm not.

10    Q    You're not on anything right now?

11    A    No.

12    Q    Okay.  If you can, take me through the

13  events of November 9th and 10th, starting with when

14  you perhaps first encountered law enforcement on

15  that day, do you remember that day, November 9th of

16  2017?

17    A    Yes.  I got pulled over.

18    Q    Where were you driving?

19    A    Where was I driving?

20    Q    Yeah.

21    A    I was on Laskey and Lewis area.

22    Q    Where were you coming from?

23    A    I was coming from a bar.

24    Q    What bar?

25    A    I believe it was Daffy's.

1     Q    I'm sorry?

2     A    Daffy's.

3     Q    Daffy's.  Can you spell that?

4     A    It's -- D-A-F-E-Y?  Daffy's --

5  D-A-F-F-E-Y?  Daffy.

6     Q    If you know.  And do you know where that

7  is?

8     A    It's on Lewis.

9     Q    It's on Lewis, okay.  And you were there

10  for how long?

11     A    Just an hour, if that.

12     Q    And what time did you leave there, if you

13  remember?

14     A    I believe it was like, it was close to bar

15  time.  I only had, like, five bucks, so it was like

16  a quick in and out.  I was waiting to go home.

17     Q    Was it the end of the night?

18     A    Yes.

19     Q    So it was like one, two o'clock in the

20  morning?

21     A    Yes.

22     Q    All right.  And you had how many beers?

23     A    Like, two.

24     Q    Okay.  And so you get in your car to go

25  home?

1     A    Yes.

2     Q    All right.  Anything notable about what's

3 in the car, or?

4     A    No.

5     Q    Did you have any beer in the car?

6     A    I believe did.  I did.

7     Q    Were you drinking in the car?

8     A    No, I was not.

9     Q    You weren't drinking in the car?

10    A    No.

11    Q    And then you get on the road, you get on

12 Lewis, Laskey, I mean, how do you go -- are you

13 going home at that particular point in time?

14    A    Yes.

15    Q    All right.  And where do you live?

16    A    On, it was -- at the time I was staying on

17 Secor and Alexis.

18    Q    Like an apartment, or?

19    A    A house.

20    Q    All right.  And that would, that was at

21 Secor and Alexis or did it have an address, or?

22    A    It had 58 -- it was 5858 Donnelly.

23    Q    You have to say that name again.

24    A    5858 Donnelly.

25    Q    Donnelly?  Okay.  5858 Donnelly?  And

1     that's where you were heading from Daffy's?

2     A     Yes.

3     Q     All right. And how -- so you got on the

4     road, you got on Alexis?

5     A     It was Laskey.

6     Q     Okay, you got on Laskey. And you're

7     heading back to 5858 Donnelly?

8     A     Yes.

9     Q     And then you got pulled over?

10     A     Yes.

11     Q     All right. How'd that go?

12     A     That didn't go too -- I mean, it didn't go

13     too good.

14     Q     Do you remember that?

15     A     I kind of do. I do.

16     Q     Do you remember, did you get, did you get

17     pulled over for a specific offense, or?

18     A     The officer had said I was going a high

19     rate of speed at the time.

20     Q     So he said you were speeding?

21     A     Yes. When I come off of Lewis onto Laskey

22     he said I accelerated a little hard. And I seen the

23     lights come behind but I didn't know they were for

24     me, so I slowed down to pull over and unfortunately

25     they were for me.

1      Q    Okay.  And then did you cooperate with the
2  officer?
3      A    At, I did at first, I had my license
4  ready.
5      Q    License, proof of insurance --
6      A    Insurance.
7      Q    -- registration?
8      A    Well, at the time I just got the vehicle
9  and I, no, I didn't have insurance.
10     Q    Okay.  So you're driving a car without
11 insurance?
12     A    Yes.
13     Q    Did you get cited for that?
14     A    No.
15     Q    And the officer told you why he pulled you
16 over?
17     A    Yes.
18     Q    All right.  And did you agree with him
19 that you were speeding?
20     A    I was not -- I mean, no, I didn't, I.
21     Q    Did you, did you have a conversation with
22 the officer?
23     A    He just asked me when, unfortunately when
24 he seen the beer can -- when he seen the beer cans
25 he had told me to get out of the car.

1     Q    So you had beer cans in the car?

2     A    Yes.

3     Q    All right.  Were any of them open?

4     A    I believe one was.

5     Q    All right.  One was open and --

6     A    But it was like a trash, it was trash.  It

7 was trash, I mean it was --

8     Q    It was trash --

9     A    -- it was for the trash.

10    Q    -- you weren't drinking out of that?

11    A    No.

12    Q    You weren't drinking out of that, all

13 right.  And were you intoxicated?

14    A    Far as -- no, I was not.

15    Q    And did you tell the officer that you had

16 had a beer or two beers or --

17    A    Yes, I did.

18    Q    All right.  Did the officer ask you to

19 exit the car at any particular point in time?

20    A    Yes, he, right away he had asked me to get

21 out.

22    Q    All right.  And did you cooperate with

23 that?

24    A    I did.

25    Q    And then did you -- did the officer ask

1    you to take a field sobriety test?

2         A    No.

3         Q    The officer ask you to blow in a

4    breathalyzer?

5         A    Hour and a half later.

6         Q    And you weren't at the scene at that, at

7    that point in time, though?

8         A    No.

9         Q    All right.  So the officer asked you to

10   get out of the car.  Did he say why he was asking

11   you to get out of the car?

12        A    He just seen the open container, just

13   assumed.

14        Q    And then he, did he inspect the inside of

15   the car?

16        A    Yes.

17        Q    All right.  And he found the open

18   container?

19        A    Yes.

20        Q    Did he find other beers rolling around

21   there, too?

22        A    Just, yes.  Not opened, though.

23        Q    Do you know how many, do you know

24   approximately how many beers were in there?

25        A    Maybe two, three.

1     Q    Do you remember, did you buy a six pack on

2  the way there?

3     A    I didn't buy no beer.  It was, my nephew

4  had left them in the car.

5     Q    And it was a November night?

6     A    Yes.

7     Q    Was it cold?

8     A    It wasn't too bad.

9     Q    Were the beers cold; do you know?

10     A    Not that I know of.

11     Q    All right.  And the open container that

12  was trash, was that sitting up?

13     A    I'm not sure even where --

14     Q    Okay.

15     A    -- it was.

16     Q    Would it surprise you he said, the officer

17  said that it was sitting up?  Like you'd been

18  drinking out of it?

19     A    Would I be surprised?

20     Q    Yeah.

21     A    I would.

22     Q    All right.  And then at some point in time

23  does the conversation you have with the officer turn

24  hostile?

25     A    There was a couple words said.

1     Q    All right, what words did you use?

2     A    I don't, I don't remember.

3     Q    Did you swear at the officer?

4     A    I don't remember.

5     Q    Would you be surprised if the officer said

6 you did swear at him?

7     A    I wouldn't.

8     Q    All right.  And at some point in time does

9 the officer cuff you, does he put you in the squad

10 car, how does that go?

11     A    Right off the, right off the bat he cuffed

12 me.

13     Q    Right off the bat?

14     A    Yes.

15     Q    When he found the open container?

16     A    Yes.

17     Q    He's gonna take you in for DUI?

18     A    Yes.

19     Q    Okay.  And how does the, how -- when he

20 put you in the -- did you resist going into the

21 squad car?

22     A    No.

23     Q    Did you resist getting cuffed?

24     A    No.

25     Q    Did you continue to use profanity in the

1    squad car?

2        A    I did.

3        Q    Were you upset that you were getting taken

4    downtown?

5        A    Yes, I was upset the way it went about,

6    the way it all came about.

7        Q    What specifically was upsetting you?

8        A    Just the way I was being treated.

9        Q    All right.  And can you give me some

10   specifics on how you thought the -- I'm presuming

11   when you say you're complaining about the, or the

12   way the officer was treating you, that he was

13   mistreating you?

14       A    Yes.

15       Q    Can you tell me how the officer was

16   mistreating you?

17       A    Just the way I was being talked to.

18       Q    And can you give a specific on that?

19       A    I don't remember.

20       Q    Okay.

21       A    I don't.

22       Q    You mean the way, like the tone of voice?

23       A    Just the way -- yes, it was just the way

24   he was talking to me.  He was -- I felt that he

25   didn't have to talk to me like the way he was

1  handling.  The way he handled things, as far as I

2  felt, like I was being disrespected.

3       Q    Okay.  And I didn't, and I don't mean to

4  cut you off and I apologize if, if I'm truncating

5  your answers with my repetitive questions, but I

6  want to make sure that I give you a full opportunity

7  to say what you want to say.  And please feel free

8  to answer the questions however you want to answer

9  them.  When you say that you feel like you were

10  being disrespected, can you give me an example of

11  that?

12       A    It was the way that they were hand -- the

13  way they were handling things towards me, I guess.

14  I mean it was, I mean -- I can't remember really,

15  it's such a long time ago.

16       Q    So did he use language, did he call you

17  names, did he?

18       A    He didn't call me no names.

19       Q    Did he swear at you?

20       A    No, he didn't swear.

21       Q    Use profanity at all?

22       A    It was just the way he was coming at me

23  towards things and I, I guess I kind of.

24       Q    So you reacted to the officer's --

25       A    Yes, I believe.

1    Q    -- authority?

2    A    Yes.

3    Q    Okay.  Do you, do you have problems with

4 authority?

5    A    I don't.

6    Q    And you have -- you've got multiple

7 interactions with police during your life, correct?

8    A    I don't.

9    Q    You haven't had, you haven't had multiple

10 interactions with --

11    A    I mean as far as -- what do you mean

12 interactions?

13    Q    You've been pulled over a bunch of times,

14 you've had a, you've had a colorful driving record,

15 correct?

16    A    Yes.

17    Q    All right.  So you, the officer put you in

18 the squad car and you're upset about being taken

19 downtown?

20    A    Yes, because --

21    Q    All right.

22    A    -- I felt that a sobriety test should have

23 been done on me.

24    Q    The field sobriety test should have been

25 done?

1     A    Should have been done right there.

2     Q    Do you know why the officer didn't take a

3 field sobriety test?

4     A    No, I didn't.

5     Q    But he did offer you a breathalyzer test,

6 right?

7     A    Not at that time he didn't.

8     Q    Not at the scene?

9     A    Not at the scene.

10    Q    And so now you're in the squad car heading

11 downtown and you are still using profanity with the

12 officer and you're still upset?

13    A    Somewhat.

14    Q    Somewhat.  Somewhat upset.  And any other,

15 any other events happen in the ride downtown?

16    A    I believe, I believe I, I had threatened

17 the officer.

18    Q    You threatened him?

19    A    I believe.

20    Q    Do you know what you --

21    A    I, I know, I mean I -- I don't even know

22 how to answer this because it wasn't like a, a

23 threat, I mean the menacing, that's where it came

24 in.

25    Q    Uh-huh.

1      A    But nothing, I mean, I was never charged

2  for.

3      Q    You never got charged --

4      A    No.

5      Q    -- with menacing?

6      A    No.  It got dropped.

7      Q    What did you get charged with?

8      A    OVI.

9      Q    So you, in the squad car down you're

10  continuing to use profanity, you're threatening the

11  officer and, but you don't know, you can't remember

12  how you did that, you just?

13      A    It was words.

14      Q    So you were -- were they physical threats

15  of violence or were you just, were you just saying

16  that you were gonna -- did you ask the officer, did

17  you say specific things to him that you were gonna

18  do to him, or?

19      A    I believe there was a, there was one time

20  I believe I had said something about a head butt or

21  something, I --

22      Q    You were gonna head butt the officer?

23      A    It was just something like that.  But that

24  was --

25      Q    Was it just the one officer or were there

1    multiple officers?

2       A    There was three.

3       Q    Were there multiple squad cars?

4       A    There was, maybe there was two.

5       Q    Did the second squad car come, like, after

6    the officer?

7       A    Right, right after I, like, right when

8    they pulled me over, they pulled up.  So I mean, he

9    was right there.

10       Q    Okay.

11          MS. HUNT:             I'm sorry,

12          can we take a break?  My pen is dying.

13          MR. RANAZZI:      Sure.

14          (WHEREUPON a discussion was held off

15          the record.)

16    BY MR. RANAZZI

17       Q   Let's leave the timeline on the, on the

18    trip downtown, but I want to actually touch base on

19    where you were before Daffy's, if you remember?

20       A    I was, believe I was with my nephew at a

21    shop.

22       Q    At a shop?

23       A    Yes.

24       Q    Like a, like a?

25       A    Workshop.

1     Q    Like a mechanic's shop or a?

2     A    It was a, some kind of warehouse-type

3 shop.

4     Q    Were you doing work, or?

5     A    No.

6     Q    Were you drinking?

7     A    Not at that time I was not.

8     Q    Had you drank before Daffy's?

9     A    No, I did not.

10    Q    That entire day?

11    A    That entire day.

12    Q    All right.  And then you only had the one

13 or two at Daffy's?

14    A    I had one, two -- I had two at Daffy's.  I

15 had five bucks.

16    Q    All right.  You had $5 and you had two

17 beers at Daffy's and you had beer in the car but

18 you're saying you weren't drinking?

19    A    Yes.

20    Q    Even though there was an open container

21 sitting up or --

22    A    Well my --

23    Q    Go ahead.

24    A    My nephew was with me.

25    Q    Your nephew was with you?

1      A      Yes.

2      Q      In the car?

3      A      Not at that time, but I just, I dropped

4  him off.

5      Q      Okay.

6      A      When we, I like, had to take him to his

7  vehicle, to where he was going.

8      Q      Did you drop him off before Daffy's?

9      A      Yes.

10     Q      So your nephew -- you're at the workshop,

11 not drinking?

12     A      Yes.

13     Q      Correct?

14     A      Correct.

15     Q      And the only beers that you had were at

16 Daffy's?

17     A      Yes.

18     Q      Okay.  All right.  And your nephew doesn't

19 have any information about anything that went on at

20 Daffy's --

21     A      No.

22     Q      -- or certainly anything in the car or the

23 stop and all that, correct?

24     A      The beer was his.

25     Q      The beer in the car?

1    A   Yes.

2    Q   Okay.  All right.  And the open container

3 was his?

4    A   I believe it was.

5    Q   Okay.

6    A   Because I had said something, he was gonna

7 throw, he was gonna throw it out, and instead of

8 throwing it on the trash I told him I would take

9 care of it.

10    Q   What's your nephew's name?

11    A   Alex Cowell.

12    Q   Can you spell that?

13    A   C-O-L-L -- C-O-L-L-W-O-L-W.

14    Q   Cowell?

15    A   Cowell.

16    Q   Alex Cowell?

17    A   Yes.

18    Q   C-O-W-E-L-L?

19    A   I believe that's how it's spelled.

20    Q   Do you know where he lives?

21    A   He lives with his grandparents, I mean,

22 I'm not sure of the address.

23    Q   Do you have -- have you seen him lately,

24 or not?

25    A   Actually, I seen him yesterday.

1    Q    All right.

2         MR. RANAZZI:              Don't intend

3         to make him a witness, but we probably

4         need to reach out and talk to him, so

5         if -- whatever information you can get me

6         on him would be great.

7         MS. HUNT:                 Okay.

8  BY MR. RANAZZI

9    Q    And you just saw him yesterday?

10   A    Yes.

11   Q    All right.  Okay, so you're driving

12 downtown.  And again, you're threatening the

13 officers with what you think is head butts and you

14 are belligerent with them, if I'm using words that

15 are inaccurate, please correct me.  You're using

16 profanity?

17   A    Somewhat.

18   Q    Okay.  Do you know what profanity you're

19 saying --

20   A    No.

21   Q    -- or is it something you can't remember?

22   A    It was not really that bad, I mean.  It

23 was not that bad.

24   Q    Do you remember?

25   A    I don't.

1     Q   Okay.  And then do you finally get to the

2  jail?

3     A   Yes.

4     Q   Which jail is it?

5     A   Lucas County.

6     Q   Okay.  And did the officer get you out of

7  the car?

8     A   They, yes, they brought me in.

9     Q   And then what happens then?

10     A   They started the booking process.

11     Q   So you're in intake or you're in the,

12  you're at the booking desk?

13     A   Yes.

14     Q   And are you dealing with Lucas County

15  personnel there?

16     A   Yes.

17     Q   And how does that go?

18     A   Fine.

19     Q   Do you know who booked you in?  Do you

20  know what --

21     A   I don't.

22     Q   Do you know what correction officer --

23     A   I don't.

24     Q   -- was booking you?  All right.

25        Do you know if he was black or white?

1      A   I don't.  I don't remember.

2      Q   Do you remember -- you don't remember

3 anything about the booking process?

4      A   I don't.  I mean, it was such a long time

5 ago I, I believe -- it could have been a

6 African-American.

7      Q   And do you recall being belligerent with

8 any Lucas County personnel?

9      A   I don't believe I was.

10      Q   All right.  And while you're getting

11 booked in did you call anybody a nigger?

12      A   No.

13      Q   All right.  Did you use that word at all?

14      A   No.

15      Q   From the, from the, let's just -- from the

16 time frame, from the time you get pulled over by the

17 Toledo, by the Toledo police to the, to the end of

18 the incident that's here, did you ever use that

19 term?

20      A   No, I did not.

21      Q   All right.  So anybody that would have

22 heard you use that term, anybody that would testify

23 or say that you used that term, would they be lying?

24      A   Yes.

25      Q   So you get booked and do they take the

1    cuffs off?

2         A    They did.

3         Q    And then what happens then?

4         A    They started to, the booking process, and

5    then for some odd reason I was just put in the

6    oranges and then put straight into the pod.

7         Q    Into the what?

8         A    Into the pod --

9         Q    Okay.

10        A    -- to hold.

11        Q    The holding cell?

12        A    Yeah.

13        Q    Okay.

14        A    Or wherever they put everybody.

15        Q    All right.  And during that particular

16   process were you belligerent with the correction

17   officers or the cops?

18        A    No, I was not.

19        Q    All right.  Did you call them any names?

20        A    I did not.

21        Q    Did you threaten them?

22        A    No, I did not.

23        Q    And so how long are you in the pod?

24        A    I'm not sure because I had fell asleep for

25   a little bit.

1    Q    You had a mattress?

2    A    Yeah, I had a.

3    Q    Okay.

4    A    Yes, a stackable.

5    Q    And do you have any interactions with any

6    of the people that you were in there with?

7    A    No, I did not.

8    Q    So you didn't talk to anybody?

9    A    No, I did not.

10   Q    And you wake up eventually?

11   A    I woke up when I heard the doors open, and

12   I wanted to make a phone call, the fact that, you

13   know, they did not allow me to make the call.

14   Q    Did you ask for a phone call?

15   A    I did.

16   Q    I mean before the -- before you woke up

17   and before you got put into the pod did you ask for

18   a phone call?

19   A    Usually the process of being booked is you

20   get booked, you get fingerprinted, you get your

21   picture taken, they give you a phone call.

22   Q    And when you got your -- and you've got

23   some experience at getting booked and getting your

24   picture taken and getting fingerprinted, correct?

25   A    That's just what happens.

1     Q   Okay.  And when this happened to you,

2  before you got put into a pod, did you ask for a

3  phone call?

4     A   They, they just put me in the pod.

5     Q   Okay.  So they never offered you a phone

6  call?

7     A   They never offered me a phone call.

8     Q   So you didn't get refused it because you

9  didn't ask it, but they didn't offer it?

10     A   Right.

11     Q   So the door opens in the pod, you wake up

12  and there's a correction officer talking to another

13  inmate, for lack of a better word?

14     A   Bringing one --

15     Q   Okay.

16     A   -- into our pod.

17     Q   Okay.

18     A   Yes.

19     Q   And when that interaction ends you

20  approach the pod door?

21     A   Yes.

22     Q   And you have a discussion with that --

23     A   Well actually, I was standing there

24  waiting patiently for him to do what he had to do.

25     Q   But when you say him, are you talking

1    about the other --

2        A    Officer.

3        Q    Are you talking about the inmate that was

4    coming in or are you talking about the correction

5    officer?

6        A    Correction officer.

7        Q    And the correction officer which we can

8    identify is the defendant in this case, Lamonte

9    Hobbs, okay.  So you're waiting for him to finish up

10   with that inmate?

11       A    Yes.

12       Q    Patiently?

13       A    Patiently.

14       Q    And then you wait for that process to end

15   and while the door's still open you engage

16   correction officer Hobbs?

17       A    Yes.

18       Q    Can you tell me how that went?

19       A    I asked if I could use the phone.  He told

20   me to use the phone that was there.  I told him

21   there was no way for myself to get out on that phone

22   because they give you a paper with numbers to dial

23   out on that phone.  I couldn't use that phone.

24       Q    So you asked him if you could get out, get

25   out of the pod and make a phone call?

1     A    I asked him if he -- if I could make a

2  phone call.

3     Q    And correction officer Hobbs told you that

4  there's a phone inside the pod that you can use and

5  you apprise him that you can't use it because you

6  didn't have a pin to get an outside line?

7     A    Correct.

8     Q    And what does correction officer Hobbs say

9  at that particular point?

10     A    Told me no.

11     Q    Told you no?

12     A    Term was brush me off, you know.

13     Q    Like I can't help you?

14     A    Pretty much.

15     Q    And then, and then what did you do?

16     A    I flipped him off, said fuck you, and

17  flipped him off and walked back to my bunk.

18     Q    Okay.  So you flip him off and you say

19  fuck you, and you turn around to go walk back to

20  your bunk.  And you didn't say fuck you nigger,

21  right?

22     A    I did not.

23     Q    Okay.  And that goes back to the previous

24  testimony that you gave, that you said you never

25  used the, you never used the N word or you never

1  said nigger for the entire time that we're —— the

2  entire relevant time of these proceedings?

3      A    Yes.

4      Q    And we also, just to clarify, we also

5  confirm that anybody that would have heard you or

6  would say that you said that would be lying?

7      A    Yes.

8      Q    All right.  Then what happens when you

9  turn around to go back to your bunk?

10      A    I was snagged out.

11      Q    And that officer Hobbs grabs you?

12      A    Yes.

13      Q    All right.  And he puts you in, does he?

14      A    Chokehold.

15      Q    Or headlock?

16      A    Yes.

17      Q    And we can use those interchangeably.  I

18  mean, the video is what the video is, there's a

19  video of this.  And are you saying anything at this

20  particular point in time?

21      A    He was telling me quit resisting and I was

22  saying I'm not resisting, my arms are wide out.

23      Q    Okay.  And then what happens, to the

24  extent that you can —— this is all happening pretty

25  fast?

1    A    Yes.

2    Q    And did you have a clear memory of what

3  happened after that?

4    A    I was pulled out and slammed on my head

5  and jumped on.

6    Q    By other officers?

7    A    Yes.

8    Q    Okay.  Do you recall how many officers

9  were there?

10    A    Probably like four or five.  I mean it was

11  quite a few that was there, few on me.  There was a

12  few on me.

13    Q    And do you recall that -- were they trying

14  to cuff you, were they trying to?

15    A    They were telling me quit resisting, and I

16  mean, they had their knees in the back of my head,

17  their thumbs up in my chin.  I mean, they were just

18  telling me to quit resisting when I was not

19  resisting.

20    Q    Okay.  And were you saying you weren't

21  resisting?

22    A    I was.

23    Q    Okay.

24    A    Was trying, I mean the one time I was

25  trying to say resisting, but I'm not resisting.  I

1    mean it was like, real hard to get out because I was

2    put in, you know, by that time I was in a chokehold.

3        Q    Were they trying to get your arms in back

4    so they could cuff you in back?

5        A    Well they didn't really have to try, I

6    was, I mean it was --

7        Q    Were you offering your arms to go back?

8        A    Yeah, I mean, I mean I was just, I was

9    like a dummy.

10        Q    Okay.  And you weren't moving your head

11    or?

12        A    No, I couldn't move my head.

13        Q    All right.  And you said that you, that

14    you got your head slammed?

15        A    Yes.

16        Q    And you got your head slammed on what?

17        A    On the concrete.

18        Q    On the floor?

19        A    On the floor.

20        Q    When you went down?

21        A    When he, yes, when he threw me down.

22        Q    And do you recall one officer trying to

23    secure your head, keep it from moving?

24        A    Say that again?

25        Q    I said do you recall a correction officer

1    trying to secure your head and keep it from moving?

2        A    Alls I remember was a knee on the back of

3    my head into the ground, that's what I remember.

4        Q    And the back of your head or on the side

5    of your head?

6        A    On the back of my head.

7        Q    Okay.

8        A    I was like this, I was like this, but I

9    mean, but there was a --

10       Q    A knee on the back of your head into the

11   ground?

12       A    Yes.

13       Q    Okay.  But you didn't have any abrasions

14   on your forehead?

15       A    I did.  Right, I had a, right here I --

16       Q    Did you have it on the side --

17       A    It was --

18       Q    -- of your head or --

19       A    It was --

20       Q    -- on your forehead?

21       A    -- like, right here on the --

22       Q    Okay.

23       A    -- top of my head.

24       Q    All right.  So your face must have been

25   turned, putting your side of your head on your, on

1    the concrete?

2        A    Well I believe when I was slammed, when I

3    slammed I -- my head turned.

4        Q    Okay.  All right.  So you get -- and other

5    than the, your head hitting the concrete, any other

6    injuries?

7        A    My, it was my elbow.  I had, my elbow was.

8        Q    Like an abrasion or a cut?

9        A    It was like, yeah, there was cut, it

10    was --

11        Q    Okay.

12        A    -- it was pretty bruised up.

13        Q    Were you bleeding?

14        A    Yes.

15        Q    Were you bleeding enough to need stitches,

16    or?

17        A    No.

18        Q    How long did the whole thing take?

19        A    It seemed like it took, like, a matter of

20    seconds, I mean, it was just like, it happened so

21    fast.

22        Q    And did you, from your head getting

23    slammed, did you -- were you disoriented?

24        A    I was pretty dizzy.

25        Q    You were pretty dizzy?

1      A    Yes.

2      Q    Like, sit down dizzy?

3      A    Yes, sir.

4      Q    You wanted to -- you could barely

5  walk-type thing?

6      A    No, I, I mean one -- no.  I wasn't like I

7  couldn't stand up dizzy, but I was pretty dazed.

8      Q    Okay.  All right.  Did you ask for medical

9  attention?

10      A    No, they automatically came over, the

11  nurse came probably, maybe couple minutes later.

12      Q    Let's not get there yet, but -- I don't

13  mean to cut you off, but.  So they get you up, they

14  get you standing up, they get you cuffed and they

15  stand you up, and then where do they take you?

16      A    Right across from the, right across from

17  where I was, the next pod.

18      Q    And are you in there by yourself?

19      A    Yes.

20      Q    And are you, are you using profanity, are

21  you using --

22      A    Yes, I was irate.

23      Q    And again because, presumably because of

24  the way you were treated?

25      A    Yes.

1    Q    All right.  When you were at the pod door

2  no other correction officer grabbed you, other than

3  Hobbs, until after they pulled you out of the pod,

4  correct?

5    A    Correct.

6    Q    All right.  And then the other officers

7  were trying to secure you and they were the ones

8  that were putting your -- putting the pressure on

9  your head and the pressure on your body to get your

10  arms to get back and get you cuffed, correct?

11    A    Yes.

12    Q    Okay.  They stood you up, they took you

13  across the way to the, to a cell where you were by

14  yourself?

15    A    Yes.

16    Q    Where you were irate, using profanity?

17    A    Yes.

18    Q    Did you do anything else?

19    A    I believe I had, was kicking the door.

20    Q    Kicking the door?

21    A    Yes.

22    Q    You were cuffed?

23    A    Not at that time I wasn't.

24    Q    You weren't cuffed in the?

25    A    I was put in the dorm, put in the pod and

1   they closed the door and they walked away.

2        Q    Were you still cuffed?

3        A    No.

4        Q    They took the cuffs off you before they

5   put you in the pod?

6        A    They took the cuffs off and they put me in

7   the pod.

8        Q    By yourself?

9        A    Yes.

10       Q    And were you dizzy then?

11       A    Yes.

12       Q    Well did you sit down, did you lay down,

13   did you?

14       A    No, I was, I was fuming.  I, I was fuming

15   to be treated like that, I was.

16       Q    So you were dizzy and fuming?

17       A    Yeah.

18       Q    All right.

19       A    I was.

20       Q    And do you recall, and you said you were

21   kicking the door?

22       A    Yes.

23       Q    Okay.  Do you recall how you kicked the

24   door?

25       A    I believe it was the back of my heel.

1    Q    Were you kicking it front-wise or were you

2  kicking it?

3    A    Just backwards.

4    Q    Back kicking it?

5    A    Backwards.

6    Q    Like a donkey?

7    A    Yeah.

8    Q    All right.  And you were doing that on,

9  with one leg --

10   A    Yes.

11   Q    -- right?

12        And were you still dizzy then?

13   A    I was.

14   Q    Okay.  Did you fall down at all kicking

15  the door?

16   A    No, but I did, I did lay down.

17   Q    Okay.

18   A    Like I.

19   Q    All right.  The nurse look at you?

20   A    Yes.

21   Q    All right.  Do you recall having

22  photographs taken of your injuries at that time?

23   A    I do.

24   Q    Do you recall?

25   A    You know, I don't remember him taking

1  pictures of the injuries.

2      Q    Let's have these marked as --

3      A    All right.

4      Q    -- exhibit, as --

5          MR. RANAZZI:           Do you want

6          to have just one set of exhibits for

7          all --

8          MS. HUNT:              Sure.

9          MR. RANAZZI:           --

10         depositions?

11         MS. HUNT:              Oh, for like

12         defendants and plaintiffs?

13         MR. RANAZZI:           Yeah.

14         MS. HUNT:              No.

15         MR. RANAZZI:           All right.

16         MR. GERHARDSTEIN:      One set for

17         defense, one set --

18         MS. HUNT:              Yeah.

19         MR. GERHARDSTEIN:      -- for

20         plaintiffs.

21         MR. RANAZZI:           All right.

22         (Exhibit A marked.)

23  BY MR. RANAZZI

24     Q    I'm showing you what has been marked as

25  Plaintiff's Exhibit A.  Do you recognize these

1  pictures?

2      A    Yes.

3      Q    Okay.  Are these pictures taken the night

4  of?

5      A    Yes.

6      Q    And do they accurately, in black and white

7  and not particularly great resolution, but do they

8  accurately depict your condition?

9      A    Yes.

10     Q    Okay.  And the elbow injury is on page 1

11 of that exhibit?

12     A    Yes.

13     Q    Is that a scrape?  Doesn't look like it's

14 bleeding there, right?

15     A    Well right now it doesn't look like it's

16 bleeding but it was, it did bleed.

17     Q    Okay.

18              (WHEREUPON a discussion was held off

19          the record.)

20 BY MR. RANAZZI

21     Q    That's your right elbow, correct?

22     A    Yes.

23     Q    All right.  There wasn't any problem with

24 your left elbow, correct?

25     A    No.

1    Q    And then the right, the second page of

2  that, is that the abrasion to your head?

3    A    Yes, the top one.

4    Q    And again, is that an accurate depiction

5  of what that was like that first hour or so after

6  the event?

7    A    Yes.

8    Q    And the second page is a more -- the third

9  page is a more magnified view of that?

10    A    Yes.

11    Q    And again, accurate depiction of what the

12  condition was?

13    A    Yes.

14    Q    All right.  And then the fourth page

15  appears to be just a, either a duplicate or

16  different angle of that, and again --

17    A    Yes.

18    Q    -- accurate depiction of what it was?

19    A    Yes.

20    Q    Did you have any other physical injuries

21  that aren't depicted in these photos from the --

22    A    No.

23    Q    -- event?

24        So this is the -- these pictures sum up

25   the extent of your injuries --

1     A    Yes.

2     Q    -- that you sustained in that, in the

3  altercation with correction officer Hobbs --

4     A    Yes.

5     Q    -- and the other Lucas County deputies?

6     A    Yes.

7     Q    There are no other physical manifestations

8  of your injuries?

9     A    Just, I mean, kind of internal, I mean, as

10  far as them putting their fingers up my chin and

11  into my ribs, I mean, that was kind of bruised.

12     Q    Okay.

13     A    I mean, I was bruised.

14     Q    All right.  And do you, you saw a nurse, a

15  Lucas County nurse?

16     A    Yes.

17     Q    And do you recall when that was?

18     A    Was maybe few minutes after maybe, 10, 15

19  minutes after it happened.

20     Q    Okay.  Can I have this marked as Exhibit

21  B?

22           (Exhibit B marked.)

23  BY MR. RANAZZI

24     Q    Okay.  Do you recall how long after the

25  incident the nurse saw you -- when the nurse saw

1    you, how long of a delay it was?

2      A    It could have been 10, 15 minutes, but I

3   was --

4      Q    Okay, but it was within an hour --

5      A    It was --

6      Q    -- within an hour --

7          THE COURT REPORTER:    Hang on you

8         two.

9          MR. MCGOVERN:      Ten or 15

10        minutes.

11 BY MR. RANAZZI

12      Q    So after, after the event the nurse came

13 down?

14      A    Yes.

15      Q    Do you recall what she did?

16      A    Just wiped my, wiped the blood off,

17 sprayed some spray on and wiped the blood off and

18 put a Band-Aid on it.

19      Q    All right. And I'm not as -- you didn't

20 prepare these records, but the second page of that

21 is the nurse's notes and I just want to see if

22 you -- have you ever seen this before?

23      A    No.

24      Q    Okay. And it says, inmate had altercation

25 with officers. Small abrasion noted on side of

1    head.  Area cleansed and Band-Aid applied and makes

2    notation about trying to avoid infection.  Do you

3    find anything inaccurate about that?

4         A    No.

5         Q    And so you're in the pod and you're seen

6    by the nurse.  Anything else happen the rest of the

7    night?

8         A    No.

9         Q    Does any other correction officer say

10   anything to you, or?

11        A    I believe they eventually brought me over

12   a blanket.  I was left in there until the morning --

13   until the next morning, another correction officer

14   come over and asked me, there must have been

15   something going on, why I was in there.  And then he

16   took me out and put me in the other pod with

17   everybody else.

18        Q    Okay.

19        A    And that's it.

20        Q    All right.  When did you -- did you get

21   released at some point in time?

22        A    I did.  It was Veterans' Day the next day

23   so they didn't have court, so that's --

24        Q    On the 10th?

25        A    Yeah.  So it was that Saturday that I had

1   got reduced, because --

2       Q    And any other altercations?

3       A    No.

4       Q    All right.  You said you were feeling

5   dizzy in the pod by yourself?

6       A    Yes.

7       Q    And did that feeling subside, did you stop

8   feeling dizzy at some point in time?

9       A    No, I just laid down.

10      Q    Okay.

11      A    Because I just started getting tired --

12      Q    All right.

13      A    -- just laid down, and.

14      Q    Any residual problems, any headaches, any?

15      A    I was getting -- yes, I did wake up with a

16  headache.

17      Q    That day?

18      A    Yes.

19      Q    You woke up with a headache?

20      A    Yes.

21      Q    And the following day did you wake up with

22  a headache?

23      A    I did.

24      Q    Can you describe the headaches, or?

25      A    Yeah, it was the front, like more of a up

1   here headache, not a back here, like in the back

2   headache, it was more of a front head headache.

3          Q    And did you seek medical attention?

4          A    I did not.  I just assumed it was just

5   headaches, I didn't even think about being caused,

6   you know, I mean, I just thought maybe it was

7   stress.

8          Q    Okay.  When did you, when did you think

9   about that?

10         A    After maybe four days, five days, however

11  long.  I just kept getting these headaches because I

12  don't get headaches.

13         Q    So you kept -- the same headaches that you

14  described you kept getting?

15         A    Yeah.  They would go away and they'd come

16  back.

17         Q    All right.  Do you recall having -- so

18  four or five days you're having these headaches,

19  correct?

20         A    Yes.

21         Q    And at that point in time did you decide

22  to seek medical attention?

23         A    I did.

24         Q    And how did you do that?

25         A    I went to the emergency room.

1    Q    Four or five days later?

2    A    Yeah.

3    Q    Okay.

4    A    I was just wondering, I was, these

5    headaches, I'm not a -- I don't get headaches and I

6    was wondering why these headaches were coming on

7    all --

8    Q    Do you recall which emergency room you

9    went to?

10   A    Toledo.

11   Q    Do you recall what date?

12   A    I don't.

13   Q    Okay.

14   A    Could have been longer maybe.

15   Q    Did anybody tell you -- could have been

16   longer than four or five days?

17   A    It could have been.

18   Q    Could have been three weeks?

19   A    I don't, I don't know.

20   Q    Well let's --

21   A    It could have been.

22   Q    Well let's get more into the, what

23   happened at the jail.  Did you ever get a phone call

24   or any Lucas County personnel communicate with you

25   to talk to you about what happened?

1     A    Yes.

2     Q    Do you recall who?

3     A    Detective Carter.

4     Q    Do you recall when?

5     A    I believe it was few days after.

6     Q    Does the 17th sound?

7     A    It does.

8     Q    Did you go see him on the 17th or maybe he

9 called you before the 17th and you made an

10 appointment to go see him?

11    A    He came and seen me.

12    Q    Did he call you first?

13    A    Actually, he stopped by my brother's

14 house.  Or actually, where I was staying on

15 Donnelly.

16    Q    Okay.

17    A    And my brother had gotten ahold of me but

18 then he had gave Carter my number and he had got

19 ahold of me.

20    Q    Okay.  And did, and was that all in the

21 same day?

22    A    It could have been, or --

23    Q    Okay.

24    A    -- I'm not sure.

25    Q    All right.  Do you recall seeing him on

1  November 17th, maybe you don't know what the day

2  was, but about a week after the event?

3      A    I did, yes.

4      Q    And did you talk to him?

5      A    Yes.

6      Q    And did you tell him, did you tell him

7  what happened?

8      A    Yes.  He asked.

9      Q    Because they were investigating Mr. Hobbs,

10  correct?

11      A    I, I assume, yes.

12      Q    Or what you thought was?

13      A    Yes.

14      Q    Okay.  Did you, did you tell him, did you

15  tell --

16              MR. RANAZZI:              Is he a

17          detective?

18              MS. SZUCH:                Yeah.

19  BY MR. RANAZZI

20      Q    Detective Carter what happened?

21      A    Yes.

22      Q    And did you, when he -- did detective

23  Carter ever ask you about your injuries?

24      A    He took pictures of my injuries.

25      Q    Okay.  Did you tell him how you were

1  feeling?

2      A    Yes.

3      Q    Did you tell him, did you, were you --

4  were you still having the headaches on the 17th?

5      A    Off and on.

6      Q    You were having the headaches off and on.

7  Did you tell him that?

8      A    I believe I did.

9      Q    All right.  And was that conversation

10  transcribed, if you remember, was there a court

11  reporter there, or?

12      A    He, he recorded.

13      Q    He recorded it?

14      A    Yes.

15      Q    All right.  Do you recall that

16  conversation, do you recall the specifics of it?

17      A    Somewhat, I, I remember he had asked me

18  about my injuries, I said, you know, my neck was

19  still sore and I was getting headaches.

20      Q    Okay.

21          MR. RANAZZI:              C.

22          MR. MCGOVERN:              He asked, I

23          believe he asked me how I felt.  I, I told

24          him I was getting, my neck was getting

25          better, or.

1    (Exhibit C marked.)

2  BY MR. RANAZZI

3    Q    I've showed you what's been marked as

4  Defendant's Exhibit C.  And do you recall that

5  detective Carter took photographs of your injuries?

6    A    I do.

7    Q    All right.  And that was a week after the

8  event?

9    A    Yes.

10    Q    All right.  And do you see the pictures in

11  front of you?

12    A    Yes.

13    Q    Are those true, accurate and correct

14  depictions of what your injuries were like a week

15  after the --

16    A    Yes.

17    Q    -- incident?

18        See your elbow, two pictures of your elbow

19  was scabbed over?

20    A    Yes.

21    Q    No stitches or no anything, just healing

22  up.  The same with your head?

23    A    Yes.

24    Q    And those are accurate?

25    A    Yes.

1    Q    Okay, thank you.  Okay, and at the time do

2  you recall your conversation -- like when detective

3  Carter asked you if you were having any residual

4  injuries, do you recall what you said to him?

5    A    I don't.

6    Q    Did he ask you if you went and sought

7  treatment?

8    A    He did.

9    Q    Okay.  And do you recall what your answer

10 was?

11   A    I believe I had not received treatment

12 yet.

13   Q    Do you recall that you might have told him

14 that the nurse came down --

15   A    Oh.

16   Q    -- put a little spray and Band-Aid on it?

17   A    Yes, on, yes.

18   Q    Do you recall that he asked you if you

19 needed, if you felt you needed treatment after you

20 left the jail or were you all right, do you recall

21 that question?

22   A    I don't.

23   Q    Do you recall what your answer was to that

24 question?

25   A    I don't.

1     Q    Okay.  Would it surprise you, would this

2  be accurate, I was sore, I was real sore, I mean, so

3  like my neck and all is kind of still sore, because

4  he did -- he had me pretty good, long, you know,

5  headlock, I mean, it's still getting better, but I

6  mean, you know.  Does that sound like something you

7  would say?

8     A    Yes.

9     Q    So that's the 17th, that's November 17th.

10  All right.  Do you recall, and you had not, you had

11  not sought the ER treatment before the Carter

12  interview.  Can you, can we --

13     A    No, I did not.

14     Q    Okay.  So, and how do you feel after the

15  Carter interview, are you having headaches, are you

16  still?

17     A    I was.

18     Q    So you're still having headaches?

19     A    Yes.  And I didn't have, I did not have

20  medical so I had come down to the victim of,

21  whatever the victim of, the victim rights that --

22     Q    Okay.

23     A    -- and common plead --

24     Q    Okay, yeah.

25     A    -- and I got some paperwork going and I

1    was gonna try get some kind of like, medical help

2    far as, like, coming from them, and that's when I

3    was told I should go get some treatment.

4        Q    And just, do you recall when you went and

5    talked to victim witness?

6        A    It was, I believe it was a couple days

7    after I had talked to Carter.

8        Q    Couple days?

9        A    Yes.

10       Q    All right.  And then how long until you

11   went and sought treatment at the --

12       A    It was --

13       Q    -- Toledo Hospital ER?

14       A    -- was the day I had left the common

15   plead, the day, that day I had left common plead.

16       Q    Could it have been December 1st, three

17   weeks after?

18       A    It could, I --

19       Q    Okay.  Two weeks after you talked to

20   Carter?

21       A    I don't believe it was that long, maybe,

22   I'm not sure.

23                    (Exhibit D marked.)

24   BY MR. RANAZZI

25       Q    I'm showing you what's been marked as

1  Defendant's Exhibit D.  And these, again, these are

2  things that your counsel provided us.  And it

3  appears that if you can look at the exam date on the

4  upper right just below the ProMedica, you see

5  appointment info there on the first page?

6      A    Yes.

7      Q    Okay.  You see that it says December 1st,

8  2017?

9      A    Yes.

10      Q    Do you have any reason to doubt that?

11      A    I don't.

12      Q    So it was approximately three weeks after

13  the incident, two weeks after you talked to --

14      A    Yes.

15      Q    -- Carter; does that sound right?

16      A    Yes.

17      Q    Okay.  And the document speaks for itself.

18  You did not prepare this document, but you had an

19  MRI?

20      A    Yes.

21      Q    They put --

22      A    I believe it was CAT scan.

23      Q    CAT scan?  And do you recall if they found

24  anything?

25      A    All I was told that it was a slight

1    concussion is what I was told.

2        Q    Who told you that?

3        A    The doctor.

4        Q    All right.  And a slight concussion is not

5    written anywhere on here, though.

6        A    Okay, that.

7        Q    Okay.

8            (Exhibit E marked.)

9    BY MR. RANAZZI

10       Q    Okay.  And again, these are documents,

11   it's been marked as Defendant's Exhibit E.  These

12   are documents provided by your counsel and they are

13   again, hospital records regarding your visit on

14   December 1st, and again, the slight concussion that

15   you, that you discussed, not referenced here, but

16   you weren't told any other, any other injuries,

17   right, from the CAT scan?

18       A    No.

19       Q    All right.  And some of the -- again, you

20   did not prepare this, these records speak for

21   themselves?

22       A    Yes.

23       Q    But I just want to get you to, to make

24   sure that you get a chance to delineate to me all of

25   the injuries that you had.  Did you get any

1    treatment, other than, other than the CT on

2    December 1st --

3         A    No.

4         Q    -- any other treatment?

5         A    No.

6         Q    All right.  Did you seek any -- I'm sorry.

7    Did you have any other injuries from the event that

8    we haven't talked about?

9         A    No.

10        Q    Any internal injuries we haven't talked

11   about?

12        A    No.

13        Q    Any emotional?

14        A    Emotional.

15        Q    You had emotional problems?

16        A    I still do.

17        Q    Okay.

18        A    I still do.

19        Q    And what, could you tell me those

20   emotional problems?

21        A    Yeah.  I, it's -- that is always in the

22   back of my head, thinking about how I was treated, I

23   mean it's, it was pretty tragic, it was.

24        Q    So like stress?

25        A    Stress, I mean it's, I mean it's there

1   every day, I think about it.

2       Q    Every day?

3       A    Every day.

4       Q    All right.  And this is emotional,

5   emotional issues?

6       A    It is.

7       Q    Okay.  And have you sought treatment for

8   that?

9       A    No.

10      Q    And it's two years -- well, it's a year

11  and a half later and you're still having this?

12      A    Yeah.

13      Q    Okay.  Did you want to seek treatment for

14  this?

15      A    I did, but I, I, my -- I have no

16  insurance, I have no insurance.

17      Q    Okay.

18      A    I do now, at the time I didn't.

19      Q    All right.  And when did you start getting

20  insurance?

21      A    I want to say since probably about three

22  months ago.

23      Q    Three months ago?  And in these past three

24  months when you've had insurance have you sought

25  emotional counseling for?

1    A    No, I've had other things going on, too.

2    Q    I mean, I understand.  You just, you

3  haven't done it?

4    A    I haven't.

5    Q    Let's talk about -- has any other Lucas

6  County personnel reached out to you at all?

7    A    No.

8    Q    Since the, since, let's just say since

9  December 1st, since you -- or since you talked to

10  Carter, since you talked to detective Carter?

11    A    No.

12    Q    Okay.

13    A    The prosecutor.

14    Q    When you were a witness in the criminal

15  matter?

16    A    Yes.

17    Q    Which prosecutor did you deal with?

18    A    I, not sure --

19    Q    Okay.

20    A    -- of his name.

21    Q    And you gave testimony in that matter?

22    A    Yes.

23    Q    Other than that, though, have you dealt

24  with any other personnel?

25    A    Have not.

1     Q   Okay.  I don't need to mark these, but

2  these are the responses that you gave us for, for

3  our discovery that we served, that your lawyer

4  prepared and you probably had a hand in answering

5  them, you signed them.  I want to make sure, if you

6  flip to the back of that, the back page, the last

7  page.

8     A   Gonna get it.

9     Q   That's okay, take your time.  All kinds of

10  time.  Is that your signature?

11     A   It is.

12     Q   Okay.  Do you recall reviewing these

13  answers?

14     A   I do.

15     Q   So to the best of your knowledge these

16  answers are true, accurate and correct?

17     A   Yes.

18     Q   All right.  Let's go to page 6, if you

19  could, the interrogatory number 3 and the list of

20  convictions there on page 6 and 7.  Take your time,

21  you can take your time to review that.

22     A   Yes.

23     Q   And to the best of your knowledge, is that

24  a complete delineation or listing of your, all of

25  your criminal offenses?

1     A    Yes.

2     Q    Do you know how many times you've been

3 convicted of DUI?

4     A    I believe three?

5     Q    Okay.

6     A    Like.

7     Q    And how many --

8     A    Four.

9     Q    -- disorderly conducts do you have?

10    A    I'm not sure how many.  I'm not sure.

11    Q    Would it surprise you that you've been

12 convicted of disorderly conduct five times?

13    A    That's what it says.

14    Q    Do you know approximately how many days

15 you've served in jail?  Approximately, you can

16 ballpark it.

17    A    At the most, 30 days.

18    Q    Thirty days is the most for one sentence?

19    A    I haven't spent that many times, days in

20 jail.

21    Q    So is it less than 30?

22    A    I've only been, I've only been to CCNO

23 about three times.

24    Q    All right.  And again, best of your

25 knowledge, this is a complete listing of all your

1  criminal convictions?

2      A     Yes.

3      Q     Do you have any current criminal matters

4  pending?

5      A     I'm not sure right now.

6      Q     I'm sorry?

7      A     Right now I'm on probation.

8      Q     Do you have any current criminal matters

9  pending that you haven't been sentenced for?

10     A     I, I believe so.

11     Q     Do you know what those are?

12     A     I, probation violation.

13     Q     And do you know what the substance of the

14  probation violation is?  Substance being what's the

15  basis for it.

16     A     It was from when I had got charged that

17  night on the 10th, was a probation violation.

18     Q     You were on probation at that time?

19     A     No.  Now I'm on probation.

20     Q     Okay.

21     A     And I violated my probation for not

22  reporting.

23     Q     So you didn't report?

24     A     Yes.

25     Q     And part of your probation is reporting to

1   your probation officer?

2       A    Yes.

3       Q    Did you just not report once or did you

4   not report a whole bunch of times?

5       A    I reported.  I did report and they had

6   switched the probation officer on me, so she was

7   like start -- it was like a start all over type

8   thing.  So I was just going down, filling paperworks

9   out -- filling the paperwork out and leaving is what

10  they were having me to do.

11      Q    And do you think that they messed up and

12  didn't know that you came down, or?

13      A    I, that's possible.

14      Q    And you're being, you're being charged now

15  with a probation violation, that's a current

16  criminal matter pending?

17      A    Yes.

18      Q    And that's the only criminal matter

19  pending that you know of?

20      A    So.

21      Q    No other, no other criminal --

22      A    Not that I know of.

23      Q    I'm not trying to trap you or --

24      A    Oh, I, I.

25      Q    Now, why don't you tell me, if you can,

1    the -- are you employed?

2         A    I'm not.

3         Q    What was your last job?

4         A    I worked for Cousino's Restoration,

5    disaster cleanup.

6         Q    Cousino's Restoration?

7         A    Cousino's Restoration.

8         Q    And disaster cleanup?

9         A    Disaster cleanup.

10        Q    How long did you work for them?

11        A    Ten years.

12        Q    Do you remember what, from what year to

13   what year?

14        A    I believe it was September 29th of 2008

15   until 2017 I have a injury.

16        Q    You had an injury that caused you to lose

17   that job?

18        A    I'm on a Worker's Comp --

19        Q    All right.

20        A    -- right now.

21        Q    And, oh, so you're on Workers' Comp from

22   that job?

23        A    Yes.

24        Q    And that's been since '17?

25        A    Actually, the injury was, I believe '16 is

1  when I injured my —— January, was like January ——

2  January 16th is when I had injured my, my shoulder.

3      Q    January of '16 or January ——

4      A    2016.

5      Q    Okay.  So January of 2016 you injure your

6  shoulder?

7      A    Yes.

8      Q    And then you're on disability, or?

9      A    I was on —— well they had ——

10     Q    Worker's Comp?

11     A    Yes, Workers' Comp.

12     Q    Worker's Comp from Cousino's disaster?

13     A    Restoration.

14     Q    Restoration.  And are you still on that?

15     A    I am.

16     Q    And is there any plan to get you back

17  working, or?

18     A    Yes, I, I had some multiple, multiple

19  surgeries on my shoulder.

20     Q    And when was the last surgery?

21     A    December 1st of 2000 —— December 1st of

22  2018.

23     Q    And you said you had multiple surgeries,

24  do you remember the dates of those?

25     A    I don't.

1     Q     Can you find out?

2     A     I can.

3              MR. RANAZZI:          Caroline,

4          can we get that, if you can?

5              MS. HUNT:              Sure.

6              MR. RANAZZI:           Thank you.

7   BY MR. RANAZZI

8     Q     And before that you worked where; if you

9   recall?

10    A     I believe I worked for Ashley's Furniture,

11  delivery.

12    Q     The delivery for the Ashley's Furniture --

13    A     Yes.

14    Q     -- that's the furniture store?

15    A     Yes.

16    Q     How long did you do that for; if you

17  recall?

18    A     A year and a half.

19    Q     Why'd you leave there?

20    A     Because Cousino's was a better job,

21  offered more money.

22    Q     Okay, so no --

23    A     No fire, no --

24    Q     You didn't get laid-off or any --

25    A     No.

1     Q    All right.  Before that do you recall?

2     A    I was in the car industry.  I worked for a

3  auto packaging company that had went under, had went

4  under due to the fact that the car industry had, was

5  going down.

6     Q    And if you were working at Ashley's for a

7  year and a half prior to 2008 and putting Ashley's

8  at -- you got that job in 2006, 2005?

9     A    I believe so.

10    Q    Okay.

11      MS. HUNT:          Objection.

12      I mean, he's already answered these.  If

13      we're gonna ask supplemental questions

14      based on that can he look at his

15      answers --

16      MR. RANAZZI:         Sure,

17      absolutely.

18      MS. HUNT:         -- and can

19      you tell him where those are?  Do you know

20      what interrogatory that was?

21      MR. RANAZZI:        I don't, I

22      don't.  I was just -- since we started

23      talking about the surgeries I decided to

24      start talking about the work history, so.

25      It's page 18.  That's where the answer is.

1          Question starts on 17.

2              MS. HUNT:              Okay.  Go

3          ahead and review what you've already said.

4              MR. MCGOVERN:              Okay.  I was

5          mess -- I was messed up with the dates.

6     BY MR. RANAZZI

7          Q    And again, I mean these answers speak for

8     themselves --

9          A    Yes, yes, yes.

10         Q    -- and to the extent that you're, your

11    prior testimony in the last 10 or 15 minutes is,

12    doesn't reconcile with this.  This is accurate,

13    correct?

14         A    Yeah.

15         Q    Okay.

16         A    And it is.

17         Q    Let's clean up one of the matters.  It

18    looks like you worked for ServiceMaster now or you

19    just did in 2017?

20         A    2017 I did.

21         Q    Did you leave Cousino's to go to

22    ServiceMaster or --

23         A    No.

24         Q    -- was there a name change, or?

25         A    No.

1      Q     Or did you do both?

2      A     I, I needed to get myself back to where I

3   was.  I, so I had taken a job with ServiceMaster.  I

4   had taken a job with ServiceMaster due to the fact

5   that doctor that had did surgery on my shoulder had

6   told me no, I could no longer do that type of work.

7      Q     You couldn't do the Cousino's work?

8      A     I couldn't do the Cousino's work.  I went

9   to ServiceMaster because they were almost the same

10  kind of, in the same kind business but it was

11  lighter --

12     Q     Okay.

13     A     -- type of work.

14     Q     All right.  And you may not know the

15  answer to this question, but you're on disability

16  from Cousino's, correct?

17     A     I'm not on disability.

18     Q     I'm sorry, you're on Worker's Comp from

19  Cousino's, right?

20     A     Yes.

21     Q     And were you getting Worker's Comp at the

22  same time you were --

23     A     No.

24     Q     -- working for ServiceMaster?

25     A     No.  I was on it, but Worker's Comp was

1   not giving me any benefits.  I have not received any

2   benefits from Worker's Comp until I had had surgery

3   on my shoulder on December 30th, 3rd, whatever, they

4   just did this last surgery is when I had started

5   again benefits.  I had not received any type of

6   benefits --

7       Q    Okay.

8       A    -- from Worker's Comp --

9       Q    All right.

10      A    -- at all.

11      Q    So you weren't getting Worker's Comp

12  benefits in '17?

13      A    No, I was not.

14      Q    Or at the time that you, that you took the

15  lesser impact job at ServiceMaster you weren't

16  getting Worker's Comp benefits and you didn't start

17  getting Worker's Comp benefits until December of

18  '18, after your last shoulder surgery?

19      A    Yes, it was when I started getting the

20  benefits.  Right now I get benefits, right now, up

21  to the end of this month and then it's pretty much

22  cut off.

23      Q    Okay.  So you got Worker's Comp, you're

24  basically -- I want to make sure I get this right.

25  Your Worker's Comp financial benefits off of the

1    Cousino's, ServiceMaster jobs that you had started

2    in '18 -- or started in December of '18 and will run

3    out in June or July of '19?  So you had them for

4    half a year?

5        A    I didn't even have them for half a year.

6    I only had them from the time that they did the

7    surgery until the time the doctor, which just had

8    told me that there was no more that he could do, so

9    yes, it's.

10       Q    Now you were not -- what did you do for

11   money then from the time that you left ServiceMaster

12   disaster to the time that you got your surgery and

13   Worker's Comp benefits in '18?

14       A    I was struggling.

15       Q    Did you live at home?

16       A    I don't -- I was staying with my brother.

17       Q    Staying with your brother.  You doing odd

18   jobs?

19       A    Odd jobs, I mean, I was doing stuff around

20   the yard for him, you know.

21       Q    Okay.

22       A    Just keeping.

23       Q    So you were making money how you could

24   make it?

25       A    I wasn't really making money, it was like,

1    more of a place to stay, kind of like earning my

2    way.

3          Q    So make sure I got this right.  Your last

4    paycheck that you got was ServiceMaster, disaster

5    restoration, cleaning, sometime in 2017?

6          A    It was, I had got a paycheck the day I had

7    got out of jail on the -- on November 11th.

8          Q    Okay.

9          A    Or whatever date I had got out, it was

10   that day I had a paycheck.

11         Q    All right.  The shoulder injury that keeps

12   you from working is totally unrelated to anything

13   that happened at the Lucas County jail, correct?

14         A    Correct.

15         Q    So you're not maintaining any wage loss

16   claim as a result of any --

17         A    No.

18         Q    -- anything that went into the correction

19   officer's -- to Mr. Hobbs's actions with you,

20   correct?

21         A    Correct.

22         Q    All right.  So, and you're not doing any

23   job currently?

24         A    I'm not.

25         Q    And are you, did you file any unemployment

1  claims, or?

2      A    No.

3      Q    Were you advised to file any unemployment

4  claims, or?

5      A    No, they're, they advised that they're

6  going to try to get me some kind of vocational

7  training.

8      Q    Yeah.  Your voice tails off --

9      A    Yes.

10     Q    -- at the end of your answer, I do it too,

11  so.  All right.

12          So we've talked about the three -- did

13   you -- how many shoulder surgeries did you have?

14     A    Three.

15     Q    And do you recall the dates of those?  The

16  last one being on the 18th?

17     A    Eighteenth.

18     Q    Or December 18th?

19     A    I believe it was December 30th of 2018.

20     Q    Okay.  Who did those surgeries, if you

21  recall?

22     A    Dr. Sohn.  Sohn.  S-O-J-O-N -- Sohn.

23     Q    Okay.

24     A    Sohn.

25     Q    S-O-J-A-N?

1      A    Yes.

2      Q    And he did all three?

3      A    No.

4      Q    Okay.

5      A    Dr. Hoeflinger did two.

6      Q    Okay.  Do you recall when those were,

7 approximately?

8      A    Oh, I don't.  At this moment I don't.

9      Q    Are those the last three surgeries for

10 anything that you've gotten?

11     A    Yes.

12     Q    Why aren't you -- make sure I have your

13 interrogatory on that.  Why don't you tell me, if

14 you can, your health history, your surgery history,

15 how many surgeries have you had?

16     A    I've had quite a bit throughout my life.

17     Q    Okay.

18     A    Far as, I had when I was, when I was

19 younger I had got hit by a car.  I was actually

20 jumped, pushed into a car.

21     Q    Do you recall when?

22     A    I actually, I do remember the date because

23 I just turned 18, that was July, it was like

24 July 23rd of 1988.

25     Q    July 23rd of 1988?

1      A    Yes.

2      Q    You just turned 18?

3      A    I just turned 18.

4      Q    And you get hit by a car?

5      A    Yes, I got pushed.

6      Q    You got pushed into a car?

7      A    Yes.

8      Q    Okay.  Was there a criminal action on

9 that, or?

10     A    They had never found the guys who pushed

11 me.  They, they knew who they were.  They had just

12 got a dishonorable discharge from the Army.

13     Q    When you say they knew who they were --

14     A    The detectives --

15     Q    Okay.

16     A    -- the cops, I mean, they had their names,

17 they had their license plates, everything was, but

18 they just never, never, nothing -- nothing came out

19 of it.

20     Q    Okay, so there was no criminal prosecution

21 on that?

22     A    No, there wasn't.

23     Q    All right.  The injuries you sustained?

24     A    I had shattered my right hand.  Shattered,

25 my right fibula tibia was shattered, and my elbow

1  was shattered.

2      Q    Okay.

3      A    And left elbow was shattered.

4      Q    What surgery did they do; do you know?

5      A    My leg, hand.

6      Q    They did surgery on it or they just set

7  it, or?

8      A    No, they, they, I believe they did

9  surgery --

10     Q    Okay.

11     A    -- and then they -- I had pins in my hand.

12     Q    Okay.  Do you recall what doctor did that

13 or --

14     A    Dr. Rusin.  Dr. Rusin.

15     Q    Rusin?

16     A    Rusin.

17     Q    R-U-S-S-E-N?

18     A    Yes.

19     Q    Okay.

20     A    Or I-N.

21     Q    Okay.  And do you still have pains from

22 those, or?

23     A    Getting older.

24     Q    Yeah.  Yeah.  So you, so you still feel

25 some of those injuries?

1      A     Well, I mean, yeah.

2      Q     Okay.

3                  (WHEREUPON a discussion was held off

4            the record.)

5   BY MR. RANAZZI

6      Q     Yeah, and if you want to, we asked this

7   question on page 8 of your discovery, page 7 and 8,

8   I don't want to -- there's a reference there to some

9   of this.

10            All right, so you have this, this first

11   remembered surgery in July of '88 when you were 18.

12   Do you recall if you had -- what your next surgery

13   was or what your next health problem was?

14      A     I, after the accident I, I mean far as

15   what happened with the injuries was what is

16   happened, had happened with injuries after that, I

17   mean.

18      Q     Did you have any other surgery after that,

19   other than the three -- so we've got the surgery on

20   the car accident in '88 and we've got three shoulder

21   surgeries for work just recently, or as recently as

22   December of '18?

23      A     I believe I did have, I had breaken -- I

24   had broke my hand.

25      Q     Okay.  Do you recall when that was or how

1  that was?

2      A    That, I believe that was, let's see, my

3  daughter was just born, so that would have been

4  2002?

5      Q    All right.  And you had a, you broke your

6  hand?

7      A    Yes.

8      Q    Do you know how you broke your hand?

9      A    Something fell on it.

10     Q    Okay.

11     A    Like, smashed my --

12     Q    Was it work or was it just --

13     A    I was at home.

14     Q    All right.  And you had surgery.  Do you

15  recall who did that?

16     A    I don't remember who did that.

17     Q    All right.  Any other medical procedures

18  between that surgery and your shoulder surgeries?

19     A    Not, no, not that I recall.

20     Q    Any other nonsurgical medical procedures,

21  vasectomy, you know?

22     A    I did have a vasectomy.

23     Q    All right.  Do you recall when that was?

24     A    I don't.

25     Q    Your answer on page 8 references some

1   nerve damage in your hand, return --

2      A   Oh, yeah, it was, that was a, when I

3   worked at High Tech Packing -- or Electro Prime.

4      Q   Do you recall when that was?

5      A   I want to say that would, probably would

6   have been 2004, '3, 2003, '4.

7      Q   Okay.  And do you still have that nerve

8   damage --

9      A   Oh, yeah.

10      Q   -- or did that help?

11      A   I do.

12      Q   And any other follow up on that, or?

13      A   No.

14      Q   Vasectomy, you don't -- do you recall when

15   that happened?

16      A   I don't.

17      Q   Do you know who did it?

18      A   I don't.

19      Q   All right.  Do you have kids?

20      A   I do.

21      Q   How many kids?

22      A   Two daughters.

23      Q   About how old are they?

24      A   Seventeen and 11.

25      Q   Seventeen and 11?

| | | |
|---|---|---|
| 1 | A | Seventeen -- |
| 2 | Q | What are they, 17 and 11? |
| 3 | A | Yes. |
| 4 | Q | And what are their names? |
| 5 | A | Neva and Jennaivea. |
| 6 | Q | Your last name? |
| 7 | A | McGovern. |
| 8 | Q | Neva McGovern is the 17 year old? |
| 9 | A | Yes. |
| 10 | Q | And Jennaivea? |
| 11 | A | McGovern. |
| 12 | Q | McGovern is the 11 year old? |
| 13 | A | Yes. |
| 14 | Q | They in school? |
| 15 | A | Yes. |
| 16 | Q | What school? |
| 17 | A | Toledo School for the Arts. |
| 18 | Q | Downtown? |
| 19 | A | Yes. |
| 20 | Q | Both of them? |
| 21 | A | Yes. |
| 22 | Q | What do they do? |
| 23 | A | Ballet. |
| 24 | Q | Both? |
| 25 | A | Yes. |

1      Q      Nice.  Married?

2      A      I was.

3      Q      How many times?

4      A      Once.

5      Q      When?  And to whom?

6      A      Renee Beauregard McGovern.

7      Q      McGovern, okay.

8      A      2001 when we got married.

9      Q      Okay.  Until, until when, or are you still

10     married?

11     A      No, we had got a divorce two years ago.

12     Q      Okay, so you were married for about 15

13     years?

14     A      Fifteen years.

15     Q      Okay.

16     A      Together 18.

17     Q      And she's the mother of your two children?

18     A      Yes, she is.

19     Q      Do your daughters live with their mother?

20     A      They do.

21     Q      Is she local?

22     A      She is.

23     Q      You got divorced?

24     A      I did.

25     Q      Was it a dissolution or was it a contested

1    divorce?

2          A    Dissolution.

3          Q    All right.  Did you have separate lawyers

4    or did you have the same lawyer?

5          A    I, at the time I was, I didn't have an

6    attorney.

7          Q    Did she have one?

8          A    She did.

9          Q    Who was her lawyer?

10         A    I'm not sure.

11         Q    But the divorce was in '15 or '16?

12         A    I believe it was '16.  '16, I believe.

13         Q    Okay, '16?  Any other family in town?

14         A    I have pretty much my whole family.

15         Q    That's mother, father?

16         A    My mother's passed.  My dad, yes.

17         Q    Sorry to hear that.  How long ago did she

18   pass?

19         A    About 14 years ago.

20         Q    Fourteen years ago?

21         A    Fourteen years ago.

22         Q    And your father?

23         A    He's here.

24         Q    Okay.  What was your mother's name, by the

25   way?

1     A    Mary Ann McGovern.

2     Q    Mary Ann McGovern.  And your father's

3 name?

4     A    Richard McGovern.

5     Q    And he's local?

6     A    Yes.

7     Q    Do you see him?

8     A    I do.

9     Q    Okay.

10         (WHEREUPON a discussion was held off

11         the record.)

12 BY MR. RANAZZI

13     Q    Doesn't take much to get me off track.

14 We're talking about your father, right?

15     A    Yes.

16     Q    He's local?

17     A    Yes.

18     Q    Do you see him?

19     A    I do.

20     Q    Often?

21     A    I do.

22     Q    And do you have a brother?

23     A    I have four brothers --

24     Q    Okay.

25     A    -- and one sister.

1    Q    They all local?

2    A    Yes.

3    Q    And you see them all?

4    A    I do.

5    Q    Okay.  And in the pecking order, where are

6    you in, in the four brothers and -- there's six of

7    you?

8    A    Yes.  I have a twin, so I would be the

9    third.  I would be -- wait.  I would be the fourth.

10    Q    Is your, were you the second of the twins

11    to come out, or?

12    A    I was the first.

13    Q    All right.  So you got a little, couple of

14    seconds advantage there.  What's your twin brother's

15    name?

16    A    Tom McGovern.

17    Q    And he's local?

18    A    Yes.

19    Q    All right.  And your oldest brother, or is

20    it -- who's the oldest in the family?

21    A    Pat McGovern.

22    Q    Is that your brother?

23    A    Yes.

24    Q    And then the second?

25    A    Daniel McGovern.

1      Q    And he's local?

2      A    Yes.

3      Q    And third?

4      A    Lisa McGovern, that's --

5      Q    That's your sister --

6      A    Yes.

7      Q    -- that's your only sister?

8      A    Yes.

9      Q    Okay.  And is she still McGovern or is she

10   married?

11     A    She's, she was married, divorced.

12     Q    Is she back to McGovern or does she have a

13   maiden name?

14     A    She still has her maiden name.

15     Q    Which is what?

16     A    Carroll.

17     Q    So it's?

18     A    Lisa Carroll.

19     Q    Lisa Carroll?

20     A    Yes.

21     Q    C-A-R-R-O-L-L?

22     A    Yes.

23     Q    And then your young -- your twin brother,

24   his name was?

25     A    Tom.

1     Q    And then your youngest brother?

2     A    Michael McGovern.

3     Q    That's everybody?

4     A    Yes.

5     Q    And they're all local?

6     A    Yes.

7     Q    When you talk about drug use, do you use

8 drugs?

9     A    No.

10    Q    Ever?

11    A    I have, and I mean --

12    Q    What drugs have you used?

13    A    Just marijuana.

14    Q    That's it?

15    A    Yes.

16    Q    No opioid use or --

17    A    No.

18    Q    -- prescription drug use or?

19    A    Medication when I was --

20    Q    Okay.

21    A    -- on medication.

22    Q    But none, none --

23    A    No.

24    Q    -- none in an inappropriate way?

25    A    No.

1     Q    But a lot of alcohol use?

2     A    I have.

3     Q    All right.  Do you think you have an

4 alcohol problem?

5     A    I do.

6     Q    All right.  Do you get treatment on that?

7     A    I am.

8     Q    And what's that treatment?

9     A    I'm going to AA.

10     Q    And how long have you been going to AA?

11     A    Last couple weeks.

12     Q    Last couple of weeks?

13     A    Yes.

14     Q    All right.  Is this your first experience

15 with AA?

16     A    No.

17     Q    When did you go -- have you been going on

18 and off?

19     A    Eighteen years ago, 18, 18, 19 years ago

20 was when I really had -- when I had kids and got --

21     Q    You drinking a lot?

22     A    No.  When I had kids and married -- when I

23 got married and had kids, that was, it wasn't about

24 me no more, it was about being a family man.

25     Q    So you got, you got into an AA treatment

1  program then?

2    A    Before, yeah, before we had kids it was --

3    Q    So when you got married you decided to,

4  for lack of a better word, clean --

5    A    Yes.

6    Q    -- clean up your act --

7    A    Yes.

8    Q    -- and go to AA?  All right.

9    A    Well I did it before I got married and did

10  before I had kids.

11    Q    When did you start drinking heavily?

12    A    I want to, I want to say I've never really

13  drank heavily.

14    Q    Okay.  What's your drink of choice, by the

15  way?

16    A    Just beer.

17    Q    Just beer?  For the most part or is it

18  always just beer?

19    A    It's just beer.

20    Q    So no scotch, no liquor?

21    A    No, no, no, no.

22    Q    No whiskey?

23    A    No.

24    Q    No clear liquor?

25    A    No.

1      Q    So beer.  What's your favorite beer?

2      A    Bud Light.

3      Q    All right.  And you've been drinking that

4  your entire life, or your entire adult life?

5      A    I mean, I'm not gonna say that.  I'm, I --

6  the 10 years that I worked at Cousino's I was not a

7  drinker at all.  I got up, went to work every

8  morning.

9      Q    And that was '6 to '16 or '7 to '17?

10     A    Yes.  So them 10 years that I worked for

11  Cousino's, I got up, you know, five o'clock in the

12  morning and went to work every day.

13     Q    Okay.

14     A    So I, I didn't, there was not much

15  drinking at all, because I mean --

16     Q    Did you start drinking -- did you drink

17  when you were 18?

18     A    No.

19     Q    Did you drink when you're -- you started

20  when you were 21?  When you were of age?

21     A    I want to say a little later.

22     Q    So 24, 25, or?

23     A    Twenty-five.  And then the divorce kind of

24  took me to -- it was, it was hard.

25     Q    The divorce happened?

1   A  Just, I mean this last two years --

2   Q  Okay.

3   A  -- has been --

4   Q  So you started drinking again and that's

5 why you got in AA again?

6   A  Yes.

7   Q  All right.  And then you were drinking the

8 night of the incident?

9   A  Yes.

10   Q  Okay.

11     MR. RANAZZI:     Time for a

12     five-minute break?

13     MS. HUNT:     Sure.

14     MR. MCGOVERN:    Yeah.

15     (WHEREUPON a short recess was taken.)

16     MR. RANAZZI:    We can go

17     back on the record.

18 BY MR. RANAZZI

19   Q  Couple of follow-ups.  The night of the,

20 the night in question, did you make any phone calls?

21   A  No.

22   Q  And when you got the treatment at the

23 Toledo ER who paid those bills?

24   A  Nobody.

25   Q  So are those outstanding, are they --

1    A    Yes, they're outstanding.

2    Q    Do you know how much they are?

3    A    I don't.

4    Q    Do you get bills from them?

5    A    I, I have mail going everywhere.  I have

6   mail going everywhere.  I had -- so my brothers,

7   they don't give me my mail, so.

8    Q    Okay.  Well maybe you can have your

9   counsel --

10        MR. RANAZZI:            And we would

11        request if you could get the bills on

12        those, that would be great.

13        MR. GERHARDSTEIN:       Talking

14        about the CAT scan?

15        MR. RANAZZI:            Yeah.

16   BY MR. RANAZZI

17    Q    And that's the only medical treatment

18   you've received, correct?

19    A    Yes.

20    Q    Your sister, Lisa Carroll, is listed as a

21   person who would have information relevant to this

22   matter?

23    A    No.

24    Q    In your interrogatories?  Has knowledge of

25   plaintiff's claim for damages, and it's page 11.

1  It's bottom of page 11.  Says Lisa Carroll, sister,

2  has knowledge of plaintiff's claim per damages.

3      A    I don't understand that.

4      Q    Is that incorrect, or?

5      A    What does that mean?

6      Q    Well we asked you for anybody who had,

7  would have information relevant to these claims and

8  you listed your sister as somebody who would have

9  knowledge of your claim for damages.

10     A    I, I don't understand why I'd even say

11  that.

12     Q    Did she see you shortly after the

13  incident?

14          MS. HUNT:                He means

15          injuries.

16          MR. MCGOVERN:            No, I, it

17          was -- I had went to my brother's house,

18          so.  I don't know why, how Lisa even got

19          involved.

20  BY MR. RANAZZI

21     Q    Okay.

22     A    I don't remember saying that.

23     Q    Well you know what, when you have a chance

24  to maybe talk with your counsel and we can maybe get

25  a clarification --

1    A    Yeah.

2    Q    -- of that if there's something there.  If

3  there's nothing there then we --

4         MR. RANAZZI:            Is that

5         right?

6         MS. HUNT:               Yeah.

7         MR. RANAZZI:            All right.

8         Thank you.

9  BY MR. RANAZZI

10   Q    When was your last DUI?

11   A    Believe it was the 10th.

12   Q    10th of what?

13   A    Of '17.

14   Q    You didn't just recently get one?

15   A    Not that I know of, I mean, I haven't been

16  charged with anything.

17   Q    Okay.

18         (WHEREUPON a discussion was held off

19         the record.)

20  BY MR. RANAZZI

21   Q    Well you know what, we're not gonna mark

22  it as an exhibit but I'll show it to your counsel.

23  It's a '19 case number with, again, we're not trying

24  to trap you, and we know you've got a lot of

25  outstanding matters going.

1    A    Could that be the violation from?

2         MS. SZUCH:              Yeah, the

3         probation violation.

4         MS. HUNT:              Oh, it would

5         come up as the original offense?

6         MR. RANAZZI:              Is that the

7         probation violation?

8         MS. SZUCH:              That's his

9         understanding.

10        MR. RANAZZI:              Okay.  All

11        right.

12   BY MR. RANAZZI

13   Q    All right, I want to go over, and a lot of

14   this is lawyer stuff but I want to make sure that

15   we've given you every opportunity to delineate your

16   claims.  That's your First Amended Complaint, which

17   we're not gonna mark as an exhibit, pleading, but I

18   want to direct you to page 8 and paragraph 47, which

19   states, and I'll read it, Mr. McGovern was in pain,

20   bloody and swollen after the assault.  Mr. McGovern

21   was seen by a nurse who treated him for his

22   injuries.  After being released from jail Mr.

23   McGovern was diagnosed with post-concussion syndrome

24   at a local hospital.  The entire experience was

25   terrifying and caused him severe emotional distress.

1    Now over the course of this deposition I've asked

2    you a bunch of questions regarding this claim.  Have

3    you given all the testimony that you believe is

4    relevant to that?

5        A    Yes.

6        Q    Okay.  In the next page, which is page 9,

7    you have an action for assault and battery, you have

8    an action for negligence and recklessness, and over

9    the course of this deposition I've asked you

10    questions regarding both of those claims.  Have you

11    had a chance to give all the evidence and testimony

12    relevant to those?

13        A    I have not -- I don't understand the

14    assault, battery, towards me?

15        Q    Yes.

16        A    Yes.

17        Q    And you've given all the evidence that you

18    believe is relevant to that?

19        A    Yes.

20        Q    Okay.  Now, and I, and I don't know --

21    strike that.

22        You appear to have some abrasions right

23    now at the, close to the spot that you injured back

24    in '17, November of '17, or that was injured.  Is

25    that unrelated to the?

1    A    Yes.

2    Q    Can you tell me, without divulging too

3  many personal details, what that is?

4    A    It's skin cancer.  Skin cancer.

5    Q    You have skin cancer?

6    A    Yes.

7    Q    When were you diagnosed with that?

8    A    I was diagnosed with that, I want to say.

9    Q    And specifically for the record, we're

10  talking about the right side of your temple?

11    A    Yes.

12    Q    And just below?

13    A    Yes.

14    Q    In front of the hairline and just below

15  the --

16    A    If you look at the picture you can see

17  that -- what picture?

18    Q    This is exhibit --

19    A    On this picture right here.

20    Q    Exhibit B?

21    A    Yes.

22    Q    Thank you.

23    A    On the head, okay, you can see where, I

24  mean it's gotten -- the skin cancer has gotten

25  worse, but right here is the skin cancer and right

1    here is the --

2        Q    Okay.  And you're pointing to Exhibit A

3    now?

4        A    Yes.

5        Q    Okay.

6              MS. SZUCH:              Which page?

7    BY MR. RANAZZI

8        Q    It's page 3 or 2?

9        A    It's 3.

10       Q    Three.  Page 3 and 4, okay.  And then

11   Exhibit C, you can see the discoloration there.  Is

12   that the --

13       A    Yes, that's the --

14       Q    -- skin cancer there?

15       A    -- skin cancer, then above it --

16       Q    Okay.

17       A    -- is the --

18       Q    That is unrelated to the things that

19   happened to you at the jail?

20       A    Yes.

21       Q    When did you get diagnosed with the skin

22   cancer?

23       A    I want to say maybe a year, a year before

24   this all happened.

25       Q    So 2016?

1    A    Yes.  But I have had it longer than that.

2    Q    Who diagnosed it?

3    A    Dr. Daiber.

4    Q    Okay.  Are you getting treatment for that

5    now?

6    A    I'm working on it, now that I have

7    insurance again.  They were gonna remove it and I'm

8    not sure --

9    Q    Do you have it anywhere else?

10   A    I have it here on my hand.

11   Q    Okay.

12   A    And then a little right here, just pretty

13   much where all sun has been beating on me.

14   Q    I'm sorry, hold on, hold on, can you

15   repeat that?

16   A    Where the sun's hit me the most --

17   Q    Okay.

18   A    -- throughout my life.

19   Q    So the sun aggravates it and causes it to

20   blister up?

21   A    Yes.

22   Q    And again, totally unrelated to anything

23   that happened to you at the hands of any Lucas

24   County personnel or --

25   A    Yes.

1      Q    -- at the Lucas County --

2      A    Yes.

3      Q    If you go back to your interrogatory

4   answers, page 17?

5           MS. SZUCH:              Question

6           starts on 16.

7           MR. RANAZZI:            Question

8           starts on 16.

9           MS. SZUCH:              Yeah.

10          MR. RANAZZI:

11          Interrogatory 20?

12          MS. SZUCH:              Uh-huh.

13   BY MR. RANAZZI

14     Q    And the top of 17.  It's all, all that's

15   on 16 is the actual heading for the interrogatory,

16   but the whole thing's on 17, top of 17.  Can you

17   tell me when you were diagnosed to need

18   antidepressants?

19     A    It was since September, maybe September,

20   July, July of '17.

21     Q    Before?

22     A    It was.

23     Q    Before the event?

24     A    Yes.

25     Q    Do you know who prescribed those?

1      A    Dr. Daiber.

2      Q    Dr. Dimer?

3      A    Daiber.

4      Q    Daiber?  Okay.  And so did you get, did

5 you get clinically diagnosed with depression, or?

6      A    Yes.

7      Q    Have you had that your entire life or is

8 this just --

9      A    No.

10     Q    All right.

11     A    No.

12     Q    And was the depression the result of a

13 divorce or the other events in your life?

14     A    It was, it was pretty much the divorce and

15 then at the time of all this I was, was lost, you

16 know, medical so I didn't have, wasn't taking my

17 prescriptions.

18     Q    And when you lost health insurance you

19 stopped taking the antidepressants?

20     A    I, yes, I did.

21     Q    You have health insurance now?

22     A    I do.

23     Q    Are you taking the antidepressants now?

24     A    No.  It's all, it's all coming, it's all

25 working, I'm all getting that in order to, to.

1    Q    So you're getting that all organized?

2    A    Yes.

3    Q    Do you know when you'll get back on them,

4    or?

5    A    As soon as I see the doctor hopefully.

6    Q    Are you still getting treatment for the

7    skin cancer or are you back getting that?

8    A    I will be getting that.  I, it's, doctor's

9    got to be set up, referrals gotta be filled out for

10   me to be able to see these doctors.

11   Q    Is Dr. Daiber your primary care physician?

12   A    He was.

13   Q    Is he now?

14   A    He's no longer doing --

15   Q    He's no longer practicing, or?

16   A    He's no longer practicing.

17   Q    Are you gonna get a new primary care

18   physician, or no?

19   A    That's what I'm working on.

20   Q    You're working on?

21   A    Yeah.

22   Q    All right.  I think I'm done, but I'm

23   gonna turn it over to Ms. Henderson, she's gonna ask

24   you some questions.  I may be back to asking you a

25   few follow-up questions but probably not, okay?

1    Thank you for your time.

2        A    Thank you.

3               (WHEREUPON a short recess was taken.)

4                 * * * * * * * * *

5                      EXAMINATION

6    BY MS. HENDERSON

7        Q    Mr. McGovern, my name's Kayla Henderson

8    and I represent defendant Hobbs in this matter, we

9    briefly met before this started.  I will try not to

10   cover too much of the same ground so that we can

11   wrap this up relatively soon.

12             I wanted to ask, your current address,

13    1328 Walbridge Avenue, Toledo, Ohio?

14       A    Yes.

15       Q    And then how long have you been at that

16   address?

17       A    For about three months.

18       Q    Okay.  And is anyone else living at that

19   address?

20       A    Yes.

21       Q    Who is that?

22       A    It's my sister, Lisa Carroll.

23       Q    Okay.

24       A    Her boyfriend, Steve Beanz.

25       Q    Beanz like the food?

1     A    It's like -- B-E -- I think they, I

2 believe it's with a Z at the end.

3     Q    Okay.  So Lisa, your sister, her

4 boyfriend, Steve Beanz, and yourself, does anyone

5 else live there?

6     A    Johnny.

7     Q    Johnny.

8     A    Longhorn, or something like that, I'm not

9 sure.

10     Q    Okay.  And how is he connected to any of

11 you?

12     A    He's a roommate that paid -- that stays

13 there.

14     Q    And during the incident that we're here

15 for you lived on Donnelly Road and you said you

16 lived with your brother?

17     A    Yes.

18     Q    Which brother?

19     A    My twin.

20     Q    Your twin, okay.

21     A    Tom.

22     Q    Tom.  Did anyone else live at that

23 address?

24     A    His wife, Karen.

25     Q    Karen?

1    A    Yes.

2    Q    And she has McGovern --

3    A    Yes.

4    Q    -- as a last name?

5         And you were born July 2nd, 1971, correct?

6    A    Yes.

7    Q    In St. Louis, Missouri?

8    A    Yes.

9    Q    When did you get out to Toledo?

10   A    I was like, 10 years old.

11   Q    And you've been here ever since?

12   A    Yes.

13   Q    All right.  Did you ever serve in the

14   military?

15   A    No, I did not.

16   Q    Okay.  In terms of prior lawsuits, you

17   said in your interrogatories in 1998 you don't

18   recall if suit was filed but you had a claim against

19   Frisch's restaurant after an injury by steam; is

20   that correct?

21   A    Yes.

22   Q    Okay.  Do you remember how that got

23   resolved?

24   A    It was, they just settled out, or.

25   Q    So you got some kind of payment?

1    A    Payment, yes.

2    Q    Okay.  And then you also indicated in 1999

3  you remember there was a claim about failure to

4  protect after being stabbed by a patron; is that

5  correct?

6    A    Yes.

7    Q    And then how did that resolve?

8    A    It was same.

9    Q    Settled out, okay.  Did you have an

10  attorney for any of those?

11    A    Yes.

12    Q    Do you remember which attorney you had?

13    A    I believe it was Fisher.

14    Q    Fisher.  A local attorney?

15    A    Yes.

16    Q    Have you ever filed for bankruptcy?

17    A    No.

18    Q    Did you review any documents in

19  preparation for your deposition today?

20    A    I did.

21    Q    Which ones?

22    A    I'm not sure.

23    Q    Okay.

24    A    Even if I did, I mean I, I.

25    Q    Did they, were they a police report or,

1    you know, what kind of documents, if you can recall?

2         A    I mean, I didn't have no documents.  It

3    was just a talk type thing, just.

4         Q    Okay.  And I don't want to know about any

5    conversations --

6         A    Yes.

7         Q    -- with your attorneys, so, okay.

8              Did you watch the video of the incident

9     before today?

10        A    I did.

11        Q    How long ago?

12        A    When the prosecutor.

13        Q    So during the criminal trial?

14        A    Yes.

15        Q    Okay.  Have you watched it since the

16   trial?

17        A    No.

18        Q    Besides your lawyers, have you talked to

19   anyone about this case?

20        A    No.

21        Q    Have you talked to your sister about this

22   case?

23        A    Pretty much so, what happened.

24        Q    Any of your other siblings?

25        A    Yeah, they know about it.

1      Q     Your dad?

2      A     He -- I did, but he probably don't

3   remember.

4      Q     Okay.  And where did you go to high

5   school?

6      A     Rogers.

7      Q     Okay.  And did you complete your degree

8   there?

9      A     I didn't.

10      Q     Have you gotten your GED?

11      A     I did not.

12      Q     And then have you gone through any other

13   kind of training programs or schooling?

14      A     No.

15      Q     Do you have any hobbies, you like to go

16   fishing or --

17      A     I do.

18      Q     -- hunting?

19            What kind of hobbies do you like to do?

20      A     I like to fish, I like to, used to like to

21   work on cars.

22      Q     Do you still do those?

23      A     Spend a lot of time with my daughters.

24      Q     You said you used to like to work with

25   cars, do you not do that anymore?

1     A    I don't.

2     Q    Why not?

3     A    Hands.

4     Q    Prior to the incident at the jail did you

5 know any of the defendants, so, and I'll list them

6 for you, Lamonte Hobbs, Nate Meyers, Matt Grant,

7 Oliver Watkins, Mark Gumpf or John Tharp?

8     A    No.

9     Q    You didn't know any of them personally?

10    A    No.

11    Q    Had you ever -- have you spoken with them

12 after this incident at all?

13    A    No.

14    Q    I just have a few things to talk about on

15 that day, and hopefully we won't re-cover too much

16 ground.  Before you were pulled over, how long,

17 approximately, were you at Daffy's, if you can

18 recall?  Was it like an hour, couple hours?

19    A    Probably less than a half hour.

20    Q    Okay.  And you said you were at a workshop

21 beforehand.  Had you been at any other bars prior to

22 that?

23    A    No.

24    Q    So when you were in the pod and officer

25 Hobbs was conversing with you about your phone call

1  request, do you recall saying anything or muttering

2  anything under your breath that could have been

3  perceived as a racial slur?

4      A    No.

5      Q    Okay.  When officer Hobbs was removing you

6  from the pod do you recall any efforts to resist

7  that removal?

8      A    That I resisted?

9      Q    Uh-huh.

10     A    No.

11     Q    No efforts?

12     A    No efforts.

13     Q    All right.  And I know it happened very

14  quickly, but to the extent you can remember, do you

15  know at what point do you -- did you feel your head

16  hit the floor of the, of the jail?

17     A    At what point?

18     Q    Uh-huh.  Were you still in the doorjamb

19  area or had you been pulled out of the --

20     A    I was pulled out.

21     Q    You were pulled out?  Okay.  So the first

22  time you felt your head make contact with the floor

23  you were already out of the pod?

24     A    Yes.

25     Q    And do you remember if you were

1  intoxicated at all during this event?

2      A    I was not.

3      Q    And before the altercation happened do you

4  remember approximately how many other inmates were

5  in the pod with you?

6      A    It was packed.

7      Q    It was packed?

8      A    I mean, I couldn't give you a number.

9      Q    But there are several people in there,

10  okay.  Did you know anyone in there?

11      A    No.

12      Q    And were you offered to take a

13  breathalyzer later when you were at the jail?

14      A    Not when I was at the jail.  They had

15  taken me over to the police station first.  I was

16  not -- I was not under -- I was not even gonna be

17  arrested, booked, into the booking at that time

18  until I, I had threatened the cops is when they.

19      Q    So after you left the scene with the

20  officers from when you were pulled over you went to

21  the police station first?

22      A    Yes.

23      Q    And that's when the threatening

24  comments --

25      A    Yes.

1          Q     -- were made and then they took you to the

2     jail, correct?

3          A     Yes.

4          Q     And so after you were placed in the

5     isolation cell, excuse me, do you remember making

6     any requests for blankets or shoes?

7          A     No.

8          Q     Do you remember if you received those?

9          A     Depending on -- I think I did ask it, for

10    a blanket after, after I was assaulted and is what

11    the -- they give you what they gave you.

12         Q     So later in the evening you remember

13    receiving a blanket and a pair of shoes?

14         A     They brought me, they brought me a

15    blanket.

16         Q     Okay.  Do you remember who brought you

17    that?

18         A     I don't.

19         Q     Did you talk to any of the officers about

20    the altercation after that?

21         A     I don't believe I did.

22         Q     Going towards some of your medical

23    history, which shoulder, I don't know if I missed

24    it, but which shoulder had the surgeries?

25         A     It's my left.

1    Q    Your left shoulder?

2    A    Yes.

3    Q    And you never -- did you have any

4   preexisting headaches before this incident?

5    A    No.

6    Q    And in the last few months those headaches

7   have gone away or gotten better?

8    A    They still come and go.

9    Q    How frequently?

10    A    Gonna say every, maybe every few days,

11   every, I mean, four to five, I mean, four days,

12   three, four, five days, I mean they, they, they come

13   back.

14    Q    When you went to Toledo Hospital did you

15   receive a prescription for any painkillers?

16    A    Yes.

17    Q    Did you fill that prescription?

18    A    I didn't, I didn't have no money to fill

19   them.

20    Q    So you did not fill it?

21    A    No, I was just taking Motrin.

22    Q    Do you still take Motrin?

23    A    I do now, I take Motrin 800.

24    Q    Have you suffered any injuries to your

25   neck or your head since the accident, have you had

1   any issues?

2     A   I, I don't know, but like today I'm kind

3   of like this, you know, so like.

4     Q   So, but --

5     A   I mean I, I mean I don't, I mean I say

6   that, I mean, I don't know, but yes.

7     Q   Okay.

8     A   I, I, I've noticed without -- within the

9   past that, yes, I -- like right now, I mean, I woke

10   up this morning, I don't know if it was, I mean I --

11   yes.

12     Q   Okay.  I think my question might have been

13   unclear.  You haven't hit your head against

14   anything --

15     A   No.

16     Q   -- been in a -- okay, no car accidents?

17     A   No.

18     Q   No other injuries, accidents --

19     A   No.

20     Q   -- that type of thing?

21     A   No.

22     Q   Okay.

23          THE COURT REPORTER:    Remember to

24          let her complete her question.

25   BY MS. HENDERSON

1     Q    When you went to Toledo Hospital did you

2  receive any treatment for the elbow scrapes?

3     A    No.

4     Q    And when you were -- you said you

5  completed an AA program previously, correct, or you

6  at least were going.  Were you going to any AA

7  meetings during November 2017?

8     A    No.

9     Q    And then I think I might have been a

10  little unclear.  You said that you had lost your

11  health insurance recently.  Is that because of your

12  lack of employment, or how did that happen?

13     A    Divorce.

14     Q    The divorce?

15     A    Yes.

16     Q    You had health insurance through your

17  wife?

18     A    Well it was -- we had Medicaid.

19     Q    Okay.

20     A    But then everything, when the divorce,

21  whatever went through, I lost it.

22     Q    Okay.

23     A    It was actually, I had, the last time I

24  had medical was August, or I got taken, was like

25  August 1st of 2017, '17?  '16, '17?

1    Q    And then you said you had got divorced in

2    2016, maybe 2017?

3    A    Yes.

4    Q    All right.

5    A    Something around there.

6    Q    And that's when you stopped taking your

7    antidepressants?

8    A    Well I didn't have no.

9    Q    And which ones did you have?

10    A    They, I know they were giving me Xanax --

11    Q    Okay.

12    A    -- for anxiety and then they were -- I was

13    taking a depress -- I don't know the name of it,

14    it's a weird name, it's hard.

15    Q    Nardil?

16    A    It could have been, I.

17    Q    When you left Toledo Hospital in

18    December 2017, do you remember any instructions they

19    gave you to feel better, discharge instructions?

20    A    Just to, to get that pack, that.

21    Q    The prescription?

22    A    Prescription.

23    Q    Did they tell you to do anything else that

24    you can recall?

25    A    I don't remember.

1    Q    Do you have any future appointments

2  scheduled as it relates to your headaches or

3  anything like that?

4    A    I don't, but I'm --

5    Q    Okay.

6    A    -- getting on it.

7    Q    Do you smoke?

8    A    I do.

9    Q    How often?

10   A    Actually, I've had cut down.

11   Q    Uh-huh.

12   A    Due to the fact of the surgery.  So I've,

13 it's like less than a pack a day.

14   Q    And when did you start?

15   A    Was years ago.

16   Q    Are there any activities that you used to

17 enjoy doing that you can't do because of the

18 injuries you're claiming in this action?

19   A    No.

20   Q    Has the incident affected your sleep at

21 all?

22   A    No.  No.

23   Q    Has it affected your relationship with

24 your children?

25   A    No.

1      Q    With any of your other family members?

2      A    No.

3      Q    Would you say that you were honest and

4 forthcoming with your doctors when you went to The

5 Toledo Hospital --

6      A    Yes.

7      Q    -- for your -- okay.

8      And were you honest with your interview

9 with doctor -- detective Carter in the weeks after

10 the incident?

11     A    Yes.

12     Q    And were you honest in your testimony at

13 the criminal trial of Lamonte Hobbs?

14     A    Yes.

15     Q    And the only social media account you have

16 is a Facebook profile, correct?

17     A    Yes.

18     Q    Okay.

19        MR. RANAZZI:        I have a

20        couple of follow up.  Can we get this

21        marked?

22        (Exhibit F marked.)

23        * * * * * * * * *

24        RE-EXAMINATION

25 BY MR. RANAZZI

1    Q    Plaintiff's Exhibit F, it appears to be

2  the ticket that you were issued for OVI and speed

3  and stopping after all?

4            MS. HENDERSON:          Accident.

5  BY MR. RANAZZI

6    Q    Do you recognize this?

7    A    Yes.  Yes.

8    Q    Do you know what this is?

9    A    It's a ticket, right?

10   Q    Do you know when it was issued?

11   A    That night.

12   Q    November?

13   A    Yes.

14   Q    And this is the original, original ticket,

15 and the notation down there for 2/13/19, is that a

16 hearing that you had in the bottom left -- bottom

17 right, excuse me, page 1?

18   A    2/13.  I'm trying to figure this out, I'm

19 not sure.

20   Q    This is a '19 case number.  Do you have

21 another matter open?

22   A    I guess I, I do.

23   Q    Do you recall getting pulled over in

24 February of this year?

25   A    I do.

1      Q    Okay.  So you had an OVI in February of

2  this year?

3      A    Not of --

4      Q    Again --

5              MR. GERHARDSTEIN:      Wait a

6              minute.  Let him answer.

7              MR. MCGOVERN:          I haven't

8              been charged with anything, though, far

9              as, I mean it's a ticket, but I haven't

10             been convicted --

11  BY MR. RANAZZI

12     Q    So this --

13     A    -- I haven't been convicted on anything.

14     Q    So this is an outstanding matter?

15     A    Yes.

16     Q    And did you get a, either in this matter

17  or another matter, did you get a monitoring device

18  put on you?

19     A    That's on the probation violation.

20     Q    You didn't have it on?

21     A    Yes.

22     Q    Do you have it on now?

23     A    Yes, I do.

24     Q    And does that require you to be any

25  specific place?

```
1        A    I can go anywhere I want.

2        Q    Okay.  But it's just you've got to have it

3   on?

4        A    Just so I don't drink.

5        Q    Okay.

6             MR. RANAZZI:            Anything

7             else?

8             (WHEREUPON a discussion was held off

9             the record.)

10  BY MR. RANAZZI

11       Q    Is it just for your alcohol intake?

12       A    Yes.

13       Q    And have you violated that at all?

14       A    No, no.

15       Q    We're good.

16            MS. HENDERSON:          I'm all set.

17            MR. RANAZZI:            Thank you

18            for your time.

19            MS. HENDERSON:          Thank you.

20            MS. HUNT:               I have some

21            follow-up.  Can we take a break?

22            MR. RANAZZI:            Sure.

23            (WHEREUPON a short recess was taken.)

24            MS. HUNT:               Okay, no,

25            I'm -- we don't have anything.
```

1          MR. RANAZZI:          I have one

2     question, though.

3          MS. HUNT:          Sure.

4     BY MR. RANAZZI

5          Q     You said you're back on health insurance?

6          A     I am.

7          Q     Okay.  How do you get your health

8     insurance?

9          A     Through the state.

10          Q     Through the state?

11          A     Through the state.

12          Q     And like, because you're on Worker's Comp,

13     is that how you get --

14          A     Yes.

15          Q     -- health insurance?

16          A     Yes.

17          Q     Do you pay a premium for that?

18          A     I don't.

19          Q     Do you know if it's getting --

20          A     I have --

21          Q     -- it gets deducted --

22          A     I have it, I mean I have --

23          THE COURT REPORTER:     Hang on

24     second.

25     BY MR. RANAZZI

1    Q    Do you know if it gets deducted from your

2  benefits?

3    A    I don't know.

4    Q    Do you get a W-2 or something for those

5  benefits or any kind of -- when you get the check

6  you get a --

7    A    I get a W-2.

8    Q    Yeah, all right.

9        MR. GERHARDSTEIN:        We'll follow

10        up.

11        MR. RANAZZI:        Can we get a

12        copy, can we get a copy of that?  I have

13        no further questions.  Kayla?

14        MS. HENDERSON:        None.

15        MR. LAVALETTE:        I'd like to

16        get the Worker's Comp files is what we'd

17        like to get.

18        MS. HENDERSON:        Related to

19        that, could we get the Worker's Comp

20        information?

21        MS. HUNT:        Okay.

22        MS. HENDERSON:        Thank you.

23        THE COURT REPORTER:        Do you want

24        to reserve signature?

25        MR. GERHARDSTEIN:        Yes, he's

1        gonna read it.

2            MR. RANAZZI:            We'll order

3        up the transcript.

4                (Deposition concluded at 11:21 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF OHIO    :

2  COUNTY OF LUCAS  :    C-E-R-T-I-F-I-C-A-T-E

3

4         LORI L. WOZNIAK, Notary Public in and for

5  the State of Ohio, duly commissioned and qualified,

6  do hereby certify that the within-named **TIMOTHY**

7  **McGOVERN** was by me first duly sworn to testify to

8  the truth, the whole truth and nothing but the

9  truth in the cause aforesaid; that the testimony

10  then given by him was by me reduced to stenotype in

11  the presence of said witness, afterwards

12  transcribed upon a computer, that the foregoing is

13  a true and correct transcript of the testimony so

14  given by him as aforesaid; and that this deposition

15  was adjourned from day to day until completed.

16         I do further certify that by agreement of

17  the counsel the said deposition may be signed by

18  the witness in the presence of another Notary

19  Public.

20         I do further certify that I am not a

21  relative, employee or counsel of any of the parties

22  hereto, and further that I am not a relative or

23  employee of any attorney or counsel employed by the

24  parties hereto, or financially interested in the

25  action.

1          IN WITNESS WHEREOF, I have hereunto set my

2     hand and affixed my seal of office at Toledo, Ohio,

3     on this 21st day of June 2019.

4

5

6                        _____

7                             LORI L. WOZNIAK
                         Notary Public in and for the
8                              STATE OF OHIO

9

10

11

12

13    My Commission Expires:  October 12, 2020

14

15                    * * * * * * * * * * *

16

17

18

19

20

21

22

23

24

25

1  STATE OF OHIO      :

2  COUNTY OF LUCAS    :    ss:

3

4                     _____

5                          **TIMOTHY McGOVERN**

6

7          I certify that this deposition was signed

8  in my presence by **TIMOTHY McGOVERN** on the _____

9  day of _____, 2019.

10         IN WITNESS WHEREOF, I have hereunto set my

11 hand and affixed my seal of office at

12 _____, Ohio, on this _____ day of

13 _____, 2019.

14

15                     _____

16                          NOTARY PUBLIC

17 My commission expires

18

19          *  *  *  *  *  *  *  *  *  *  *

20

21

22

23

24

25