Deposition of:

# Lamonte Hobbs

July 13, 2020

TIMOTHY McGOVERN

v.

. LUCAS COUNTY, OHIO, et al.

Case No. 3:18-cv-2506



513-233-3000
877.233.4403
FAX: 513-233-2310
depo@elitereportingagency.com

www.elitereportingagency.com

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF OHIO

 3                   WESTERN DIVISION

 4

 5  _____
                                   )
 6  TIMOTHY McGOVERN,              )
                                   )
 7          Plaintiff,             )
                                   ) CASE NO.
 8                vs.              ) 3:18-cv-2506
                                   )
 9  LUCAS COUNTY, OHIO, et al.,   )
                                   )
10          Defendants.           )
    _____)
11

12

13

14
        Videoconference
15      Deposition of:  LAMONTE HOBBS

16      Pursuant to:    Notice

17      Date and Time:  Wednesday, July 13, 2020
                        9:03 a.m.
18      Place:          Robison, Curphey
                          & O'Connell, LLC
19                      433 North Summit Street
                        Toledo, Ohio  43604
20      Reporter:       Wendy Scott
                          (via videoconference)
21                      Notary Public - State
                                  of Ohio
22

23

24

25
```

```
1    APPEARANCES OF COUNSEL:

2

3         For the plaintiff:

4               Alphonse A. Gerhardstein, Esq.
                   (via videoconference)
5                  of
                 Gerhardstein & Branch Co., LPA
6                441 Vine Street
                 Suite 3400
7                Cincinnati, Ohio  45202
                 513.621.9100
8                agerhardstein@gbfirm.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2

 3         For the defendants:

 4              Andrew K. Ranazzi, Esq.
                  (via videoconference)
 5                   of
                Lucas County Prosecutor's Office
 6              700 Adams Street
                Suite 250
 7              Toledo, Ohio  43604-5634
                419.213.4700
 8              aranazzi@co.lucas.oh.us

 9                   and

10              Kayla L. Henderson, Esq.
                     and
11              Peter N. Lavalette, Esq.
                  (both via videoconference)
12                   of
                Robison, Curphey & O'Connell, LLC
13              433 North Summit Street
                Toledo, Ohio  43604
14              419.418.6931
                419.418.6927
15              khenderson@rcolaw.com
                plavalette@rcolaw.com
16

17

18         Also Present:

19              Jeanne Young (via videoconferenc)

20

21                        - - -

22

23

24

25
```

1                    I N D E X

2

3    LAMONTE HOBBS                              PAGE

4       EXAMINATION BY MR. GERHARDSTEIN          6

5

6

7

8    EXHIBITS                    MARKED   REFERENCED

9       PLAINTIFF'S EXHIBIT  8      17        17
        PLAINTIFF'S EXHIBIT  9      21        21
10      PLAINTIFF'S EXHIBIT 10      40        40
        PLAINTIFF'S EXHIBIT 11      42        42
11      PLAINTIFF'S EXHIBIT 12      46        46

12

13                      - - -

14

15

16

17

18

19

20

21

22

23

24

25

1          THE REPORTER:  This is the remote

2    deposition of Lamonte Hobbs.

3          Would counsel and everyone present in

4    each room please identify yourself for the

5    record?

6          MR. GERHARDSTEIN:  Al Gerhardstein for

7    the plaintiff.

8          MR. RANAZZI:  Andy Ranazzi for the

9    Lucas County Prosecutor's Office, on behalf

10   of the Lucas County defendants, including

11   Sheriff John Tharp's office.

12         MS. HENDERSON:  Kayla Henderson for

13   Lamonte Hobbs.

14         MR. LAVALETTE:  Peter Lavalette, also

15   for Mr. Hobbs.

16         MS. YOUNG:  And Jeanne Young,

17   prosecutor's office paralegal.

18         THE REPORTER:  The witness has shown

19   the reporter identification, and I have the

20   physical address so I can verify identity

21   and notary venue.

22         Does everyone understand that this

23   deposition is being taken remotely and that

24   a remote oath will be administered by me, a

25   stenograph reporter, who is also a notary in

1       the State of Ohio?

2               MR. GERHARDSTEIN:  Yes.

3               MS. HENDERSON:  Yes.

4               MR. RANAZZI:  Yes.

5               MR. LAVALETTE:  Yes.

6               THE REPORTER:  Thank you.

7                       LAMONTE HOBBS

8   a defendant herein, having been duly sworn, was

9   examined and deposed as follows:

10                      EXAMINATION

11  BY MR. GERHARDSTEIN:

12      Q.   Okay.  State your name, please.

13           Mr. Hobbs?

14      A.   Lamonte Hobbs.

15      Q.   And what's your highest level of

16  education?

17      A.   College.

18      Q.   What degree do you have?

19      A.   Associate's degree.

20      Q.   In what field?

21      A.   Criminal justice.

22      Q.   When?  When did you get it?

23      A.   2004.

24      Q.   And what institution?

25      A.   Owens Community College.

1       Q.    Where is that?

2       A.    Ohio, in Toledo, Ohio, and Oregon.  I'm

3  not for sure of the specific city.  I don't know

4  if that's Oregon or Perrysburg.

5       Q.    And prior to 2004, did you have any

6  employment?  Where did you work?

7       A.    I did security for Best Buy stores

8  prior to 2004.

9       Q.    When was -- what was the dates of that

10 employment?

11      A.    May of 2001 to 2004 maybe.

12      Q.    Any employment before Best Buy?

13      A.    Just self-employed.

14      Q.    What did you do on your own?

15      A.    Cut hair.

16      Q.    Were you licensed?

17      A.    Yes.

18      Q.    When did you get your hair license?

19      A.    '96, '97 maybe.

20      Q.    Did you have any other employment

21 beyond cutting hair?

22      A.    No.

23      Q.    When did you get your job with the

24 county?

25      A.    2005.

1      Q.   Is there any employment that you had

2  prior to your county job that you haven't told me

3  about?

4      A.   As far as -- I'm not understanding what

5  you're saying, sir.

6      Q.   Any employment.

7      A.   I mean, I -- from my criminal justice,

8  I've been in the field of security.

9      Q.   So prior to your county job, did you

10  have any other security jobs other than Best Buy?

11      A.   Sir, I can't remember all the security

12  positions I had prior to getting my criminal

13  justice degree, but I was in the field of

14  security.

15      Q.   How many different jobs did you have in

16  security?

17      A.   I'll say maybe three or -- three or

18  four security positions.

19      Q.   And what does that mean, when you say

20  you were in security?  What kind of job is

21  that?

22      A.   Some of it was site security.  Some of

23  it was watching vacant buildings for customers.

24  Some of it was standing post at a particular

25  location.

1          But it was all in the realm of security

2     work.

3          Q.   Do you have any military?

4          A.   No.

5          Q.   In any of those jobs that you had prior

6     to your county job, were you ever disciplined?

7          A.   I can't recall, sir, that far back.

8          Q.   Were you ever fired from any of those

9     jobs?

10         A.   I can't recall, sir, that far back.

11         Q.   So you don't recall if you were fired

12    from a job?

13         A.   I remember me quitting, moving on to

14    other jobs, but as far as specifics, I can't

15    recall, sir.

16         Q.   Were you ever accused of any dishonesty

17    in any of those jobs prior to the job you had

18    with the county?

19         A.   No.

20         Q.   Did you have any arrests or convictions

21    other than the one that followed your use of

22    force that is the source of this case?

23         A.   No.

24         Q.   Ever filed bankruptcy?

25         A.   No.

```
 1        Q.    Are you married?

 2        A.    Yes.

 3        Q.    Any kids?

 4        A.    Yes.

 5        Q.    How old?

 6        A.    Sir, I feel like that's personal and I

 7   don't want that on the record.

 8        Q.    I'm not going to put their names or

 9   anything.

10        A.    People have access to this stuff, sir,

11   and would like to leave my family out of this,

12   please.

13        Q.    How many kids do you have?

14        A.    I have two boys and a girl.

15        Q.    Were you ever trained on use of

16   force?

17        A.    Yes.

18        Q.    How did you get your county job?

19        A.    I applied, I interviewed, and I was

20   hired.

21        Q.    Did you have to take a test?

22        A.    State test, yes.

23        Q.    What kind of test?

24        A.    A state test.

25        Q.    What's that mean?
```

1     A.   The state administers a test that you

2    go to OPOTA and take, and they ask you various

3    questions that -- you are licensed based on if

4    you pass or fail.

5     Q.   So did you go to an OPOTA training

6    course?

7     A.   Correct.

8     Q.   And was that for corrections or for --

9    or for something else?

10     A.   It was for corrections.

11     Q.   Where did you take your OPOTA course?

12     A.   Owens Community College.

13     Q.   Was that part of your criminal justice

14    degree?

15     A.   It was something that the sheriff's

16    office administered.

17     Q.   As part of the OPOTA course, you were

18    trained on use of force, right?

19     A.   Correct.

20     Q.   As part of the OPOTA course, you were

21    trained on subject control, right?

22     A.   Correct.

23     Q.   When you got the job with the county in

24    2005, did you get any Lucas County specific

25    training for handling inmates?

1     A.   I want to say I recall we took a week

2  physical tactics course.

3     Q.   Do you have any of the materials that

4  you used in either your OPOTA course or in your

5  Lucas County training?

6     A.   I'm sure -- I'm sure they gave us a

7  pamphlet or some kind of booklet.

8     Q.   Do you have a copy?

9     A.   I currently don't now, but I had a

10  copy.

11     Q.   After 2005, did you have any

12  in-services at Lucas County?

13     A.   I can't recall anything specifically.

14  We did various different trainings over the

15  years, CPR and different update courses, but I

16  can't recall anything specifically.

17     Q.   So from 2005 until your discharge in

18  2017, what jobs did you have at the county?

19     A.   I was a floor officer in the jail, and

20  then I worked the booking section.

21     Q.   When did you start in booking?

22     A.   I can't recall the actual year, sir.

23  2012 maybe.

24     Q.   I think in your criminal trial you

25  testified you'd been working in booking about

1    five years, so that would make it 2012.

2              Does that help?

3         A.   Yes.

4         Q.   So would you agree that on August --

5    I'm sorry.

6              On November 10th, 2017, you were a

7    corrections officer at the Lucas County Jail; is

8    that right?

9         A.   Yes.

10        Q.   And then on November 10th, 2017, you

11   were working in booking?

12        A.   Yes.

13        Q.   And on November 10th, 2017,

14   Mr. McGovern was a pretrial inmate in booking at

15   the Lucas County jail, right?

16        A.   Yes.

17        Q.   Now, he was in an area of booking

18   called D West tank.

19             Does that sound right?

20        A.   West D tank, yes.

21        Q.   West D tank?

22             What kind of inmates go to West D

23   tank?

24        A.   In that particular situation, it was

25   all intoxicated individuals.  But on a normal

1    day, anybody can go to the West D module.

2              But on that particular day, it was a

3    tank -- specifically, where everybody that was

4    drunk went to that module.

5         Q.   And Mr. McGovern was in that module,

6    West D, at approximately 5:30 in the morning,

7    right?

8         A.   Correct.

9         Q.   And at or about that time, you used

10   force on Mr. McGovern, on November 10th, 2017,

11   right?

12        A.   I removed him from that module, yes.

13        Q.   And you used force to remove him from

14   the module, right?

15        A.   Yes.

16        Q.   And Mr. McGovern suffered injuries to

17   his head and his right elbow during that

18   altercation, right?

19              MR. RANAZZI:  Objection.  Calls for

20        speculation.

21   BY MR. GERHARDSTEIN:

22        Q.   You can answer.

23        A.   Sir, I don't know when the injuries

24   occurred.

25        Q.   Well, you know that by the time he went

1  into the cell across the way from West D tank, he

2  had injuries to his head and his elbow, right?

3          MR. RANAZZI:  I just want to note a

4      continuing objection to this line of

5      questioning on the basis of both it calls

6      for speculation and --

7          MR. GERHARDSTEIN:  You don't have to

8      give --

9          MR. RANAZZI:  -- presumes facts not in

10     evidence.

11         And I'll object the way I'm going to

12     object, Al.

13         MR. GERHARDSTEIN:  No.  You don't do

14     talking objections.

15  BY MR. GERHARDSTEIN:

16     Q.   Go ahead, Mr. Hobbs.

17     A.   Again, sir, I don't know where the

18  abrasions came from.

19     Q.   Well, you knew that they arrived on

20  Mr. McGovern as a result of the use of force that

21  Mr. McGovern experienced, right?

22     A.   Say that again, sir, please.

23     Q.   You know that the abrasions were

24  experienced by Mr. McGovern at some point during

25  the use of force that incurred -- that resulted

1   in him going across the hall to the other cell,

2   right?

3       A.   I knew when the nurse came and checked

4   him out that he had a cut on his forehead and a

5   scrape on his elbow.

6          Prior to that, I did not know.

7       Q.   Okay.  You were criminally charged with

8   assault as a result of the use of force that you

9   engaged in with respect to Mr. McGovern, right?

10      A.   That's correct.

11      Q.   And you were eventually convicted of

12   assault, right?

13      A.   That's correct.

14      Q.   Now, there's some exhibits.  There is

15   an entry -- do you have the exhibits that you

16   printed out?  Do you have the entry?

17         MR. GERHARDSTEIN:  And are you going to

18      let me share screen, Wendy?

19         THE REPORTER:  Yes.

20         MR. GERHARDSTEIN:  All right.  Is that

21      happening?

22         THE REPORTER:  I don't see it yet.

23         MR. GERHARDSTEIN:  Well, okay.  Let

24   me --

25         THE REPORTER:  Now it is.

1          MR. GERHARDSTEIN:  All right.

2      Mr. Hobbs, can you see the entry either on

3      the screen or in the booklet that --

4          THE WITNESS:  Yes.

5          MR. GERHARDSTEIN:  Okay.  So that will

6      be Exhibit 8.

7          (Plaintiff's Exhibit 8 was marked for

8          identification.)

9          MR. GERHARDSTEIN:  Because we use a

10     single numbering of exhibits on the

11     plaintiff's side.

12  BY MR. GERHARDSTEIN:

13     Q.    And is that the entry that was filed in

14  your criminal case?

15     A.    Yes.

16     Q.    And would you agree that your sentence

17  for the conviction was 180 days, which was

18  suspended, and probation for a year was imposed,

19  along with 30 hours of community service?

20     A.    Yes.

21     Q.    Did you complete that probation?

22     A.    Yes.

23     Q.    Were there any violations?

24     A.    No.

25     Q.    And where did you do your community

1  service?

2      A.   Padua Center.

3      Q.   I'm sorry.  What was that called?

4      A.   Padua Center.

5      Q.   And what is that?

6      A.   It's a -- it's a house where they do

7  outreach to kids and mentor kids from inner city

8  schools.

9      Q.   Were you -- okay.  Were you also fired

10  from your job?

11     A.   Yes.  I was terminated.

12     Q.   Did you file a charge of discrimination

13  in connection with your termination?

14     A.   Yes.

15     Q.   With respect to your termination, did

16  you arbitrate that through the services of the

17  union?

18     A.   No.

19     Q.   Why not?

20     A.   You'll have to call them and ask them

21  that, sir.

22     Q.   And with respect to your -- and when

23  you say, you have to call them and ask them that,

24  do you mean --

25     A.   The union.

1      Q.    Okay.

2      A.    Yes.

3      Q.    And with respect to the OCRC charge,

4   what happened to that?  Was that concluded?

5      A.    I'm not understanding your question,

6   sir.

7      Q.    Did the Ohio Civil Rights Commission

8   make any ruling on your charge of

9   discrimination?

10      A.    They gave me a right to sue letter.

11      Q.    And at the time they gave you the right

12   to sue, did they indicate whether they thought

13   there was reasonable cause to believe there was

14   discrimination or not?

15      A.    I can't recall what our whole

16   conversation was, sir.

17      Q.    And did you file a lawsuit in

18   connection with that charge of discrimination?

19      A.    Yes.

20      Q.    What court did you file the lawsuit

21   in?

22      A.    US District Court.

23      Q.    Is that still pending?

24      A.    Yes.

25            MR. GERHARDSTEIN:  Counsel, I would

1      like the case number to that lawsuit, if you

2      could provide that.  Okay?

3         MR. RANAZZI:  You can find that out on

4      PACER if you want it right away.

5         MR. GERHARDSTEIN:  No.  It's okay.  I'm

6      sure that you've got it there.  I don't need

7      it right away.

8  BY MR. GERHARDSTEIN:

9      Q.  By the way, Mr. Hobbs, who represents

10  you in that lawsuit?

11     A.  I'd prefer not to say.

12     Q.  And is the discovery in that lawsuit

13  concluded?

14     A.  Sir, I feel like it's an ongoing

15  investigation, and this line of questioning, I

16  don't see the relevance of it.

17     Q.  Well, I'll be the judge of that, if you

18  don't mind.

19        If it involved the same --

20     A.  Well --

21     Q.  If it involved the same use of force

22  and determination from that -- based on that use

23  of force, it does relate.  And I just want to

24  know the status of your case.

25        MR. RANAZZI:  Al, can we go off the

1      record for a second?  I probably could give

2      you some insight on that.

3              MR. GERHARDSTEIN:  Sure.

4              (Off the record.)

5              MR. GERHARDSTEIN:  Okay.  We're going

6      to share the screen again.  Let me go to

7      what was produced as the OCRC case file.

8      And this will be Exhibit 9.  It's a 70-page

9      packet.

10             (Plaintiff's Exhibit 9 was marked for

11             identification.)

12             MR. GERHARDSTEIN:  Can you see -- are

13     we sharing?

14             THE REPORTER:  Not yet.

15             MR. GERHARDSTEIN:  Okay.  Do I need to

16     do something further to share it?

17             THE REPORTER:  No.  It looks like it's

18     coming up.  I think sometimes it just takes

19     a minute.

20             MR. GERHARDSTEIN:  Okay.  That's fine.

21 BY MR. GERHARDSTEIN:

22     Q.   Mr. Hobbs, I'm showing you what's been

23 marked as Exhibit 9, which is the OCRC case file.

24 And it's Bates numbered 23 within that file.

25             Is that a copy of your charge of

1   discrimination?

2       A.   Yes.

3       Q.   And then I'm also showing you a copy of

4   page 49 of that packet.  And that is a

5   correspondence dated November 28th, 2017, from

6   Sheriff Tharp to you, advising you that you've

7   been terminated, right?

8            Is that correct?

9       A.   Correct.

10           MR. RANAZZI:  Counsel, just for

11       clarification, that's Bates stamped 49?

12           MR. GERHARDSTEIN:  Correct.

13           MR. RANAZZI:  But it's page 31 of that

14       actual exhibit?

15           MR. GERHARDSTEIN:  Yeah, if you count

16       PDF numbers.

17           MR. RANAZZI:  Right.

18           MR. GERHARDSTEIN:  31 would not appear

19       on the --

20           MR. RANAZZI:  No.  It's Bates stamped

21       49.

22           MR. GERHARDSTEIN:  But it's Bates

23       stamped 49, right?

24   BY MR. GERHARDSTEIN:

25       Q.   Mr. Hobbs, how many inmates were in

1    West D at the time that you confronted

2    Mr. McGovern?

3        A.   I will say between 10 and 12 inmates.

4        Q.   And in November of 2017, if an inmate

5    in West D caused a verbal disturbance -- in other

6    words was yelling or making statements that you

7    thought might disrupt the module -- what were

8    your options to handle that?

9        A.   There's a lot of different options,

10   sir.  It just depends on the scenario.

11       Q.   Okay.  Well, the scenario is that

12   you've got an inmate making verbal statements

13   that are loud, and you, as the booking officer,

14   thought that maybe they could disrupt the other

15   inmates.

16            What were your options in that

17   scenario?

18       A.   You would put them in a single cell --

19   by hisself so he couldn't disrupt anyone.

20       Q.   And if you chose to put such an inmate

21   in a single cell, did you need the sergeant's

22   permission?

23       A.   No.

24       Q.   If you chose to put that inmate in a

25   single cell, could you use force to accomplish

1    that transfer?

2        A.   Depends on the situation, sir.

3        Q.   So if the inmate were to be moved by

4    you to a single cell, just tell me how you would

5    do that --

6        A.   Sir, again --

7        Q.   -- the steps.

8        A.   -- it depends on the situation.  Every

9    situation is not the same.

10        Q.   Well, normally, would you go to the

11    inmate -- go to the doorway and -- is there a

12    place for the inmate to cuff up, like with

13    presenting his hands through a slot?

14        A.   Some cells they do have that.  In that

15    particular scenario, there was not that.

16        Q.   Okay.  So West D did not have a cuff

17    slot?

18        A.   No.

19        Q.   So in a scenario where you were going

20    to transfer the inmate from West D across the way

21    to a single cell, would you just open the door

22    and order the inmate to cross the hall?

23        A.   Again, sir, all situations are

24    different.

25        Q.   In a scenario where you are seeking to

1    have an inmate move across the hall into a single

2    cell, would you always cuff the inmate?

3        A.    Depends on the situation, sir.  No --

4    everyone does not -- to answer your question,

5    everyone does not get cuffed when they get moved.

6        Q.    If you --

7        A.    But again, it would depend.

8            Sorry.

9        Q.    If you chose to cuff the inmate, would

10   you always do that with backup present, or would

11   you also do that sometimes alone?

12       A.    Both.

13       Q.    Did you receive the sheriff's rule

14   manual when you started at the jail?

15       A.    That's correct.

16       Q.    And so if we go, within that Exhibit 9,

17   to Bates numbered page 41 -- I don't know if

18   we're sharing yet.  Okay.

19           So do you see the policies and

20   procedures on use of force, starting at Bates

21   numbered page 41, Mr. Hobbs?

22       A.    I don't have that.  All I see is --

23           MR. RANAZZI:  It doesn't look like you

24       clicked on the file, Al.

25           (Off the record.)

1    BY MR. GERHARDSTEIN:

2        Q.    So the question is, do you see the use

3    of force section within that OCRC packet,

4    starting at Bates numbered page 41?

5        A.    I see page 1 of 19, if that's what

6    you're referring to.

7        Q.    Yeah.  Okay.  And that's dated 6/1/09,

8    right?

9        A.    Yes.

10       Q.    And was that in effect at the time of

11   the use of force on Mr. McGovern, in 2017?

12       A.    Yes.

13       Q.    And was it -- were you expected to

14   follow the use-of-force rules as a correction

15   officer working in booking?

16       A.    Yes.

17       Q.    So at the Lucas County jail in 2017,

18   was it consistent with the work rules to use

19   force on an inmate if he said, fuck you, without

20   any physical provocation or a refusal to follow a

21   verbal command?

22       A.    I don't think there's anything in the

23   policy about that.

24       Q.    Well, what was your understanding of

25   your authorization?  Were you allowed, as you

1    understood it, to use force on an inmate for

2    simply saying, fuck you?

3         A.   That wasn't the whole basis of the

4    using -- removing him, but -- it wasn't just him

5    using verbal language.  That was not my sole

6    reasoning for removing him.

7         Q.   And I'll get to the specific incident

8    with Mr. McGovern.  But first, I'm just trying to

9    establish some rules of the road.

10             So my question was, at the Lucas County

11   jail in 2017, if an inmate said, fuck you, but

12   didn't do anything else -- no physical

13   provocation or refusal to follow a verbal

14   command -- were you allowed to use force on the

15   inmate because he said, fuck you?

16        A.   According to the policy, no.

17        Q.   And at the Lucas County jail in 2017,

18   was it consistent with the work rules to use

19   force on an inmate who called a staff member a

20   nigger, without any physical provocation or

21   refusal to follow a verbal command?

22        A.   Repeat that again, sir.

23        Q.   If the inmate used the N word toward a

24   staff member, but otherwise didn't physically

25   provoke or refuse to follow a verbal command, was

1    that, in and of it itself, enough reason to use

2    force on an inmate?

3         A.    According to policy, no.

4         Q.    Was there a difference, as you

5    understood it, between the -- between the way in

6    which the work rules were followed and the way

7    they were written, at the Lucas County jail?

8         A.    I think there's a difference between

9    policy and reality, and the --

10        Q.    Tell me about that.

11        A.    It's a reality, and it's a policy.

12        Q.    So how did they differ?

13        A.    They differ like they would do in

14   everyone's everyday life.  It's a policy that's

15   written in black and white, and it's reality,

16   what's really going on.

17        Q.    So can you give me an example of how

18   policies that were written differed from the way

19   your actual interaction with inmates was

20   experienced, in November of 2017 at the Lucas

21   County jail?

22        A.    Again, sir, you have a policy that's

23   written, but you have actual reality where -- a

24   policy doesn't cover a billion different

25   scenarios.  Policy don't cover that, but reality

1    does.

2        Q.    Well, I understand what you said at

3    what level, I'm just trying to get an example of

4    what you mean.

5        A.    An example of what I mean of what, sir?

6    A policy or --

7        Q.    Of how it -- how they differ.

8        A.    I mean, nothing is never black and

9    white.  And what I mean by black and white, I

10   mean as policy.  It doesn't -- it doesn't happen

11   that way in that particular setting.

12       Q.    Now, the policy called for a supervisor

13   to be involved in any cell transfer, right?

14       A.    Again, sir, that's a policy.

15       Q.    Okay.  And was there a -- was there a

16   difference in the way you actually managed

17   inmates, with respect to transferring inmates

18   from cell to cell -- different from the policy?

19       A.    Yes.  I -- are you asking, did I remove

20   him?

21            Is that -- I'm not understanding the

22   question.

23       Q.    Well, you were allowed -- as you

24   understood the day-to-day operation, the reality,

25   as you put it, could you move an inmate without

1    solving the sergeant?

2        A.    Yes, sir.

3        Q.    And who was your supervisor in

4    November of 2017?

5        A.    On that particular shift, it was Mark

6    Gumpf.

7        Q.    How long had he been your supervisor?

8        A.    On and off, in different areas, ten

9    years probably.

10        Q.    So tell me what happened with

11    Mr. McGovern.

12        A.    What in specific are you asking, sir?

13        Q.    Describe your interaction with him.

14        A.    He came in irritated.  He came in

15    complaining of -- he had some interaction with

16    the officers that he didn't appreciate.  I

17    remember him coming to the booking counter.  I

18    remember starting to interview him.

19            He started to complain about the

20    interactions he had with the Toledo officers, how

21    tight the cuffs were, if I remember correctly.

22            I remember asking his name, trying to

23    get through the booking process, which he refused

24    to cooperate.  The booking process was

25    terminated.

1          I remember him going to get a jumpsuit.

2    He got put in the cell.  We had a brief

3    interaction.  I removed him from the cell.  I

4    fell with him.  We had a brief struggle.  And he

5    was ultimately put into a single cell.

6          Q.    And did you treat -- when you had that

7    interaction with Mr. McGovern, were you treating

8    him the same way that you had treated other

9    inmates over your five years in booking?

10         A.    When I was initially talking to him,

11   yes.  And I treated him the same way, with

12   respect, as I would do anyone else.

13         Q.    And were -- did you treat him the same

14   way when you went to transfer him from the module

15   to the single cell?

16         A.    Same way as who, sir?

17         Q.    Other inmates.

18         A.    I've had to ask -- I've had to move

19   other inmates before.  Just with me and

20   Mr. McGovern, I fell -- we fell.

21         Q.    And why was it that you fell?

22         A.    I don't know how I fell, sir.  I

23   wasn't -- I don't know how I fell.

24         I know we both fell in the doorway.

25         Q.    With respect to your transfer of

1    McGovern from -- he was in West D -- to the

2    single cell, did you follow the procedures as

3    written?

4        A.    Not the written policy.

5        Q.    And you said that you were treating

6    Mr. McGovern in the same way you had treated

7    other inmates when you transferred them, right?

8        A.    As I was interacting with Mr. McGovern

9    and talking him I was treating him with respect.

10           I didn't even have to talk to him at

11   that given time.  I could have just shut the door

12   and been done with him, but I was still trying to

13   accommodate him.

14           And when I did, we fell -- when I moved

15   him.

16       Q.    During those five years you worked in

17   booking had you ever been disciplined for failing

18   to follow the written policy?

19       A.    My understanding, sir, I didn't have

20   any write-ups in my file.  So if there's

21   something in there, I don't know about it.

22       Q.    In the five years you had worked in

23   booking, and followed this unwritten practice

24   with respect to how you transferred inmates, were

25   you ever sent to retraining or warned or

1  counseled about it?

2      A.   No, sir.

3          And I will -- I wouldn't say unwritten

4  policy, I would just say reality, everyday

5  situations.

6      Q.   Were there times when there were other

7  sergeants in addition or instead of Mr. Gumpf --

8  Gumfel (phonetic)?  Is it Gumf (phonetic)?

9      A.   Gumpf.

10     Q.   Gumpf.

11         Were there times when there were other

12 sergeants other than Mr. Gumpf that served as

13 your supervisor?

14     A.   Yes.

15     Q.   And when you were working under those

16 sergeants, would there be times when you moved an

17 inmate from a module that had multiple inmates to

18 a single cell without involving the sergeant?

19     A.   Yes.

20     Q.   And did those sergeants ever write you

21 up or warn you or tell you that that was wrong,

22 you're not allowed to do that?

23     A.   Never been written up, sir.

24     Q.   And did anybody give you a verbal

25 warning for moving an inmate without involving a

1    sergeant?

2         A.   No, sir.

3         Q.   So your understanding was that you had

4    authority to move an inmate without engaging the

5    sergeant when you were working in booking in

6    2017, right?

7         A.   Yes.

8         Q.   Now, when you moved Mr. McGovern, did

9    you put your hands on him?

10        A.   Now, do what, sir?

11        Q.   Did you put your hands on him?

12        A.   Yes.  I grabbed him from the back.

13        Q.   Where did you grab him?

14        A.   If my memory serves me correct, I want

15   to say the back of the collar or the back of the

16   jumpsuit.

17        Q.   And after you transferred him to the

18   single cell, were you surprised that you were

19   disciplined for this use of force, in light of

20   your understanding of the way you had transferred

21   other inmates over the five years you worked

22   there?

23        A.   I didn't transfer him.  The other two

24   officers did.

25             When I grabbed him, we fell.  I never

1    transferred him anywhere.

2         Q.   Well, that was your intent, though,

3    right, is you were trying to move him across the

4    hall?

5         A.   Right.

6              But I was -- just to answer your

7    question, I was never involved in transferring

8    him.

9         Q.   All right.

10        A.   It was my -- it was my intent to

11   transfer him across the hall to a cell, and we

12   fell to the ground.

13        Q.   Did you think you did anything wrong in

14   your interaction with Mr. McGovern?

15        A.   No, I did not, sir.

16        Q.   What was your reason for intending to

17   transfer Mr. McGovern from West D to the single

18   cell?

19        A.   It was a corroboration of things, it

20   wasn't just that particular moment.  And the

21   situation was escalating, as far as when he was

22   unhappy about the phone call.

23             So I was just trying to put him in a

24   single cell, by himself, and shut the door.

25   That's it.

1        Q.   Did you see any agitation among the

2    other inmates in West D?

3        A.   I seen active people in the cell.  I

4    wasn't zoned in on any particular one person, but

5    I did see, at the time, there was two active

6    inmates in there.

7             But, again, this is a tank where

8    everyone is drunk, and all it takes is one

9    disruption to wake up everyone, and now you've

10   got a whole different scenario going on.

11       Q.   Did you -- do you maintain that, by

12   grabbing him at the collar, you were following

13   the discretion that you were allowed by your

14   supervisors at the Lucas County jail in 2017?

15       A.   I believe I was following the orders

16   that, if we see a potential problem, we're

17   supposed to remove the inmate.

18       Q.   Would you agree that, at the time you

19   grabbed Mr. McGovern by the collar he was walking

20   away from you?

21       A.   Did you say walking away, sir?

22       Q.   Yeah.

23       A.   It was a continuation of the situation.

24            So I did not wait till Mr. McGovern

25   turned his back to decide to grab him.  It was a

1    continuation of the whole involvement.

2           So I didn't just sit there and, in my

3    mind, say, okay, he's walking away, here's my

4    opportunity, no.  It was just a continuation of

5    the whole situation.

6           So, yes, he did turn, and that's when I

7    grabbed him.  But I was not purposely trying to

8    wait on him to turn around so I could grab him,

9    it was just a continuation.

10          My reaction time was a little slower.

11    If I had reacted quicker, I probably would have

12    grabbed him from the front, but it didn't happen

13    that way.

14          Q.   So at the time you grabbed him, he was

15    walking away, right?

16          A.   He had turned.  He had turned.

17          Q.   And he had stepped in -- further into

18    the West D tank, right?

19          A.   At that particular time, sir -- that's

20    what the video showed, but at that particular

21    time, I'm seeing a turn, I don't see how many

22    steps he took in.  I don't see none of that right

23    there at that particular time.

24          I just seen him turn, and I grabbed

25    him.  How many steps he took and all that, I

1   wouldn't know at that particular -- right at that

2   instance.

3        Q.   Prior to grabbing him, you didn't give

4   him any verbal commands, did you?

5        A.   No, sir, I did not.

6        Q.   And prior to grabbing him, he wasn't

7   striking you, was he?

8        A.   No, sir.

9        Q.   He wasn't spitting on you, was he?

10       A.   No, sir.

11       Q.   He wasn't threatening you, was he?

12       A.   No, sir.

13       Q.   He wasn't trying to head butt you, was

14   he?

15       A.   I never said that, sir.

16       Q.   He wasn't harming any of the other

17   inmates, was he?

18       A.   No, sir.

19       Q.   And you had to enter the cell by a

20   couple of steps in order to grab him by the

21   collar of his jumpsuit, right?

22       A.   Again, sir, at that particular time, I

23   don't know how many steps I took.  I don't know

24   that form of action.  At that particular time, at

25   that moment, I remember, when he turned, I

1    grabbed him.

2            So you say that I went in after him.

3    I, at that particular time, was just grabbing him

4    to move him.

5        Q.   And you'd agree that, as you were going

6    to the ground with him your arm was around his

7    neck, right?

8        A.   Yes.  My arm did go around his neck,

9    yes.

10       Q.   So you'd agree that, prior to being on

11   the ground with Mr. McGovern, there was no risk

12   posed by Mr. McGovern to your physical safety,

13   right?

14       A.   Say that again, sir.

15       Q.   Prior to being on the ground with

16   Mr. McGovern, there was no risk posed to your

17   physical safety by Mr. McGovern, right?

18       A.   Correct.

19       Q.   Did you ever get legal updates, like at

20   roll call or in-services, about any changes in

21   the law with respect to use of force?

22       A.   I can't recall, sir.

23       Q.   Do you see the document titled, United

24   States Supreme Court, Use of Force of Pretrial

25   Detainees, that I have on the screen now?

1      A.   Yeah, I see it.

2      Q.   Okay.

3      A.   Yeah, I see it.

4           MR. GERHARDSTEIN:  And that will be

5      Exhibit 10 -- what am I up to, Wendy?

6           THE REPORTER:  10, I think.

7           MR. GERHARDSTEIN:  Was the OCRC file

8      10?

9           THE REPORTER:  Let me look.

10          MR. GERHARDSTEIN:  No, that was 9.

11          This will be 10.

12          THE REPORTER:  Okay.

13          (Plaintiff's Exhibit 10 was marked for

14          identification.)

15     BY MR. GERHARDSTEIN:

16     Q.   So this Exhibit 10, have you ever seen

17     this before, Mr. Hobbs?

18     A.   I can't recall, sir.  If I did see it,

19     I don't remember seeing it.

20     Q.   Did you have a roll call process when

21     you would show up for work?

22     A.   We had a briefing.

23     Q.   Go ahead.

24     A.   We had a briefing.

25     Q.   And who would provide the briefing?

     1          A.    The sergeant on duty.

     2          Q.    And would that briefing ever include

     3    legal updates?

     4          A.    I would say it included policy

     5    updates.

     6          Q.    Would you agree that prior to your

     7    using force on Mr. McGovern, he wasn't resisting

     8    you?

     9          A.    At the time that I interacted with him,

    10    prior to going to the ground, no.

    11          Q.    And would you agree that -- while he

    12    was on the ground, you were saying, stop

    13    resisting, and he was saying, I'm not resisting,

    14    right?

    15          A.    I don't agree to that, sir.

    16                Just -- just because someone is saying

    17    they're not resisting doesn't mean they're --

    18    again, we're -- we're talking about what you're

    19    feeling from whoever you're trying to handcuff or

    20    whoever you're trying to control.

    21                Video or audio doesn't feel the muscle

    22    tension, the movement.  It doesn't feel that.

    23                So just because someone's saying

    24    they're not resisting doesn't mean they're not

    25    resisting.

1          Q.   Would you agree that Mr. McGovern would

2   have been pretty surprised by being yanked from

3   behind by his collar?

4          MR. RANAZZI:  Objection.  Calls for

5      speculation.

6   BY MR. GERHARDSTEIN:

7          Q.   You can answer.

8          A.   I don't know what he would feel or what

9   he -- what his thoughts were.  I'm not going to

10  say that.  I don't know.

11         Q.   Did you know an inmate named Corey

12  Marshall?

13         A.   I don't know.  I don't know, sir.

14              I came in contact with a hundred

15  different inmates at -- I don't know.

16         Q.   Do you see the declaration of Corey

17  Marshall on the screen?

18         A.   Yeah, I see it.

19         MR. GERHARDSTEIN:  And that will be

20      Exhibit 11.

21              (Plaintiff's Exhibit 11 was marked for

22              identification.)

23  BY MR. GERHARDSTEIN:

24         Q.   He claims he was in the module but

25  didn't hear any use of the N word by

1   Mr. McGovern.

2           Is it your contention that Mr. McGovern

3   said -- used the N word prior to you grabbing his

4   collar?

5       A.   Say that again.

6       Q.   Is it your contention that Mr. McGovern

7   used the N word toward you prior to you grabbing

8   his collar?

9       A.   Yes.

10      Q.   And did he use -- say it loud enough

11  that the other inmates in the pod should have

12  heard it?

13          MR. RANAZZI:  Objection.  Calls for

14      speculation.

15  BY MR. GERHARDSTEIN:

16      Q.   You can answer.

17      A.   He said it to me, sir, so I'm not -- I

18  don't know who would have heard what.  But he

19  said it to -- he said it loud enough to where I

20  could hear it.

21      Q.   You'd agree that you can't hear it when

22  you play the video, right?

23      A.   The audible is low.

24      Q.   So the audio on the video doesn't allow

25  you to hear the alleged use of the N word, right?

1      A.   The audible doesn't allow you to hear a

2 lot of the conversation him and I had.  It wasn't

3 just that, it was several things that the audio

4 didn't pick up.

5      Q.   Okay.  But I'm just trying to focus on

6 that for a minute.

7           Do you agree that when you reviewed the

8 video you did not hear the use of the N word?

9      A.   Correct.

10     Q.   And would you agree -- did you, by the

11 way, listen to the -- and watch the video through

12 the period when you returned to the booking desk,

13 after the time Mr. McGovern is in the single

14 cell?

15     A.   Yes.

16     Q.   And would you agree that, when you

17 described the events that led to your use of

18 force on Mr. McGovern to your colleagues at the

19 booking desk, you do not mention anything about

20 the N word being used toward you?

21     A.   No, I do not.

22     Q.   So that was a bad question by me.

23          Do we both agree that -- when you're

24 talking to your colleagues and you're describing

25 the events that led to the use of force on

1   Mr. McGovern, do you describe his statement about

2   using the N word?

3           MR. RANAZZI:  Objection.  Convoluted.

4           And are you asking him to agree or to

5       know what you agree with?

6           MR. GERHARDSTEIN:  All right.  Let me

7       ask it again.

8   BY MR. GERHARDSTEIN:

9       Q.   Did you say anything about using the

10  N word to you, when you reported the events to

11  your colleagues back at the booking desk?

12      A.   I didn't feel like, sir, I needed to

13  keep throwing that word around.

14          I mean, you're even, right now,

15  referring to it as just the N word.  So I don't

16  think that's something, when I'm talking about an

17  event, I need to just keep throwing around.

18      Q.   Okay.  So I think you're telling me

19  why, but I just want to clarify it for the

20  record.

21          Did you tell your colleagues that --

22      A.   No, I did not.

23          I told my sergeant.

24      Q.   And when was that?

25      A.   Moments -- in the booth, right after

1    the incident.

2         Q.   And just so the record is clear, you're

3    saying you did not tell your colleagues about the

4    use of the N word, but you did tell your

5    sergeant, correct?

6         A.   Yes.

7         Q.   And you'd agree -- or would you agree

8    that -- the statements to your colleagues were on

9    the video, but the statement to your sergeant is

10   not, right?

11        A.   Yes.

12        Q.   All right.  Can you see the video on

13   the screen now?

14             MS. HENDERSON:  No.

15             (Off the record.)

16   BY MR. GERHARDSTEIN:

17        Q.   Okay.  Mr. Hobbs, do you recognize the

18   scene that's depicted in the four screens on this

19   video?

20        A.   Yes.

21             MR. GERHARDSTEIN:  And we'll mark the

22        video Exhibit 12.

23             (Plaintiff's Exhibit 12 was marked for

24             identification.)

25   BY MR. GERHARDSTEIN:

1       Q.   Now, these are four different camera

2  angles, the same activity, right -- or the same

3  time frame; is that correct?

4       A.   Are you talking to me?

5       Q.   Yeah.

6       A.   Yes.

7       Q.   Okay.  Do you know who the inmate is,

8  at 5:31 -- this is 5:31 in the morning -- who's

9  coming down the hallway toward West D, in the

10 upper left-hand frame?

11          It's -- the camera angle is booking

12 west hall.

13          Do you know who that inmate is?

14      A.   You'll have to bring it a little bit

15 closer.  I can't see his clear face from this

16 angle.

17      Q.   Does that help at all?

18      A.   Yeah.  Yes.

19      Q.   Who was that?

20      A.   I'm not sure of his full name.  I know

21 he's a frequent flyer there, I'm just not

22 familiar with his full name.

23      Q.   So we're watching at 5:31 a.m.  Okay?

24          And who is the officer on the screen on

25 the top right?

1          A.   Oliver Watkins.

2          Q.   Oliver Watkins.

3               And who's the officer at booking, with

4     his back to you?

5          A.   Nate Meyers.

6          Q.   And he's the one in front of the

7     screen?

8          A.   Yes.

9          Q.   What who's the officer to the left, in

10    front of the booking desk?

11         A.   I don't know who that is.

12         Q.   Who's the person with the rolling cart,

13    the female?

14         A.   The nurse.

15         Q.   What was her name?

16         A.   Jennifer.

17         Q.   All right.  I'm going to continue

18    playing the video.  We're at 5:31:10.

19              By the way, can you hear the audio?

20              THE WITNESS:  No.

21              MR. GERHARDSTEIN:  Huh.  Well, it's

22         playing for me.  There's no -- I haven't

23         heard any statements yet.

24              I'll stop it when we get some dialogue.

25              Have you heard any audio yet?

```
 1            THE WITNESS:  No.

 2            MR. GERHARDSTEIN:  All right.  That's

 3        unfortunate.  I guess when you screen share

 4        you don't always get to share the audio.

 5   BY MR. GERHARDSTEIN:

 6        Q.   Officer -- or, Mr. Hobbs, is that you

 7   interacting with the inmate, in the lower

 8   right-hand corner, in that screen?

 9        A.   Yes.

10        Q.   We're at 5:32.

11             Have you heard any of the dialogue

12   between Watkins and you?

13        A.   No.

14        Q.   You've watched this video before,

15   right?

16        A.   Correct.

17        Q.   When was the last time you saw it?

18        A.   Was it Fri -- Thursday.

19        Q.   Do you recall what Officer Watkins is

20   talking to you about?

21        A.   He wouldn't be talking to me.  I don't

22   think he's -- he's talking to the inmate.  I

23   don't think he's talking to me.

24        Q.   Oh, okay.  And what was it he was

25   talking about, if you recall?
```

1          A.    If I recall correctly, I think the

2     inmate was trying to get him to do something

3     else, and the officer explained to him it's the

4     end of the shift.

5          Q.    Okay.  We're at 5:32:24.

6                Now, at this point, we see in the

7     bottom right-hand corner screen, which is booking

8     West C-D, that you're standing at the open door

9     with an inmate.

10               Who is that?

11         A.    Tim McGovern.

12         Q.    Now, apparently, you can't hear the

13    audio of your conversation with Mr. McGovern as

14    we watch to this together.

15               But based on your most recent review of

16    the video, what did Mr. McGovern say to you and

17    what did you say to him?

18         A.    I can't remember word for word.  It

19    was, basically, a conversation about him using

20    the phone.  I told him he wasn't cooperative when

21    he came in, he couldn't use the phone, if he

22    wanted to use the phone, he'd have to use the one

23    on the wall.

24         Q.    And in order to use the phone on the

25    wall do you need any account or a pin number?

1  Are there any sort of rules about that phone?

2      A.   If I remember, you need a -- some kind

3  of pin to get through.

4          But if you call someone on the phone

5  and they set up an account, you get it for free.

6          I don't remember specifically how the

7  phone situation worked.

8      Q.   So at least for a pretrial inmate just

9  coming in, that inmate would have to call someone

10  who would accept the duty of setting up an

11  account and working with the inmate in order to

12  get a call accomplished, right?

13     A.   I never made a call there, sir.  I

14  guess that's how it works.  I'm not sure of the

15  specifics, again, about how the phone worked once

16  you pick it up.

17          I believe they have to call someone and

18  set up an account, and they go from there --

19     Q.   Okay.

20     A.   -- if I remember correctly.

21     Q.   And did -- based on your last review of

22  this video, did Mr. McGovern apologize for the

23  way he had acted at booking when he first came

24  in?

25     A.   I want to say when he was across, in

1    the single cell, and I gave him a blanket, we had

2    a brief conversation.

3         Q.   How about at this point, where we're at

4    on the video, at 5:32?  During this interaction

5    with him did he apologize for the way he had

6    acted when he first came into booking?

7         A.   I don't think so.  I believe, if my

8    memory is correct, that we were just talking

9    about a phone call at this point.

10        Q.   And based on your last review of the

11   video, did Mr. McGovern also explain that he had

12   a job and that he wanted to get word to the

13   employer so that he wouldn't lose his job?

14        A.   Again, I don't remember all the

15   specifics.  I remember we were discussing

16   about -- I remember specifically we were

17   discussing -- the conversation about him using

18   the phone.

19        Q.   Okay.  We're going to watch more of the

20   video, and we're starting again at 5:32:26.

21             So at 5:33, do agree that Mr. McGovern

22   has stepped into the cell and had his back to

23   you, and you stepped in after him and are

24   grabbing his collar?

25        A.   Yes.

1      Q.   And when you grabbed his collar and

2   pulled on him, he goes down and is obviously

3   trying to break his fall with his right arm,

4   right?

5      A.   If that's what -- yes.  That's what the

6   video shows, yes.

7      Q.   And now, at 5:33:03, your arm is --

8   your left arm is around Mr. McGover's neck,

9   right?

10     A.   Yes.

11     Q.   At 5:33:05, who is that that has just

12   arrived at the doorway to West D?

13     A.   Nate Meyers.

14     Q.   And that's Officer Watkins coming up

15   also?

16     A.   Yes.

17     Q.   But Meyers is right at you -- right at

18   the doorway, and Watkins is still back a ways,

19   right?

20     A.   Yes.

21     Q.   Now, at 5:33:10, it's -- what officers

22   are present attempting to cuff Mr. McGovern?

23     A.   The one that showed up is Matt Grant --

24   Matthew Grant.

25     Q.   So if we -- and we -- that's the one

1    bending over, with his head toward the doorway?

2        A.    That's him with his back to me, yes.

3              Nate is up against the door, Matt is

4    the one with his back to me.

5        Q.    Well, you're still in the frame,

6    right?

7        A.    Yes.

8        Q.    Okay.  And you're sort of bent over,

9    right?

10       A.    Yes.

11       Q.    So that's Nate Meyers and Matt --

12   Matthew Grant?

13       A.    Yes.

14       Q.    Now, at 5:33:12, would you agree that

15   Matthew Grant is grabbing Mr. McGovern's head?

16       A.    I can't agree to that, sir.  I can't

17   see.

18       Q.    At 5:33:15 -- and I think we can see it

19   best in the top left frame -- is Matthew Grant --

20   does he have his knee on Mr. McGovern's head?

21       A.    I see his -- his -- him leaning down,

22   but I can't see clearly where his knee is at

23   exactly.  I just can't.

24       Q.    At 5:33:17, does that make it any

25   easier to see that his knee is on Mr. McGovern's

1   head?

2           And again, I think you can see best in

3   the top left-hand corner.

4       A.   If that's his head and that's his knee,

5   yes, I can see -- I can see that.

6           But, again, the picture is not clear

7   enough for me to tell exactly which part of --

8   his ear is -- I can't -- I can't make it -- it's

9   not that clear.

10      Q.   So you would agree what Matthew Grant's

11  knee is on the head, but you're not sure what

12  part?

13      A.   I would say his knee is up, yes,

14  somewhere -- yeah.  I just can't see which

15  part.

16      Q.   Which part of the head?

17      A.   Correct.

18      Q.   Who's the officer standing behind

19  Matthew Grant?

20      A.   Sergeant Gumpf.

21      Q.   And at this point, you have stood up

22  and are no longer engaging?

23      A.   Yes.

24          MR. RANAZZI:  Al's frozen.

25          (Off the record.)

         1          MR. GERHARDSTEIN:  So can you read the

         2     last question?

         3          (The record was read.)

         4     BY MR. GERHARDSTEIN:

         5          Q.   And the point we're talking about is

         6     5:33:17, right, Mr. Hobbs?

         7          A.   Yes.

         8          Q.   Okay.  And did you stand up because you

         9     believed your colleagues had control of

        10     Mr. McGovern at that point?

        11          A.   I stood up because -- they were trying

        12     to handcuff him and control him, and I stood up.

        13          They came in in better position than

        14     me.

        15          Q.   All right.  So they were able to get

        16     that job done, and you weren't needed, right?

        17          A.   Yes.

        18          Q.   I'm going to back it up a little bit.

        19          Now, at 5:33:21, would you agree that

        20     Matthew Grant used his hands on Mr. McGovern's

        21     head and forcibly hit his head against the

        22     concrete floor?

        23          A.   Sir, I don't know what he hit his head

        24     on.  Again, I seen pushing the back of his body

        25     down -- I mean, the upper part, his neck.  I

1    don't know what his head hit.  I can't -- I can't

2    tell that.

3        Q.   Well, the floor is concrete, right?

4        A.   Correct.

5        Q.   And there's nothing -- there's no pad

6    or anything between Mr. McGovern's head and the

7    floor, right?

8        A.   Again, sir, I can't say what his --

9    what he hit.  I -- I can't say.  The picture --

10   the video is not clear enough to show me -- that

11   I can say that he hit his head when he went -- I

12   don't know.

13       Q.   You'd agree that Matthew Grant is --

14   has Mr. McGovern's head in his hand and forcibly

15   picks it up and puts it down, right?

16            MR. RANAZZI:  Objection.  Asked and

17       answered.

18            You can answer again.

19       A.   I don't know what Matt Grant is doing,

20   sir.

21   BY MR. GERHARDSTEIN:

22       Q.   Well, you can see his hand on the head,

23   right?

24       A.   I see his hands on the back of the

25   neck, from the angle I have.

1          Q.   And you can see his head go up and

2     down, right?

3          A.   No.  I see a paused frame right now.

4          Q.   Well, I can play it again, if you want.

5               Right there.

6               Do you see that?  Do you see that,

7     where his head went up and down, at 5:33:21 and

8     22?

9          A.   I think you want me to say -- I can't

10    say.  I don't know what it -- I'm not confident

11    in saying his head hit.  I don't know.

12         Q.   All right.  I'm going to play the video

13    further.

14              Now, you'd agree that Mr. Grant has his

15    hand on Mr. McGovern's head at 5:33:34, right?

16         A.   Looks like his hand is around the side

17    of his face at this point.  It doesn't look like

18    it's on the back of his head.  It looks like

19    maybe on his cheek or something like that.  It

20    looked like his head is turned.

21         Q.   Now, at 5:34:15, have you returned to

22    the booking counter, and are you standing in

23    front of the computer screen?

24         A.   Yes.

25         Q.   Now, at 5:34:47, did you mimic the hand

1   gesture that Mr. McGovern had used toward you?

2        A.   Yes.

3        Q.   And that was raising his middle finger

4   toward you, right?

5        A.   Yes.

6        Q.   And when Mr. McGovern did that, he

7   didn't touch you, did he?

8        A.   No.

9        Q.   At 5:35, you are typing on the

10  computer.

11            Are you -- well, just tell me, if you

12  know, what you're writing on the computer at that

13  point.

14       A.   Sir, I have no clue.  That was three

15  years ago.  I have no idea.

16       Q.   I notice that your report is typed the

17  next day.

18            Did you start it at the time you

19  were -- well, first of all, do you write the

20  reports on the computer?

21       A.   Yes.

22       Q.   Did you write your report the next day,

23  or did you start it on the day when the use of

24  force occurred?

25       A.   I started it with the next shift, or

1    the next day.

2         Q.   Okay.  So you're not writing your

3    report; is that right?

4         A.   If I had to remember correctly, sir, I

5    think I was finishing up his booking information,

6    since I was the booking officer.  All I can say

7    is, all I was doing is saving information on the

8    computer.

9         Q.   Okay.  I'm going to go back to the

10   OCRC file.  And are you -- do you have the OCRC

11   file up on the screen?

12        A.   Yes, I do.

13        Q.   All right.  I'm going to go to your

14   report, which is 76.

15             Do you see that?

16        A.   Yes.

17        Q.   Is this the report you prepared in

18   connection with the use of force on

19   Mr. McGovern?

20        A.   Yes.

21        Q.   And you left -- you were working third

22   shift, right?

23        A.   Yes.

24        Q.   What was the hours of that third

25   shift?

1        A.    10:30 to 6:30.

2        Q.    So you would have started at 10:30 on

3 November 9th and finished up at 6:30,

4 November 10th, right?

5        A.    Correct.

6        Q.    And so the use of force occurred at

7 5:30, November 10th, right?

8        A.    Yes.

9        Q.    And then when you returned, it's still

10 November 10th, and you fill out this report at

11 11:45 p.m., right?

12       A.    Yes.

13       Q.    Now, in this report, you state that on

14 November 10th, 2017, at approximately 5:30 hours,

15 while putting an inmate into West D holding tank

16 Inmate McGovern, Timothy, 0889105, began to argue

17 with me that he didn't get a phone call.  I

18 explained to Inmate McGovern, Timothy that he did

19 not get a phone call at the time of booking

20 because he was intoxicated, uncooperative, and

21 disrespectful.

22         Did I read that correctly?

23       A.    Yes.

24       Q.    Then it goes on -- towards LCCC staff

25 and the TPD officers.  Inmate McGovern then threw

1    up his middle finger and said, fuck you,

2    nigger -- then grabbed inmate by his left arm and

3    shoulder to escort him to single number 7 for

4    being disruptive and disrespectful toward staff.

5             Did I read that correctly?

6        A.   Yes.

7        Q.   And where you say that you grabbed

8    inmate by left shoulder -- I'm sorry -- that you

9    grabbed inmate by his left arm and shoulder, is

10   that accurate?

11       A.   No.

12       Q.   I didn't hear you.

13       A.   No, sir.

14       Q.   Right.  You actually grabbed him by his

15   collar, right?

16       A.   Correct.

17       Q.   And then where you say that, Inmate

18   McGovern, Timothy began to resist my escort to

19   single number 7, he was taken to the ground and

20   handcuffed for officer safety -- when you say he

21   began to resist your escort, was that accurate?

22       A.   The reference I'm talking about --

23   resistance -- is when we were on the ground.

24       Q.   Well, but the way you wrote it is

25   that -- you're writing about him resisting before

1   you write that he was taken to the ground, right?

2      A.   Correct.  But that's not how it was

3   supposed to have been.

4      What I meant -- the resistance I'm

5   referring to in the report is the resistance

6   that -- was being when we fell to the ground.

7      Q.   Because he was not told anything before

8   you grabbed him, right?

9      A.   Correct.

10     Q.   So there was no way to assess any

11  resistance because he wasn't being instructed to

12  do anything, right?

13     A.   Correct.

14     Q.   And when you say that he was taken to

15  the ground, that's not accurate, right?

16     A.   We -- no.  He wasn't taken to the

17  ground, we fell to the ground.

18     Q.   Now, it's important to be accurate when

19  you write those reports, right?

20     A.   If I would have went back and watched

21  the video, sir, and tried to get a fresher

22  recollection, yes.  But I did not.

23      I just went off my pure memory.

24     Q.   Now, when you reviewed the video,

25  either with me here today or last week, would you

1  agree that there's no indication that other

2  inmates were reacting at all to the exchange

3  between you and Mr. McGovern in the immediate

4  moments before you grabbed Mr. McGovern?

5      A.   They were all drunk, sir, asleep.

6      Q.   Would you agree that when an inmate's

7  head is hit against the floor, that that's a

8  significant use of force?

9      A.   Are you asking me if he hit his head

10 against the floor, sir?

11     Q.   No.

12          I'm asking you whether you agree what

13 when an inmate's head is hit against the floor,

14 that that's a significant use of force.

15          MR. RANAZZI:  Objection.  Presumes

16          facts not in evidence.

17          You can answer.

18     A.   Could you repeat the question again,

19 sir?

20 BY MR. GERHARDSTEIN:

21     Q.   It's significant use of force to hit an

22 inmate's head against the floor, right?

23     A.   I didn't hit anyone's head up against

24 the floor, sir.

25     Q.   I'm not asking -- I'm not saying you

1  did.

2      A.   What you are asking me, sir?  I'm not

3  understanding you.

4      Q.   You saw Matthew Grant --

5      A.   Yes, sir.

6      Q.   -- right?

7           And in his placement of Mr. McGovern's

8  head against the floor, that's a significant use

9  of force, right?

10     A.   As I said before, sir, the images I

11 see, I can't -- I can't tell clearly what was

12 going on with Matt Grant and Mr. McGovern's

13 head.

14     Q.   In your training on subject control,

15 did you learn that -- by striking the head with a

16 solid object, that that can be deadly force?

17     A.   I'm not understanding that, sir.

18     Q.   Well, you went through subject control

19 training, right?

20     A.   Correct.

21     Q.   And one of the things you learned, for

22 example, was baton handling, right?

23     A.   False.  We don't use batons.

24     Q.   Well, I know you don't in corrections,

25 but were you trained on it?

    1          A.    No.

    2          Q.    Were you trained that striking the head

    3    of an inmate can be deadly force?

    4          A.    I don't recall ever -- anyone telling

    5    me if I hit somebody with something, it's dead --

    6    I don't recall -- I don't recall that, sir.  I

    7    can't recall something happening two -- I don't

    8    know.

    9          Q.    As you sit today, do you agree that

   10    it's dangerous to strike an inmate in the head?

   11          A.    You said, is it dangerous to strike

   12    someone -- someone in the head?

   13          Q.    Right.

   14          A.    It could be -- it could be dangerous to

   15    hit anyone in the head.

   16          Q.    And if an inmate is -- if an inmate's

   17    head strikes the floor, is actually in some

   18    officer's hand and is hit upon the floor, that

   19    can be very dangerous, right?

   20          A.    It's all a matter of intent, sir.

   21                You can't just say because someone's

   22    head hit the floor they're trying to hurt them or

   23    kill them.

   24                I mean, I could stand up right now and

   25    fall, and that don't mean I'm hurting myself.  I

1    mean --

2         Q.   In your training, did you learn any

3    techniques that involve kneeling on the head of

4    an inmate or striking their head against the

5    floor?

6         A.   I can't recall, sir.

7         Q.   Is kneeling on the head of an inmate

8    consistent with any of the training you learned

9    in subject control?

10        A.   I'm sure there's times where we've had

11   to secure someone -- I don't -- I can't recall us

12   kneeling on heads.  I don't -- I don't recall

13   that, sir, no.

14             MR. GERHARDSTEIN:  All right.  We're

15        going to take a short break, and then I'll

16        have a few more questions maybe, and then

17        we'll be done.

18             So let's just leave the screen open,

19        but we're going to take a short break.

20        Okay?

21             (A recess was taken from 10:39 to

22        10:49.)

23   BY MR. GERHARDSTEIN:

24        Q.   Mr. Hobbs, your current job is in

25   security as well, right?

1          I'm not going to get into details.

2   Don't worry.

3          A.   Yes.

4          Q.   And in connection with that job, you

5   have to give reports on potential breaches of

6   security, right?

7          MS. HENDERSON:  Objection.

8   BY MR. GERHARDSTEIN:

9          Q.   Again, I'm not going to get into the

10  industry or the details.  I'm trying to honor

11  your request the keep that -- details

12  confidential.

13         But you'll agree that you have to give

14  reports on potential security breaches, right?

15         A.   Sir, I really don't want to even talk

16  about my job.  I'm trying to move on.

17         Q.   You've got to tell the truth in your

18  job, right?

19         A.   Yes.  I have to do reports.

20         Q.   All right.  And you expect those

21  reports to be honest, because you want to have

22  people rely on them, right?

23         A.   Correct.

24         Q.   Now, you said when you used force on

25  Mr. McGovern, that it was more than just the

1    immediate dialogue you had had with him before

2    you decided to move him.

3                Can you explain that a little bit more?

4                What is it that caused you to use force

5    on him?

6          A.    I was trying to just move him across to

7    a single cell, sir.

8          Q.    Yeah.  So what was the basis for

9    trying -- for deciding to move him across to a

10   single cell?

11         A.    It was a collaboration of things, like

12   I said.

13                It was one -- when he came in, he came

14   in with four officers; came in the door

15   complaining about whatever business he had with

16   them.  It was uncooperation from -- they had

17   briefed us they told him that -- he was over in

18   the safety building, the whole shabang-bang over

19   there.

20                Then he came to our building with four

21   officers -- that's a red flag -- came up to the

22   booking counter, wasn't cooperating -- that was a

23   red flag.

24                So when the behavior started at the

25   West D tank, I made a split-second decision to

1    put him in a single cell.

2         Q.    And when you say, the behavior started

3    in the West D tank, what behavior are you talking

4    about?

5         A.    Well, when I first tried to shut the

6    door, he stooped me from shutting the door.  I

7    continued to talk to him.

8              I told him once he couldn't use the --

9    phone call, he still went on, went on, went on

10   about the phone call.

11             The throwing up the hand, using the

12   language, all of that's all in one in sequence.

13   And that's when I decided to put him into a

14   single cell.

15        Q.    So you decided to put him in the single

16   cell because he threw up his hand -- meaning he

17   gave you the finger -- and he had used the

18   language -- are you talking about the N word?

19        A.    As I explained, sir, it wasn't just

20   that.

21             It had been a long -- it was a whole

22   collaboration of events; from the time he entered

23   the building, to the time he went -- came up to

24   the counter, got his dress on -- uniform, went to

25   West D cell.

1          It wasn't just that particular -- at

2   that interaction.  It wasn't just that alone.

3          I just stated that.

4      Q.   And you contend that it was consistent

5   with the discretion you had as an officer to grab

6   him by the back of the jumpsuit and pull him

7   through the door; is that correct?

8      A.   It was my discretion to remove an

9   inmate and to put him into a single cell, yes.

10     Q.   And was it your discretion to remove

11  Mr. McGovern in the way you did it?

12     A.   The way I did it, and the way it took

13  down -- the way I intended to do it was to just

14  pull him back and put him into a single cell door

15  across the hall.

16          That was it.

17     Q.   And is it your position that you didn't

18  do anything wrong with respect to the manner in

19  which you attempted to transfer Mr. McGovern from

20  West D to the single cell?

21     A.   It was my intent to -- to pull him, or

22  grab him, take him over to the single cell across

23  the hall, when we fell to the ground.

24     Q.   And there wasn't anything wrong with

25  putting your arm around his neck?

1    A.   That's how we fell, sir.

2         Did I purposely do that?  No, I did

3    not.  It's just how we fell.

4    Q.   So why do you contend that your

5    discharge was on the basis of race

6    discrimination?

7    A.   Sir, that's an ongoing case, and I'd

8    rather not talk.

9    Q.   Well, you must believe that there's

10   some unfair judging of you, with respect to the

11   use of force, because the county fired you

12   because of the use of force.

13        What is it that makes you think that

14   it's okay to use that amount of force, and

15   instead, you're contending that it was race

16   discrimination?

17        MS. HENDERSON:  Continuing line of

18        objection, and also objection to the

19        question.

20   BY MR. GERHARDSTEIN:

21   Q.   You can answer.

22   A.   Sir, again, you have county

23   representatives here.  It's an ongoing case and I

24   prefer not to talk about it.

25   Q.   Well, I understand what you prefer, but

1    it's relevant to the -- our ongoing case.

2         A.   I don't know how to answer that, sir.

3    I don't want to answer that.

4         Q.   Well, what's your proof that you want

5    to show the Court about why it's -- you were

6    fired for race discrimination rather than the way

7    you treated Mr. McGovern?

8         A.   I can't answer that, sir.

9         Q.   Well, do you have any evidence at all

10   of racial --

11        A.   I can't answer that question.

12        Q.   -- discrimination?

13        A.   I can't answer that.

14        Q.   Is there a reason -- are you saying you

15   can't answer it because you don't want to or

16   because you just don't have any proof?

17        A.   I can't answer that, sir.

18        Q.   Yeah, my question is, are you saying, I

19   can't answer that, sir, because you are refusing

20   to answer, or because you really don't have any

21   proof of race discrimination?

22        A.   I can't answer that, sir.

23        Q.   Why can't you answer?

24        A.   I feel like you're putting me in a

25   situation where I can't answer that.

1        Q.   I'm not putting you in any situation.

2   I'm just asking you what proof you have for the

3   lawsuit you filed.

4        A.   Follow the case, sir.  I guess you'll

5   find out.

6        Q.   Well, it sounds like you're refusing to

7   answer the question, and it is relevant evidence,

8   and I'm going to ask you again -- and I'll ask

9   your counsel's help with this -- to give me the

10  best answer you can for why you think it's race

11  discrimination.

12       A.   That's up to my lawyers to determine.

13       Q.   Well, what evidence have you provided

14  to anybody that you think that it's based on race

15  discrimination?

16       A.   I would ask that I have time to confer

17  with my lawyers who's dealing with me in that

18  case before I answer any questions concerning my

19  civil matter.

20       Q.   Well, all right.  I guess we'll have to

21  leave the deposition open, unless you want to

22  make a phone call.  I'd kind of like to wrap this

23  up.

24            Can you make the phone call?

25       A.   Sir, you're a lawyer.  You know lawyers

1    aren't available like that.  You know that.

2         Q.   Well, I don't know, you can give it --

3    give it a try.

4         A.   Unless you want to pay $500 a call,

5    then we can go ahead.

6         Q.   All right.  Well, that's all the

7    questions I have, except for this one.  And I'm

8    going to have to leave the record open in order

9    to see if there's some further explanation that

10   we can secure after you talk to your civil

11   lawyers.  And I really don't want to do that, but

12   you don't really leave me any choice.

13             MR. GERHARDSTEIN:  I don't have any

14        other questions.

15             Counsel, do you have any questions?

16             MR. RANAZZI:  I have a couple.

17             But I want to make sure I'm clear on

18        this, Al.

19             Your sole line of inquiry that you are

20        leaving open is what evidence does he have

21        regarding his -- regarding the county's --

22        the claim against the county of racism

23        within his civil rights lawsuit as an OCRC

24        complainant, correct?

25             MR. GERHARDSTEIN:  Well, yeah.

1          I mean, understand, though, that in a

2    disparate treatment case, I suspect that his

3    answer is going to be that he has A, B, C

4    proof of race, the county's then going to

5    say they fired him because of his use of

6    force, then he has to show his pretext.

7          So once you lay all this stuff out,

8    there may be more further exploration of the

9    use of force, because there may be other

10   comparisons to other uses of force by white

11   guys.

12         I mean, I'm making all this up because

13   I don't know for sure.

14         But I -- that's where that inquiry

15   could go.

16         MR. RANAZZI:  All right.  Your inquiry

17   presumes a response from the county, when

18   that's not going to happen in this

19   deposition.  The only answer you're going to

20   get, at any point in time, is going to be

21   Mr. Hobbs' answer as to what he would have

22   with regards to the county.  You're not

23   going get a county --

24         MR. GERHARDSTEIN:  Well --

25         MR. RANAZZI:  You're not going to get a

1      county official to say anything about

2      pretext within this deposition, so you're

3      not going to have a further inquiry.  It's

4      going to end at Mr. Hobbs' response.

5           MR. GERHARDSTEIN:  Well, except that

6      there is some evidence in the record of

7      comparables.  And if, in fact, his

8      allegation is that certain people used force

9      comparable to his, and we have evidence in

10     the record of those people, that could

11     trigger further dialogue.

12          I don't know where he's going with --

13          MR. RANAZZI:  Well, you have the

14     opportunity to ask him questions right now

15     about comparables.  I mean, I -- I don't

16     want to see -- I don't want -- I don't want

17     any other deposition, is what I don't want.

18          MR. GERHARDSTEIN:  Well, that's fine.

19     Okay.  I can -- I can try and see if he'll

20     answer.

21   BY MR. GERHARDSTEIN:

22     Q.  Are there white people that you compare

23   yourself to, Mr. Hobbs, that you think were

24   treated better than you?

25          MS. HENDERSON:  Objection.

1          MR. RANAZZI:  Objection.

2     BY MR. GERHARDSTEIN:

3          Q.   You can answer.

4          A.   I'm the only one sitting here, right,

5     sir; the only one terminated?

6          Q.   Okay.  And so who do you think was

7     treated better than you were who used force like

8     you did?

9          A.   Sir --

10         THE REPORTER:  I'm sorry.  Did you say

11         something, Mr. Hobbs?

12         THE WITNESS:  I didn't say anything.

13    BY MR. GERHARDSTEIN:

14         Q.   Can you answer, please?

15         A.   I don't know what discipline another

16    officers received, sir, for whatever they did.

17         Q.   Well, in your -- in your charge to

18    discrimination, you mentioned Marcus Wall

19    (phonetic), Dee Young (phonetic), Dana Holsmer

20    (phonetic), and Javier Martinez (phonetic).

21              Are those people that you believe did

22    things similar to you, as far as use of force,

23    who were not black but were treated better?

24         A.   If that's what my disposition you have

25    says -- in front of you -- that's what I said.

 1    Q.   All right.  Are there any other people,

 2  in addition to those, who are the people to whom

 3  you'd compare yourself to, in showing that your

 4  termination was for race, even though they did

 5  stuff just as bad as yours?

 6    A.   I would ask, again, sir, to consult my

 7  civil attorneys about the matter and follow the

 8  case, sir.

 9    Q.   Well, can you tell me anything about

10  the -- well, look, if you're going to invoke a

11  need to talk to an attorney, I don't want to

12  disturb that.

13         Again, I'll offer you an opportunity to

14  give your attorney a call.  Because I agree with

15  Andy, I'd rather get this done.  But it seems

16  like we have a problem.

17         So if you want to try calling your

18  attorney, that would be fine.

19    A.   Sir, it's not going to happen, sir.

20    Q.   All right.

21         MR. GERHARDSTEIN:  Okay.  On that same

22         basis then, I'll terminate the deposition

23         with this loose end.  And if, after talking

24         to your attorney, you have additional

25         information you want to share, we can reopen

1   it.

2       Andy, do you have any questions?

3       MR. RANAZZI:  Any questions?

4       MS. HENDERSON:  No.

5       MR. RANAZZI:  No.  Actually, I don't

6   have any questions.  I think we're good.

7       MR. GERHARDSTEIN:  All right.  Kayla,

8   do you have any questions?

9       MS. HENDERSON:  No.

10      MR. GERHARDSTEIN:  All right.  Do you

11  want to instruct him on answering -- or on

12  signing?

13      MS. HENDERSON:  We're going to reserve.

14

15

16      _____
        LAMONTE HOBBS

17

18              - - -

19    DEPOSITION ADJOURNED AT 11:03 A.M.

20              - - -

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3     STATE OF OHIO       :
                           :  SS
 4     COUNTY OF CLERMONT  :

 5              I, Wendy Scott, the undersigned, a duly

 6     qualified and commissioned notary public within

 7     and for the State of Ohio, do certify that before

 8     the giving of his deposition, LAMONTE HOBBS was

 9     by me first duly sworn to depose the truth, the

10     whole truth and nothing but the truth; that the

11     foregoing is the deposition given at said time

12     and place by LAMONTE HOBBS; that I am neither a

13     relative of nor employee of any of the parties or

14     their counsel, and have no interest whatever in

15     the result of the action.

16              IN WITNESS WHEREOF, I hereunto set my hand

17     and official seal of office at Cincinnati, Ohio,

18     this 23rd day of July 2020.

19

20     _____

21     Wendy Scott
       Notary Public - State of Ohio
22     My commission expires September 3, 2022

23

24

25
```

1               E R R A T A   S H E E T

2          DEPOSITION OF:  LAMONTE HOBBS
                    TAKEN:  JULY 13, 2020
3

4     Please make the following corrections to my
      deposition transcript:
5

6     Page  Line Number          Correction Made

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24

      _____    _____
25    Witness Signature                  Date

**$**

**$500** 75:4

**0**

**0889105** 61:16

**1**

**1** 26:5
**10** 23:3 40:5,6,8,11,13,16
**10:30** 61:1,2
**10:39** 67:21
**10:49** 67:22
**10th** 13:6,10,13 14:10
  61:4,7,10,14
**11** 42:20,21
**11:45** 61:11
**12** 23:3 46:22,23
**180** 17:17
**19** 26:5

**2**

**2001** 7:11
**2004** 6:23 7:5,8,11
**2005** 7:25 11:24 12:11,17
**2012** 12:23 13:1
**2017** 12:18 13:6,10,13
  14:10 22:5 23:4 26:11,17
  27:11,17 28:20 30:4 34:6
  36:14 61:14
**22** 58:8
**23** 21:24
**28th** 22:5

**3**

**30** 17:19
**31** 22:13,18

**4**

**41** 25:17,21 26:4
**49** 22:4,11,21,23

**5**

**5:30** 14:6 61:7,14
**5:31** 47:8,23
**5:31:10** 48:18
**5:32** 49:10 52:4
**5:32:24** 50:5
**5:32:26** 52:20

**5:33** 52:21
**5:33:03** 53:7
**5:33:05** 53:11
**5:33:10** 53:21
**5:33:12** 54:14
**5:33:15** 54:18
**5:33:17** 54:24 56:6
**5:33:21** 56:19 58:7
**5:33:34** 58:15
**5:34:15** 58:21
**5:34:47** 58:25
**5:35** 59:9

**6**

**6/1/09** 26:7
**6:30** 61:1,3

**7**

**7** 62:3,19
**70-page** 21:8
**76** 60:14

**8**

**8** 17:6,7

**9**

**9** 21:8,10,23 25:16 40:10
**96** 7:19
**97** 7:19
**9th** 61:3

**A**

**a.m.** 47:23
**able** 56:15
**abrasions** 15:18,23
**accept** 51:10
**access** 10:10
**accommodate** 32:13
**accomplish** 23:25
**accomplished** 51:12
**account** 50:25 51:5,11,18
**accurate** 62:10,21 63:15,
  18
**accused** 9:16
**acted** 51:23 52:6
**action** 38:24
**active** 36:3,5
**activity** 47:2
**actual** 12:22 22:14 28:19,
  23

**addition** 33:7
**administered** 11:16
**administers** 11:1
**advising** 22:6
**agitation** 36:1
**ago** 59:15
**agree** 13:4 17:16 36:18
  39:5,10 41:6,11,15 42:1
  43:21 44:7,10,16,23 45:4,
  5 46:7 52:21 54:14,16
  55:10 56:19 57:13 58:14
  64:1,6,12 66:9 68:13
**ahead** 15:16 40:23 75:5
**Al** 15:12 20:25 25:24
  75:18
**Al's** 55:24
**allegation** 77:8
**alleged** 43:25
**allow** 43:24 44:1
**allowed** 26:25 27:14 29:23
  33:22 36:13
**altercation** 14:18
**amount** 72:14
**angle** 47:11,16 57:25
**angles** 47:2
**answer** 14:22 25:4 35:6
  42:7 43:16 57:18 64:17
  72:21 73:2,3,8,11,13,15,
  17,19,20,22,23,25 74:7,
  10,18 76:3,19,21 77:20
  78:3,14
**answered** 57:17
**anybody** 14:1 33:24 74:14
**anyone's** 64:23
**apologize** 51:22 52:5
**apparently** 50:12
**appear** 22:18
**applied** 10:19
**appreciate** 30:16
**approximately** 14:6 61:14
**arbitrate** 18:16
**area** 13:17
**areas** 30:8
**argue** 61:16
**arm** 39:6,8 53:3,7,8 62:2,9
  71:25
**arrests** 9:20
**arrived** 15:19 53:12
**Asked** 57:16
**asking** 29:19 30:12,22
  45:4 64:9,12,25 65:2 74:2
**asleep** 64:5
**assault** 16:8,12
**assess** 63:10

**Associate's** 6:19
**attempted** 71:19
**attempting** 53:22
**audible** 43:23 44:1
**audio** 41:21 43:24 44:3
  48:19,25 49:4 50:13
**August** 13:4
**authority** 34:4
**authorization** 26:25
**available** 75:1

---

**B**

**back** 9:7,10 34:12,15
  36:25 45:11 48:4 52:22
  53:18 54:2,4 56:18,24
  57:24 58:18 60:9 63:20
  71:6,14
**backup** 25:10
**bad** 44:22
**bankruptcy** 9:24
**based** 11:3 20:22 50:15
  51:21 52:10 74:14
**basically** 50:19
**basis** 15:5 27:3 69:8 72:5
**Bates** 21:24 22:11,20,22
  25:17,20 26:4
**baton** 65:22
**batons** 65:23
**began** 61:16 62:18,21
**behavior** 69:24 70:2,3
**believe** 19:13 36:15 51:17
  52:7 72:9 78:21
**believed** 56:9
**bending** 54:1
**bent** 54:8
**best** 7:7,12 8:10 54:19
  55:2 74:10
**better** 56:13 77:24 78:7,23
**beyond** 7:21
**billion** 28:24
**bit** 47:14 56:18 69:3
**black** 28:15 29:8,9 78:23
**blanket** 52:1
**body** 56:24
**booking** 12:20,21,25
  13:11,14,17 23:13 26:15
  30:17,23,24 31:9 32:17,23
  34:5 44:12,19 45:11 47:11
  48:3,10 50:7 51:23 52:6
  58:22 60:5,6 61:19 69:22
**booklet** 12:7 17:3
**booth** 45:25
**bottom** 50:7

---

**boys** 10:14
**breaches** 68:5,14
**break** 53:3 67:15,19
**brief** 31:2,4 52:2
**briefed** 69:17
**briefing** 40:22,24,25 41:2
**bring** 47:14
**building** 69:18,20 70:23
**buildings** 8:23
**business** 69:15
**butt** 38:13
**Buy** 7:7,12 8:10

---

**C**

**C-D** 50:8
**call** 18:20,23 35:22 39:20
  40:20 51:4,9,12,13,17
  52:9 61:17,19 70:9,10
  74:22,24 75:4
**called** 13:18 18:3 27:19
  29:12
**calls** 14:19 15:5 42:4 43:13
**camera** 47:1,11
**cart** 48:12
**case** 9:22 17:14 20:1,24
  21:7,23 72:7,23 73:1 74:4,
  18 76:2
**cause** 19:13
**caused** 23:5 69:4
**cell** 15:1 16:1 23:18,21,25
  24:4,21 25:2 29:13,18
  31:2,3,5,15 32:2 33:18
  34:18 35:11,18,24 36:3
  38:19 44:14 52:1,22 69:7,
  10 70:1,14,16,25 71:9,14,
  20,22
**cells** 24:14
**Center** 18:2,4
**certain** 77:8
**changes** 39:20
**charge** 18:12 19:3,8,18
  21:25 78:17
**charged** 16:7
**checked** 16:3
**cheek** 58:19
**choice** 75:12
**chose** 23:20,24 25:9
**city** 7:3 18:7
**civil** 19:7 74:19 75:10,23
**claim** 75:22
**claims** 42:24
**clarification** 22:11
**clarify** 45:19

---

**clear** 46:2 47:15 55:6,9
  57:10 75:17
**clearly** 54:22 65:11
**clicked** 25:24
**closer** 47:15
**clue** 59:14
**collaboration** 69:11 70:22
**collar** 34:15 36:12,19
  38:21 42:3 43:4,8 52:24
  53:1 62:15
**colleagues** 44:18,24 45:11,
  21 46:3,8 56:9
**College** 6:17,25 11:12
**coming** 21:18 30:17 47:9
  51:9 53:14
**command** 26:21 27:14,21,
  25
**commands** 38:4
**Commission** 19:7
**community** 6:25 11:12
  17:19,25
**comparable** 77:9
**comparables** 77:7,15
**compare** 77:22
**comparisons** 76:10
**complain** 30:19
**complainant** 75:24
**complaining** 30:15 69:15
**complete** 17:21
**computer** 58:23 59:10,12,
  20 60:8
**concerning** 74:18
**concluded** 19:4 20:13
**concrete** 56:22 57:3
**confer** 74:16
**confident** 58:10
**confidential** 68:12
**confronted** 23:1
**connection** 18:13 19:18
  60:18 68:4
**consistent** 26:18 27:18
  67:8 71:4
**contact** 42:14
**contend** 71:4 72:4
**contending** 72:15
**contention** 43:2,6
**continuation** 36:23 37:1,4,
  9
**continue** 48:17
**continued** 70:7
**continuing** 15:4 72:17
**control** 11:21 41:20 56:9,
  12 65:14,18 67:9
**conversation** 19:16 44:2
  50:13,19 52:2,17

**convicted** 16:11
**conviction** 17:17
**convictions** 9:20
**Convoluted** 45:3
**cooperate** 30:24
**cooperating** 69:22
**cooperative** 50:20
**copy** 12:8,10 21:25 22:3
**Corey** 42:11,16
**corner** 49:8 50:7 55:3
**correct** 11:7,19,22 14:8
  16:10,13 22:8,9,12 25:15
  34:14 39:18 44:9 46:5
  47:3 49:16 52:8 55:17
  57:4 61:5 62:16 63:2,9,13
  65:20 68:23 71:7 75:24
**correction** 26:14
**corrections** 11:8,10 13:7
  65:24
**correctly** 30:21 50:1 51:20
  60:4 61:22 62:5
**correspondence** 22:5
**corroboration** 35:19
**Counsel** 19:25 22:10 75:15
**counsel's** 74:9
**counseled** 33:1
**count** 22:15
**counter** 30:17 58:22 69:22
  70:24
**county** 7:24 8:2,9 9:6,18
  10:18 11:23,24 12:5,12,18
  13:7,15 26:17 27:10,17
  28:7,21 36:14 72:11,22
  75:22 76:17,22,23 77:1
**county's** 75:21 76:4
**couple** 38:20 75:16
**course** 11:6,11,17,20 12:2,
  4
**courses** 12:15
**court** 19:20,22 39:24 73:5
**cover** 28:24,25
**CPR** 12:15
**criminal** 6:21 8:7,12 11:13
  12:24 17:14
**criminally** 16:7
**cross** 24:22
**cuff** 24:12,16 25:2,9 53:22
**cuffed** 25:5
**cuffs** 30:21
**current** 67:24
**currently** 12:9
**customers** 8:23
**cut** 7:15 16:4
**cutting** 7:21

**D**

**Dana** 78:19
**dangerous** 66:10,11,14,19
**dated** 22:5 26:7
**dates** 7:9
**day** 14:1,2 59:17,22,23
  60:1
**day-to-day** 29:24
**days** 17:17
**dead** 66:5
**deadly** 65:16 66:3
**dealing** 74:17
**decide** 36:25
**decided** 69:2 70:13,15
**deciding** 69:9
**decision** 69:25
**declaration** 42:16
**Dee** 78:19
**defendant** 6:8
**degree** 6:18,19 8:13 11:14
**depend** 25:7
**depends** 23:10 24:2,8 25:3
**depicted** 46:18
**deposed** 6:9
**deposition** 74:21 76:19
  77:2,17
**describe** 30:13 45:1
**described** 44:17
**describing** 44:24
**desk** 44:12,19 45:11 48:10
**details** 68:1,10,11
**Detainees** 39:25
**determination** 20:22
**determine** 74:12
**dialogue** 48:24 49:11 69:1
  77:11
**differ** 28:12,13 29:7
**differed** 28:18
**difference** 28:4,8 29:16
**different** 8:15 12:14,15
  23:9 24:24 28:24 29:18
  30:8 36:10 42:15 47:1
**discharge** 12:17 72:5
**discipline** 78:15
**disciplined** 9:6 32:17
  34:19
**discovery** 20:12
**discretion** 36:13 71:5,8,10
**discrimination** 18:12 19:9,
  14,18 22:1 72:6,16 73:6,
  12,21 74:11,15 78:18
**discussing** 52:15,17

**dishonesty** 9:16
**disparate** 76:2
**disposition** 78:24
**disrespectful** 61:21 62:4
**disrupt** 23:7,14,19
**disruption** 36:9
**disruptive** 62:4
**District** 19:22
**disturbance** 23:5
**document** 39:23
**doing** 57:19 60:7
**door** 24:21 32:11 35:24
  50:8 54:3 69:14 70:6 71:7,
  14
**doorway** 24:11 31:24
  53:12,18 54:1
**dress** 70:24
**drunk** 14:4 36:8 64:5
**duly** 6:8
**duty** 41:1 51:10

**E**

**ear** 55:8
**easier** 54:25
**education** 6:16
**effect** 26:10
**either** 12:4 17:2 63:25
**elbow** 14:17 15:2 16:5
**employer** 52:13
**employment** 7:6,10,12,20
  8:1,6
**engaged** 16:9
**engaging** 34:4 55:22
**enter** 38:19
**entered** 70:22
**entry** 16:15,16 17:2,13
**escalating** 35:21
**escort** 62:3,18,21
**establish** 27:9
**event** 45:17
**events** 44:17,25 45:10
  70:22
**eventually** 16:11
**everybody** 14:3
**everyday** 28:14 33:4
**everyone's** 28:14
**evidence** 15:10 64:16 73:9
  74:7,13 75:20 77:6,9
**exactly** 54:23 55:7
**EXAMINATION** 6:10
**examined** 6:9
**example** 28:17 29:3,5
  65:22

exchange 64:2
exhibit 17:6,7 21:8,10,23
  22:14 25:16 40:5,13,16
  42:20,21 46:22,23
exhibits 16:14,15 17:10
expect 68:20
expected 26:13
experienced 15:21,24
  28:20
explain 52:11 69:3
explained 50:3 61:18
  70:19
explanation 75:9
exploration 76:8

**F**

face 47:15 58:17
fact 77:7
facts 15:9 64:16
fail 11:4
failing 32:17
fall 53:3 66:25
False 65:23
familiar 47:22
family 10:11
far 8:4 9:7,10,14 35:21
  78:22
feel 10:6 20:14 41:21,22
  42:8 45:12 73:24
feeling 41:19
fell 31:4,20,21,22,23,24
  32:14 34:25 35:12 63:6,17
  71:23 72:1,3
female 48:13
field 6:20 8:8,13
file 18:12 19:17,20 21:7,
  23,24 25:24 32:20 40:7
  60:10,11
filed 9:24 17:13 74:3
fill 61:10
find 20:3 74:5
fine 21:20 77:18
finger 59:3 62:1 70:17
finished 61:3
finishing 60:5
fired 9:8,11 18:9 72:11
  73:6 76:5
first 27:8 51:23 52:6 59:19
  70:5
five 13:1 31:9 32:16,22
  34:21
flag 69:21,23
floor 12:19 56:22 57:3,7
  64:7,10,13,22,24 65:8

66:17,18,22 67:5
flyer 47:21
focus 44:5
follow 26:14,20 27:13,21,
  25 32:2,18 74:4
followed 9:21 28:6 32:23
following 36:12,15
follows 6:9
force 9:22 10:16 11:18
  14:10,13 15:20,25 16:8
  20:21,23 23:25 25:20
  26:3,11,19 27:1,14,19
  28:2 34:19 39:21,24 41:7
  44:18,25 59:24 60:18 61:6
  64:8,14,21 65:9,16 66:3
  68:24 69:4 72:11,12,14
  76:6,9,10 77:8 78:7,22
forcibly 56:21 57:14
forehead 16:4
form 38:24
four 8:18 46:18 47:1
  69:14,20
frame 47:3,10 54:5,19
  58:3
free 51:5
frequent 47:21
fresher 63:21
Fri 49:18
front 37:12 48:6,10 58:23
  78:25
frozen 55:24
fuck 26:19 27:2,11,15 62:1
full 47:20,22
further 21:16 37:17 58:13
  75:9 76:8 77:3,11

**G**

GERHARDSTEIN 6:2,11
  14:21 15:7,13,15 16:17,
  20,23 17:1,5,9,12 19:25
  20:5,8 21:3,5,12,15,20,21
  22:12,15,18,22,24 26:1
  40:4,7,10,15 42:6,19,23
  43:15 45:6,8 46:16,21,25
  48:21 49:2,5 56:1,4 57:21
  64:20 67:14,23 68:8 72:20
  75:13,25 76:24 77:5,18,21
  78:2,13
gesture 59:1
getting 8:12
girl 10:14
give 15:8 21:1 28:17 33:24
  38:3 68:5,13 74:9 75:2,3
given 32:11

go 11:2,5 13:22 14:1 15:16
  20:25 21:6 24:10,11 25:16
  39:8 40:23 51:18 58:1
  60:9,13 75:5 76:15
goes 53:2 61:24
going 10:8 15:11 16:1,17
  21:5 24:19 28:16 31:1
  36:10 39:5 41:10 42:9
  48:17 52:19 56:18 58:12
  60:9,13 65:12 67:15,19
  68:1,9 74:8 75:8 76:3,4,
  18,19,20,23,25 77:3,4,12
grab 34:13 36:25 37:8
  38:20 71:5,22
grabbed 34:12,25 36:19
  37:7,12,14,24 39:1 53:1
  62:2,7,9,14 63:8 64:4
grabbing 36:12 38:3,6
  39:3 43:3,7 52:24 54:15
Grant 53:23,24 54:12,15,
  19 55:19 56:20 57:13,19
  58:14 65:4,12
Grant's 55:10
ground 35:12 39:6,11,15
  41:10,12 62:19,23 63:1,6,
  15,17 71:23
guess 49:3 51:14 74:4,20
Gumf 33:8
Gumfel 33:8
Gumpf 30:6 33:7,9,10,12
  55:20
guys 76:11

**H**

hair 7:15,18,21
hall 16:1 24:22 25:1 35:4,
  11 47:12 71:15,23
hallway 47:9
hand 57:14,22 58:15,16,25
  66:18 70:11,16
handcuff 41:19 56:12
handcuffed 62:20
handle 23:8
handling 11:25 65:22
hands 24:13 34:9,11 56:20
  57:24
happen 29:10 37:12 76:18
happened 19:4 30:10
happening 16:21 66:7
harming 38:16
he'll 77:19
head 14:17 15:2 38:13
  54:1,15,20 55:1,4,11,16
  56:21,23 57:1,6,11,14,22
  58:1,7,11,15,18,20 64:7,9,

13,22,23 65:8,13,15 66:2,
10,12,15,17,22 67:3,4,7
**heads** 67:12
**hear** 42:25 43:20,21,25
44:1,8 48:19 50:12 62:12
**heard** 43:12,18 48:23,25
49:11
**help** 13:2 47:17 74:9
**HENDERSON** 6:3 46:14
68:7 72:17 77:25
**highest** 6:15
**hired** 10:20
**hisself** 23:19
**hit** 56:21,23 57:1,9,11
58:11 64:7,9,13,21,23
66:5,15,18,22
**Hobbs** 6:7,13,14 15:16
17:2 20:9 21:22 22:25
25:21 40:17 46:17 49:6
56:6 67:24 77:23 78:11
**Hobbs'** 76:21 77:4
**holding** 61:15
**Holsmer** 78:19
**honest** 68:21
**honor** 68:10
**hours** 17:19 60:24 61:14
**house** 18:6
**Huh** 48:21
**hundred** 42:14
**hurt** 66:22
**hurting** 66:25

**I**

**idea** 59:15
**identification** 17:8 21:11
40:14 42:22 46:24
**images** 65:10
**immediate** 64:3 69:1
**important** 63:18
**imposed** 17:18
**in-services** 12:12 39:20
**incident** 27:7 46:1
**include** 41:2
**included** 41:4
**incurred** 15:25
**indicate** 19:12
**indication** 64:1
**individuals** 13:25
**industry** 68:10
**information** 60:5,7
**initially** 31:10
**injuries** 14:16,23 15:2
**inmate** 13:14 23:4,12,20,
24 24:3,11,12,20,22 25:1,

2,9 26:19 27:1,11,15,19,
23 28:2 29:25 33:17,25
34:4 36:17 42:11 47:7,13
49:7,22 50:2,9 51:8,9,11
61:15,16,18,25 62:2,8,9,
17 66:3,10,16 67:4,7 71:9
**inmate's** 64:6,13,22 66:16
**inmates** 11:25 13:22 22:25
23:3,15 28:19 29:17 31:9,
17,19 32:7,24 33:17 34:21
36:2,6 38:17 42:15 43:11
64:2
**inner** 18:7
**inquiry** 75:19 76:14,16
77:3
**insight** 21:2
**instance** 38:2
**institution** 6:24
**instructed** 63:11
**intended** 71:13
**intending** 35:16
**intent** 35:2,10 66:20 71:21
**interacted** 41:9
**interacting** 32:8 49:7
**interaction** 28:19 30:13,15
31:3,7 35:14 52:4 71:2
**interactions** 30:20
**interview** 30:18
**interviewed** 10:19
**intoxicated** 13:25 61:20
**investigation** 20:15
**involve** 67:3
**involved** 20:19,21 29:13
35:7
**involvement** 37:1
**involving** 33:18,25
**irritated** 30:14

**J**

**jail** 12:19 13:7,15 25:14
26:17 27:11,17 28:7,21
36:14
**Javier** 78:20
**Jennifer** 48:16
**job** 7:23 8:2,9,20 9:6,12,17
10:18 11:23 18:10 52:12,
13 56:16 67:24 68:4,16,18
**jobs** 8:10,15 9:5,9,14,17
12:18
**judge** 20:17
**judging** 72:10
**jumpsuit** 31:1 34:16 38:21
71:6
**justice** 6:21 8:7,13 11:13

**K**

**keep** 45:13,17 68:11
**kids** 10:3,13 18:7
**kill** 66:23
**kind** 8:20 10:23 12:7
13:22 51:2 74:22
**knee** 54:20,22,25 55:4,11,
13
**kneeling** 67:3,7,12
**knew** 15:19 16:3
**know** 7:3 14:23,25 15:17,
23 16:6 20:24 25:17
31:22,23,24 32:21 38:1,23
42:8,10,11,13,15 43:18
45:5 47:7,13,20 48:11
56:23 57:1,12,19 58:10,11
59:12 65:24 66:8 73:2
74:25 75:1,2 76:13 77:12
78:15

**L**

**Lamonte** 6:7,14
**language** 27:5 70:12,18
**LAVALETTE** 6:5
**law** 39:21
**lawsuit** 19:17,20 20:1,10,
12 74:3 75:23
**lawyer** 74:25
**lawyers** 74:12,17,25 75:11
**lay** 76:7
**LCCC** 61:24
**leaning** 54:21
**learn** 65:15 67:2
**learned** 65:21 67:8
**leave** 10:11 67:18 74:21
75:8,12
**leaving** 75:20
**led** 44:17,25
**left** 48:9 53:8 54:19 60:21
62:2,8,9
**left-hand** 47:10 55:3
**legal** 39:19 41:3
**let's** 67:18
**letter** 19:10
**level** 6:15 29:3
**license** 7:18
**licensed** 7:16 11:3
**life** 28:14
**light** 34:19
**line** 15:4 20:15 72:17
75:19
**listen** 44:11

**little** 37:10 47:14 56:18 69:3
**location** 8:25
**long** 30:7 70:21
**longer** 55:22
**look** 25:23 40:9 58:17
**looked** 58:20
**looks** 21:17 58:16,18
**lose** 52:13
**lot** 23:9 44:2
**loud** 23:13 43:10,19
**low** 43:23
**lower** 49:7
**Lucas** 11:24 12:5,12 13:7, 15 26:17 27:10,17 28:7,20 36:14

**M**

**maintain** 36:11
**making** 23:6,12 76:12
**managed** 29:16
**manner** 71:18
**manual** 25:14
**Marcus** 78:18
**mark** 30:5 46:21
**marked** 17:7 21:10,23 40:13 42:21 46:23
**married** 10:1
**Marshall** 42:12,17
**Martinez** 78:20
**materials** 12:3
**Matt** 53:23 54:3,11 57:19 65:12
**matter** 66:20 74:19
**Matthew** 53:24 54:12,15, 19 55:10,19 56:20 57:13 65:4
**Mcgover's** 53:8
**Mcgovern** 13:14 14:5,10, 16 15:20,21,24 16:9 23:2 26:11 27:8 30:11 31:7,20 32:1,6,8 34:8 35:14,17 36:19,24 39:11,12,16,17 41:7 42:1 43:1,2,6 44:13, 18 45:1 50:11,13,16 51:22 52:11,21 53:22 56:10 59:1,6 60:19 61:16,18,25 62:18 64:3,4 68:25 71:11, 19 73:7
**Mcgovern's** 54:15,20,25 56:20 57:6,14 58:15 65:7, 12
**mean** 8:7,19 10:25 18:24 29:4,5,8,9,10 41:17,24 45:14 56:25 66:24,25 67:1

76:1,12 77:15
**meaning** 70:16
**meant** 63:4
**member** 27:19,24
**memory** 34:14 52:8 63:23
**mention** 44:19
**mentioned** 78:18
**mentor** 18:7
**Meyers** 48:5 53:13,17 54:11
**middle** 59:3 62:1
**military** 9:3
**mimic** 58:25
**mind** 20:18 37:3
**minute** 21:19 44:6
**module** 14:1,4,5,12,14 23:7 31:14 33:17 42:24
**moment** 35:20 38:25
**moments** 45:25 64:4
**morning** 14:6 47:8
**move** 25:1 29:25 31:18 34:4 35:3 39:4 68:16 69:2, 6,9
**moved** 24:3 25:5 32:14 33:16 34:8
**movement** 41:22
**moving** 9:13 33:25
**multiple** 33:17
**muscle** 41:21

**N**

**name** 6:12 30:22 47:20,22 48:15
**named** 42:11
**names** 10:8
**Nate** 48:5 53:13 54:3,11
**neck** 39:7,8 53:8 56:25 57:25 71:25
**need** 20:6 21:15 23:21 45:17 50:25 51:2
**needed** 45:12 56:16
**never** 29:8 33:23 34:25 35:7 38:15 51:13
**nigger** 27:20 62:2
**normal** 13:25
**normally** 24:10
**note** 15:3
**notice** 59:16
**November** 13:6,10,13 14:10 22:5 23:4 28:20 30:4 61:3,4,7,10,14
**number** 20:1 50:25 62:3, 19

**numbered** 21:24 25:17,21 26:4
**numbering** 17:10
**numbers** 22:16
**nurse** 16:3 48:14

**O**

**object** 15:11,12 65:16
**objection** 14:19 15:4 42:4 43:13 45:3 57:16 64:15 68:7 72:18 77:25 78:1
**objections** 15:14
**obviously** 53:2
**occurred** 14:24 59:24 61:6
**OCRC** 19:3 21:7,23 26:3 40:7 60:10 75:23
**office** 11:16
**officer** 12:19 13:7 23:13 26:15 47:24 48:3,9 49:6, 19 50:3 53:14 55:18 60:6 62:20 71:5
**officer's** 66:18
**officers** 30:16,20 34:24 53:21 61:25 69:14,21 78:16
**official** 77:1
**Oh** 49:24
**Ohio** 6:1 7:2 19:7
**okay** 6:12 16:7,23 17:5 18:9 19:1 20:2,5 21:5,15, 20 23:11 24:16 25:18 26:7 29:15 37:3 40:2,12 44:5 45:18 46:17 47:7,23 49:24 50:5 51:19 52:19 54:8 56:8 60:2,9 67:20 72:14 77:19 78:6
**old** 10:5
**Oliver** 48:1,2
**once** 51:15 70:8 76:7
**ongoing** 20:14 72:7,23 73:1
**open** 24:21 50:8 67:18 74:21 75:8,20
**operation** 29:24
**OPOTA** 11:2,5,11,17,20 12:4
**opportunity** 37:4 77:14
**options** 23:8,9,16
**order** 24:22 38:20 50:24 51:11 75:8
**orders** 36:15
**Oregon** 7:2,4
**outreach** 18:7
**Owens** 6:25 11:12

**P**

**p.m.** 61:11
**PACER** 20:4
**packet** 21:9 22:4 26:3
**pad** 57:5
**Padua** 18:2,4
**page** 22:4,13 25:17,21
26:4,5
**pamphlet** 12:7
**part** 11:13,17,20 55:7,12,
15,16 56:25
**particular** 8:24 13:24 14:2
24:15 29:11 30:5 35:20
36:4 37:19,20,23 38:1,22,
24 39:3 71:1
**pass** 11:4
**paused** 58:3
**pay** 75:4
**PDF** 22:16
**pending** 19:23
**people** 10:10 36:3 68:22
77:8,10,22 78:21
**period** 44:12
**permission** 23:22
**Perrysburg** 7:4
**person** 36:4 48:12
**personal** 10:6
**phone** 35:22 50:20,21,22,
24 51:1,4,7,15 52:9,18
61:17,19 70:9,10 74:22,24
**phonetic** 33:8 78:19,20
**physical** 12:2 26:20 27:12,
20 39:12,17
**physically** 27:24
**pick** 44:4 51:16
**picks** 57:15
**picture** 55:6 57:9
**pin** 50:25 51:3
**place** 24:12
**placement** 65:7
**plaintiff's** 17:7,11 21:10
40:13 42:21 46:23
**play** 43:22 58:4,12
**playing** 48:18,22
**please** 6:12 10:12 15:22
78:14
**pod** 43:11
**point** 15:24 50:6 52:3,9
55:21 56:5,10 58:17 59:13
76:20
**policies** 25:19 28:18
**policy** 26:23 27:16 28:3,9,
11,14,22,24,25 29:6,10,

12,14,18 32:4,18 33:4
41:4
**posed** 39:12,16
**position** 56:13 71:17
**positions** 8:12,18
**post** 8:24
**potential** 36:16 68:5,14
**practice** 32:23
**prefer** 20:11 72:24,25
**prepared** 60:17
**present** 25:10 53:22
**presenting** 24:13
**presumes** 15:9 64:15
76:17
**pretext** 76:6 77:2
**pretrial** 13:14 39:24 51:8
**pretty** 42:2
**printed** 16:16
**prior** 7:5,8 8:2,9,12 9:5,17
16:6 38:3,6 39:10,15 41:6,
10 43:3,7
**probably** 21:1 30:9 37:11
**probation** 17:18,21
**problem** 36:16
**procedures** 25:20 32:2
**process** 30:23,24 40:20
**produced** 21:7
**proof** 73:4,16,21 74:2 76:4
**provide** 20:2 40:25
**provided** 74:13
**provocation** 26:20 27:13,
20
**provoke** 27:25
**pull** 71:6,14,21
**pulled** 53:2
**pure** 63:23
**purposely** 37:7 72:2
**pushing** 56:24
**put** 10:8 23:18,20,24 29:25
31:2,5 34:9,11 35:23 70:1,
13,15 71:9,14
**puts** 57:15
**putting** 61:15 71:25 73:24
74:1

**Q**

**question** 19:5 25:4 26:2
27:10 29:22 35:7 44:22
56:2 64:18 72:19 73:11,18
74:7
**questioning** 15:5 20:15
**questions** 11:3 67:16
74:18 75:7,14,15 77:14

**quicker** 37:11
**quitting** 9:13

**R**

**race** 72:5,15 73:6,21
74:10,14 76:4
**racial** 73:10
**racism** 75:22
**raising** 59:3
**RANAZZI** 6:4 14:19 15:3,
9 20:3,25 22:10,13,17,20
25:23 42:4 43:13 45:3
55:24 57:16 64:15 75:16
76:16,25 77:13 78:1
**reacted** 37:11
**reacting** 64:2
**reaction** 37:10
**read** 56:1,3 61:22 62:5
**reality** 28:9,11,15,23,25
29:24 33:4
**really** 28:16 68:15 73:20
75:11,12
**realm** 9:1
**reason** 28:1 35:16 73:14
**reasonable** 19:13
**reasoning** 27:6
**recall** 9:7,10,11,15 12:1,
13,16,22 19:15 39:22
40:18 49:19,25 50:1 66:4,
6,7 67:6,11,12
**receive** 25:13
**received** 78:16
**recess** 67:21
**recognize** 46:17
**recollection** 63:22
**record** 10:7 21:1,4 25:25
45:20 46:2,15 55:25 56:3
75:8 77:6,10
**red** 69:21,23
**reference** 62:22
**referring** 26:6 45:15 63:5
**refusal** 26:20 27:13,21
**refuse** 27:25
**refused** 30:23
**refusing** 73:19 74:6
**regarding** 75:21
**regards** 76:22
**relate** 20:23
**relevance** 20:16
**relevant** 73:1 74:7
**rely** 68:22
**remember** 8:11 9:13
30:17,18,21,22 31:1 38:25
40:19 50:18 51:2,6,20

52:14,15,16 60:4
**remove** 14:13 29:19 36:17
71:8,10
**removed** 14:12 31:3
**removing** 27:4,6
**repeat** 27:22 64:18
**report** 59:16,22 60:3,14,17
61:10,13 63:5
**reported** 45:10
**REPORTER** 6:6 16:19,
22,25 21:14,17 40:6,9,12
78:10
**reports** 59:20 63:19 68:5,
14,19,21
**representatives** 72:23
**represents** 20:9
**request** 68:11
**resist** 62:18,21
**resistance** 62:23 63:4,5,11
**resisting** 41:7,13,17,24,25
62:25
**respect** 16:9 18:15,22 19:3
29:17 31:12,25 32:9,24
39:21 71:18 72:10
**response** 76:17 77:4
**result** 15:20 16:8
**resulted** 15:25
**retraining** 32:25
**returned** 44:12 58:21 61:9
**review** 50:15 51:21 52:10
**reviewed** 44:7 63:24
**right** 11:18,21 13:8,15,19
14:7,11,14,17,18 15:2,21
16:2,9,12,20 17:1 19:10,
11 20:4,7 22:7,17,23 26:8
29:13 32:7 34:6 35:3,5,9
37:15,18,22 38:1,21 39:7,
13,17 41:14 43:22,25
45:6,14,25 46:10,12 47:2,
25 48:17 49:2,15 51:12
53:3,4,9,17,19 54:6,9
56:6,15,16 57:3,7,15,23
58:2,3,5,12,15 59:4 60:3,
13,22 61:4,7,11 62:14,15
63:1,8,12,15,19 64:22
65:6,9,19,22 66:13,19,24
67:14,25 68:6,14,18,20,22
74:20 75:6 76:16 77:14
78:4
**right-hand** 49:8 50:7
**rights** 19:7 75:23
**risk** 39:11,16
**road** 27:9
**roll** 39:20 40:20
**rolling** 48:12

**rule** 25:13
**rules** 26:14,18 27:9,18
28:6 51:1
**ruling** 19:8

_____

**S**

**safety** 39:12,17 62:20
69:18
**saving** 60:7
**saw** 49:17 65:4
**saying** 8:5 27:2 41:12,13,
16,23 46:3 58:11 64:25
73:14,18
**says** 78:25
**scenario** 23:10,11,17
24:15,19,25 36:10
**scenarios** 28:25
**scene** 46:18
**schools** 18:8
**scrape** 16:5
**scream** 16:18 17:3 21:6
39:25 42:17 46:13 47:24
48:7 49:3,8 50:7 58:23
60:11 67:18
**screens** 46:18
**second** 21:1
**section** 12:20 26:3
**secure** 67:11 75:10
**security** 7:7 8:8,10,11,14,
16,18,20,22 9:1 67:25
68:6,14
**see** 16:22 17:2 20:16 21:12
25:19,22 26:2,5 36:1,5,16
37:21,22 39:23 40:1,3,18
42:16,18 46:12 47:15 50:6
54:17,18,21,22,25 55:2,5,
14 57:22,24 58:1,3,6
60:15 65:11 75:9 77:16,19
**seeing** 37:21 40:19
**seeking** 24:25
**seen** 36:3 37:24 40:16
56:24
**self-employed** 7:13
**sent** 32:25
**sentence** 17:16
**sequence** 70:12
**sergeant** 30:1 33:18 34:1,5
41:1 45:23 46:5,9 55:20
**sergeant's** 23:21
**sergeants** 33:7,12,16,20
**served** 33:12
**serves** 34:14
**service** 17:19 18:1
**services** 18:16

**set** 51:5,18
**setting** 29:11 51:10
**shabang-bang** 69:18
**share** 16:18 21:6,16 49:3,4
**sharing** 21:13 25:18
**Sheriff** 22:6
**sheriff's** 11:15 25:13
**shift** 30:5 50:4 59:25
60:22,25
**short** 67:15,19
**shoulder** 62:3,8,9
**show** 40:21 57:10 73:5
76:6
**showed** 37:20 53:23
**showing** 21:22 22:3
**shows** 53:6
**shut** 32:11 35:24 70:5
**shutting** 70:6
**side** 17:11 58:16
**significant** 64:8,14,21 65:8
**similar** 78:22
**simply** 27:2
**single** 17:10 23:18,21,25
24:4,21 25:1 31:5,15 32:2
33:18 34:18 35:17,24
44:13 52:1 62:3,19 69:7,
10 70:1,14,15 71:9,14,20,
22
**sir** 8:5,11 9:7,10,15 10:6,
10 12:22 14:23 15:17,22
18:21 19:6,16 20:14 23:10
24:2,6,23 25:3 27:22
28:22 29:5,14 30:2,12
31:16,22 32:19 33:2,23
34:2,10 35:15 36:21 37:19
38:5,8,10,12,15,18,22
39:14,22 40:18 41:15
42:13 43:17 45:12 51:13
54:16 56:23 57:8,20 59:14
60:4 62:13 63:21 64:5,10,
19,24 65:2,5,10,17 66:6,
20 67:6,13 68:15 69:7
70:19 72:1,7,22 73:2,8,17,
19,22 74:4,25 78:5,9,16
**sit** 37:2 66:9
**site** 8:22
**sitting** 78:4
**situation** 13:24 24:2,8,9
25:3 35:21 36:23 37:5
51:7 73:25 74:1
**situations** 24:23 33:5
**slot** 24:13,17
**slower** 37:10
**sole** 27:5 75:19
**solid** 65:16

**solving** 30:1
**somebody** 66:5
**someone's** 41:23 66:21
**sorry** 13:5 18:3 25:8 62:8
  78:10
**sort** 51:1 54:8
**sound** 13:19
**sounds** 74:6
**source** 9:22
**specific** 7:3 11:24 27:7
  30:12
**specifically** 12:13,16 14:3
  51:6 52:16
**specifics** 9:14 51:15 52:15
**speculation** 14:20 15:6
  42:5 43:14
**spitting** 38:9
**split-second** 69:25
**staff** 27:19,24 61:24 62:4
**stamped** 22:11,20,23
**stand** 56:8 66:24
**standing** 8:24 50:8 55:18
  58:22
**start** 12:21 59:18,23
**started** 25:14 30:19 59:25
  61:2 69:24 70:2
**starting** 25:20 26:4 30:18
  52:20
**state** 6:1,12 10:22,24 11:1
  61:13
**stated** 71:3
**statement** 45:1 46:9
**statements** 23:6,12 46:8
  48:23
**States** 39:24
**status** 20:24
**stepped** 37:17 52:22,23
**steps** 24:7 37:22,25 38:20,
  23
**stood** 55:21 56:11,12
**stooped** 70:6
**stop** 41:12 48:24
**stores** 7:7
**strike** 66:10,11
**strikes** 66:17
**striking** 38:7 65:15 66:2
  67:4
**struggle** 31:4
**stuff** 10:10 76:7
**subject** 11:21 65:14,18
  67:9
**sue** 19:10,12
**suffered** 14:16
**supervisor** 29:12 30:3,7
  33:13

**supervisors** 36:14
**supposed** 36:17 63:3
**Supreme** 39:24
**sure** 7:3 12:6 20:6 21:3
  47:20 51:14 55:11 67:10
  75:17 76:13
**surprised** 34:18 42:2
**suspect** 76:2
**suspended** 17:18
**sworn** 6:8

---

**T**

**tactics** 12:2
**take** 10:21 11:2,11 67:15,
  19 71:22
**taken** 62:19 63:1,14,16
  67:21
**takes** 21:18 36:8
**talk** 32:10 68:15 70:7 72:8,
  24 75:10
**talking** 15:14 31:10 32:9
  41:18 44:24 45:16 47:4
  49:20,21,22,23,25 52:8
  56:5 62:22 70:3,18
**tank** 13:18,20,21,23 14:3
  15:1 36:7 37:18 61:15
  69:25 70:3
**techniques** 67:3
**tell** 24:4 28:10 30:10 33:21
  45:21 46:3,4 55:7 57:2
  59:11 65:11 68:17
**telling** 45:18 66:4
**ten** 30:8
**tension** 41:22
**terminated** 18:11 22:7
  30:25 78:5
**termination** 18:13,15
**test** 10:21,22,23,24 11:1
**testified** 12:25
**Thank** 6:6
**Tharp** 22:6
**things** 35:19 44:3 65:21
  69:11 78:22
**think** 12:24 21:18 26:22
  28:8 35:13 40:6 45:16,18
  49:22,23 50:1 52:7 54:18
  55:2 58:9 60:5 72:13
  74:10,14 77:23 78:6
**third** 60:21,24
**thought** 19:12 23:7,14
**thoughts** 42:9
**threatening** 38:11
**three** 8:17 59:14
**threw** 61:25 70:16

**throwing** 45:13,17 70:11
**Thursday** 49:18
**tight** 30:21
**till** 36:24
**Tim** 50:11
**time** 14:9,25 19:11 23:1
  26:10 32:11 36:5,18
  37:10,14,19,21,23 38:22,
  24 39:3 41:9 44:13 47:3
  49:17 59:18 61:19 70:22,
  23 74:16 76:20
**times** 33:6,11,16 67:10
**Timothy** 61:16,18 62:18
**titled** 39:23
**today** 63:25 66:9
**told** 8:2 45:23 50:20 63:7
  69:17 70:8
**Toledo** 7:2 30:20
**top** 47:25 54:19 55:3
**touch** 59:7
**TPD** 61:25
**trained** 10:15 11:18,21
  65:25 66:2
**training** 11:5,25 12:5
  65:14,19 67:2,8
**trainings** 12:14
**transfer** 24:1,20 29:13
  31:14,25 34:23 35:11,17
  71:19
**transferred** 32:7,24 34:17,
  20 35:1
**transferring** 29:17 35:7
**treat** 31:6,13
**treated** 31:8,11 32:6 73:7
  77:24 78:7,23
**treating** 31:7 32:5,9
**treatment** 76:2
**trial** 12:24
**tried** 63:21 70:5
**trigger** 77:11
**truth** 68:17
**try** 75:3 77:19
**trying** 27:8 29:3 30:22
  32:12 35:3,23 37:7 38:13
  41:19,20 44:5 50:2 53:3
  56:11 66:22 68:10,16
  69:6,9
**turn** 37:6,8,21,24
**turned** 36:25 37:16 38:25
  58:20
**two** 10:14 34:23 36:5 66:7
**typed** 59:16
**typing** 59:9

**U**

**ultimately** 31:5
**uncooperation** 69:16
**uncooperative** 61:20
**understand** 29:2 72:25
76:1
**understanding** 8:4 19:5
26:24 29:21 32:19 34:3,20
65:3,17
**understood** 27:1 28:5
29:24
**unfair** 72:10
**unfortunate** 49:3
**unhappy** 35:22
**uniform** 70:24
**union** 18:17,25
**United** 39:23
**unwritten** 32:23 33:3
**update** 12:15
**updates** 39:19 41:3,5
**upper** 47:10 56:25
**use** 9:21 10:15 11:18
15:20,25 16:8 17:9 20:21,
22 23:25 25:20 26:2,11,18
27:1,14,18 28:1 34:19
39:21,24 42:25 43:10,25
44:8,17,25 46:4 50:21,22,
24 59:23 60:18 61:6 64:8,
14,21 65:8,23 69:4 70:8
72:11,12,14 76:5,9 78:22
**use-of-force** 26:14
**uses** 76:10

**V**

**vacant** 8:23
**various** 11:2 12:14
**verbal** 23:5,12 26:21 27:5,
13,21,25 33:24 38:4
**video** 37:20 41:21 43:22,
24 44:8,11 46:9,12,19,22
48:18 49:14 50:16 51:22
52:4,11,20 53:6 57:10
58:12 63:21,24
**violations** 17:23

**W**

**wait** 36:24 37:8
**wake** 36:9
**walking** 36:19,21 37:3,15
**wall** 50:23,25 78:18
**want** 10:7 12:1 15:3 20:4,
23 34:14 45:19 51:25
58:4,9 68:15,21 73:3,4,15

**wanted** 50:22 52:12
**warn** 33:21
**warned** 32:25
**warning** 33:25
**wasn't** 27:3,4 31:23 35:20
36:4 38:6,9,11,13,16 41:7
44:2 50:20 63:11,16 69:22
70:19 71:1,2,24
**watch** 44:11 50:14 52:19
**watched** 49:14 63:20
**watching** 8:23 47:23
**Watkins** 48:1,2 49:12,19
53:14,18
**way** 15:1,11 20:9 24:20
28:5,6,18 29:11,16 31:8,
11,14,16 32:6 34:20 37:13
44:11 48:19 51:23 52:5
62:24 63:10 71:11,12,13
73:6
**ways** 53:18
**we'll** 46:21 67:17 74:20
**we're** 21:5 25:18 36:16
41:18 47:23 48:18 49:10
50:5 52:3,19,20 56:5
67:14,19
**we've** 67:10
**week** 12:1 63:25
**Wendy** 16:18 40:5
**went** 14:4,25 31:14 39:2
57:11 58:7 63:20,23 65:18
70:9,23,24
**weren't** 56:16
**west** 13:18,20,21,22 14:1,6
15:1 23:1,5 24:16,20 32:1
35:17 36:2 37:18 47:9,12
50:8 53:12 61:15 69:25
70:3,25 71:20
**white** 28:15 29:9 76:10
77:22
**WITNESS** 17:4 48:20
49:1 78:12
**word** 27:23 42:25 43:3,7,
25 44:8,20 45:2,10,13,15
46:4 50:18 52:12 70:18
**words** 23:6
**work** 7:6 9:2 26:18 27:18
28:6 40:21
**worked** 12:20 32:16,22
34:21 51:7,15
**working** 12:25 13:11
26:15 33:15 34:5 51:11
60:21
**works** 51:14
**worry** 68:2

**wouldn't** 33:3 38:1 49:21
52:13
**wrap** 74:22
**write** 33:20 59:19,22 63:1,
19
**write-ups** 32:20
**writing** 59:12 60:2 62:25
**written** 28:7,15,18,23
32:3,4,18 33:23
**wrong** 33:21 35:13 71:18,
24
**wrote** 62:24

**Y**

**yanked** 42:2
**yeah** 22:15 26:7 36:22
40:1,3 42:18 47:5,18
55:14 69:8 73:18 75:25
**year** 12:22 17:18
**years** 12:15 13:1 30:9 31:9
32:16,22 34:21 59:15
**yelling** 23:6
**Young** 78:19

**Z**

**zoned** 36:4